**Appendix K**                                                    **Revised: 12/3/03**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
Lufkin   DIVISION

FILED - CLERK
U.S. DISTRICT COURT

## APPLICATION TO APPEAR PRO HAC VICE

2006 DEC 16  AM 11: 17

1. This application is being made for the following: Case # 9:06-cv-00157-RHC
TX EASTERN - LUFKIN

Style: AmberWave Systems Corp. vs. Intel Corp.

2. Applicant is representing the following party/ies:                    BY _____

AmberWave Systems Corp.

3. Applicant was admitted to practice in California   (state) on 11/25/2003            (date).

4. Applicant is in good standing and is otherwise eligible to practice law before this court.

5. Applicant is not currently suspended or disbarred in any other court.

6. Applicant has/has not had an application for admission to practice before another court denied (please circle appropriate language). If so, give complete information on a separate page.

7. Applicant has/has not ever had the privilege to practice before another court suspended (please circle). If so, give complete information on a separate page.

8. Applicant has/has not been disciplined by a court or Bar Association or committee thereof that would reflect unfavorably upon applicant's conduct, competency or fitness as a member of the Bar (please circle).   If so, give complete information on a separate page.

9. Describe in detail on a separate page any charges, arrests or convictions for criminal offense(s) filed against you. Omit minor traffic offenses.

10. There are no pending grievances or criminal matters pending against the applicant.

11. Applicant has been admitted to practice in the following courts:

Supreme Court of California, United States District Court, Southern District of California

12. Applicant has read and will comply with the Local Rules of the Eastern District of Texas, including Rule AT-3, the "Standards of Practice to be Observed by Attorneys."

13. Applicant has included the requisite $25 fee (see Local Rule AT-1(d)).

14. Applicant understands that he/she is being admitted for the limited purpose of appearing in the case specified above only.

**Application Oath:**

I, Amir A. Naini                                        do solemnly swear (or affirm) that the above information is true; that I will discharge the duties of attorney and counselor of this court faithfully; that I will demean myself uprightly under the law and the highest ethics of our profession; and that I will support and defend the Constitution of the United States.

Date 7/31/2006                Signature _____

Name (please print) Amir A. Naini

State Bar Number California 226627

Firm Name: Irell & Manella LLP

Address/P.O. Box: 1800 Avenue of the Stars

City/State/Zip: Los Angeles, CA 90067

Telephone #: (310) 277-1010

Fax #: (310) 203-7199

E-mail Address: anaini@irell.com

Applicant is authorized to enter an appearance as counsel for the party/parties listed above. This application has been approved for the court this 10 day of August , 20 06

David J. Maland, Clerk

U.S. District Court, Eastern District of Texas

By _D. Hoschke_

Deputy Clerk

**Appendix K**

Revised: 12/3/03

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### ___Lufkin___ DIVISION
## APPLICATION TO APPEAR PRO HAC VICE

FILED - CLERK
U.S. DISTRICT COURT

2004 AUG 16  AM 11: 17

EASTERN - LUFKIN

BY _____

1.This application is being made for the following: Case # _9:06-cv-00157-RHC___

Style: AmberWave Systems Corp. vs. Intel Corp. _____

2.  Applicant is representing the following party/ies:

AmberWave Systems Corp. _____

3.Applicant was admitted to practice in California___ (state) on 1994_____ (date).

4. Applicant is in good standing and is otherwise eligible to practice law before this court.

5. Applicant is not currently suspended or disbarred in any other court.

6. Applicant has/has not an application for admission to practice before another court denied (please circle appropriate language). If so, give complete information on a separate page.

7. Applicant has/has not ever had the privilege to practice before another court suspended (please circle). If so, give complete information on a separate page.

8. Applicant has/has not been disciplined by a court or Bar Association or committee thereof that would reflect unfavorably upon applicant's conduct, competency or fitness as a member of the Bar (please circle).    If so, give complete information on a separate page.

9. Describe in detail on a separate page any charges, arrests or convictions for criminal offense(s) filed against you.  Omit minor traffic offenses.

10. There are no pending grievances or criminal matters pending against the applicant.

11. Applicant has been admitted to practice in the following courts:

Central/Northern District of CA; Eastern/Southern District of NY; US S. Ct.; Ct. App. Fed. Cir; USPTO

12. Applicant has read and will comply with the Local Rules of the Eastern District of Texas, including Rule AT-3, the "Standards of Practice to be Observed by Attorneys."

13. Applicant has included the requisite $25 fee (see Local Rule AT-1(d)).

14. Applicant understands that he/she is being admitted for the limited purpose of appearing in the case specified above only.

**Application Oath:**

I, Samuel K. Lu_____do solemnly swear (or affirm) that the above information is true; that I will discharge the duties of attorney and counselor of this court faithfully; that I will demean myself uprightly under the law and the highest ethics of our profession; and that I will support and defend the Constitution of the United States.

Date _7/31___                    Signature _____

Name (please print) Samuel K. Lu

State Bar Number CA Bar #171969

Firm Name: Irell & Manella LLP

Address/P.O. Box: 1800 Avenue of the Stars

City/State/Zip: Los Angeles, CA 90067

Telephone #: (310) 277-1010

Fax #: (310) 203-7199

E-mail Address: SLu@irell.com

Applicant is authorized to enter an appearance as counsel for the party/parties listed above. This application has been approved for the court this 16 day of August , 20 06

David J. Maland, Clerk

U.S. District Court, Eastern District of Texas

By _____

Deputy Clerk

**Appendix K**                                    **Revised: 12/3/03**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
__Lufkin__ **DIVISION**
### APPLICATION TO APPEAR PRO HAC VICE

FILED - CLERK
U.S. DISTRICT COURT

2004 AUG 16 AM 11:17

EASTERN - LUFKIN

BY _____

1.This application is being made for the following: Case # __9:06-cv-00157-RHC__
Style: AmberWave Systems Corp. vs. Intel Corp.

2. Applicant is representing the following party/ies:
AmberWave Systems Corp.

3.Applicant was admitted to practice in California (state) on 12/2004 (date).

4. Applicant is in good standing and is otherwise eligible to practice law before this court.

5. Applicant is not currently suspended or disbarred in any other court.

6. Applicant has/has not had an application for admission to practice before another court denied (please circle appropriate language). If so, give complete information on a separate page.

7. Applicant has/has not ever had the privilege to practice before another court suspended (please circle). If so, give complete information on a separate page.

8. Applicant has/has not been disciplined by a court or Bar Association or committee thereof that would reflect unfavorably upon applicant's conduct, competency or fitness as a member of the Bar (please circle). If so, give complete information on a separate page.

9. Describe in detail on a separate page any charges, arrests or convictions for criminal offense(s) filed against you. Omit minor traffic offenses.

10. There are no pending grievances or criminal matters pending against the applicant.

11. Applicant has been admitted to practice in the following courts:
Central District of California and Northern District of California

12. Applicant has read and will comply with the Local Rules of the Eastern District of Texas, including Rule AT-3, the "Standards of Practice to be Observed by Attorneys."

13. Applicant has included the requisite $25 fee (see Local Rule AT-1(d)).

14. Applicant understands that he/she is being admitted for the limited purpose of appearing in the case specified above only.

**Application Oath:**

I, Andrew D. Weiss do solemnly swear (or affirm) that the above information is true; that I will discharge the duties of attorney and counselor of this court faithfully; that I will demean myself uprightly under the law and the highest ethics of our profession; and that I will support and defend the Constitution of the United States.

Date 7/31/06                    Signature _____

Name (please print) Andrew D. Weiss

State Bar Number CA Bar #232974

Firm Name: Irell & Manella LLP

Address/P.O. Box: 1800 Avenue of the Stars

City/State/Zip: Los Angeles, CA 90067

Telephone #: (310) 277-1010

Fax #: (310) 203-7199

E-mail Address: AWeiss@irell.com

Applicant is authorized to enter an appearance as counsel for the party/parties listed above. This application has been approved for the court this 16 day of August , 20 06

David J. Maland, Clerk

U.S. District Court, Eastern District of Texas

By _____

Deputy Clerk

**Appendix K**                                                    **Revised: 12/3/03**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
## Lufkin    DIVISION
### APPLICATION TO APPEAR PRO HAC VICE

FILED - CLERK
U.S. DISTRICT COURT

2006 AUG 16  AM 11: 18

TX EASTERN - LUFKIN

BY _____

1. This application is being made for the following: Case # 9:06-cv-00157-RHC
Style: AmberWave Systems Corp. vs. Intel Corp.

2. Applicant is representing the following party/ies:
AmberWave Systems Corp.

3. Applicant was admitted to practice in California (state) on 2001 (date).

4. Applicant is in good standing and is otherwise eligible to practice law before this court.

5. Applicant is not currently suspended or disbarred in any other court.

6. Applicant has/has not had an application for admission to practice before another court denied (please circle appropriate language). If so, give complete information on a separate page.

7. Applicant has/has not ever had the privilege to practice before another court suspended (please circle). If so, give complete information on a separate page.

8. Applicant has/has not been disciplined by a court or Bar Association or committee thereof that would reflect unfavorably upon applicant's conduct, competency or fitness as a member of the Bar (please circle). If so, give complete information on a separate page.

9. Describe in detail on a separate page any charges, arrests or convictions for criminal offense(s) filed against you. Omit minor traffic offenses.

10. There are no pending grievances or criminal matters pending against the applicant.

11. Applicant has been admitted to practice in the following courts:
Central/Northern Districts of California, U.S. Court of Appeals Federal Circuit, U.S. Patent and Trademark Office

12. Applicant has read and will comply with the Local Rules of the Eastern District of Texas, including Rule AT-3, the "Standards of Practice to be Observed by Attorneys."

13. Applicant has included the requisite $25 fee (see Local Rule AT-1(d)).

14. Applicant understands that he/she is being admitted for the limited purpose of appearing in the case specified above only.

**Application Oath:**

I, Alexander C.D. Giza do solemnly swear (or affirm) that the above information is true; that I will discharge the duties of attorney and counselor of this court faithfully; that I will demean myself uprightly under the law and the highest ethics of our profession; and that I will support and defend the Constitution of the United States.

Date 7/31/06          Signature _Alexander C.D. Giza_

Name (please print) Alexander C.D. Giza

State Bar Number Ca. Bar #212327

Firm Name: Irell & Manella LLP

Address/P.O. Box: 1800 Avenue of the Stars

City/State/Zip: Los Angeles, CA 90067

Telephone #: (310) 277-1010

Fax #: (310) 203-7199

E-mail Address: AGiza@irell.com

Applicant is authorized to enter an appearance as counsel for the party/parties listed above. This application has been approved for the court this 16th day of August , 2006

David J. Maland, Clerk

U.S. District Court, Eastern District of Texas

By _D Has Clk_

Deputy Clerk

**Appendix K**                                                    **Revised: 12/3/03**

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
<u>Lufkin</u>   **DIVISION**

### APPLICATION TO APPEAR PRO HAC VICE

FILED – CLERK
U.S. DISTRICT COURT

2006 AUG 16  AM 11: 18

TX EASTERN – LUFKIN

BY_____

1.This application is being made for the following: Case # <u>9:06-cv-00157-RHC</u>

Style: <u>AmberWave Systems Corp. vs. Intel Corp.</u>

2. Applicant is representing the following party/ies:

<u>AmberWave Systems Corp.</u>

3.Applicant was admitted to practice in <u>California</u>   (state) on <u>12/05/2002</u>   (date).

4. Applicant is in good standing and is otherwise eligible to practice law before this court.

5. Applicant is not currently suspended or disbarred in any other court.

6. Applicant has/has not had an application for admission to practice before another court denied (please circle appropriate language). If so, give complete information on a separate page.

7. Applicant has/has not ever had the privilege to practice before another court suspended (please circle). If so, give complete information on a separate page.

8. Applicant has/has not been disciplined by a court or Bar Association or committee thereof that would reflect unfavorably upon applicant's conduct, competency or fitness as a member of the Bar (please circle).   If so, give complete information on a separate page.

9. Describe in detail on a separate page any charges, arrests or convictions for criminal offense(s) filed against you. Omit minor traffic offenses.

10. There are no pending grievances or criminal matters pending against the applicant.

11. Applicant has been admitted to practice in the following courts:

Courts of Appeals for the Ninth Circuit & Federal Circuit, Central/Northern Districts of California, California State Court, USPTO

12. Applicant has read and will comply with the Local Rules of the Eastern District of Texas, including Rule AT-3, the "Standards of Practice to be Observed by Attorneys."

13. Applicant has included the requisite $25 fee (see Local Rule AT-1(d)).

14. Applicant understands that he/she is being admitted for the limited purpose of appearing in the case specified above only.

**Application Oath:**

I, <u>Maclain Wells</u>                                    do solemnly swear (or affirm) that the above information is true; that I will discharge the duties of attorney and counselor of this court faithfully; that I will demean myself uprightly under the law and the highest ethics of our profession; and that I will support and defend the Constitution of the United States.

Date  <u>7/31/06</u>                    Signature  _____

Name (please print) Maclain Wells

State Bar Number Ca. Bar #221609

Firm Name: Irell & Manella LLP

Address/P.O. Box: 1800 Avenue of the Stars

City/State/Zip: Los Angeles, CA 90067

Telephone #: (310) 277-1010

Fax #: (310) 203-7199

E-mail Address: MWells@irell.com

Applicant is authorized to enter an appearance as counsel for the party/parties listed above. This application has been approved for the court this 16th day of August , 20 06

David J. Maland, Clerk

U.S. District Court, Eastern District of Texas

By _____

Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### LUFKIN DIVISION

| | | |
|---|---|---|
| AMBERWAVE SYSTEMS CORPORATION, | § § § | |
| *Plaintiff*, | § § | **Civil Action No. 9:06cv00157** |
| v. | § § | **DEMAND FOR JURY TRIAL** |
| INTEL CORPORATION, | § § | **Judge Clark** |
| *Defendant*. | § § | |

## INTEL CORPORATION'S ANSWER

Defendant Intel Corporation ("Intel") responds as follows to AmberWave's Complaint For Patent Infringement filed in the above cause on July 28, 2006 ("Complaint").

### INTRODUCTION

1.     Intel admits that it has for years improved the performance of its microprocessors using many methods.  Intel denies knowledge or information sufficient to form a belief as to whether AmberWave Systems Corporation ("AmberWave") is a small technology and engineering firm founded by a university professor and one of his former students.  Except as so admitted, Intel denies the allegations of paragraph 1 of the Complaint.

### THE PATENT IN SUIT

2.     Intel admits that AmberWave purports to attach a copy of United States Patent No. 5,158,907 (the "'907 patent"), titled "*Method For Making Semiconductor Devices With Low Dislocation Defects*," as Exhibit A to the Complaint.  Intel admits that the '907 patent was issued on October 27, 1992, and that it names Eugene Fitzgerald as its sole inventor.  Intel denies that the '907 patent was duly and legally issued and that AmberWave is the assignee of all right, title,

1

and interest in the '907 patent.  Intel denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 2 of the Complaint.

**PARTIES AND JURISDICTION**

3.      Intel admits that AmberWave purports to bring a claim for patent infringement arising under the United States Patent Act, 35 U.S.C. § 101 *et seq.*  Except as so admitted, Intel denies the allegations of paragraph 3 of the Complaint.

4.      Intel admits, on information and belief, that AmberWave is a Delaware corporation with its principal place of business in Salem, New Hampshire.

5.      Intel admits that it is a Delaware corporation with its principal place of business in Santa Clara, California.

6.      Intel admits that it manufactures microprocessors with dual-core technology that may have been sold in this District.  Intel admits that it maintains a worldwide website that allows users throughout the world (including in this District) to submit information to Intel, to download information, and to locate companies who sell Intel products, including microprocessors with dual-core technology, both in this District and elsewhere.   Except as so admitted, Intel denies the allegations of paragraph 6 of the Complaint.

7.      Intel admits that it has filed complaints in this District as a plaintiff and intervenor, and that it has previously appeared as a defendant and a counterclaim plaintiff in this District without contesting venue.   Except as so admitted, Intel denies the allegations of paragraph 7 of the Complaint.

8.      Intel admits that it has over 600 employees in the State of Texas; that it has a registered agent in the State of Texas; that it has sought and received authorization to do business

in Texas; and that it maintains multiple business offices in the State of Texas.  Except as so admitted, Intel denies the allegations of paragraph 8 of the Complaint.

9.     Intel admits that this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).  Intel admits that rules concerning venue are set forth in 28 U.S.C. §§ 1391 and 1400(b).  Except as so admitted, Intel denies the allegations of paragraph 9 of the Complaint. Intel further avers that Delaware, where the first-filed action between the parties was commenced, is the proper forum for this litigation.

## RELATED ACTIONS

10.     Intel admits that on May 17, 2005, Intel filed a declaratory judgment action for non-infringement of U.S. Patent No. 6,831,292 before Judge Jordan in the District of Delaware (the "Delaware I Action").[1]  Intel further admits that on July 15, 2005, AmberWave filed an action against Intel in the Eastern District of Texas alleging infringement of U.S Patent No. 6,881,632 (the "'632 Action").[2]  Intel also admits that on September 20, 2005, AmberWave filed a separate action in the Eastern District of Texas alleging that Intel infringed U.S. Patent No. 6,946,371 (the "'371 Action).[3]  Intel admits that on November 1, 2005, Judge Davis transferred the '632 Action to Delaware because he determined that the issues in the '632 Action were "closely related" to the issues in the Delaware I Action.  Intel admits that the parties stipulated to the consolidation of AmberWave's infringement claims on the three patents (including the '371 Action) in the Delaware I Action.  Except as so admitted, Intel denies the allegations in

---

[1]     *Intel Corp. v. AmberWave Systems Corp.*, 05-301-KAJ

[2]     *AmberWave Systems Corp. v. Intel Corp.,* 02-05cv-321-LED

[3]     *AmberWave Systems Corp. v. Intel Corp.*, 02-05cv-449-TJW

3

paragraph 10 of the Complaint.

11.     Intel admits that AmberWave sought leave to amend its complaint in the consolidated Delaware I Action to add the '907 patent.  Intel admits that it opposed adding the '907 patent to the Delaware I Action (although it did not oppose asserting the patent in the District of Delaware before Judge Jordan) because AmberWave lacked standing to maintain that action, because AmberWave unduly delayed in seeking to add the '907 patent, and because adding the '907 patent to the Delaware I Action without change to the then current schedule in the Delaware I Action would prejudice both parties.  Although Intel believed that the '907 patent raises sufficiently new issues so that the patent could not be added to the Delaware I Action – only a few months before expert reports were due – without affecting the pretrial schedule previously ordered in that action, Intel agrees with AmberWave's representations to Judge Jordan that the patents involve the same field of technology and raise significant issues that overlap with those raised in the actions between the parties already pending in Delaware.  Except as so admitted, Intel denies the allegations of paragraph 11 of the Complaint.

12.     Intel admits that on July 8, 2006, AmberWave asked Intel whether it would assent to a motion to amend in the consolidated Delaware I Action to add U.S. Patent No. 7,074,655 (the "'655 patent") when it issued.  Intel further admits that on July 11, 2006, it instituted a declaratory judgment action concerning the '655 patent in the District of Delaware and designated the action as related to the consolidated Delaware I Action pending before Judge Jordan, so that the declaratory judgment action would be assigned to him and could be coordinated with the consolidated Delaware I Action.[4]  Except as so admitted, Intel denies the

---

[4]     *Intel Corp. v. AmberWave Systems Corp.*, 06-429-KAJ

allegations of paragraph 12 of the Complaint.

### CLAIM FOR RELIEF

13.     Paragraph 13 repeats and realleges the allegations of paragraphs 1 through 12 of the Complaint, and Intel therefore incorporates by reference its responses to paragraphs 1 through 12 of the Complaint as if fully set forth herein.

14.     Intel denies the allegations in paragraph 14 of the Complaint.

15.     Intel denies the allegations in paragraph 15 of the Complaint.

16.     Intel denies the allegations in paragraph 16 of the Complaint.

17.     Intel denies the allegations in paragraph 17 of the Complaint.

### FIRST DEFENSE

The Complaint fails to state a claim for which relief can be granted against Intel.

### SECOND DEFENSE

The '907 patent is invalid for failure to meet one or more of the conditions for patentability set forth in Title 35 of U.S.C. §§ 101 *et seq*, including but not limited to: 35 U.S.C. §§ 102 and 103 and failure to meet the requirements of 35 U.S.C. § 112.

### THIRD DEFENSE

Intel is licensed to the '907 patent. The '907 patent names AT&T Bell Laboratories ("AT&T") as assignee. After being assigned the '907 patent, AT&T spun-off its systems and technology unit as a separate entity named Lucent Technologies Inc. ("Lucent"). On information and belief, as a result of the spin-off, Lucent became the assignee of the '907 patent. On September 29, 2000, Intel entered into a cross-license agreement with Lucent Technologies GRL Corporation ("Lucent GRL"), a subsidiary of Lucent, by which Lucent GRL, on behalf of itself and (among others) its parent Lucent, granted Intel, among other things, a license to the '907

5

INTEL CORPORATION'S ANSWER
*AmberWave Systems Corporation v. Intel Corporation*
{A12\7395\0006\W0310332.1 }
047008-0028-10103-LosAngeles.2036511.3

patent (the "Intel License"). Lucent's subsequent assignment of the '907 patent to Agere Systems Optoelectronics Guardian Corporation ("Agere"), on January 30, 2001, was subject to the Intel License. AmberWave took any rights it has in the '907 patent from Agere subject to the Intel License.

## FOURTH DEFENSE

The Intel License requires that any disputes arising out of or related to the Intel License, including but not limited to any disputes regarding the scope of Intel's license rights to the '907 patent, are subject to mandatory, binding alternative dispute resolution procedures, including mediation and arbitration. Therefore, it may be necessary to stay AmberWave's claims for infringement of the '907 patent pending determination of Intel's license rights pursuant to the mandatory, binding alternative dispute resolution provisions of the Intel License.

## PRAYER FOR RELIEF

WHEREFORE, Intel respectfully requests judgment granting the following relief:

1.      The court stay this action pending the outcome of mandatory, binding arbitration required by §4.08 of the Intel License.

2.      In the event any litigable issue remains after the arbitration, that AmberWave take nothing by its Complaint and the Court dismiss AmberWave's Complaint with prejudice;

3.      That the Court award Intel attorneys' fees and expenses against AmberWave and deny that AmberWave's Complaint is exceptional under 35 U.S.C. § 285; and

4.      That the Court award Intel such other and additional relief as it deems just and proper.

INTEL CORPORATION'S ANSWER
*AmberWave Systems Corporation v. Intel Corporation*
{A12\7395\0006\W0310332.1 }
047008-0028-10103-LosAngeles.2036511.3

Dated: August 21, 2006

Respectfully submitted,

By:   */s/ John F. Bufe*
_____

MICHAEL E. JONES, Attorney-In-Charge
Texas Bar No. 10929400
mikejones@potterminton.com
JOHN F. BUFE
Texas Bar No. 03316930
johnbufe@potterminton.com

POTTER MINTON, PC
110 North College
500 Plaza Tower
Tyler, Texas 75702
Telephone:  (903) 597-8311
Facsimile:  (903) 593-0846

**ATTORNEYS FOR DEFENDANT
INTEL CORPORATION**

**Of Counsel:**

George M. Newcombe
(CA Bar No. 202898)
gnewcombe@stblaw.com
SIMPSON THACHER &
BARTLETT LLP
2550 Hanover Street
Palo Alto, California 94304
Telephone:  (650) 251-5000
Facsimile:  (650) 251-5002

**ATTORNEYS FOR DEFENDANT
INTEL CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on August 21, 2006.  Any other counsel of record will be served by First Class mail on this same date.

*/s/ John F. Bufe*
_____

INTEL CORPORATION'S ANSWER
*AmberWave Systems Corporation v. Intel Corporation*
{A12\7395\0006\W0310332.1 }
047008-0028-10103-LosAngeles.2036511.3

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### LUFKIN DIVISION

| | | |
|---|---|---|
| AMBERWAVE SYSTEMS CORPORATION, | § § § | |
| *Plaintiff*, | § § | Civil Action No. 9-06CV-157 [RHC] |
| **v.** | § § | **DEMAND FOR JURY TRIAL** |
| INTEL CORPORATION, | § § | |
| *Defendant*. | § § | |

## INTEL'S MOTION TO TRANSFER ACTION TO EARLIER-FILED LITIGATION PENDING IN THE DISTRICT OF DELAWARE

This is AmberWave's third attempt to sue Intel in the Eastern District of Texas on claims that it should have brought before the Judge Kent Jordan in the District of Delaware. AmberWave's first attempt was rejected by Judge Leonard Davis, who found that the case before him shared core issues—the same parties, products, and technology—with an earlier-filed Delaware litigation before Judge Jordan. Applying the first-to-file rule, Judge Davis properly transferred that case to Delaware. AmberWave fared no better in its second attempt. Judge Jordan found that the action before him in Delaware and AmberWave's second Texas lawsuit involved overlapping issues—the same parties, products, and technology—and held that the overlapping disputes should be resolved before him in the First-Filed Action in Delaware.

Now, AmberWave is back in the Eastern District of Texas for a third time with claims that involve *the same parties, products, and technology* that are before Judge Jordan in a pair of earlier-filed cases involving four AmberWave patents. Indeed, AmberWave recognized these facts in a June 2006 motion to add the '907 patent to the **First-Filed Action in Delaware**. Intel indicated that it would oppose that motion because, at that time, AmberWave did not have

standing to assert the '907 patent as a result of fatal defects in a patent assignment document AmberWave hastily executed with Agere Systems, Inc. ("Agere") the day before bringing the motion to amend. Before Intel even had the chance to express fully and formally its position on the motion to amend in a responsive pleading, AmberWave seized on Intel's stated opposition to the motion as a pretext for withdrawing that motion and filing this lawsuit against Intel in the Eastern District of Texas. Intel's original objection to AmberWave's motion to amend was proven meritorious when AmberWave and Agere executed a second assignment of the '907 patent a month later.

The first-to-file rule requires that this action be transferred the District of Delaware. This time, it is ***undisputed*** that AmberWave's assertion of the '907 patent in this case will substantially overlap with the earlier-filed Delaware litigation and that it would be more efficient for Judge Jordan to resolve that claim: AmberWave certified to Judge Jordan in its motion to amend that this claim will "substantially overlap" with the other issues already in the Delaware litigation and that, "[g]iven this overlap, the parties and the [Delaware] Court would benefit from the efficient resolution of all infringement and damages issues...in one forum...." Intel agrees and respectfully requests that this action be transferred to the District of Delaware.

## **FACTUAL BACKGROUND**

### A. **Intel Files First In Delaware**

Litigation between Intel Corporation ("Intel") and AmberWave Systems Corporation ("AmberWave") has been proceeding in the District of Delaware for more than one year. That litigation began on May 17, 2005 when Intel, in response to a formal notice of infringement from AmberWave, brought suit seeking a declaratory judgment that its products do not infringe U.S. Patent No. 6,831,292 (the "'292 Patent"). Declaration of Michael E. Jones

("JONES DECL."), Ex. A.  AmberWave, which is a Delaware corporation, has never challenged

jurisdiction or venue in that lawsuit (the "First-Filed Action").  Instead, on July 15, 2005, it

asserted a counterclaim in the First-Filed Action accusing certain Intel microprocessors of

infringing the '292 Patent.  JONES DECL., Ex. B.

### B.    AmberWave's First Texas Lawsuit Is Transferred To Delaware

Also on July 15, 2005, AmberWave instituted a separate infringement action

against Intel in the Eastern District of Texas (the "Texas I Action").  JONES DECL., Ex. C.  In

the Texas I Action, AmberWave accused the same Intel devices of infringement that were the

subject of its counterclaim in the First-Filed Action.  *Id.*  Furthermore, while it asserted a

different patent against Intel in the Texas I Action – U.S. Patent No. 6,881,632 (the "'632

Patent") – both that patent and the patent in the First-Filed Action relate to the same field of art:

the design and fabrication of strained silicon transistors. *Id.*  Shortly after AmberWave instituted

the Texas I Action, Intel moved before Judge Davis, requesting that the Texas I Action be

transferred to Delaware pursuant to the first-to-file rule.  In an order dated November 1, 2005,

Judge Davis granted Intel's motion, holding:

> If this Court retains this action, there will be two complex and simultaneous
> actions between the same parties over related technologies and involving
> the same accused products.  Consequently, justice and expediency do not
> outweigh application of the first-to-file rule. Accordingly, the Court applies
> the first-to-file rule and transfers the case to Judge Jordan's docket in the
> District of Delaware.

JONES DECL., Ex. D at 4.

### C.    AmberWave's Second Texas Action Is Dismissed

On the evening of September 19, 2005, the United States Patent and Trademark

Office issued U.S. Patent No. 6,946,371 (the "'371 Patent").  Hours later – at 5:50 in the

morning – AmberWave deposited a complaint in this Court's drop box.   JONES DECL., Ex. E.

In that lawsuit (the "Texas II Action"), as in the earlier actions, AmberWave accused the same

Intel microprocessors of infringement.  *Id.*  Also as before, the '371 patent asserted in the Texas

II Action relates to the technological field of strained-silicon circuits and transistors.  *Id.*

As a consequence of AmberWave's second effort at forum shopping, Intel was

again forced to seek judicial relief.  This time, Intel moved the Delaware court, pursuant to

Federal Rule of Civil Procedure 15(d), for leave to supplement its complaint in order to add a

claim for non-infringement of the '371 Patent.  Intel argued that the additional claim should be

found to relate back to May 17, 2005, the date Intel originally filed suit in Delaware, making that

action indisputably first filed as to the parties' dispute concerning the '371 Patent.  In a published

opinion dated November 29, 2005, Judge Jordan granted Intel's motion.  In so doing, Judge

Jordan agreed with Judge Davis that it would be most efficient for the parties to litigate each of

their "substantially overlapping" disputes before him in the District of Delaware:

> In short, as Judge Davis concluded in the related '632 litigation, there is
> substantial overlap of core issues with respect to the alleged infringement
> of the '371 and the '292 patents. . . .  It makes no sense to burden the
> Eastern District of Texas with this third and latest version of the
> substantially overlapping disputes between the parties.

*Intel Corp. v. AmberWave Sys. Corp*, 233 F.R.D. 416, 418-19 (D. Del. 2005); JONES DECL.,

Ex. F.  Following Judge Jordan's ruling, the parties entered into a stipulation whereby

AmberWave agreed to dismiss its complaint in the Texas II Action and to file a consolidated

complaint as part of the First-Filed Action that asserted all three patents in dispute.  JONES

DECL., Ex. G.  On February 27, 2006, AmberWave filed a consolidated complaint in the First-

Filed Action, in which it asserted the '292, '632, and '371 patents against Intel.  JONES DECL.,

Ex. H.

**D.** **AmberWave's Pursuit of the '907 Patent in the First-Filed Action in Delaware**

AmberWave purports to have recently acquired the '907 patent from Agere. Compl. ¶ 2. Intel has had a cross-license with Agere and its predecessor (Lucent Technologies) that covers the '907 patent since 2000. In apparent anticipation of acquiring the '907 patent from Agere and asserting it against Intel, AmberWave invoked the subpoena powers of *the Delaware Court* in September 2005 to obtain documents from Agere relating to the '907 patent, including its cross-license with Intel. JONES DECL., Ex. P. AmberWave purported to acquire limited rights to the '907 patent from Agere in a first patent assignment document hastily executed on June 26, 2006.

A day later, AmberWave filed a motion to amend its complaint in the First-Filed Action in Delaware to add the '907 patent to the case ("Motion to Amend"). JONES DECL., Ex. I. In support of its Motion to Amend – a motion it filed subject to Fed. R. Civ. P. 11 – AmberWave represented that its assertion of the '907 patent involved similar subject matter, technology, and a subset of the same Intel products accused in the First-Filed Litigation before Judge Jordan. Hence, AmberWave notably certified that there was "substantial overlap" between its assertion of the '907 patent and the First-Filed Litigation, and that the "the parties and the Court would benefit from the efficient resolution of all infringement and damages issues relating to Intel's accused products" in one forum. *Id.* at 2.

Intel informed AmberWave that it intended to oppose the Motion to Amend for reasons that were subsequently proven justified based on AmberWave's own conduct. For example, the first patent assignment between AmberWave and Agere purported to convey only limited rights in the '907 patent and therefore Intel maintained that AmberWave lacked standing to assert the '907 patent. Intel was proven correct when AmberWave obtained a second, broader

5

patent assignment from Agere a month later in which it purportedly acquired all "right, title, and interest in the '907 patent."  Compl. ¶2  Indeed, AmberWave even dismissed its original complaint before this Court and immediately re-filed a second complaint after obtaining the second assignment because the issue of standing must be determined as of the date the action is initiated.  JONES DECL., Ex. J.

After filing its Motion to Amend in the First-Filed Action to add a claim for infringement of the '907 Patent, AmberWave informed Intel that it intended to accuse Intel of infringing a fifth patent relating to strained-silicon technology:  U.S. Patent No. 7,074,655 (the "'655 Patent").  On July 11, 2006, in response to these threats, Intel filed suit in the District of Delaware seeking a declaration of non-infringement as to the '655 Patent (the "'655 Action"). JONES DECL., Ex. K.  In accordance with Delaware local rules, Intel filed a civil cover sheet case together with its complaint, by which it indicated that the '655 Action is related to the First-Filed Action.  JONES DECL., Ex. L.  As a result, the '655 Action was assigned to and is now before Judge Jordan so that Judge Jordan can determine the most efficient way to coordinate or consolidate the '655 Action with the First-Filed Action.  JONES DECL. at ¶ 20.  Intel was concerned that there was already too much work to be done in the First-Filed Action given the aggressive case schedule in Delaware (expert reports were due in three months).  Intel was again proven correct when AmberWave subsequently requested a six-month extension to *all deadlines* in the First-Filed Action.  JONES DECL., Ex. Q.

In the meantime, AmberWave withdrew its motion to add the '907 patent to the First-Filed Action and it initiated an action against Intel for infringement of the '907 patent (the "Texas III Action") – thereby bringing, *for the third time*, a claim against Intel in Texas that substantially overlaps with litigation before Judge Jordan.  JONES DECL., Ex. M.  In its notice

of withdrawal of the Motion to Amend, which it filed the same day it sued Intel in this Court,

AmberWave purported to justify its conduct by mischaracterizing Intel's objections to its

attempts to add the additional patents into the First-Filed Action.  JONES DECL., Ex. N.  But

AmberWave's mischaracterizations are flat wrong.  Intel filed the '655 Action in Delaware and

designated it as a "related" case because it believes there are enormous benefits to coordinating

all suits between Intel and AmberWave on related technology involving the same products.  Intel

has in fact consistently taken the position that efficiency requires that all related litigation

proceed in one Court and before a single judge who can manage the cases and their related

discovery, and ultimately decide how and when each claim will be tried.  Whether, post-transfer,

this case is consolidated with the First-Filed Action, consolidated with the related '655 Action, or

disposed of in some other manner is a decision for Judge Jordan to make in his discretion.

## <u>ARGUMENT</u>

## I.      THE FIRST-TO-FILE RULE COMPELS TRANSFER OF THIS CASE

The first-to-file rule is grounded in principles of comity and the orderly

administration of justice.  "The federal courts long have recognized that the principle of comity

requires federal district courts — courts of coordinate jurisdiction and equal rank — to exercise

care to avoid interference with each other's affairs." *W. Gulf Maritime Ass'n v. ILA Deep Sea

Local 24*, 751 F.2d 721, 728 (5th Cir. 1985) (citations omitted).  "The concern manifestly is to

avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister

courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Id.* at 729.

(citations omitted)  As applied by the Federal Circuit, the first-to-file rule provides that "the

forum of the first-filed case [should be] favored, unless considerations of judicial and litigant

economy, and the just and effective disposition of disputes, require otherwise." *Genentech, Inc. v Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993).[1]

Application of the first-to-file rule requires a three-part analysis:

1. As a threshold matter, a court must confirm that the case before it was filed later in time than an action pending in another district. *Genentech*, 998 F.2d at 937; *accord Save Power Ltd. v. Syntek Fin. Corp.,* 121 F.3d 947, 950-51 (5th Cir. 1997).

2. The court must then determine whether the earlier-filed case is likely to raise issues that substantially overlap with the later case. *Syntek*, 121 F.3d at 950-51.

3. If the issues are likely to substantially overlap, the court must transfer the later-filed action to the court in which the first-filed action is pending, unless it finds that it would be "unjust or inefficient" to do so. *Genentech*, 998 F.2d at 938; *accord Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 407 (5th Cir. 1971) (transfer required absent "compelling" reasons to favor later action).

After the action is transferred, it is the responsibility of the first-filed court to determine whether, in the interests of fairness and efficiency, the later action "must be dismissed, stayed, or transferred and consolidated." *Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 920 (5th Cir. 1997).

### 1. The Delaware Litigation was Filed-First

This case was filed more than one year after the First-Filed Action was commenced in Delaware in May 2005. It was also brought weeks after Intel filed the '655

---

[1] The law of the Federal Circuit governs application of the first-to-file rule in patent cases. *Genentech*, 998 F.2d at 937. (holding that rule "is important to national uniformity in patent practice" and rejecting standard of regional circuit); *see also Elecs. for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1347-48 (Fed. Cir. 2005) (following *Genentech* and reviewing application of first-to-file rule). Intel has cited authority from courts within the Fifth Circuit to the extent it has been unable to find relevant Federal Circuit authority.

Action in Delaware.  Accordingly, both litigations in Delaware are, in relation to this case, "first

filed."  The first-to-file rule therefore mandates transfer of this case to Judge Jordan's docket if it

is likely to overlap substantially with either of those actions.  *Mann*, 439 F.2d at 407.

## 2. It Is Undisputed That The Cases Substantially Overlap

The "substantial overlap" test does not require a strict identity of subject matter.

"[R]egardless of whether or not the suits . . . are identical, if they overlap on the substantive

issues, the cases would be required to be consolidated in . . . the jurisdiction first seized of the

issues."  *Id.* at 408 n.6; *see also Syntek*, 121 F.3d at 950 ("The rule does not, however, require

that cases be identical."); *Rooster Prods. Int'l, Inc. v. Custom Leathercraft Mfg. Co., Inc.*, No.

SA: 04-CA-864-XR, 2005 WL 357657, at *2 (W.D. Tex. Feb. 1, 2005) ("all that is required is

that the two actions involve closely related questions or common subject matter, or that the core

issues substantially overlap[]").  In fact, the rule does not require that the lawsuits will actually

overlap substantially; the mere likelihood of overlapping issues requires transfer to the first-filed

forum.  *Mann*, 439 F.2d at 408.

Here, it is *undisputed* that there is substantial overlap between this action and the

earlier-filed litigation in Delaware.  In papers it submitted to the court in Delaware, just days

before it initially filed suit in Texas on the '907 patent, AmberWave certified that the sole claim

in this case will overlap substantially with the First-Filed Action:

> [T]he patent that AmberWave seeks to add [the '907 Patent] relates to
> similar subject matter as the patents already in suit and is directed against
> some of the same Intel products, ***resulting in substantial overlap with the
> facts and arguments implicated by the other patents*** . . . .  Given this
> overlap, the parties and the Court would benefit from the efficient
> resolution of all infringement and damages issues relating to Intel's
> accused products ***in one forum*** and in a single proceeding.

JONES DECL., Ex. I at 6-7, 2.  (emphasis added).

9

Intel agrees with AmberWave that the issues in this case will overlap substantially with the litigation pending before Judge Jordan. The cases before both courts involve the same two parties: Intel and AmberWave. As shown above, AmberWave is asserting the '907 patent against a subset of the same Intel products accused in the in the First-Filed Action. Furthermore, in AmberWave's own words, "the area of technology of the '907 Patent is the same as that of the '292, '632, and '371 patents" asserted in the First-Filed Action. JONES DECL., Ex. I at 1. Because of these substantially overlapping issues, there would be, as AmberWave concedes, a "substantial overlap in discovery" between the two courts if this case were not transferred. *Id.* at 6. Judge Jordan has already admonished AmberWave once for complicating the discovery process with its forum shopping in the Texas I Action:

> You guys [AmberWave] have created now a conflict that probably shouldn't have existed by suing the same party in another district. Now, maybe you got a good reason for that and it's just not something I'm aware of but it certainly does, on the face of it, create the potential for conflicting discovery rules and schedules and that is a problem. That is a real problem.

JONES DECL., Ex. O at 6:2-8. AmberWave's third foray into Texas has again created the potential for conflicting discovery rules and schedules.

When presented with this same venue question, Judges Davis and Jordan both concluded that the substantial overlap required transfer to Delaware. In support of his decision to transfer the Texas I Action, Judge Davis explained: "[I]f the Court retains this action, there will be two complex and simultaneous actions between the same parties over related technologies and involving the same accused products." JONES DECL., Ex. D at 4. In finding that the claim asserted in the Texas II Action should proceed before him, rather than in the Eastern District of Texas, Judge Jordan likewise ruled:

> [A]t a minimum, presentations on infringement for both the '292 and the '371 Patents will require a judge . . . to become familiar with the same field of art, the same fundamental science and technology associated with

> methods of semiconductor fabrication, the same allegedly infringing
> devices, and, in any damages analysis, the same pricing, sales, and related
> market data. . . .  In short, as Judge Davis concluded in the related '632
> litigation, there is substantial overlap of core issues with respect to the
> alleged infringement of both the '371 and the '292 patents.

*Intel Corp. v. Amberwave Sys. Corp.*, 233 F.R.D. 416, 418 (D. Del. 2005); JONES DECL., Ex. F

Because of these prior rulings, Delaware is the center of the litigation between Intel and

AmberWave.  As Judge Jordan previously noted: "I will already be dealing with the '292 and the

'632 patents.  It makes no sense to burden the Eastern District of Texas with this third and latest

version of the substantially overlapping disputes between the parties."  *Id*. at 419.  Since those

words were written, two additional patents – the '371 and '655 – have been placed before Judge

Jordan.  It therefore makes even less sense now to burden the Eastern District of Texas with this

fifth and latest "substantially overlapping" dispute between Intel and AmberWave.

### 3. No Compelling Circumstances Justify Disregarding the First-To-File Rule

Once a case is deemed substantially similar to an earlier-filed action, it must be

transferred unless it would be "unjust or inefficient" to do so.  *Genentech,* 998 F.2d at 938.  In

deciding whether to disregard the first-to-file rule, the Federal Circuit considers the following

factors:  (i) the convenience and availability of witnesses, (ii) the absence of jurisdiction over all

necessary parties, (iii) the possibility of consolidation with related litigation, and (iv) whether the

first-filed case involves the real parties in interest.  *Elecs for Imaging, Inc. v. Coyle*, 394 F.3d

1341, 1347-48 (Fed. Cir. 2005).  Courts may also consider whether the first-filed action can be

characterized as an instance of improper forum shopping.  *Id.*  None of these considerations

justifies disregarding the first-to-file rule in this case.

The convenience and availability of witnesses do not favor the Eastern District of

Texas.  Intel is not aware of a single fact witnesses in the State of Texas.  See Jones Dec. at ¶ 21.

It is unlikely that AmberWave, which is incorporated in Delaware and headquartered in New Hampshire, would have reason to call any Texas-based fact witnesses either. Indeed, the sole named inventor of the '907 patent (Eugene Fitzgerald) is, according to AmberWave's Complaint, a professor at MIT in Boston, Massachusetts. Compl. ¶ 1. Because Mr. Fitzgerald is also a named inventor on two of the patents being litigated in Delaware, he will likely be testifying in that forum regardless of the outcome here. Hence, Delaware, not Texas, is likely to be the more convenient forum for him and for any other common witnesses.

There are also no jurisdictional reasons to disregard the first-to-file rule. AmberWave, a Delaware corporation, has been actively pursuing related litigation in the District of Delaware for more than a year without contesting that court's jurisdiction. In fact, just days before it instituted this action, AmberWave sought leave to introduce a claim for infringement of the '907 patent in Delaware. AmberWave's voluntary and systematic participation in the Delaware litigation belie any claim that it is not subject to the jurisdiction of that court.

The third factor – the possibility of consolidation with related litigation – also provides no basis for declining Intel's transfer request. There are no related actions in the Eastern District of Texas. To the contrary, each of the claims that AmberWave previously brought in this district are being litigated in Delaware. Far from providing reason to deny Intel's request, this factor affirmatively supports transfer to Delaware.

Whether the first-filed case involves the real parties in interest – the fourth factor in the analysis – is neutral here for the simple reason that the same entities, Intel and AmberWave, are the only parties in both Delaware and Texas. Nor can Intel's decision to file suit in Delaware be characterized as an instance of improper forum shopping. Intel initially sought relief in the state in which both parties chose to incorporate. *See Stomp, Inc. v. Neato,*

*LLC*, 61 F. Supp. 2d 1074, 1082 (N.D. Cal. 1999) (company's decision to file declaratory suit in home state did not amount to forum shopping). Judge Davis, who addressed this precise issue in ruling on Intel's original transfer motion, recognized that Intel properly filed suit in Delaware when licensing discussions between the parties reached an impasse. JONES DECL., Ex. D at 4.

Finally, AmberWave's attempts to justify this case based on Intel's initial objection to the addition of the '907 patent to the First-Filed Action have no merit. As shown above, Intel's standing and scheduling concerns were ratified by AmberWave's subsequent actions: AmberWave obtained a second assignment of the '907 patent in an attempt to correct the standing defects identified by Intel, and AmberWave requested a six-month extension to all deadlines in the First-Filed Action.

In sum, there are *no* compelling circumstances to justify dividing the parties' substantially overlapping litigation between two separate courts. To the contrary, principles of equity, efficiency and judicial comity require that this case be transferred to Delaware. AmberWave has sued time and again in a forum that has no meaningful connection to the parties or their dispute. AmberWave filed this action despite affirmatively representing to Judge Jordan that this particular claim would be most efficiently litigated in Delaware, and despite having invoked the subpoena power of the Delaware Court to obtain the very documents upon which this lawsuit is based.

13

## CONCLUSION

For the foregoing reasons, Intel respectfully submits that the Court should grant

Intel's motion to transfer this case to Judge Kent Jordan in the United States District Court for

the District of Delaware.

Respectfully submitted,

By: */s John F. Bufe*
    Michael Jones, Esq. – Attorney-In-Charge
    State Bar No. 10929400
    John F. Bufe
    State Bar No. 03316930
    Potter Minton
    110 North College
    500 Plaza Tower
    Tyler, Texas 75702
    Telephone:  (903) 597-8311
    Facsimile:  (903) 593-0846
    mikejones@potterminton.com
    johnbufe@potterminton.com

OF COUNSEL:

George M. Newcombe
(CA Bar No. 202898)
gnewcombe@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2550 Hanover Street
Palo Alto, California 94304
Telephone:  (650) 251-5000
Facsimile:  (650) 251-5002

Attorneys for Defendant Intel Corporation

## CERTIFICATE OF CONFERENCE

The undersigned attorney for Intel conferred with Plaintiff's local counsel, Thad
Heartfield, and certifies to the court that Plaintiff opposes the motion.

*/s/ John F. Bufe*

14

## <u>CERTIFICATE OF SERVICE</u>

       The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on August 21, 2006.  Any other counsel of record will be served by First Class mail on this same date.

                                      */s/ John F. Bufe*

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| AMBERWAVE SYSTEMS CORPORATION, | § § § | |
| Plaintiff, | § | Civil Action No. 9-06CV-157 [RHC] |
| | § | |
| v. | § | DEMAND FOR JURY TRIAL |
| | § | |
| INTEL CORPORATION, | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF MICHAEL E. JONES IN SUPPORT OF

## MOTION TO TRANSFER

I, Michael E. Jones, declare and state as follows:

1.　　I submit this declaration in support of the Motion to Transfer filed on behalf of Defendant Intel Corporation ("Intel"). I base this declaration on personal knowledge and information and belief and, if called as a witness, I could and would testify to the matters set forth herein.

2.　　I am a Shareholder at Potter Minton, counsel for Intel in this action.

3.　　Based upon information and belief, on May 17, 2005, Intel filed a complaint against AmberWave Systems Corporation ("AmberWave") in the matter of *Intel Corporation v. AmberWave Systems Corporation,* Civ. Action No. 05-301-KAJ (D. Del.) (Honorable Kent A. Jordan) (the "First-Filed Action"). A true and correct copy of the complaint in the First-Filed Action (with attachments) is appended hereto as Exhibit A.

4.　　Based upon information and belief, on July 15, 2005, AmberWave filed an answer to the complaint in the First Filed Action, in which it asserted a counterclaim alleging that Intel infringed U.S. Patent No. 6,831,292 (the "Answer and Counterclaim"). A true and

correct copy of the Answer and Counterclaim (without attachment) is appended hereto as Exhibit B.

5.     Based upon information and belief, on July 15, 2005, AmberWave filed a complaint against Intel in the matter of *AmberWave Systems Corporation v. Intel Corporation*, Civ. Action No. 2-05CV-321 (the "Texas I Action"). A true and correct copy of the complaint (with exhibit) in the Texas I Action is appended hereto as Exhibit C.

6.     Based upon information and belief, on November 1, 2005, Judge Leonard Davis granted Intel's motion to transfer the Texas I Action to Delaware. A true and correct copy of Judge Davis' order is appended hereto as Exhibit D.

7.     Based upon information and belief, on September 20, 2005, AmberWave initiated an action against Intel in the matter of *AmberWave Systems Corporation v. Intel Corporation*, Civ. Action No. 2-05CV-449 (E.D. Tex.) (the "Texas II Action"). A true and correct copy of the complaint in the Texas II Action is appended hereto as Exhibit E.

8.     Based upon information and belief, on November 29, 2005, Judge Kent A. Jordan granted Intel's motion to supplement the First-Filed Complaint. A true and correct copy of Judge Jordan's order is appended hereto as Exhibit F.

9.     Based upon information and belief, on February 2, 2006, AmberWave stipulated to withdrawing its complaint in the Texas II Action and to filing a consolidated complaint (the "Stipulation"). A true and correct copy of the Stipulation is appended hereto as Exhibit G.

10.     Based upon information and belief, on February 27, 2006 AmberWave filed a consolidated complaint against Intel in the First-Filed Action (the "Consolidated Complaint"). A true and correct copy of the Consolidated Complaint (without attachments) is appended hereto as Exhibit H.

11.     Based upon information and belief, on June 27, 2006, AmberWave filed a motion to amend the Consolidated Complaint to add a claim against Intel for infringement of U.S. Patent No. 5,158,907 (the "Motion to Amend"). A true and correct copy of AmberWave's Opening Brief in Support of its Motion to Amend is appended hereto as Exhibit I.

12.     Based upon information and belief, on July 31, 2006, AmberWave filed a Notice of Voluntary Dismissal Pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure (the "Notice of Dismissal") in the matter of *AmberWave Systems Corporation v. Intel Corporation*, Civ. Action No. 9-06CV-143 (the "Texas III Action"). A true and correct copy of the Notice of Dismissal is appended hereto as Exhibit J.

13.     Based upon information and belief, on July 11, 2006, Intel filed a complaint against AmberWave in the matter of *Intel Corporation v. AmberWave Systems Corporation*, Civ. Action No. 06-429-KAJ (D. Del.) (the "'655 Action"). A true and correct copy of the complaint in the '655 Action (with attachments) is appended hereto as Exhibit K.

14.     Based upon information and belief, Intel filed a civil cover sheet together with its complaint in the '655 Action by which it indicated that that action is related to the First-Filed Action (the "Civil Cover Sheet"). A true and correct copy of the Civil Cover Sheet is appended hereto as Exhibit L.

15.     Based upon information and belief, on July 12, 2006 AmberWave filed a complaint against Intel in the Texas III Action. A true and correct copy of the complaint in the Texas III Action (without attachment) is appended hereto as Exhibit M.

16.     Based upon information and belief, on July 12, 2006, AmberWave filed Plaintiff AmberWave Systems Corporation's Notice of Withdrawal of its Motion for Leave to Amend its

Complaint (the "Notice of Withdrawal") in the First-Filed Action. A true and correct copy of AmberWave's Notice of Withdrawal is appended hereto as Exhibit N.

17.     Based upon information and belief, a true and correct copy of the transcript of a scheduling conference held by Judge Kent Jordan in the First-Filed Action on September 7, 2005 is appended hereto as Exhibit O.

18.     Based upon information and belief, attached hereto as Exhibit P is a true and correct copy of a Notice of Subpoena and Subpoena to AmberWave Systems Corporation, which was served on Agere Systems, Inc. in the matter of *Intel Corporation v. AmberWave Systems Corporation*, Civ. Action No. 05-301-KAJ (D.Del.) (Honorable Kent A. Jordan) on September 16, 2005. This document was also served on Intel on the same date.

19.     Based upon information and belief, attached hereto as Exhibit Q is a true and correct copy of a letter dated August 18, 2006 from Kerry Konrad to Jason Sheasby.

20.     Based upon information and belief, the '655 Action has since been assigned to Judge Jordan in the District of Delaware.

21.     Intel does not presently expect to call any fact witnesses who live in the state of Texas to testify in this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21ˢᵗ day of August 2006.

Respectfully submitted,

By:_____

# EXHIBIT A

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2006 MAY 17  PM 2:46

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTEL CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>AMBERWAVE SYSTEMS CORPORATION, )<br><br>Defendant. ) | Civil Action No. _____ 0 6 - 3 0 1<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Intel Corporation ("Intel") by and through its undersigned attorneys, hereby demands a trial by jury on all issues so triable and, for its Complaint in this declaratory judgment action, alleges as follows:

### JURISDICTION AND VENUE

1. Jurisdiction of this action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions relating to patents, 28 U.S.C. § 1338(a).

2. Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), because, upon information and belief, AmberWave Systems Corporation ("Defendant") is incorporated in Delaware.

### THE PARTIES

3. Intel is a Delaware corporation with its principal place of business in Santa Clara, California. Intel is engaged in the business of manufacturing high performance computer microprocessors.

       

4.     Upon information and belief, Defendant is a Delaware corporation with its principal place of business in Salem, New Hampshire. Defendant is engaged in the business of manufacturing and developing strained silicon technology.

### BACKGROUND

5.     On December 14, 2004, United States Patent No. 6,831,292 entitled "Semiconductor structures employing strained material layers with defined impurity gradients and methods for fabricating same" ("the '292 Patent") was issued, naming Matthew Currie, Anthony Lochtefeld, Richard Hammond and Eugene Fitzgerald as inventors and Defendant as assignee. A copy of the '292 Patent is attached as Exhibit A.

6.     On or about May 10, 2005, Steven Frank, counsel for Defendant, sent to Paul Otellini, President of Intel a letter formally notifying Intel "that its current commercial products, including, without limitation, its Prescott and Dothan processors, infringes claims" of the '292 Patent and allowed application publication nos. 2004/0161947 ("the '947 Application") and 2004/0045499 ("the '499 Application"). Defendant "request[ed] that Intel take immediate steps to conclude license negotiations with AmberWave or to cease infringement of AmberWave's intellectual property." A true and correct copy of Mr. Frank's letter is attached as Exhibit B.

7.     Prior to the notice letter, the parties had been engaged in communications with respect to, among other things, the '292 Patent and the applications.

8.     By reason of Mr. Frank's allegations of infringement in his correspondence of May 10, 2005, Intel reasonably apprehends that a suit will imminently be filed against Intel under 35 U.S.C. § 271 alleging infringement of the '292 Patent by Intel's continuing to make, offer to sell, and selling its current commercial products, including, without limitation, its Prescott and Dothan processors.

9.     There is a substantial and continuing justiciable controversy between Intel and Defendant as to Defendant's rights to threaten or maintain suit for infringement of the '292 Patent and as to whether any of Intel's current commercial products infringes any of the claims of the '292 Patent.

10.     By reason of Mr. Frank's allegations of infringement in his correspondence of May 10, 2005, Intel reasonably apprehends that a suit will imminently be filed against Intel under 35 U.S.C. § 271 if and when the '947 and '499 Applications issue as patents alleging infringement of the '947 and '499 Applications by Intel's continuing to make, offer to sell, and selling its current commercial products, including, without limitation, its Prescott and Dothan processors.  If and when the '947 and '499 Applications issue as patents, Intel reserves all rights to amend this Complaint to seek a declaratory judgment of non-infringement of the patents that issue from the '947 and '499 Applications.

## CLAIM FOR RELIEF

### (Declaratory Judgment of Non-infringement)

11.     Intel re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 10, inclusive, as set forth above.

12.     Intel has not manufactured, assembled, sold, offered for sale or distributed within the Unites States any devices or systems that directly infringe any of the claims of the '292 Patent.

13.     Intel has not manufactured, assembled, sold, offered for sale or distributed within the United States any devices or systems that fall within the range of equivalents of any of the claims of the '292 Patent.

14.     Intel has not induced, and is not now inducing, infringement of the '292 Patent in any manner whatsoever.

15.     Intel has not, and is not now, contributing to the infringement of the '292 Patent in any manner whatsoever.

## PRAYER FOR RELIEF

WHEREFORE, Intel respectfully prays for relief and judgment against Defendant as follows:

(a) a declaration that Intel has not infringed the '292 Patent directly, by inducement, or by contribution; and

(b) for such other and further relief that may be just and appropriate.

Respectfully submitted,

Josy W. Ingersoll (No. 1088)
John W. Shaw (No 3362)
Glenn C. Mandalas (No. 4432)
YOUNG CONWAY STARGATT &
TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
jingersoll@ycst.com

George M. Newcombe (CA Bar No. 202898)
SIMPSON THACHER & BARTLETT
3330 Hillview Avenue
Palo Alto, California 94303
(650) 251-5000

Attorneys for Plaintiff Intel Corporation

Dated:  May 17, 2005

# EXHIBIT A

US006831292B2

## (12) United States Patent
Currie et al.

(10) Patent No.: **US 6,831,292 B2**
(45) Date of Patent: **Dec. 14, 2004**

(54) **SEMICONDUCTOR STRUCTURES EMPLOYING STRAINED MATERIAL LAYERS WITH DEFINED IMPURITY GRADIENTS AND METHODS FOR FABRICATING SAME**

(75) Inventors: **Matthew Currie**, Windham, NH (US); **Anthony Lochtefeld**, Somerville, MA (US); **Richard Hammond**, Cambridge, MA (US); **Eugene Fitzgerald**, Windham, NH (US)

(73) Assignee: **AmberWave Systems Corporation**, Salem, NH (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 124 days.

(21) Appl. No.: **10/251,424**

(22) Filed: **Sep. 20, 2002**

(65) **Prior Publication Data**

US 2003/0057416 A1 Mar. 27, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/324,325, filed on Sep. 21, 2001.

(51) Int. Cl.[7] ............................................. H01L 29/06
(52) U.S. Cl. ............................................. 257/19; 257/18
(58) Field of Search ...................... 257/18, 19, E29.193

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,283,456 A | 2/1994 | Hsieh et al. | 257/347 |
| 5,340,759 A | 8/1994 | Hsieh et al. | 437/41 |
| 5,461,250 A | 10/1995 | Burghartz et al. | 257/347 |
| 5,516,721 A | 5/1996 | Galli et al. | 437/67 |
| 5,847,419 A | 12/1998 | Imai et al. | 257/192 |
| 5,891,769 A | 4/1999 | Liaw et al. | 438/167 |
| 6,051,482 A | 4/2000 | Yang | 438/526 |
| 6,059,895 A | * 5/2000 | Chu et al. | 148/33.1 |
| 6,096,590 A | 8/2000 | Chan et al. | 438/233 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 100 11 054 A1 | 9/2000 |
| EP | 0 587 520 A1 | 3/1994 |
| EP | 0 889 502 A2 | 1/1999 |
| EP | 0 810 124 A2 | 4/1999 |
| EP | 0 910 124 A2 | 4/1999 |

OTHER PUBLICATIONS

IDS Reference C14, Ohguro et al., "Undoped Epitaxial Si Channel n–MOSFET Grown by UHV–CVD with Preheating", IEEE Trans. on Electron Devices 45, No. 3, Mar. 1998.*

Monroe, D. et al.; "Comparison of mobility–limiting mechanisms in high–mobility Si$_{1-x}$Ge$_x$ heterostructures," J. Vac. Sci. Technol. B 11(4), Jul./Aug. 1993, pp. 1731–1737.

Currie, M.T.; "SiGe Virtual Substrate Engineering for Integration of III–V Materials, Microelectromechanical Systems, and Strained Silicon MOSFET's with Silicon," Dept. of Materials Science and Engineering in Partial Fulfillment of the Requirements for the Degree of Doctor of Philosophy in Electronic Materials at the Massachusetts Institute of Technology, Feb. 2001, pp. 158–162, 170–18243.

(List continued on next page.)

*Primary Examiner*—Minhloan Tran
*Assistant Examiner*—Scott R. Wilson
(74) *Attorney, Agent, or Firm*—Testa, Hurwitz & Thibeault, LLP

(57) **ABSTRACT**

Semiconductor structures and devices including strained material layers having impurity-free zones, and methods for fabricating same. Certain regions of the strained material layers are kept free of impurities that can interdiffuse from adjacent portions of the semiconductor. When impurities are present in certain regions of the strained material layers, there is degradation in device performance. By employing semiconductor structures and devices (e.g., field effect transistors or "FETs") that have the features described, or are fabricated in accordance with the steps described, device operation is enhanced.

**62 Claims, 4 Drawing Sheets**



# US 6,831,292 B2
Page 2

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,111,267 | A | 8/2000 | Fischer et al. | 257/19 |
| 6,180,978 | B1 | 1/2001 | Chatterjee et al. | 257/327 |
| 6,350,993 | B1 | 2/2002 | Chu et al. | 257/19 |
| 6,368,925 | B2 | 4/2002 | Weon et al. | 438/289 |
| 6,368,946 | B1 | 4/2002 | Dekker et al. | 438/488 |
| 6,380,013 | B2 | 4/2002 | Lee | 438/184 |
| 6,429,061 | B1 | 8/2002 | Rim | 438/198 |
| 6,455,377 | B1 | 9/2002 | Zheng et al. | 438/268 |
| 6,482,714 | B1 | 11/2002 | Hieda et al. | 438/416 |
| 6,483,156 | B1 | 11/2002 | Adkisson et al. | 257/401 |
| 2002/0038898 | A1 | 4/2002 | Sugiyama et al. | 257/378 |
| 2002/0109135 | A1 | 8/2002 | Murota et al. | 257/20 |
| 2002/0113294 | A1 | 8/2002 | Rhee et al. | 257/616 |
| 2002/0158311 | A1 | 10/2002 | Ohnishi et al. | 257/591 |

## OTHER PUBLICATIONS

Fitzgerald, E.A. et al.; "Relaxed $Ge_xSi_{1-x}$ structures for III–V integration with Si and high mobility two–dimensional electron gases in Si," Journal of Vacuum Science and Technology; Part B, American Institute of Physics; vol. 10, No. 4, Jul. 1, 1992, pp. 1807–1819.

Samavedam, S.B. et al.; "Novel dislocation structure and surface morphology effects in relaxed Ge/Si–Ge(graded)/Si structures," Journal of Applied Physics, American Institute of Physics; vol. 81, No. 7, Apr. 1, 1997, pp. 3108–3116.

Abiko et al., "A Channel Engineering Combined with Channel Epitaxy Optimization and TED Suppression for 0.15 $\mu$m n–n Gate CMOS Technology", 1995 Symposium on VLSI Technology Digest of Technical Papers, Apr. 1995, pp. 23–24.

Butler and Beaty, "MOS Fabrication Process Integrating Self–Aligned Polysilicon Gate and Post–Processed Metal Gate Devices on a Single Die", IEEE, Sep. 1991, pp. 199–203.

Chang et al., "SALVO Process for Sub–50 nm Low–$V_T$ Replacement Gate CMOS with KrF Lithography", IEDM, Apr. 2000, pp. 53–56.

Chatterjee et al., "CMOS Metal Replacement Gate Transistors using Tantalum Pentoxide Gate Insulator", IEDM, Sep. 1998, pp. 777–780.

Chatterjee et al., "Sub–100nm Gate Length Metal Gate NMOS Transistors Fabricated by a Replacement Gate Process", IEDM, Jul. 1997, pp. 821–824.

Hergenrother et al., "50nm Vertical Replacement–Gate (VRG) nMOSFETs with ALD $HfO_2$ and $Al_2O_3$ Gate Dielectrics", IEDM, Mar. 2001, pp. 51–54.

Hergenrother et al., "The Vertical Replacement–Gate (VRG) MOSFET: A 50nm Vertical MOSFET with Lithography–Independent Gate Length", IEDM, Sep. 1999, pp. 75–78.

Lee et al., "Characteristics of TaN Gate MOSFET with Ultrathin Hafnium Oxide (8Å–12Å)", IEDM, Apr. 2000, pp. 39–42.

Leong et al., "A Self–Aligned Epitaxially Grown Channel MOSFET Device Architecture for Strained Si/SiGe Systems", Thin Solid Films, vol. 369, 2000, pp. 375–378.

Manchanda et al., "Si–Doped Aluminates for High Temperature Metal–Gate CMOS: Zr–A1–Si–O, A Novel Gate Dielectric for Low Power Applications", IEDM, Apr. 2000, p. 23–26.

Noda et al., "A 0.1–$\mu$m Delta–Doped MOSFET Fabricated with Post–Low–Energy Implanting Selective Epitaxy", IEEE Transactions on Electron Devices, vol. 45, No. 4, Apr. 1998, pp. 809–814.

Oh et al., "50 nm Vertical Replacement–Gate (VRG) pMOSFETs", IEDM, Apr. 2000, pp. 65–68.

Ohguro et al., "An 0.18–$\mu$m CMOS for Mixed Digital and Analog Applications with Zero–Volt–$V_{th}$ Epitaxial–Channel MOSFET's", IEEE Transactions on Electron Devices, vol. 46, No. 7, Jul. 1999, pp. 1378–1383.

Ohguro et al., "Undoped Epitaxial Si Channel n–MOSFET Grown by UHV–CVD with Preheating", IEEE Transactions on Electron Devices, vol. 45, No. 3, Mar. 1998, pp. 710–716.

Ohguro et al., "0.15–$\mu$m Buried–Channel p–MOSFET's with Ultrathin Boron–Doped Epitaxial Si Layer", IEEE Transactions on Electron Devices, vol. 45, No. 3, Mar. 1998, pp. 717–721.

Vuong et al., "Design of 25–nm Salvo PMOS Devices", IEEE Electron Devices Letters, vol. 21, No. 5, May 2000, pp. 248–250.

Wong et al., "Fabrication of Ultrathin, Highly Uniform Thin–Film SOI Mosfet's with Low Series Resistance Using Pattern–Constrained Epitaxy", IEEE Transactions on Electron Devices, vol. 44, No. 7, Jul. 1997, pp. 1131–1135.

Yeo et al., "Nanoscale Ultra–Thin–Body–Silicon–on–Insulator P–MOSFET with a SiGe/Si Heterostructure Channel", IEEE Electron Device Letters, vol. 21, No. 4, Apr. 2000, pp. 161–163.

Yeo et al., "Enhanced Performance in Sub–100 nm CMOS–FETs using Strained Epitaxial Silicon–Germanium", IEDM, 2000, pp. 753–756.

Yeo et al., "Design and Fabrication of 50–nm Thin–Body p–MOSFETs with a SiGe Heterostructure Channel", IEEE Transactions on Electron Devices, vol. 49, No. 2, Feb. 2002, pp. 279–286.

* cited by examiner

Case 06-cv-00081-SLR-MPT   Document 183-10   Filed 06/21/2006   Page 2 of 21



Fig. 1



Fig. 2



**Fig. 3**



Fig. 4

US 6,831,292 B2

1

# SEMICONDUCTOR STRUCTURES EMPLOYING STRAINED MATERIAL LAYERS WITH DEFINED IMPURITY GRADIENTS AND METHODS FOR FABRICATING SAME

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims priority to and the benefit of, and incorporates herein by reference, in its entirety, provisional U.S. patent application Ser. No. 60/324,325, filed Sep. 21, 2001.

## FIELD OF THE INVENTION

The present invention relates generally to semiconductor structures and devices and, more specifically, to semiconductor structures and field effect transistors (hereinafter, "FETs") incorporating strained material layers and controlled impurity diffusion gradients.

## BACKGROUND OF THE INVENTION

"Virtual substrates" based on silicon (Si) and germanium (Ge) provide a platform for new generations of VLSI devices that exhibit enhanced performance when compared to devices fabricated on bulk Si substrates. The important component of a SiGe virtual substrate is a layer of SiGe that has been relaxed to its equilibrium lattice constant (i.e., one that is larger than that of Si). This relaxed SiGe layer can be directly applied to a Si substrate (e.g., by wafer bonding or direct epitaxy) or atop a relaxed graded SiGe layer, in which the lattice constant of the SiGe material has been increased gradually over the thickness of the layer. The SiGe virtual substrate can also incorporate buried insulating layers, in the manner of a silicon-on-insulator ("SOI") wafer. To fabricate high-performance devices on these platforms, thin strained layers of Si, Ge, or SiGe are grown on the relaxed SiGe virtual substrates. The resulting biaxial tensile or compressive strain alters the carrier mobilities in the layers, enabling the fabrication of high-speed devices, or low-power devices, or both.

A technique for fabricating strained Si wafers includes the following steps:

1. Providing a silicon substrate that has been edge polished;
2. Epitaxially depositing a relaxed graded SiGe buffer layer to a final Ge composition on the silicon substrate;
3. Epitaxially depositing a relaxed SiGe cap layer having a uniform composition on the graded SiGe buffer layer;
4. Planarizing the SiGe cap layer by, e.g., chemical mechanical polishing ("CMP");
5. Epitaxially depositing a relaxed SiGe regrowth layer having a uniform composition on the planarized surface of the SiGe cap layer; and
6. Epitaxially depositing a strained silicon layer on the SiGe regrowth layer.

The deposition of the relaxed graded SiGe buffer layer enables engineering of the lattice constant of the SiGe cap layer (and therefore the amount of strain in the strained silicon layer), while reducing the introduction of dislocations. The lattice constant of SiGe is larger than that of Si, and is a direct function of the amount of Ge in the SiGe alloy. Because the SiGe graded buffer layer is epitaxially deposited, it will initially be strained to match the in-plane lattice constant of the underlying silicon substrate. However,

2

above a certain critical thickness, the SiGe graded buffer layer will relax to its inherently larger lattice constant.

The process of relaxation occurs through the formation of misfit dislocations at the interface between two lattice-mismatched layers, e.g., a Si substrate and a SiGe epitaxial layer (epilayer). Because dislocations cannot terminate inside a crystal, misfit dislocations have vertical dislocation segments at each end, i.e., threading dislocations, that may rise through the crystal to reach a top surface of the wafer. Both misfit and threading dislocations have stress fields associated with them. As explained by Eugene Fitzgerald et al., *Journal of Vacuum Science and Technology B*, Vol. 10, No. 4, 1992, incorporated herein by reference, the stress field associated with the network of misfit dislocations affects the localized epitaxial growth rate at the surface of the crystal. This variation in growth rates may result in a surface cross-hatch on lattice-mismatched, relaxed SiGe buffer layers grown on Si.

The stress field associated with misfit dislocations may also cause dislocation pile-ups under certain conditions. Dislocation pile-ups are a linear agglomeration of threading dislocations. Because pile-ups represent a high localized density of threading dislocations, they may render devices formed in that region unusable. Inhibiting the formation of dislocation pile-ups is, therefore, desirable. Dislocation pile-ups are formed as follows. (See, e.g., Srikanth Samavedam et al., *Journal of Applied Physics*, Vol. 81, No. 7, 1997, incorporated herein by reference.) A high density of misfit dislocations in a particular region of a crystal will result in that region having a high localized stress field. This stress field may have two effects. First, the stress field may present a barrier to the motion of other threading dislocations attempting to glide past the misfits. This pinning or trapping of threading dislocations due to the high stress field of other misfit dislocations is known as work hardening. Second, the high stress field may strongly reduce the local epitaxial growth rate in that region, resulting in a deeper trough in the surface morphology in comparison to the rest of the surface cross-hatch. This deep trough may also pin threading dislocations attempting to glide past the region of high misfit dislocations. This cycle may perpetuate itself and result in a linear region with a high density of trapped threading dislocations, i.e., dislocation pile-up.

The term "MOS" (meaning "metal-oxide-semiconductor") is here used generally to refer to semiconductor devices, such as FETs, that include a conductive gate spaced at least by an insulating layer from a semiconducting channel layer. The terms "SiGe" and "Si$_{1-x}$Ge$_x$" are here used interchangeably to refer to silicon-germanium alloys. The term "silicide" is here used to refer to a reaction product of a metal, silicon, and optionally other components, such as germanium. The term "silicide" is also used, less formally, to refer to the reaction product of a metal with an elemental semiconductor, a compound semiconductor or an alloy semiconductor.

One challenge to the manufacturability of MOS devices with strained layers is that one or more high temperature processing steps are typically employed after the addition of the strained material. This can cause intermixing of the strained layer and underlying material. This intermixing is generally referred to as interdiffusion, and it can be described by well-known diffusion theory (e.g., Fick's laws). One example of interdiffusion is found in a FET where a strained layer is used as the channel. In this example, one or more impurities (e.g., dopants) are implanted after addition of the strained layer. If implantation is followed by a moderately high temperature step (e.g., a

US 6,831,292 B2

3

drive-in or anneal step), there can be rampant interdiffusion of the channel by the implant impurity due to the presence of implant damage and excess point defects in the strained layer. A result is that the impurity is present in the strained layer. Stated differently, the impurity profile (i.e., a gradient describing the impurity concentration as a function of location in the overall semiconductor or device) has a non-zero value in the strained layer. Presence of one or more impurities in the strained layer can, at certain concentrations, degrade overall device performance.

From the foregoing, it is apparent that there is still a need for a way to produce semiconductor structures and devices that include one or more strained layers that are not subject to the incursion of one or more impurity species during structure or device fabrication.

## SUMMARY OF THE INVENTION

The present invention provides semiconductor structures and devices (e.g., FETs) that include one or more strained material layers that not only improve operational performance, but also are relatively free of interdiffused impurities. Consequently, the resulting semiconductor structures and devices do not exhibit the degraded performance that results from the presence of such impurities in the strained layers.

The invention features a semiconductor structure where at least one strained layer is disposed on a semiconductor substrate, forming an interface between the two. This structure is characterized by an impurity gradient that describes the concentration of one or more impurities (i.e., dopants) as a function of location in the structure. At the furthest part of the strained layer (i.e., a "distal zone" of the layer away from the interface), this impurity gradient has a value that is substantially equal to zero.

In one version of this embodiment, the invention provides a method for fabricating a semiconductor structure in a substrate. The method includes the step of disposing at least one strained layer on the substrate, forming an interface between the two. Performing at least one subsequent processing step on the substrate, after which the impurity gradient has a value substantially equal to zero in the distal zone, follows this. The subsequent processing step is generally performed within a predetermined temperature range, which affects the value of the impurity gradient, particularly in the distal zone.

In certain embodiments, the semiconductor substrate can include Si, SiGe, or any combination of these materials. It can also be multi-layered. In this latter case, the layers can include relaxed SiGe disposed on compositionally graded SiGe. The layers can also include relaxed SiGe disposed on Si. One or more buried insulating layers may be included as well.

In other embodiments, the strained layer can include Si, Ge, SiGe, or any combination of these materials. At least about fifty Angstroms of the furthest part of the strained layer defines a distal zone where the impurity gradient has a value that is substantially equal to zero.

Various features of the invention are well suited to applications utilizing MOS transistors (e.g., FETs) that include, for example, one or more of Si, Si$_{1-x}$Ge$_x$, or Ge layers in or on a substrate.

In another embodiment, the invention includes a FET fabricated in a semiconductor substrate. The FET has a channel region that includes at least one strained channel layer. The strained channel layer has a distal zone away from the substrate. The impurity gradient that characterizes the

4

substrate and the channel region has a value substantially equal to zero in the distal zone.

In one version of this embodiment, the invention provides a method for fabricating a FET in a semiconductor substrate. The method includes the step of disposing at least one strained channel layer in at least the channel region of the FET. (The strained channel layer has a distal zone away from the substrate.) Performing at least one subsequent processing step on the substrate, after which the impurity gradient has a value substantially equal to zero in the distal zone, follows this. The subsequent processing step is generally performed within a predetermined temperature range, which affects the value of the impurity gradient, particularly in the distal zone.

Other aspects and advantages of the present invention will become apparent from the following detailed description, taken in conjunction with the accompanying drawings, illustrating the principles of the invention by way of example only.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other objects, features, and advantages of the present invention, as well as the invention itself, will be more fully understood from the following description of various embodiments, when read together with the accompanying drawings, in which:

FIG. 1 is a schematic (unscaled) cross-sectional view that depicts a semiconductor structure in accordance with an embodiment of the invention;

FIG. 2 is a schematic (unscaled) cross-sectional view that depicts a FET in accordance with an embodiment of the invention;

FIG. 3 is a flowchart depicting the steps of fabricating a FET in accordance with an embodiment of the invention; and

FIG. 4 is a flowchart depicting the steps of fabricating a FET in accordance with another embodiment of the invention.

## DETAILED DESCRIPTION

As shown in the drawings for the purposes of illustration, the invention may be embodied in a semiconductor structure or device, such as, for example, a FET, with specific structural features. A semiconductor structure or FET according to the invention includes one or more strained material layers that are relatively free of interdiffused impurities. These strained material layers are characterized by at least one diffusion impurity gradient that has a value that is substantially equal to zero in a particular area of the strained layer. Consequently, the semiconductor structure or FET does not exhibit the degraded performance that results from the presence of such impurities in certain parts of the strained layers.

In brief overview, FIG. 1 depicts a schematic (unscaled) cross-sectional view of a semiconductor structure 100 in accordance with an embodiment of the invention. The semiconductor structure 100 includes a substrate 102. The substrate 102 may be Si, SiGe, or other compounds such as, for example, GaAs or InP. The substrate 102 may also include multiple layers 122, 124, 126, 128, typically of different materials. (Although FIG. 1 depicts four layers 122, 124, 126, 128, this is for illustration only. A single, two, or more layers are all within the scope of the invention.)

In one embodiment, the multiple layers 122, 124, 126, 128 include relaxed SiGe disposed on compositionally

US 6,831,292 B2

5

graded SiGe. In another embodiment, the multiple layers 122, 124, 126, 128 include relaxed SiGe disposed on Si. One or more of the multiple layers 122, 124, 126, 128 may also include a buried insulating layer, such as $SiO_2$ or $Si_3N_4$. The buried insulating layer may also be doped.

In another embodiment, a relaxed, compositionally graded SiGe layer 124 is disposed on a Si layer 122 (typically part of an Si wafer that may be edge polished), using any conventional deposition method (e.g., chemical vapor deposition ("CVD") or molecular beam epitaxy ("MBE")), and the method may be plasma-assisted. A further relaxed SiGe layer 126, but having a uniform composition, is disposed on the relaxed, compositionally graded SiGe layer 124. The relaxed, uniform SiGe layer 126 is then planarized, typically by CMP. A relaxed SiGe regrowth layer 128 is then disposed on the relaxed, uniform SiGe layer 126.

One or more strained layers 104 are disposed on the substrate 102. Between the substrate 102 and the strained layer 104 is an interface 106. Located away from the interface 106 is the distal zone 108 of the strained layer 104.

In various embodiments, the strained layer 104 includes one or more layers of Si, Ge, or SiGe. The "strain" in the strained layer 104 may be compressive or tensile, and it may be induced by lattice mismatch with respect to an adjacent layer, as described above, or mechanically. For example, strain may be induced by the deposition of overlayers, such as $Si_3N_4$. Another way to create underlying voids for, for example, implantation of one or more gases followed by annealing. Both of these approaches induce strain in the underlying substrate 102, in turn causing strain in the strained layer 104.

The substrate 102, strained layer 104, and interface 106 are characterized, at least in part, by an impurity gradient 110A, 110B (collectively, 110). The impurity gradient 110 describes the concentration of the impurity species as a function of location across the substrate 102, strained layer 104, and interface 106. The impurity gradient 110 may be determined by solving Fick's differential equations, which describe the transport of matter:

$$J = -D \frac{\partial N}{\partial x}$$ (Equation 1)

$$\frac{\partial N}{\partial t} = D \frac{\partial^2 N}{\partial x^2}$$ (Equation 2)

In equations (1) and (2), "J" is the impurity flux, "D" is the diffusion coefficient, and "N" is the impurity concentration. Equation (1) describes the rate of the permeation of the diffusing species through unit cross sectional area of the medium under conditions of steady state flow. Equation (2) specifies the rate of accumulation of the diffusing species at different points in the medium as a function of time, and applies to transient processes. In the general case, equations (1) and (2) are vector-tensor relationships that describe these phenomena in three dimensions. In some cases, equations (1) and (2) may be simplified to one dimension.

The steady state solution to equation (1), which is not detailed herein, is a function of the Gaussian error function:

6

$$erf(y) = \frac{2}{\sqrt{\pi}} \int_0^y e^{-z^2} \, dz$$ (Equation 3)

An example solution is shown in FIG. 1 as the impurity gradient 110. Axis 112 represents the impurity concentration, typically in units of $cm^{-3}$. Axis 114 corresponds to the location in the semiconductor structure 100. Axis 114 is aligned with the semiconductor structure 100 to illustrate a typical impurity profile, meaning that the impurity concentration at any point in the semiconductor structure 100 can be ascertained as a function of location. Except as described below, the depicted shape of the impurity gradient 110 is not intended to be limiting. For example, impurity gradient 110A may describe a profile of a p-type (e.g., boron) or n-type (e.g., phosphorous or arsenic) dopant introduced in the substrate 102. On the other hand, impurity gradient 110B may, for example, describe a substantially constant concentration of Ge, or Si, or both, in the substrate 102 that takes on a desired value (e.g., a reduced value) in the strained layer 104. Stated differently, the impurity gradient 110 may describe the concentration of any species in the substrate 102, including the substrate species itself, at any point in the semiconductor structure 100.

Boundary 116 represents the interface between the substrate 102 and the strained layer 104. Boundary 118 depicts the start of the distal zone 108 of the strained layer 104. Boundary 120 corresponds to the edge of the strained layer 104. Of note are the locations where the boundaries 116, 118, 120 intersect the axis 114 and the impurity gradient 110. In particular, the impurity gradient 110 has a value substantially equal to zero in the distal zone 108. This is depicted by the impurity gradient 110 approaching the axis 114 at boundary 118, and remaining there, or at zero, or at another value substantially equal to zero, between boundary 118 and 120. Of course, the impurity gradient 110 can also have a value substantially equal to zero before reaching the boundary 118. In any case, one embodiment of the invention features a distal zone 108 that includes at least about fifty Angstroms of the furthest part of the strained layer 104. That is, the distal zone 108 is at least about fifty Angstroms thick.

In another embodiment depicted schematically (i.e., unscaled) in FIG. 2, a FET 200 is fabricated in a similar semiconductor structure. The FET 200 includes a semiconductor substrate 202, which may be Si, SiGe, or other compounds such as, for example, GaAs or InP. The substrate 202 can be multi-layered, and it can include relaxed SiGe disposed on compositionally graded SiGe, or relaxed SiGe disposed on Si. The substrate 202 may also include a buried insulating layer, such as $SiO_2$ or $Si_3N_4$. The buried insulating layer may also be doped.

Disposed on the substrate 202 is an isolation well 204, typically including an oxide. Within the isolation well 204 are isolation trenches 206. In a source region 208 and a drain region 212 are typically formed by ion implantation. A FET channel 210 is formed from one or more strained layers. The strained layers can include one or more layers of Si, Ge, or SiGe. The "strain" in the strained layers may be compressive or tensile, and it may be induced as described above. The furthest part of the channel 210 is located away from the substrate 202. This furthest part forms the distal zone of the channel 210.

Disposed on at least part of the channel 210 is a gate dielectric 214, such as, for example, $SiO_2$, $Si_3N_4$, or any other material with a dielectric constant greater than that of $SiO_2$ (e.g., $HfO_2$, $HfSiON$). The gate dielectric 214 is

7

typically twelve to one hundred Angstroms thick, and it can include a stacked structure (e.g., thin SiO₂ capped with another material having a high dielectric constant).

Disposed on the gate dielectric 214 is the gate electrode 216. The gate electrode 216 material can include doped or undoped polysilicon, doped or undoped poly-SiGe, or metal. Disposed about the gate electrode 216 are the transistor spacers 218. The transistor spacers 218 are typically formed by depositing a dielectric material, which may be the same material as the gate dielectric 214, followed by anisotropic etching.

The impurity gradient 110 also characterizes the channel 210 and the substrate 202, as well as the isolation well 204. This is shown in FIG. 2 in an expanded view that, for clarity, differs in scale compared to the remainder of (unscaled) FIG. 2. The distal zone of the channel 210 corresponds to that portion of the impurity gradient 110 between boundaries 118, 120 (expanded for clarity). Within the distal zone of the channel 210, the impurity gradient 110 has a value substantially equal to zero. As discussed above, the depicted shape of the impurity gradient 110 is not intended to be limiting, and the impurity gradient 110 can also have a value substantially equal to zero before reaching the boundary 118. One embodiment of the invention features a distal zone 108 that includes at least about fifty Angstroms of the furthest part of the channel 210. That is, the distal zone is at least about fifty Angstroms thick.

One version of an embodiment of the invention provides a method for fabricating a FET in a semiconductor substrate. The method includes the step of disposing one or more strained channel layers in the FET channel region. The channel layer has a distal zone away from the substrate. The distal zone includes at least about fifty Angstroms of the furthest part of the channel region. An impurity gradient characterizes at least the substrate and the strained layers.

Next, one or more subsequent processing steps are performed on the substrate. After these subsequent processing steps are performed, the impurity gradient has a value that is substantially equal to zero in the distal zone. Since the impurity gradient can be influenced by temperature, the subsequent processing steps are typically performed within a predetermined temperature range that is chosen to ensure that the impurity gradient has a desired value, particularly in the distal zone.

FIG. 3 depicts a method 300 for fabricating the FET in accordance with an embodiment of the invention. This method includes the step of providing a substrate, typically planarized, without strained layers (step 302). The substrate can include relaxed SiGe on a compositionally graded SiGe layer, relaxed SiGe on a Si substrate, relaxed SiGe on Si, or other compounds such as GaAs or InP. The substrate can also contain a buried insulating layer.

Next, initial VLSI processing steps are performed such as, for example, surface cleaning, sacrificial oxidation, deep well drive-in, and isolation processes like shallow trench isolation with liner oxidation or LOCOS (step 304). Any number of these steps may include high temperatures or surface material consumption. Features defined during step 304 can include deep isolation wells and trench etch-refill isolation structures. Typically, these isolation trenches will be refilled with SiO₂ or another insulating material, examples of which are described above.

Next, the channel region is doped by techniques such as shallow ion implantation or outdiffusion from a solid source (step 306). For example, a dopant source from glass such as BSG or PSG may be deposited (step 308), followed by a

8

high temperature step to outdiffuse dopants from the glass (step 310). The glass can then be etched away, leaving a sharp dopant spike in the near-surface region of the wafer (step 312). This dopant spike may be used to prevent short-channel effects in deeply scaled surface channel FETs, or as a supply layer for a buried channel FET that would typically operate in depletion mode. The subsequently deposited channel layers can then be undoped, leading to less mobility-limiting scattering in the channel of the device and improving its performance. Likewise, this shallow doping may be accomplished via diffusion from a gas source (e.g., rapid vapor phase doping or gas immersion laser doping) (step 314) or from a plasma source as in plasma immersion ion implantation doping (step 316).

Next, deposit one or more strained channel layers, preferably by a CVD process (step 318). The channel may be Si, Ge, SiGe, or a combination of multiple layers of Si, Ge, or SiGe. Above the device isolation trenches or regions, the deposited channel material typically will be polycrystalline. Alternatively, the device channels may be deposited selectively, i.e., only in the device active area and not on top of the isolation regions. Typically, the remaining steps in the transistor fabrication sequence will involve lower thermal budgets and little or no surface material consumption.

Next, the transistor fabrication sequence is continued with the growth or deposition of a gate dielectric (step 320) and the deposition of a gate electrode material (step 322). Examples of gate electrode material include doped or undoped polysilicon, doped or undoped poly-SiGe, or metal. This material stack is then etched (step 324), forming the gate of the transistor. Typically, this etch removes the gate electrode material by a process such as reactive ion etching ("RIE") and stops on the gate dielectric, which is then generally removed by wet etching. After this, the deposited channel material typically is still present.

Next, the transistor spacers are formed by the traditional process of dielectric material deposition and anisotropic etching (step 326). Step 326 may be preceded by extension implantation, or removal of the channel material in the regions not below the gate, or both. If the channel material is not removed before spacer material deposition, the spacer etch may be tailored to remove the excess channel material in the regions not below the gate. Failure to remove the excess channel material above the isolation regions can result in device leakage paths.

Next, the source and drain regions are fabricated, typically by ion implantation (step 328). Further steps to complete the device fabrication can include salicidation (step 330) and metallization (step 332).

FIG. 4 depicts another method 400 for fabricating the FET in accordance with an embodiment of the invention. This method includes creating the channel at a different point in the fabrication process, and starts with performing the traditional front-end VLSI processing steps, such as, for example, well formation, isolation, gate stack deposition and definition, spacer formation, source-drain implant, silicidation (step 402). In place of a gate electrode, fabricate a "dummy gate" (step 404). This dummy gate is etched and replaced in subsequent processing steps. The dummy gate may include an insulating material such as Si₃N₄ (or any of the other dielectric materials discussed), or a conducting material such as polysilicon, poly-Ge, or metal. In contrast to a typical MOSFET process where the gate is separated from the semiconductor substrate by a gate dielectric, the dummy gate is separated from the substrate by an etch-stop layer. The etch-stop layer can be of SiO₂, either thermally grown or deposited.

US 6,831,292 B2

9

Next, a dielectric layer is deposited (e.g., by a CVD process) (step 406) and planarized (step 408) by, for example, CMP. This "planarization layer" is typically a different material then the dummy gate.

Next, the dummy gate is removed by a selective etching process (step 410). The etch-stop layer protects the substrate from this etching process. A wet or dry etch then removes the etch-stop layer.

An example configuration includes a polysilicon dummy gate, an $SiO_2$ etch-stop layer, $Si_3N_4$ spacers, and an $SiO_2$ planarization layer. This configuration allows selective removal of the dummy gate with an etchant such as heated tetramethylammonium hydroxide ("TMAH"), thereby leaving the $SiO_2$ and $Si_3N_4$ intact. The etch-stop is subsequently removed by a wet or dry etch (e.g., by HF).

Next, one or more strained channel layers is deposited, typically by a CVD process (step 412). The channel layers may be Si, Ge, SiGe, or a combination of multiple layers of Si, Ge, or SiGe. The gate dielectric is then thermally grown or deposited (by CVD or sputtering, for example) (step 416). This is followed by deposition of the gate electrode material (step 418), which can include doped or undoped polysilicon, doped or undoped poly-SiGe, or metal.

Next, the gate electrode is defined (step 420). This can be by photomasking and etching (step 422) of the gate electrode material. This may also be done by a CMP step (step 424), where the gate electrode material above the planarization layer is removed.

Using this method, a silicide is generally formed on the source and drain regions before the deposition of the planarization layer. In this case, all subsequent processing steps are typically limited to a temperature that the silicide can withstand without degradation. One alternative is to form the silicide at the end of the process. In this case, the planarization layer may be removed by a selective wet or dry etch which leaves the gate electrode material and the spacers intact. This is followed by a traditional silicide process, e.g., metal deposition and thermally activated silicide formation on the source and drain regions (and also on the gate electrode material, if the latter is polysilicon), followed by a wet etch strip of unreacted metal. Further steps to complete the device fabrication can include inter-layer dielectric deposition and metallization. Note that if the step of forming the gate dielectric is omitted, a metal gate electrode may be deposited directly on the channel, resulting in the fabrication of a self-aligned HEMT (or MESFET) structure.

From the foregoing, it will be appreciated that the semiconductor structures and devices provided by the invention afford a simple and effective way to minimize or eliminate the impurities in certain parts of strained material layers used therein. The problem of degraded device performance that results from the presence of such impurities is largely eliminated.

One skilled in the art will realize the invention may be embodied in other specific forms without departing from the spirit or essential characteristics thereof. The foregoing embodiments are therefore to be considered in all respects illustrative rather than limiting of the invention described herein. Scope of the invention is thus indicated by the appended claims, rather than by the foregoing description, and all changes which come within the meaning and range of equivalency of the claims are therefore intended to be embraced therein.

10

What is claimed is:

1. A semiconductor structure comprising:
a substrate; and
at least one strained layer disposed on the substrate, thereby defining an interface therebetween, the at least one strained layer having a distal zone away from the interface;
wherein the substrate, the interface, and the at least one strained layer are characterized at least in part by an impurity gradient having a value substantially equal to zero in the distal zone.

2. The semiconductor structure of claim 1 wherein the substrate comprises Si.

3. The semiconductor structure of claim 1 wherein the substrate comprises SiGe.

4. The semiconductor structure of claim 1 wherein the substrate comprises a p-type dopant.

5. The semiconductor structure of claim 1 wherein the substrate comprises an n-type dopant.

6. The semiconductor structure of claim 1 wherein the substrate comprises a plurality of layers.

7. The semiconductor structure of claim 6 wherein the plurality of layers comprises relaxed SiGe disposed on compositionally graded SiGe.

8. The semiconductor structure of claim 6 wherein the plurality of layers comprises relaxed SiGe disposed on Si.

9. The semiconductor structure of claim 6 wherein the plurality of layers comprises a buried insulating layer.

10. The semiconductor structure of claim 1 wherein the at least one strained layer comprises Si.

11. The semiconductor structure of claim 1 wherein the at least one strained layer comprises Ge.

12. The semiconductor structure of claim 1 wherein the at least one strained layer comprises SiGe.

13. The semiconductor structure of claim 1 wherein the distal zone comprises at least about fifty Angstroms of the at least one strained layer.

14. The semiconductor structure of claim 10 wherein the impurity gradient describes at least the concentration of Ge.

15. The semiconductor structure of claim 11 wherein the impurity gradient describes at least the concentration of Si.

16. A FET fabricated in a semiconductor substrate, the FET comprising a channel region including at least one strained channel layer, the at least one strained channel layer having a distal zone away from the substrate, wherein the substrate and the channel region are characterized at least in part by an impurity gradient having a value substantially equal to zero in the distal zone.

17. The FET of claim 16 wherein the substrate comprises Si.

18. The FET of claim 16 wherein the substrate comprises SiGe.

19. The FET of claim 16 wherein the substrate comprises a p-type dopant.

20. The FET of claim 16 wherein the substrate comprises an n-type dopant.

21. The FET of claim 16 wherein the substrate comprises a plurality of layers.

22. The FET of claim 21 wherein the plurality of layers comprises relaxed SiGe disposed on compositionally graded SiGe.

23. The FET of claim 21 wherein the plurality of layers comprises relaxed SiGe disposed on Si.

24. The FET of claim 21 wherein the plurality of layers comprises a buried insulating layer.

25. The FET of claim 16 wherein the at least one strained channel layer comprises Si.

US 6,831,292 B2

11

26. The FET of claim 16 wherein the at least one strained channel layer comprises Ge.

27. The FET of claim 16 wherein the at least one strained channel layer comprises SiGe.

28. The FET of claim 16 wherein the distal zone comprises at least about fifty Angstroms of the at least one strained channel layer.

29. The FET of claim 25 wherein the impurity gradient describes at least the concentration of Ge.

30. The FET of claim 26 wherein the impurity gradient describes at least the concentration of Si.

31. A method for fabricating a semiconductor structure in a substrate, the method comprising the steps of:

disposing at least one strained layer on the substrate thereby defining an interface therebetween, the at least one strained layer having a distal zone away from the interface; and

performing at least one subsequent processing step on the substrate after which an impurity gradient characterizing, at least in part, the substrate, the interface, and the at least one strained layer has a value substantially equal to zero in the distal zone.

32. The method of claim 31 wherein the substrate comprises Si.

33. The method of claim 31 wherein the substrate comprises SiGe.

34. The method of claim 31 wherein the substrate comprises a p-type dopant.

35. The method of claim 31 wherein the substrate comprises an n-type dopant.

36. The method of claim 31 wherein the substrate comprises a plurality of layers.

37. The method of claim 36 wherein the plurality of layers comprises relaxed SiGe disposed on compositionally graded SiGe.

38. The method of claim 36 wherein the plurality of layers comprises relaxed SiGe disposed on Si.

39. The method of claim 36 wherein the plurality of layers comprises a buried insulating layer.

40. The method of claim 31 wherein the at least one strained layer comprises Si.

41. The method of claim 31 wherein the at least one strained layer comprises Ge.

42. The method of claim 31 wherein the at least one strained layer comprises SiGe.

43. The method of claim 31 wherein the distal zone comprises at least about fifty Angstroms of the at least one strained layer.

44. The method of claim 31 wherein the at least one subsequent processing step is performed within a predetermined temperature range.

12

45. The method of claim 40 wherein the impurity gradient describes at least the concentration of Ge.

46. The method of claim 41 wherein the impurity gradient describes at least the concentration of Si.

47. A method for fabricating a FET in a semiconductor substrate, the FET comprising a channel region, the method comprising the steps of:

disposing at least one strained channel layer in at least the channel region, the at least one strained channel layer having a distal zone away from the substrate; and

performing at least one subsequent processing step on the substrate after which an impurity gradient characterizing, at least in part, the substrate and the at least one strained layer has a value substantially equal to zero in the distal zone.

48. The method of claim 47 wherein the substrate comprises Si.

49. The method of claim 47 wherein the substrate comprises SiGe.

50. The method of claim 47 wherein the substrate comprises a p-type dopant.

51. The method of claim 47 wherein the substrate comprises an p-type dopant.

52. The method of claim 47 wherein the substrate comprises a plurality of layers.

53. The method of claim 52 wherein the plurality of layers comprises relaxed SiGe disposed on compositionally graded SiGe.

54. The method of claim 52 wherein the plurality of layers comprises relaxed SiGe disposed on Si.

55. The method of claim 52 wherein the plurality of layers comprises a buried insulating layer.

56. The method of claim 47 wherein the at least one strained layer comprises Si.

57. The method of claim 47 wherein the at least one strained layer comprises Ge.

58. The method of claim 47 wherein the at least one strained layer comprises SiGe.

59. The method of claim 47 wherein the distal zone comprises at least about fifty Angstroms of the at least one strained layer.

60. The method of claim 47 wherein the at least one subsequent processing step is performed within a predetermined temperature range.

61. The method of claim 56 wherein the impurity gradient describes at least the concentration of Ge.

62. The method of claim 57 wherein the impurity gradient describes at least the concentration of Si.

* * * * *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.     : 6,831,292 B2                                    Page 1 of 1
DATED          : December 14, 2004
INVENTOR(S)    : Currie et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

<u>Column 12,</u>
Line 24, claim 51 should read as follows:
-- 51. The method of claim 47 wherein the substrate comprises an n-type dopant. --

Signed and Sealed this

Fifth Day of April, 2005

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

# **<u>EXHIBIT B</u>**

GOODWIN | PROCTER

Steven J. Frank
617.570.1241
sfrank@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

May 9, 2005

**By Federal Express**

Mr. Paul S. Otellini
President and Chief Operating Officer
Intel Corporation
2200 Mission College Blvd.
Santa Clara, CA 95052

Dear Mr. Otellini:

We represent AmberWave Systems Corporation in connection with business and intellectual-property matters. On Tuesday, May 3, 2005, I accompanied a high-level team from AmberWave to Intel's Hillsboro campus, where we met with Brad Greenwald, Reza Afghan, Farshid Adibi-Rizi, and Reed Stahlie. Our presentation covered Intel's technology and its infringement of U.S. Patent No. 6,831,292 and allowed application serial nos. 2004/0161947 and 2004/0045499, all owned by AmberWave. I note that AmberWave had raised the '292 patent and the '947 application with Intel in a meeting with members Intel's Intellectual Property Licensing Group at Intel on January 27, 2005 in Santa Clara, California.

This will serve as formal notice to Intel that its current commercial products, including, without limitation, its Prescott and Dothan processors, infringes claims of the patent and allowed applications set forth above. Accordingly, we respectfully request that Intel take immediate steps to conclude license negotiations with AmberWave or to cease infringement of AmberWave's intellectual property.

Neither this letter nor any past or future correspondence will be deemed to constitute a release or waiver of any of Intel's obligations, liabilities, failures or defaults, or of any of AmberWave's rights and remedies, all of which are expressly reserved and not waived.

Very truly yours,

Steven J. Frank

SJF:nmg
cc:   Mr. Thomas R. Franz (by Federal Express)
      Mr. Richard J. Faubert
      Bryan P. Lord, Esq.

LIBC/2467501.1

Case 06-00081-SLR-MPT    Document 289-11    Filed 08/21/2008    Page 1 of 7

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTEL CORPORATION,                    )
                                      )
            Plaintiff,                )
                                      )
      v.                              )     Civil Action No. 05-301-KAJ
                                      )
AMBERWAVE SYSTEMS                     )
CORPORATION,                          )     **DEMAND FOR JURY TRIAL**
                                      )
            Defendant.                )

## <u>AMBERWAVE'S ANSWER AND COUNTERCLAIM</u>

Defendant AmberWave Systems Corporation ("AmberWave") responds as follows to the

Complaint of Plaintiff Intel Corporation ("Intel").

1.     In response to paragraph 1, AmberWave admits that rules regarding jurisdiction

are set forth in 28 U.S.C. §§ 1338(a), 2201, and 2202, which speak for themselves.  Except as

expressly admitted, AmberWave denies each and every allegation of paragraph 1.

2.     In response to paragraph 2, AmberWave admits that rules regarding venue are set

forth in 28 U.S.C. §§ 1391(b) and (c), which speak for themselves, and that AmberWave is

incorporated in Delaware.

3.     In response to paragraph 3, AmberWave admits, on information and belief, that

Intel is a Delaware corporation with its principal place of business in Santa Clara, California, and

that Intel is engaged in, among other things, the business of manufacturing computer

microprocessors.

4.     In response to paragraph 4, AmberWave admits that it is a Delaware corporation

with its principal place of business in Salem, New Hampshire, and that it is engaged in, among

other things, the business of developing strained silicon semiconductor technology.

5.     AmberWave admits the allegations of paragraph 5.

6.     In response to paragraph 6, AmberWave admits that Steven Frank, counsel for AmberWave, sent the letter attached to the Complaint as Exhibit B to Paul Otellini, Intel's president, on or about May 9, 2005, and that that letter speaks for itself.  Except as expressly admitted, AmberWave denies each and every allegation of paragraph 6.

7.     In response to paragraph 7, AmberWave admits that, before Mr. Frank sent his letter, the parties had been engaged in communications regarding United States Patent No. 6,831,292 and United States Patent Application Publication Nos. 2004/0161947 and 2004/0045499.  Except as expressly admitted, AmberWave denies each and every allegation of paragraph 7.

8.     In response to paragraph 8, AmberWave denies each and every allegation contained therein.

9.     In response to paragraph 9, AmberWave denies each and every allegation contained therein.

10.    In response to paragraph 10, AmberWave denies each and every allegation contained therein, and further denies that Intel is entitled to any relief whatsoever.

11.    In response to paragraph 11, AmberWave incorporates herein by this reference paragraphs 1 through 10 as if set forth in full.

12.    In response to paragraph 12, AmberWave denies each and every allegation contained therein.

13.    In response to paragraph 13, AmberWave denies each and every allegation contained therein.

14.     In response to paragraph 14, AmberWave denies each and every allegation contained therein.

15.     In response to paragraph 15, AmberWave denies each and every allegation contained therein.

## COUNTERCLAIM

For its counterclaim, AmberWave alleges as follows:

## PARTIES AND JURISDICTION

16.     This is an action for patent infringement arising under the United States Patent Act, 35 U.S.C. § 101 *et seq.*

17.     AmberWave is a Delaware corporation with its principal place of business in Salem, New Hampshire.

18.     AmberWave is informed and believes, and thereon alleges, that Intel is a Delaware corporation with its principal place of business in Santa Clara, California.

19.     This Court has subject matter jurisdiction over this counterclaim under 28 U.S.C. §§ 1331 and 1338(a).

20.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(c) and 1400(b).

## PATENT IN SUIT

21.     United States Patent No. 6,831,292 (the "'292 patent"), entitled "Semiconductor Structures Employing Strained Material Layers With Defined Impurity Gradients And Methods For Fabricating Same," was duly and legally issued on December 14, 2001.  AmberWave is the owner by assignment of all right, title and interest in and to the '292 patent.  A true and correct copy of the '292 patent is attached hereto as Exhibit A.

## CLAIM FOR RELIEF

### (Patent Infringement by Intel)

22.     AmberWave incorporates herein by this reference paragraphs 16 through 21 as if set forth in full.

23.     AmberWave is informed and believes, and thereon alleges, that in violation of 35 U.S.C. § 271, Intel has been and is currently directly infringing, contributorily infringing, and/or inducing infringement of the '292 patent by, among other things, making, using, offering to sell, selling and/or importing, without or authority or license from AmberWave, certain semiconductor products.

24.     AmberWave is informed and believes, and thereon alleges, that Intel's infringement of the '292 patent has been and continues to be willful.

25.     Unless enjoined, Intel will continue to infringe the '292 patent, and AmberWave will suffer irreparable injury as a direct and proximate result of Intel's conduct.

26.     AmberWave has been damaged by Intel's conduct, and until an injunction issues will continue to be damaged in an amount yet to be determined.

## PRAYER FOR RELIEF

WHEREFORE, AmberWave prays for relief as follows:

A.     For a determination that Intel has infringed the '292 patent, and that Intel's infringement has been willful;

B.     For an order preliminarily and permanently enjoining Intel, and its directors, officers, employees, attorneys, agents and all persons in active concert or participation with any of them from further acts of infringement of the '292 patent;

C.    For damages resulting from infringement of the '292 patent by Intel in an amount to be determined at trial, and the trebling of such damages due to the willful nature of the infringement;

D.    For an award of interest on damages;

E.    For a declaration that this case is exceptional pursuant to 35 U.S.C. § 285 and an award of attorneys' fees and costs; and

F.    For such other and further relief as this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

AmberWave hereby demands a trial by jury on any issue triable of right by a jury.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Leslie A. Polizoti*
Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
Tel: (302) 658-9200
lpolizoti@mnat.com
Attorneys for Defendant and Counterclaim Plaintiff
AmberWave Systems Corporation

OF COUNSEL:
Morgan Chu
David I. Gindler
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel: (310) 277-1010

July 15, 2005

474298

- 5 -

## CERTIFICATE OF SERVICE

I, Leslie A. Polizoti, hereby certify that on July 15, 2005 I electronically filed

AmberWave's Answer and Counterclaim with the Clerk of the Court using CM/ECF, which will

send notification of such filing(s) to the following:

> Josy W. Ingersoll (#1088)
> Young, Conaway, Stargatt & Taylor, LLP

I also certify that copies were caused to be served on July 15, 2005 upon the

following in the manner indicated:

### BY HAND

Josy W. Ingersoll
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899

<div style="margin-left:50%">

/s/    Leslie A. Polizoti (#4299)

Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
lpolizoti@mnat.com

</div>

454672

# EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

FILED-CLERK
U.S. DISTRICT COURT

05 JUL 15 AM 9: 54

TX EASTERN-MARSHALL

BY _____

| | |
|---|---|
| AMBERWAVE SYSTEMS CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> INTEL CORPORATION <br><br> Defendant. | § § § § § § § § § § § § § § |

Civil Action No ___**2-05CV-321**___
*LED*

Jury

## AMBERWAVE'S COMPLAINT FOR PATENT INFRINGEMENT
## AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff AmberWave Systems Corporation ("AmberWave"), for its complaint against Defendant Intel Corporation ("Intel"), alleges as follows:

### INTRODUCTION

1.       AmberWave is a small technology and engineering firm founded by a university professor and one of his former students. AmberWave develops innovative technology for the production of microprocessors and other semiconductor devices. For years, Intel has been improving the performance of its microprocessors by shrinking the size of their fundamental components. Intel now finds itself unable to continue its historical pace of performance enhancement using its own technological developments. In order to defend its market position against inroads by competitors, Intel is using AmberWave's patented inventions to enable the production of faster and more efficient microprocessors—without obtaining a license from AmberWave. This action seeks redress for Intel's infringing activities.

1324519

## **PARTIES AND JURISDICTION**

2.    This is an action for patent infringement arising under the United States Patent Act, 35 U.S.C. § 101 *et seq.*

3.    AmberWave is a Delaware corporation with its principal place of business in Salem, New Hampshire.

4.    AmberWave is informed and believes, and thereon alleges, that Intel is a Delaware corporation with business locations throughout the United States.

5.    AmberWave is informed and believes, and thereon alleges, that Intel has done and continues to do business in this District. AmberWave is informed and believes, and thereon alleges, that Intel has harmed and continues to harm AmberWave in this District. AmberWave is informed and believes, and thereon alleges, that Intel products have been sold in this District. AmberWave is informed and believes, and thereon alleges, that these products include 90nm Pentium® processors. AmberWave is informed and believes, and thereon alleges, that Intel maintains a website accessible to the residents of this District. AmberWave is informed and believes, and thereon alleges, that Intel's website allows users in this District to submit information to Intel, and to download information from the website. AmberWave is informed and believes, and thereon alleges, that Intel's website allows users in this District to locate companies who will sell Intel products to users in this District, including 90 nm Pentium® processors.

6.    AmberWave is informed and believes, and thereon alleges, that Intel has voluntarily availed itself of the courts in this District. AmberWave is informed and believes, and thereon alleges, that Intel has filed complaints in this District as both a plaintiff and as an intervenor. AmberWave is informed and believes, and thereon alleges, that Intel has appeared as a defendant and a counterclaim plaintiff in this District, without contesting that venue is proper in the District.

7.    AmberWave is informed and believes, and thereon alleges, that Intel has sought and received authorization to do business in the State of Texas. AmberWave is

informed and believes, and thereon alleges, that Intel has a registered agent in the State of Texas. AmberWave is informed and believes, and thereon alleges, that Intel maintains at least eight business offices in State of Texas. AmberWave is informed and believes, and thereon alleges, that Intel has at least approximately 600 employees in the State of Texas.

8       This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), and venue in this District is proper under 28 U.S.C. §§ 1391 and 1400(b).

## THE PATENT IN SUIT

9.      United States Patent No. 6,881,632 ("'632 patent"), entitled "Method of Fabricating CMOS Inverter and Integrated Circuits Utilizing Strained Surface Channel MOSFETS," was duly and legally issued on April 19, 2005. AmberWave is the owner by assignment of all right, title and interest in and to the '632 patent. A true and correct copy of the '632 patent is attached as Exhibit A.

## CLAIM FOR RELIEF

### (Patent Infringement by Intel)

10.     AmberWave incorporates by reference paragraphs 1 through 9 as if set forth here in full.

11.     AmberWave is informed and believes, and thereon alleges, that in violation of 35 U.S.C. § 271, Intel has been and is currently directly infringing, contributorily infringing, and/or inducing infringement of the '632 patent by, among other things, making, using, offering to sell, selling and/or importing, without authority or license from AmberWave, certain computer processor products, including 90 nm Pentium® processors.

12.     AmberWave is informed and believes, and thereon alleges, that Intel's infringement of the '632 patent has been and continues to be willful.

13.     Unless enjoined, Intel will continue to infringe the '632 patent, and AmberWave will suffer irreparable injury as a direct and proximate result of Intel's conduct.

14.     AmberWave has been damaged by Intel's conduct, and until an injunction issues will continue to be damaged in an amount yet to be determined.

## DEMAND FOR JURY TRIAL

AmberWave demands a trial by jury on all issues triable to a jury

## PRAYER FOR RELIEF

WHEREFORE, AmberWave prays for relief as follows:

A. For a determination that the '632 patent is valid and enforceable;

B. For a determination that Intel infringes the '632 patent, and that Intel's infringement is willful;

C. For an order preliminarily and permanently enjoining Intel, and its directors, officers, employees, attorneys, agents and all persons in active concert or participation with any of the foregoing from further acts of infringement of the '632 patent;

D. For damages resulting from infringement of the '632 patent Intel in an amount to be determined at trial, and the trebling of such damages due to the willful nature of their infringement;

E. For an award of interest on damages;

F. For a declaration that this case is exceptional pursuant to 35 U.S.C. § 285 and an award of attorneys' fees and costs; and

G. For an award of such other and further relief as this Court deems just and proper.

Dated: July 15, 2005                    Respectfully submitted,

                                        IRELL & MANELLA LLP
                                        BROWN McCARROLL LLP
                                        IRELAND, CARROLL & KELLY, PC
                                        JONES & JONES, INC., PC
                                        McKOOL SMITH, PC

                                        Morgan Chu (CA #70446)
                                        David I. Gindler (CA #117824)
                                        IRELL & MANELLA LLP
                                        1800 Avenue of the Stars, Suite 900
                                        Los Angeles, California 90067-4276
                                        Phone: (310) 277-1010
                                        Facsimile: (310) 203-7199
                                        E-mail:dgindler@irell.com

                                        By: _____
                                        S. Calvin Capshaw III (TX #03783900)
                                        BROWN McCARROLL LLP
                                        Attorney-in-Charge
                                        1127 Judson Road, Suite 220
                                        P.O. Box 3999
                                        Longview, Texas 75601-5157
                                        Phone: (903) 236-9800
                                        Facsimile: (903) 236-8787
                                        E-mail: CCapshaw@mailbmc.com

                                        Otis W. Carroll (TX #03895700)
                                        IRELAND, CARROLL & KELLY, PC
                                        6101 South Broadway Avenue
                                        Suite 500
                                        P.O. Box 7879
                                        Tyler, Texas 75711
                                        Phone: (903) 561-1600
                                        Facsimile: (903) 581-1070

                                        Franklin Jones, Jr. (TX #00000055)
                                        JONES & JONES, INC., PC
                                        201 W. Houston Street
                                        P.O. Drawer 1249
                                        Marshall, Texas 75671-1249
                                        Phone: (903) 938-4395
                                        Facsimile: (903) 938-3360

1324519                                 - 5 -

Samuel F. Baxter (TX #01938000)
MCKOOL SMITH, PC
300 Crescent Court
Suite 1500
Dallas, TX 75201
Phone: (214) 978-4000
Facsimile: (214) 978-4044

**ATTORNEYS FOR PLAINTIFF**
**AmberWave Systems Corporation**

# EXHIBIT A



US006881632B2

(12) **United States Patent**
Fitzgerald et al.

(10) Patent No.: **US 6,881,632 B2**
(45) Date of Patent: **Apr. 19, 2005**

(54) **METHOD OF FABRICATING CMOS INVERTER AND INTEGRATED CIRCUITS UTILIZING STRAINED SURFACE CHANNEL MOSFETS**

(75) Inventors: **Eugene A. Fitzgerald**, Windham, NH (US); **Nicole Gerrish**, Cambridge, MA (US)

(73) Assignee: **AmberWave Systems Corporation**, Salem, NH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 10/611,739

(22) Filed: **Jul. 1, 2003**

(65) **Prior Publication Data**

US 2004/0097025 A1 May 20, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 09/884,172, filed on Jun 19, 2001, now Pat No. 6,649,480.

(60) Provisional application No. 60/250,985, filed on Dec 4, 2000

(51) Int. Cl.⁷ .................................... H01L 21/336
(52) U.S. Cl. ............... 438/285; 438/199; 438/455 438/199; 257/368–369
(58) Field of Search ............. ........ 438/285–283, 438/199; 257/368–369

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,010,045 A | 3/1977 | Ruehrwein |
| 4,710,788 A | 12/1987 | Dämbkes et al |
| 4,987,462 A | 1/1991 | Kim et al. ......... 357/22 |
| 4,990,979 A | 2/1991 | Otto |
| 4,994,866 A | 2/1991 | Awano |
| 4,997,776 A | 3/1991 | Harame et al |
| 5,013,681 A | 5/1991 | Godbey et al |
| 5,089,872 A | 2/1992 | Ozturk et al |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 41 01 167 | 7/1992 |
| EP | 0 514 018 | 11/1992 |

(Continued)

OTHER PUBLICATIONS

Armstrong et al., "Design of Si/SiGe Heterojunction Complementary Metal–Oxide–Semiconductor Transistors," *IEDM Technical Digest* (1995 *International Electron Devices Meeting*), pp. 761–764.

Armstrong, "Technology for SiGe Heterostructure–Based CMOS Devices," PhD Thesis, Massachusetts Institute of Technology, 1999, pp 1–154.

Augusto et al., "Proposal for a New Process Flow for the Fabrication of Silicon–Based Complementary MOD–MOS–FETs without Ion Implantation," *Thin Solid Films*, vol. 294, No. 1–2 (Feb. 15, 1997), pp 254–258.

(Continued)

*Primary Examiner*—Dung A Le
(74) *Attorney, Agent, or Firm*—Testa, Hurwitz & Thibeault, LLP

(57) **ABSTRACT**

A method of fabricating a CMOS inverter including providing a heterostructure having a Si substrate, a relaxed $Si_{1-x}Ge_x$ layer on the Si substrate, and a strained surface layer on said relaxed $Si_{1-x}Ge_x$ layer; and integrating a pMOSFET and an nMOSFET in said heterostructure, wherein the channel of said pMOSFET and the channel of the nMOSFET are formed in the strained surface layer Another embodiment provides a method of fabricating an integrated circuit including providing a heterostructure having a Si substrate, a relaxed $Si_{1-x}Ge_x$ layer on the Si substrate, and a strained layer on the relaxed $Si_{1-x}Ge_x$ layer; and forming a p transistor and an n transistor in the heterostructure, wherein the strained layer comprises the channel of the n transistor and the p transistor, and the n transistor and the p transistor are interconnected in a CMOS circuit

**16 Claims, 13 Drawing Sheets**



**US 6,881,632 B2**

Page 2

## US PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,155,571 A | 10/1992 | Wang et al |
| 5,166,084 A | 11/1992 | Pfiester |
| 5,177,583 A | 1/1993 | Endo et al |
| 5,202,284 A | 4/1993 | Kamins et al |
| 5,207,864 A | 5/1993 | Bhat et al |
| 5,208,182 A | 5/1993 | Narayan et al |
| 5,212,110 A | 5/1993 | Pfiester et al |
| 5,221,413 A | 6/1993 | Brasen et al |
| 5,240,876 A | 8/1993 | Gaul et al ......... 437/131 |
| 5,241,197 A | 8/1993 | Murakami et al |
| 5,242,847 A | 9/1993 | Ozturk et al |
| 5,250,445 A | 10/1993 | Bean et al |
| 5,285,086 A | 2/1994 | Fitzgerald |
| 5,291,439 A | 3/1994 | Kauffmann et al |
| 5,298,452 A | 3/1994 | Meyerson |
| 5,310,451 A | 5/1994 | Tejwani et al |
| 5,316,958 A | 5/1994 | Meyerson |
| 5,346,848 A | 9/1994 | Grupen-Shemansky et al |
| 5,374,564 A | 12/1994 | Bruel |
| 5,399,522 A | 3/1995 | Ohori |
| 5,413,679 A | 5/1995 | Godbey |
| 5,424,243 A | 6/1995 | Takasaki ......... 437/132 |
| 5,426,069 A | 6/1995 | Selvakumar et al |
| 5,426,316 A | 6/1995 | Mohammad |
| 5,442,205 A | 8/1995 | Brasen et al |
| 5,461,243 A | 10/1995 | Ek et al. |
| 5,461,250 A | 10/1995 | Burghartz et al |
| 5,462,883 A | 10/1995 | Dennard et al |
| 5,476,813 A | 12/1995 | Naruse |
| 5,479,033 A | 12/1995 | Baca et al |
| 5,484,664 A | 1/1996 | Kitahara et al |
| 5,523,243 A | 6/1996 | Mohammad |
| 5,523,592 A | 6/1996 | Nakagawa et al. |
| 5,534,713 A | 7/1996 | Ismail et al. |
| 5,536,361 A | 7/1996 | Kondo et al |
| 5,540,785 A | 7/1996 | Dennard et al. |
| 5,572,043 A | 11/1996 | Shimizu et al. ......... 257/18 |
| 5,596,527 A | 1/1997 | Tomioka et al |
| 5,617,351 A | 4/1997 | Bertin et al |
| 5,630,905 A | 5/1997 | Lynch et al |
| 5,659,187 A | 8/1997 | Legoues et al |
| 5,683,934 A | 11/1997 | Candelaria |
| 5,698,869 A | 12/1997 | Yoshimi et al |
| 5,714,777 A | 2/1998 | Ismail et al |
| 5,728,623 A | 3/1998 | Mori |
| 5,739,567 A | 4/1998 | Wong |
| 5,759,898 A | 6/1998 | Ek et al. |
| 5,777,347 A | 7/1998 | Bartelink |
| 5,786,612 A | 7/1998 | Otani et al |
| 5,786,614 A | 7/1998 | Chuang et al ......... 257/318 |
| 5,792,679 A | 8/1998 | Nakato |
| 5,808,344 A | 9/1998 | Ismail et al |
| 5,847,419 A | 12/1998 | Imai et al. |
| 5,877,070 A | 3/1999 | Goesele et al |
| 5,891,769 A | 4/1999 | Liaw et al. |
| 5,906,708 A | 5/1999 | Robinson et al |
| 5,906,951 A | 5/1999 | Chu et al. |
| 5,912,479 A | 6/1999 | Mori et al |
| 5,943,560 A | 8/1999 | Chang et al. |
| 5,963,817 A | 10/1999 | Chu et al |
| 5,966,622 A | 10/1999 | Levine et al |
| 5,998,807 A | 12/1999 | Lustig et al |
| 6,013,134 A | 1/2000 | Chu et al. |
| 6,033,974 A | 3/2000 | Henley et al. |
| 6,033,995 A | 3/2000 | Muller |
| 6,058,044 A | 5/2000 | Sugiura et al |
| 6,059,895 A | 5/2000 | Chu et al |
| 6,074,919 A | 6/2000 | Gardner et al |
| 6,096,590 A | 8/2000 | Chan et al. |
| 6,103,559 A | 8/2000 | Gardner et al. |

| | | |
|---|---|---|
| 6,107,653 A | 8/2000 | Fitzgerald |
| 6,111,267 A | 8/2000 | Fischer et al. |
| 6,117,750 A | 9/2000 | Bensahel et al |
| 6,130,453 A | 10/2000 | Mei et al |
| 6,133,799 A | 10/2000 | Favors et al |
| 6,140,687 A | 10/2000 | Shimomura et al |
| 6,143,636 A | 11/2000 | Forbes et al |
| 6,153,495 A | 11/2000 | Kub et al. |
| 6,154,475 A | 11/2000 | Soref et al |
| 6,160,303 A | 12/2000 | Fattaruso |
| 6,162,688 A | 12/2000 | Gardner et al |
| 6,184,111 B1 | 2/2001 | Henley et al. |
| 6,191,007 B1 | 2/2001 | Matsui et al |
| 6,191,432 B1 | 2/2001 | Sugiyama et al |
| 6,194,722 B1 | 2/2001 | Fiorini et al |
| 6,204,529 B1 | 3/2001 | Lung et al |
| 6,207,977 B1 | 3/2001 | Augusto |
| 6,210,988 B1 | 4/2001 | Howe et al. |
| 6,218,677 B1 | 4/2001 | Broekaert |
| 6,228,694 B1 | 5/2001 | Doyle et al. |
| 6,232,138 B1 | 5/2001 | Fitzgerald et al |
| 6,235,567 B1 | 5/2001 | Huang |
| 6,235,568 B1 | 5/2001 | Murthy et al. |
| 6,242,324 B1 * | 6/2001 | Kub et al. ......... 438/455 |
| 6,249,022 B1 | 6/2001 | Lin et al. |
| 6,251,755 B1 | 6/2001 | Furukawa et al |
| 6,261,929 B1 | 7/2001 | Gehrke et al. |
| 6,266,278 B1 | 7/2001 | Harari et al |
| 6,271,551 B1 | 8/2001 | Schmitz et al |
| 6,271,726 B1 | 8/2001 | Fransis et al |
| 6,281,532 B1 | 8/2001 | Doyle et al. |
| 6,291,321 B1 | 9/2001 | Fitzgerald |
| 6,313,016 B1 | 11/2001 | Kibbel et al. |
| 6,316,301 B1 | 11/2001 | Kant |
| 6,323,108 B1 | 11/2001 | Kub et al. |
| 6,326,664 B1 | 12/2001 | Chau et al. |
| 6,329,063 B1 | 12/2001 | Lo et al. |
| 6,335,546 B1 | 1/2002 | Tsuda et al |
| 6,339,232 B1 | 1/2002 | Takagi |
| 6,350,993 B1 | 2/2002 | Chu et al. |
| 6,352,909 B1 | 3/2002 | Usenko ......... 438/458 |
| 6,368,733 B1 | 4/2002 | Nishinaga |
| 6,372,356 B1 | 4/2002 | Thornton et al |
| 6,399,970 B1 | 6/2002 | Kubo et al |
| 6,403,975 B1 | 6/2002 | Brunner et al |
| 6,407,406 B1 | 6/2002 | Tezuka |
| 6,420,937 B1 | 7/2002 | Akatsuka et al. |
| 6,425,951 B1 | 7/2002 | Chu et al |
| 6,429,061 B1 | 8/2002 | Rim |
| 6,521,041 B1 | 2/2003 | Wu et al |
| 6,524,935 B1 | 2/2003 | Canaperi et al |
| 6,555,839 B1 | 4/2003 | Fitzgerald |
| 6,563,152 B1 | 5/2003 | Roberds et al |
| 6,573,126 B1 | 6/2003 | Cheng et al |
| 6,583,015 B1 | 6/2003 | Fitzgerald et al. |
| 6,593,191 B1 | 7/2003 | Fitzgerald |
| 6,602,613 B1 | 8/2003 | Fitzgerald |
| 6,605,498 B1 | 8/2003 | Murthy et al |
| 6,621,131 B1 | 9/2003 | Murthy et al. |
| 6,646,322 B1 | 11/2003 | Fitzgerald ......... 257/531 |
| 6,649,480 B1 | 11/2003 | Fitzgerald et al. |
| 6,657,223 B1 | 12/2003 | Wang et al. |
| 6,677,192 B1 | 1/2004 | Fitzgerald ......... 438/172 |
| 6,682,965 B1 | 1/2004 | Noguchi et al. |
| 6,703,144 B1 | 3/2004 | Fitzgerald ......... 428/641 |
| 6,703,648 B1 | 3/2004 | Xiang et al |
| 6,703,688 B1 | 3/2004 | Fitzgerald ......... 257/616 |
| 6,709,903 B1 | 3/2004 | Christiansen ......... 438/149 |
| 6,713,326 B1 | 3/2004 | Cheng et al ......... 438/149 |
| 6,723,661 B1 | 4/2004 | Fitzgerald ......... 438/763 |
| 6,737,670 B1 | 5/2004 | Cheng et al ......... 257/19 |

Case 2:05-cv-00321-LED   Document 1-2   Filed 07/15/2005   Page 3 of 12

**US 6,881,632 B2**

Page 3

| | | | |
|---|---|---|---|
| 6,743,684 B1 | 6/2004 | Liu | |
| 6,750,130 B1 | 6/2004 | Fitzgerald | 438/607 |
| 2001/0003364 A1 | 6/2001 | Sugawara et al | |
| 2002/0043660 A1 | 4/2002 | Yamazaki et al. | |
| 2002/0063292 A1 | 5/2002 | Armstrong et al. | |
| 2002/0084000 A1 | 7/2002 | Fitzgerald | 148/33.2 |
| 2002/0096717 A1 | 7/2002 | Chu et al. | |
| 2002/0100942 A1 | 8/2002 | Fitzgerald | |
| 2002/0123167 A1 | 9/2002 | Fitzgerald | |
| 2002/0123183 A1 | 9/2002 | Fitzgerald | |
| 2002/0123197 A1 | 9/2002 | Fitzgerald et al. | |
| 2002/0125471 A1 | 9/2002 | Fitzgerald et al. | |
| 2002/0125497 A1 | 9/2002 | Fitzgerald | |
| 2002/0140031 A1 | 10/2002 | Rim | |
| 2002/0168864 A1 | 11/2002 | Cheng et al. | |
| 2002/0190284 A1 | 12/2002 | Murthy et al. | |
| 2003/0003679 A1 | 1/2003 | Doyle et al | |
| 2003/0013323 A1 | 1/2003 | Hammond et al | |
| 2003/0025131 A1 | 2/2003 | Lee et al. | |
| 2003/0034529 A1 | 2/2003 | Fitzgerald et al | 257/369 |
| 2003/0057439 A1 | 3/2003 | Fitzgerald | |
| 2003/0102498 A1 | 6/2003 | Braithwaite et al | 257/288 |
| 2003/0199126 A1 | 10/2003 | Chu et al | 438/149 |
| 2003/0203600 A1 | 10/2003 | Chu et al. | 438/479 |
| 2003/0215990 A1 | 11/2003 | Fitzgerald et al | 438/172 |
| 2003/0218189 A1 | 11/2003 | Christiansen | 257/200 |
| 2003/0227057 A1 | 12/2003 | Lochtefeld et al | 257/347 |
| 2004/0005740 A1 | 1/2004 | Lochtefeld et al | 438/149 |
| 2004/0007724 A1 | 1/2004 | Murthy et al | |
| 2004/0014276 A1 | 1/2004 | Murthy et al | |
| 2004/0014304 A1 | 1/2004 | Bhattacharyya | 438/570 |
| 2004/0031979 A1 | 2/2004 | Lochtefeld | 257/233 |
| 2004/0041210 A1 | 3/2004 | Mouli | 257/347 |
| 2004/0070035 A1 | 4/2004 | Murthy et al | |
| 2004/0075149 A1 | 4/2004 | Fitzgerald et al. | 257/369 |
| 2004/0084735 A1 | 5/2004 | Murthy et al. | |
| 2004/0119101 A1 | 6/2004 | Schrom et al | |
| 2004/0142545 A1 | 7/2004 | Ngo et al | |
| 2004/0173815 A1 | 9/2004 | Yeo et al | |

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| EP | 0 587 520 | 3/1994 |
| EP | 0 683 522 | 11/1995 |
| EP | 0 828 296 | 3/1998 |
| EP | 0 829 908 | 3/1998 |
| EP | 0 838 858 | 4/1998 |
| EP | 1 020 900 | 7/2000 |
| EP | 1 174 928 | 1/2002 |
| FR | 2 701 599 | 3/1995 |
| GB | 2 342 777 | 4/2000 |
| JP | 61-141116 | 6/1986 |
| JP | 2-210816 | 8/1990 |
| JP | 3-036717 | 2/1991 |
| JP | 4-307974 | 10/1992 |
| JP | 5-166724 | 7/1993 |
| JP | 6-177046 | 6/1994 |
| JP | 6-244112 | 9/1994 |
| JP | 6-252046 | 9/1994 |
| JP | 7-94420 | 4/1995 |
| JP | 7-106446 | 4/1995 |
| JP | 7-240372 | 9/1995 |
| JP | 10-270685 | 10/1998 |
| JP | 11-233744 | 8/1999 |
| JP | 2000-021783 | 1/2000 |
| JP | 2000-031491 | 1/2000 |
| JP | 2001-319935 | 11/2001 |
| JP | 2002-076334 | 3/2002 |
| JP | 2002-164520 | 6/2002 |
| JP | 2002-289533 | 10/2002 |
| WO | 98/59365 | 12/1998 |
| WO | 99/53539 | 10/1999 |

| | | |
|---|---|---|
| WO | 00/48239 | 8/2000 |
| WO | 00/54338 | 9/2000 |
| WO | 01/022482 | 3/2001 |
| WO | 01/54202 | 7/2001 |
| WO | 01/93338 | 12/2001 |
| WO | 01/99169 | 12/2001 |
| WO | 02/13262 | 2/2002 |
| WO | 02/15244 | 2/2002 |
| WO | 02/27783 | 4/2002 |
| WO | 02/47168 | 6/2002 |
| WO | 02/071488 | 9/2002 |
| WO | 02/071491 | 9/2002 |
| WO | 02/071495 | 9/2002 |
| WO | 02/082514 | 10/2002 |
| WO | 2004/006327 | 1/2004 |
| WO | 2004/0006311 | 1/2004 |

**OTHER PUBLICATIONS**

Barradas et al , "RBS analysis of MBE–grown SiGe/(001) Si heterostructures with thin, high Ge content SiGe channels for HMOS transistors," *Modern Physics Letters B*, vol 15 (2001), abstract

Borenstein et al., "A New Ultra–Hard Etch–Stop Layer for High Precision Micromachining," Proceedings of the 1999 12th IEEE International Conference on Micro Electro Mechanical Systems (MEMs) (Jan 17–21, 1999), pp 205–210

Bouillon et al , "Search for the optimal channel architecture for 0.18/0 12 μm bulk CMOS experimental study," *IEEE* (1996), pp. 21 2.1–21 2.4

Bruel et al , "⊕Smart Cut: A Promising New SOI Material Technology," Proceedings of the 1995 IEEE International SOI Conference (Oct. 1995), pp. 178–179

Bruel, "Silicon on Insulator Material Technology," *Electronic Letters*, vol 13, No 14 (Jul 6, 1995), pp 1201–1202.

Bufler et al , "Hole transport in strained Sil–xGex alloys on Sil–yGey substrates," *Journal of Applied Physics*, vol 84, No 10 (Nov. 15, 1998), pp 5597–5602

Burghartz et al., "Microwave Inductors and Capacitors in Standard Multilevel Interconnect Silicon Technology," *IEEE Transactions on Microwave Theory and Techniques*, vol. 44, No. 1 (Jan 1996), pp. 100–104

Canaperi et al , "Preparation of a relaxed Si–Ge layer on an insulator in fabricating high-speed semiconductor devices with strained epitaxial films," International Business Machines Corporation, USA (2002), abstract

Carlin et al , "High Efficiency GaAs–on–Si Solar Cells with High Voc using Graded GeSi Buffers," *IEEE–2000* (2000), pp 1006–1011.

Chang et al , "Selective Etching of SiGe/Si Heterostructures," *Journal of the Electrochemical Society*, No 1 (Jan 1991), pp 202–204

Cheng et al., "Electron Mobility Enhancement in Strained–Si n–MOSFETs Fabricated on SiGe–on–Insulator (SGOI) Substrates," *IEEE Electron Device Letters*, vol 22, No 7 (Jul 2001), pp. 321–323

Cheng et al , "Relaxed Silicon–Germanium on Insulator Substrate by Layer Transfer," *Journal of Electronic Materials*, vol 30, No 12 (2001), pp. L37–L39

Cullis et al., "Growth ripples upon strained SiGe epitaxial layers on Si and misfit dislocation interactions," *Journal of Vacuum Science and Technology A*, vol. 12, No. 4 (Jul./Aug. 1994), pp. 1924–1931.

US 6,881,632 B2

Page 4

Currie et al., "Carrier mobilities and process stability of strained Si n– and p–MOSFETs on SiGe virtual substrates," *Journal of Vacuum Science and Technology B*, vol. 19, No 6 (Nov./Dec 2001), pp 2268–2279

Currie et al., "Controlling Threading Dislocation Densities in Ge on Si Using Graded SiGe Layers and Chemical–Mechanical Polishing," *Applied Physics Letters*, vol 72, Issue 14 (Apr 6, 1998), pp 1718–1720

Eaglesham et al., "Dislocation–Free Stranski–Krastanow Growth of Ge on Si(100)," *Physical Review Letters*, vol. 64, No. 16 (Apr 16, 1990), pp. 1943–1946

Feijoo et al., "Epitaxial Si–Ge Etch Stop Layers with Ethylene Diamine Pyrocatechol for Bonded and Etchback Silicon–on–Insulator," *Journal of Electronic Materials*, vol 23, No 6 (Jun. 1994), pp 493–496

Fischetti et al., "Band structure, deformation potentials, and carrier mobility in strained Si, Ge, and SiGe alloys," *Journal of Applied Physics*, vol. 80, No. 4 (Aug. 15, 1996), pp 2234–2252

Fischetti, "Long–range Coulomb interactions in small Si devices Part II Effective electronmobility in thin–oxide structures," *Journal of Applied Physics*, vol 89, No 2 (Jan 15, 2001), pp 1232–1250

Fitzgerald et al., "Dislocation dynamics in relaxed graded composition semiconductors," *Materials Science and Engineering*, B67 (1999), pp 53–61

Fitzgerald et al, "Relaxed GexSil–x structures for III–V integration with Si and high mobility two–dimensional electron gases in Si," *Journal of Vacuum Science Technology*, B 10(4) (Jul./Aug. 1992), pp 1807–1819

Fitzgerald et al, "Totally Relaxed GexSil–x Layers with Low Threading Dislocation Densities Grown on Si Substrates," *Applied Physics Letters*, vol 59, No 7 (Aug. 12, 1991), pp 811–813

Garone et al., "Silicon vapor phase epitaxial growth catalysis by the presence of germane," *Applied Physics Letters*, vol. 56, No. 13 (Mar 26, 1990), pp 1275–1277.

Gray et al, "Analysis and Design of Analog Integrated Circuits," John Wiley & Sons, 1984, pp. 605–632

Grützmacher et al., "Ge segregation in SiGe/Si heterostructures and its dependence on deposition technique and growth atmosphere," *Applied Physics Letters*, vol 63, No 18 (Nov 1, 1993), pp 2531–2533

Hackbarth et al, "Alternatives to thick MBE–grown relaxed SiGe buffers," *Thin Solid Films*, vol. 369, No. 1–2 (Jul 2000), pp 148–151.

Hackbarth et al, "Strain relieved SiGe buffers for Si–based heterostructure field–effect transistors," *Journal of Crystal Growth*, vol 201/202 (1999), pp. 734–738

Herzog et al, "SiGe–based FETs: buffer issues and device results," *Thin Solid Films*, vol 380 (2000), pp 36–41

Höck et al, "Carrier mobilities in modulation doped Sil–xGex heterostructures with respect to FET applications," *Thin Solid Films*, vol 336 (1998), pp 141–144.

Höck et al., "High hole mobility in SiO.17 GeO.83 channel metal–oxide–semiconductor field–effect transistors grown by plasma–enhanced chemical vapor deposition," *Applied Physics Letters*, vol. 76, No 26 (Jun 26, 2000), pp 3920–3922

Höck et al, "High performance 0 25 μm p–type Ge/SiGe MODFETs," *Electronics Letters*, vol. 34, No 19 (Sep. 17, 1998), pp. 1888–1889

Huang et al, "High–quality strain–relaxed SiGe alloy grown on implanted silicon–on–insulator substrate," *Applied Physics Letters*, vol. 76, No 19 (May 8, 2000), pp 2680–2682

Huang et al., "The Impact of Scaling Down to Deep Submicron on CMOS RF Circuits," *IEEE Journal of Solid–State Circuits*, vol. 33, No 7 (Jul 1998), pp 1023–1036.

Ishikawa et al, "Creation of Si–Ge–based SIMOX structures by low energy oxygen implantation," Proceedings of the 1997 IEEE International SOI Conference (Oct 1997), pp 16–17

Ishikawa et al., "SiGe–on–insulator substrate using SiGe alloy grown Si(001)," *Applied Physics Letters*, vol 75, No 7 (Aug 16, 1999), pp 983–985.

Ismail et al., "Modulation–doped n–type Si/SiGe with inverted interface," *Applied Physics Letters*, vol 65, No 10 (Sep. 5, 1994), pp 1248–1250

Ismail, "Si/SiGe High–Speed Field–Effect Transistors," Electron Devices Meeting, Washington, D C, (Dec. 10, 1995), pp 20.1 1–20.1 4

Kearney et al., "The effect of alloy scattering on the mobility of holes in a Sil–xGex quantum well," *Semiconductor Science and Technology*, vol 13 (1998), pp 174–180

Kim et al., "A Fully Integrated 1.9–GHz CMOS Low–Noise Amplifier," *IEEE Microwave and Guided Wave Letters*, vol. 8, No. 8 (Aug 1998), pp 293–295.

Koester et al., "Extremely High Transconductance Ge/Si0 4Ge0 6 p–MODFET's Grown by UHV–CVD," *IEEE Electron Device Letters*, vol 21, No 3 (Mar 2000), pp 110–112

König et al, "Design Rules for n–Type SiGe Hetero FETs," *Solid State Electronics*, vol 41, No 10 (1997), pp. 1541–1547.

König et al, "p–Type Ge–Channel MODFET's with High Transconductance Grown on Si Substrates," *IEEE Electron Device Letters*, vol 14, No 4 (Apr. 1993), pp. 205–207

König et al, "SiGe HBTs and HFETs," *Solid–State Electronics*, vol 38, No. 9 (1995), pp. 1595–1602.

Kummer et al., "Low energy plasma enhanced chemical vapor deposition," *Materials Science and Engineering*, B89 (2002), pp 288–295

Kuznetsov et al, "Technology for high–performance n–channel SiGe modulation–doped field–effect transistors," *Journal of Vacuum Science and Technology*, B 13(6) (Nov./Dec 1995), pp 2892–2896.

Larson, "Integrated Circuit Technology Options for RFIC's Present Status and Future Directions," *IEEE Journal of Solid–State Circuits*, vol 33, No 3 (Mar. 1998), pp 387–399.

Lee et al, "CMOS RF Integrated Circuits at 5 GHz and Beyond," *Proceedings of the IEEE*, vol 88, No 10 (Oct. 2000), pp 1560–1571.

Lee et al, "Strained Ge channel p–type metal–oxide–semiconductor field–effect transistors grown on Sil–xGex/Si virtual substrates," *Applied Physics Letters*, vol 79, No 20 (Nov 12, 2001), pp 3344–3346.

Lee et al, "Strained Ge channel p–type MOSFETs fabricated on Sil–xGex/Si virtual substrates," *Materials Research Society Symposium Proceedings*, vol 686 (2002), pp. A1 9 1–A1.9 5

Leitz et al, "Channel Engineering of SiGe–Based Heterostructures for High Mobility MOSFETs," *Materials Research Society Symposium Proceedings*, vol. 686 (2002), pp. A3 10 1–A3 10 6

US 6,881,632 B2
Page 5

Leitz et al., "Dislocation glide and blocking kinetics in compositionally graded SiGe/Si," *Journal of Applied Physics*, vol 90, No 6 (Sep 15, 2001), pp 2730–2736

Leitz et al., "Hole mobility enhancements in strained Si/Si1–yGey p-type metal-oxide-semiconductor field-effect transistors grown on relaxed Si1–xGex (x<y) virtual substrates," *Applied Physics Letters*, vol. 79, No 25 (Dec. 17, 2001), pp 4246–4248

Li et al., "Design of high speed Si/SiGe heterojunction complementary metal-oxide-semiconductor field effect transistors with reduced short-channel effects," *Journal of Vacuum Science and Technology A*, vol. 20, No. 3 (May/Jun 2002), pp 1030–1033

Lu et al., "High Performance 0.1 μm Gate–Length P–Type SiGe MODFET's and MOS–MODFET's," *IEEE Transactions on Electron Devices*, vol. 47, No. 8 (Aug. 2000), pp 1645–1652

Maiti et al., "Strained–Si heterostructure field effect transistors," *Semiconductor Science and Technology*, vol. 13 (1998), pp 1225–1246

Maszara, "Silicon–On–Insulator by Wafer Bonding: A Review," *Journal of the Electrochemical Society*, No 1 (Jan. 1991), pp. 341–347.

Meyerson et al., "Cooperative Growth Phenomena in Silicon/Germanium Low–Temperature Epitaxy," *Applied Physics Letters*, vol. 53, No 25 (Dec 19, 1988), pp 2555–2557

Mizuno et al., "Advanced SOI–MOSFETs with Strained–Si Channel for High Speed CMOS–Electron/Hole Mobility Enhancement," 2002 Symposium on VLSI Technology, Honolulu (Jun 13–15), *IEEE New York*, pp. 210–211

Mizuno et al., "Electron and Hole Mobility Enhancement in Strained–Si MOSFET's on SiGe–on–Insulator Substrates Fabricated by SIMOX Technology," *IEEE Electron Device Letters*, vol. 21, No 5 (May 2000), pp 230–232.

Mizuno et al., "High Performance Strained–Si p–MOSFETs on SiGe–on–Insulator Substrates Fabricated by SIMOX Technology," *IEEE IDEM Technical Digest* (1999 International Electron Device Meeting), pp. 934–936

Nayak et al., "High–Mobility Strained–Si PMOSFET's," *IEEE Transactions on Electron Devices*, vol. 43, No. 10 (Oct 1996), pp. 1709–1716

O'Neill et al., "SiGe virtual substrate N–channel heterojunction MOSFETS," *Semiconductor Science and Technology*, vol 14 (1999), pp. 784–789

"Optimal Growth Technique and Structure for Strain Relaxation of Si–Ge Layers on Si Substrates," *IBM Technical Disclosure Bulletin*, vol. 32, No 8A (Jan 1990), pp. 330–331

Papananos, "Radio–Frequency Microelectronic Circuits for Telecommunication Applications," Kluwer Academic Publishers, 1999, pp. 115–117, 188–193.

Parker et al., "SiGe heterostructure CMOS circuits and applications," *Solid State Electronics*, vol 43 (1999), pp. 1497–1506

Ransom et al., "Gate–Self–Aligned n–channel and p–channel Germanium MOSFET's," *IEEE Transactions on Electron Devices*, vol. 38, No. 12 (Dec. 1991), pp. 2695.

Reinking et al., "Fabrication of high–mobility Ge p–channel MOSFETs on Si substrates," *Electronics Letters*, vol. 35, No. 6 (Mar. 18, 1999), pp. 503–504.

Rim et al., "Enhanced Hole Mobilities in Surface–Channel Strained–Si p–MOSFETs," *IEDM* (1995) pp. 517–520.

Rim et al., "Fabrication and Analysis of Deep Submicron Strained–Si N–MOSFET's," *IEEE Transactions on Electron Devices*, vol. 47, No. 7 (Jul. 2000), pp. 1406–1415

Rim, "Application of Silicon–Based Heterostructures to Enhanced Mobility Metal–Oxide–Semiconductor Field–Effect Transistors," PhD Thesis, Stanford University, 1999, pp. 1–184

Robbins et al., "A model for heterogeneous growth of Si1–xGex films for hydrides," *Journal of Applied Physics*, vol. 69, No 6 (Mar 15, 1991), pp. 3729–3732.

Sadek et al., "Design of Si/SiGe Heterojunction Complementary Metal–Oxide–Semiconductor Transistors," *IEEE Transactions on Electron Devices* (Aug. 1996), pp. 1224–1232.

Schäffler, "High–Mobility Si and Ge Structures," *Semiconductor Science and Technology*, vol. 12 (1997), pp 1515–1549

Sugimoto et al., "A 2V, 500 MHz and 3V, 920 MHz Low–Power Current–Mode 0.6 μm CMOS VCO Circuit," *IEICE Trans Electron*, vol. E82–C, No. 7 (Jul. 1999), pp. 1327–1329

Ternent et al., "Metal Gate Strained Silicon MOSFETs for Microwave Integrated Circuits," *IEEE* (Oct. 2000), pp 38–43

Tweet et al., "Factors determining the composition of strained GeSi layers grown with disilane and germane," *Applied Physics Letters*, vol. 65, No 20 (Nov. 14, 1994), pp. 2579–2581.

Usami et al., "Spectroscopic study of Si–based quantum wells with neighboring confinement structure," *Semiconductor Science and Technology*, (1997), abstract.

Welser et al., "Electron Mobility Enhancement in Strained–Si N–Type Metal–Oxide–Semiconductor Field–Effect Transistors," *IEEE Electron Device Letters*, vol. 15, No. 3 (Mar 1994), pp 100–102.

Welser et al., "Evidence of Real–Space Hot–Electron Transfer in High Mobility, Strained–Si Multilayer MOSFETs," *IEEE IDEM Technical Digest* (1993 International Electron Devices Meeting), pp. 545–548.

Welser et al., "NMOS and PMOS Transistors Fabricated in Strained Silicon/Relaxed Silicon–Germanium Structures," *IEEE IDEM Technical Digest* (1992 International Electron Devices Meeting), pp. 1000–1002.

Welser, "The Application of Strained Silicon/Relaxed Silicon Germanium Heterostructures to Metal–Oxide–Semiconductor Field–Effect Transistors," PhD Thesis, Stanford University, 1994, pp 1–205.

Wolf, et al., "Silicon Processing for the VLSI Era, vol. 1: Process Technology," Lattice Press, Sunset Beach, CA, 1986, pp. 384–386.

Xie et al., "Semiconductor Surface Roughness: Dependence on Sign and Magnitude of Bulk Strain," *The Physical Review Letters*, vol. 73, No. 22 (Nov. 28, 1994), pp. 3006–3009.

Xie et al., "Very High Mobility Two–Dimensional Hole Gas in Si/GexSi1–x/Ge Structures Grown by Molecular Beam Epitaxy," *Applied Physics Letters*, vol. 63, Issue 16 (Oct 18, 1993), pp. 2263–2264

Xie, "SiGe Field Effect Transistors," *Materials Science and Engineering*, vol. 25 (1999), pp. 89–121.

Yeo et al., "Nanoscale Ultra–Thin–Body Silicon–on–Insulator P–MOSFET with a SiGe/Si Heterostructure Channel," *IEEE Electron Device Letters*, vol. 21, No. 4 (Apr 2000), pp. 161–163.

US 6,881,632 B2

Page 6

Zhang et al., "Demonstration of a GaAs-Based Compliant Substrate Using Wafer Bonding and Substrate Removal Techniques," Electronic Materials and Processing Research Laboratory, Department of Electrical Engineering, University Park, PA 16802, 1998, pp. 25–28

"2 Bit/Cell EEPROM Cell Using Band to Band Tunneling for Data Read–Out," IBM Technical Disclosure Bulletin, vol. 35, No 4B (Sep 1992), pp. 136–140.

Grillot et al., "Acceptor diffusion and segregation in $(Al_xGa_{1-x})_{0.5}In_{0.5}P$ heterostructures," Journal of Applied Physics, vol. 91, No. 8 (2002), pp. 4891–4899.

Halsall et al., "Electron diffraction and Raman studies of the effect of substrate misorientation on ordering in the AlGaInP system," Journal of Applied Physics, vol. 85, No. 1 (1999), pp. 199–202.

Hsu et al., "Surface morphology of related $Ge_xSi_{1-x}$ films," Appl. Phys. Lett., vol. 61, No. 11 (1992), pp. 1293–1295

IBM Technical Disclosure Bulletin, vol. 32, No. 8A, Jan 1990, "Optimal Growth Technique and Structure for Strain Relaxation of Si–Ge Layers on Si Substrates", pp. 330–331

Ota, Y. et al., "Application of heterojunction FET to power amplifier for cellular telephone," Electronics Letters, vol. 30 No. 11 (May 26, 1994) pp. 906–907.

Sakaguchi et al., "ELTRAN® by Splitting Porous Si Layers," Proc. 195th Int. SOI Symposium, vol. 99–3, Electrochemical Society (1999) pp. 117–121

Gannavaram, et al., "Low Temperature ($\leqq800°$ C) Recessed Junction Selective Silicon–Germanium Source/Drain Technology for Sub–70 nm CMOS," IEEE International Electron Device Meeting Technical Digest, (2000), pp. 437–440

Ge et al., "Process–Strained Si (PSS) CMOS Technology Featuring 3D Strain Engineering," IEEE International Electron Device Meeting Technical Digest, (2003) pp. 73–76

Ghani et al., "A 90nm High Volume Manufacturing Logic Technology Featuring Novel 45nm Gate Length Strained Silicon CMOS Transistors," IEEE International Electron Devices Meeting Technical Digest, (2003), 978–980.

Hamada et al., "A New Aspect of Mechanical Stress Effects in Scaled MOS Devices," IEEE Transactions on Electron Devices, vol. 38, No. 4 (Apr 1991), pp. 895–900

Huang et al., "Isolation Process Dependence of Channel Mobility in Thin–Film SOI Devices," IEEE Electron Device Letters, vol. 17, No. 6 (Jun 1996), pp. 291–293.

Huang et al., "LOCOS–Induced Stress Effects on Thin–Film SOI Devices," IEEE Transactions on Electron Devices, vol 44, No. 4 (Apr. 1997), pp 646–650.

Huang, et al., "Reduction of Source/Drain Series Resistance and Its Impact on Device Performance for PMOS Transistors with Raised $Si_{1-x}Ge_x$ Source/Drain", IEEE Electron Device Letters, vol 21, No. 9, (Sep. 2000) pp 448–450.

Iida et al., "Thermal behavior of residual strain in silicon–on–insulator bonded wafer and effects on electron mobility," Solid–State Electronics, vol 43 (1999), pp 1117–1120.

Ito et al., "Mechanical Stress Effect on Etch–Stop Nitride and its Impact on Deep Submicron Transistor Design," IEEE International Electron Devices Meeting Technical Digest (2000), pp. 247–250.

Lochtefeld et al., "Investigating the Relationship Between Electron Mobility and Velocity in Deeply Scaled NMOS via Mechanical Stress," IEEE Electron Device Letters, vol. 22, No. 12 (2001), pp. 591–593.

Ootsuka et al., "A Highly Dense, High–Performance 130nm node CMOS Technology for Large Scale System–on–a–Chip Applications," IEEE International Electron Devices Meeting Technical Digest, (2000), pp. 575–578.

Ota et al., "Novel Locally Strained Channel Technique for High Performance 55nm CMOS," IEEE International Electron Devices Meeting Technical Digest, (2002), pp. 27–30.

Öztürk, et al., "Advanced $Si_{1-x}Ge_x$ Source/Drain and Contact Technologies for Sub–70 nm CMOS," IEEE International Electron Device Meeting Technical Digest, (2002), pp. 375–378

Öztürk, et al., "Ultra–Shallow Source/Drain Junctions for Nanoscale CMOS Using Selective Silicon–Germanium Technology," Extended Abstracts of International Workshop on Junction Technology, (2001), pp. 77–82

Öztürk, et al., "Selective Silicon–Germanium Source/Drain Technology for Nanoscale CMOS," Mat. Res. Soc. Symp. Proc., vol. 717, (2002), pp. C4.1.1–C4.1.12.

Öztürk, et al., "Low Resistivity Nickel Germanosilicide Contacts to Ultra–Shallow $Si_{1-x}Ge_x$ Source/Drain Junctions for Nanoscale CMOS," IEEE International Electron Device Meeting Technical Digest (2003), pp. 497–500.

Shimizu et al., "Local Mechanical–Stress Control (LMC): A New Technique for CMOS–Performance Enhancement," IEEE International Electron Devices Meeting Technical Digest, (2001), pp. 433–436

Thompson et al., "A Logic Nanotechnology Featuring Strained–Silicon," IEEE Electron Device Letters, vol. 25, No. 4 (Apr. 2004), pp. 191–193.

Thompson et al., "A 90 nm Logic Technology Featuring 50nm Strained–Silicon Channel Transistors, 7 layers of Cu Interconnects, Low k ILD, and 1 um$^2$ SRAM Cell," IEEE International Electron Devices Meeting Technical Digest, (2002), pp. 61–64

Tiwari et al., "Hole Mobility Improvement in Silicon–on–Insulator and Bulk Silicon Transistors Using Local Strain," IEEE International Electron Devices Meeting Technical Digest, (1997), pp. 939–941.

Uchino, et al., "A Raised Source/Drain Technology Using In–situ P–doped SiGe and B–doped Si for 0.1–$\mu m$ CMOS ULSIs," IEEE International Electron Device Meeting Technical Digest, (1997), pp. 479–482

* cited by examiner



FIG. 1

**U.S. Patent**　　Apr. 19, 2005　　Sheet 2 of 13　　US 6,881,632 B2



FIG. 2A



FIG. 2B

| TYPE OF SURFACE | AVERAGE ROUGHNESS (nm) |
|---|---|
| AS-GROWN GRADED COMPOSITION RELAXED SiGe | 7.9 |
| PLANARIZED SiGe | 0.57 |
| REGROWTH SiGe | -0.6 |

FIG. 3



**FIG. 4**

**U.S. Patent**      Apr. 19, 2005      **Sheet 5 of 13**      **US 6,881,632 B2**



**FIG. 5A**



**FIG. 5B**

**U.S. Patent**     Apr. 19, 2005     Sheet 6 of 13        US 6,881,632 B2

|  | n ENHANCEMENT | p ENHANCEMENT |
|---|---|---|
| $Si_{0.8}Ge_{0.2}$ | 1.75 | 1 |
| $Si_{0.7}Ge_{0.3}$ | 1.8 | 1.4 |

FIG. 6

**U.S. Patent**       Apr. 19, 2005       Sheet 7 of 13       US 6,881,632 B2

| | BULK SILICON | STRAINED-Si ON 20% SiGe: HIGH SPEED | STRAINED-Si ON 30% SiGe: HIGH SPEED | STRAINED-Si ON 20% SiGe: LOW POWER | STRAINED-Si ON 30% SiGe: LOW POWER |
|---|---|---|---|---|---|
| n ENHANCEMENT | 1 | 1.75 | 1.8 | 1.75 | 1.8 |
| p ENHANCEMENT | 1 | 1 | 1.4 | 1 | 1.4 |
| $W_p$ (μm) | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 |
| $W_n$ (μm) | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 |
| $L_n, L_p$ (μm) | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 |
| $C_L$ (fF) | 32 | 32 | 32 | 32 | 32 |
| $V_{DD}$ (V) | 5 | 4.7 | 4.4 | 4.3 | 3.8 |
| $NM_H$ (V) | 2.053 | 2.218 | 1.949 | 2.037 | 1.682 |
| $NM_L$ (V) | 2.067 | 1.654 | 1.721 | 1.542 | 1.504 |
| $t_{PHL}$ (psec) | 211.3 | 133.7 | 141.6 | 152.2 | 180.1 |
| $t_{PLH}$ (psec) | 195.8 | 220.0 | 173.3 | 254.8 | 226.9 |
| $t_p$ (psec) | 203.5 | 176.9 | 157.4 | 203.5 | 203.5 |
| POWER (mW) | 3.93 | 3.93 | 3.93 | 2.87 | 2.21 |
| % SPEED INCREASE | - | 15.1% | 29.3% | - | - |
| % POWER REDUCTION | - | - | - | 27 0% | 43 7% |

FIG. 7

| | BULK SILICON | STRAINED-Si ON 20% SiGe: CONSTANT $V_{DD}$ | STRAINED-Si ON 30% SiGe: CONSTANT $V_{DD}$ | STRAINED-Si ON 20% SiGe: HIGH SPEED SYMMETRICAL INVERTER | STRAINED-Si ON 30% SiGe: HIGH SPEED SYMMETRICAL INVERTER | STRAINED-Si ON 20% SiGe: LOW POWER SYMMETRICAL INVERTER | STRAINED-Si ON 30% SiGe: LOW POWER SYMMETRICAL INVERTER |
|---|---|---|---|---|---|---|---|
| n ENHANCEMENT | 1 | 1.75 | 1.8 | 1.75 | 1.8 | 1.75 | 1.8 |
| p ENHANCEMENT | 1 | 1 | 1.4 | 1 | 1.4 | 1 | 1.4 |
| $W_p$ ($\mu$m) | 5.4 | 5.4 | 5.4 | 9.45 | 6.94 | 9.45 | 6.94 |
| $W_n$ ($\mu$m) | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 |
| $L_n$-$L_p$ ($\mu$m) | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 |
| $C_L$ (fF) | 32 | 32 | 32 | 32 | 32 | 32 | 32 |
| $V_{DD}$ (V) | 5 | 5 | 5 | 4.3 | 4.2 | 3.5 | 3.5 |
| $NM_H$ (V) | 2.053 | 2.376 | 2.198 | 1.782 | 1.770 | 1.5018 | 1.4796 |
| $NM_L$ (V) | 2.067 | 1.751 | 1.923 | 1.794 | 1.781 | 1.5101 | 1.4876 |
| $t_{pHL}$ (psec) | 211.3 | 120.7 | 117.4 | 152.0 | 149.5 | 204.4 | 204.1 |
| $t_{pLH}$ (psec) | 195.8 | 195.8 | 139.9 | 145.4 | 143.3 | 202.6 | 202.9 |
| $t_p$ (psec) | 203.5 | 168.3 | 128.6 | 148.7 | 146.4 | 203.5 | 203.5 |
| POWER (mW) | 3.93 | 5.06 | 6.22 | 3.93 | 3.93 | 1.95 | 1.89 |
| % SPEED INCREASE | - | 28.6% | 58.3% | 36.9% | 39.0% | - | - |
| % POWER REDUCTION | - | - | - | - | - | 50.4% | 52.0% |

FIG. 8

**U.S. Patent**        Apr. 19, 2005        Sheet 9 of 13        US 6,881,632 B2

| | BULK SILICON | STRAINED-Si ON 20% SiGe: HIGH SPEED | STRAINED-Si ON 30% SiGe: HIGH SPEED | STRAINED-Si ON 20% SiGe: LOW POWER | STRAINED-Si ON 30% SiGe: LOW POWER |
|---|---|---|---|---|---|
| n ENHANCEMENT | 1 | 1.75 | 1.8 | 1.75 | 1.8 |
| p ENHANCEMENT | 1 | 1 | 1.4 | 1 | 1.4 |
| $W_p$ (μm) | 3.11 | 4.12 | 3.53 | 4.12 | 3.53 |
| $W_n$ (μm) | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 |
| $L_n, L_p$ (μm) | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 |
| $C_L$ (fF) | 22.5 | 26.7 | 24.2 | 26.7 | 24.2 |
| $V_{DD}$ (V) | 5 | 4.5 | 4.3 | 4.4 | 3.8 |
| $NM_H$ (V) | 2.370 | 2.275 | 2.123 | 2.220 | 1.872 |
| $NM_L$ (V) | 1.756 | 1.485 | 1.511 | 1.458 | 1.371 |
| $t_{pHL}$ (psec) | 148.4 | 117.3 | 109.3 | 121.5 | 132.4 |
| $t_{pLH}$ (psec) | 238.5 | 254.8 | 204.9 | 265.3 | 254.4 |
| $t_p$ (psec) | 193.4 | 186.0 | 157.1 | 193.4 | 193.4 |
| POWER (mW) | 2.90 | 2.90 | 2.90 | 2.66 | 1.83 |
| % SPEED INCREASE | - | 4 0% | 23 1% | - | - |
| % POWER REDUCTION | - | - | - | 8.4% | 37 1% |

FIG. 9



**FIG. 10**



FIG. 11



FIG. 12A

FIG. 12B

FIG. 12C

FIG. 12D

FIG. 12E



**FIG. 13A**                    **FIG. 13B**



**FIG. 13C**

US 6,881,632 B2

1

## METHOD OF FABRICATING CMOS INVERTER AND INTEGRATED CIRCUITS UTILIZING STRAINED SURFACE CHANNEL MOSFETS

### PRIORITY INFORMATION

This is a continuation of U.S. Ser. No. 09/884,172, filed on Jun. 19, 2001, now U.S. Pat. No. 6,649,480, and which claims priority from provisional application Ser. No 60/250, 985, filed Dec. 4, 2000

### BACKGROUND OF THE INVENTION

The invention relates to the field of strained silicon surface channel MOSFETs, and in particular to using them in CMOS inverters and other integrated circuits

The ability to scale CMOS devices to smaller and smaller dimensions has enabled integrated circuit technology to experience continuous performance enhancement Since the 1970's, gate lengths have decreased by two orders of magnitude, resulting in a 30% improvement in the price/ performance per year Historically, these gains have been dictated by the advancement of optical photolithography tools and photoresist materials. As CMOS device size progresses deeper and deeper into the sub-micron regime, the associated cost of these new tools and materials can be prohibitive. A state of the art CMOS facility can cost more than 1–2 billion dollars, a daunting figure considering that the lithography equipment is generally only useful for two scaling generations

In addition to economic constraints, scaling is quickly approaching constraints of device materials and design. Fundamental physical limits such as gate oxide leakage and source/drain extension resistance make continued minimization beyond 0 1 $\mu$m difficult if not impossible to maintain New materials such as high k dielectrics and metal gate electrodes must be introduced in order to sustain the current roadmap until 2005 Beyond 2005, the fate of scaling is unclear

Since the limits of scaling are well within sight, researchers have actively sought other methods of increasing device performance One alternative is to make heterostructure FETs in GaAs/AlGaAs in order to take advantage of the high electron mobilities in these materials However, the high electron mobility in GaAs is partially offset by the low hole mobility, causing a problem for complementary FET architectures. In addition, GaAs devices are usually fabricated with Schottky gates Schottky diodes have leakage currents that are orders of magnitudes higher than MOS structures The excess leakage causes an increase in the off-state power consumption that is unacceptable for highly functional circuits Schottky diodes also lack the self-aligned gate technology enjoyed by MOS structures and thus typically have larger gate-to-source and gate-to-drain resistances. Finally, GaAs processing does not enjoy the same economies of scale that have caused silicon technologies to thrive As a result, wide-scale production of GaAs circuits would be extremely costly to implement

The most popular method to increase device speed at a constant gate length is to fabricate devices on silicon-on-insulator (SOI) substrates In an SOI device, a buried oxide layer prevents the channel from fully depleting Partially depleted devices offer improvements in the junction area capacitance, the body effect, and the gate-to-body coupling. In the best-case scenario, these device improvements will result in an 18% enhancement in circuit speed

2

However, this improved performance comes at a cost The partially depleted floating body causes an uncontrolled lowering of the threshold voltage, known as the floating body effect This phenomenon increases the off-state leakage of the transistor and thus offsets some of the potential performance advantages Circuit designers must extract enhancements through design changes at the architectural level This redesign can be costly and thus is not economically advantageous for all Si CMOS products Furthermore, the reduced junction capacitance of SOI devices is less important for high functionality circuits where the interconnect capacitance is dominant As a result, the enhancement offered by SOI devices is limited in its scope.

Researchers have also investigated the mobility enhancement in strained silicon as a method to improve CMOS performance To date, efforts have focused on circuits that employ a buried channel device for the PMOS, and a surface channel device for the NMOS This method provides the maximum mobility enhancement; however, at high fields the buried channel device performance is complex due to the activation of two carrier channels. In addition, monolithic buried and surface channel CMOS fabrication is more complex than bulk silicon processing. This complexity adds to processing costs and reduces the device yield

### SUMMARY OF THE INVENTION

In accordance with the invention, the performance of a silicon CMOS inverter by increasing the electron and hole mobilities is enhanced. This enhancement is achieved through surface channel, strained-silicon epitaxy on an engineered SiGe/Si substrate. Both the n-type and p-type channels (NMOS and PMOS) are surface channel, enhancement mode devices The technique allows inverter performance to be improved at a constant gate length without adding complexity to circuit fabrication or design

When silicon is placed under tension, the degeneracy of the conduction band splits forcing two valleys to be occupied instead of six. As a result, the in-plane, room temperature electron mobility is dramatically increased, reaching a value as high as 2900 cm$^2$/V-sec in buried channel devices for electrons densities of 10$^{11}$–10$^{12}$ cm$^{-2}$. Mobility enhancement can be incorporated into a MOS device through the structure of the invention. In the structure, a compositionally graded buffer layer is used to accommodate the lattice mismatch between a relaxed SiGe film and a Si substrate. By spreading the lattice mismatch over a distance, the graded buffer minimizes the number of dislocations reaching the surface and thus provides a method for growing high-quality relaxed SiGe films on Si. Subsequently, a silicon film below the critical thickness can be grown on the SiGe film Since the lattice constant of SiGe is larger than that of Si, the Si film is under biaxial tension and thus the carriers exhibit strain-enhanced mobilities.

There are two primary methods of extracting performance enhancement from the increased carrier mobility. First, the frequency of operation can be increased while keeping the power constant The propagation delay of an inverter is inversely proportional to the carrier mobility. Thus, if the carrier mobility is increased, the propagation delay decreases, causing the overall device speed to increase This scenario is useful for applications such as desktop computers where the speed is more crucial than the power consumption Second, the power consumption can be decreased at a constant frequency of operation When the carrier mobility increases, the gate voltage can be reduced by an inverse fraction while maintaining the same inverter speed Since

US 6,881,632 B2

**3**

power is proportional to the square of the gate voltage, this reduction results in a significant decrease in the power consumption. This situation is most useful for portable applications that operate off of a limited power supply

Unlike GaAs high mobility technologies, strained silicon devices can be fabricated with standard silicon CMOS processing methods and tools. This compatibility allows for performance enhancement with no additional capital expenditures. The technology is also scalable and thus can be implemented in both long and short channel devices. The physical mechanism behind short channel mobility enhancement is not completely understood; however it has been witnessed and thus can be used to improve device performance Furthermore, if desired, strained silicon can be incorporated with SOI technology in order to provide ultra-high speed/low power circuits. In summary, since strained silicon technology is similar to bulk silicon technology, it is not exclusive to other enhancement methods. As a result, strained silicon is an excellent technique for CMOS performance improvement.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a cross-section of the substrate structure required to produce a strained silicon surface channel MOSFET;

FIGS. 2A and 2B are graphs of mobility enhancements for electrons and holes, respectively, for strained silicon on $Si_{1-x}Ge_x$ for x=10–30%;

FIG. 3 is a table that displays surface roughness data for various relaxed SiGe buffers on Si substrates;

FIG. 4 is a schematic diagram of a CMOS inverter;

FIGS. 5A and 5B are schematic diagrams of the structures of a strained silicon MOSFET **500** and a strained silicon MOSFET **550** on SOI, respectively;

FIG. 6 is a table showing electron and hole mobility enhancements measured for strained silicon on 20% and 30% SiGe;

FIG. 7 is a table showing inverter characteristics for 1.2 $\mu m$ CMOS fabricated in both bulk and strained silicon when the interconnect capacitance is dominant;

FIG. 8 is a table showing additional scenarios for strained silicon inverters when the interconnect capacitance is dominant;

FIG. 9 is a table showing inverter characteristics for 1.2 $\mu m$ CMOS fabricated in both bulk and strained silicon when the device capacitance is dominant;

FIG. 10 is a graph showing NMOSFET transconductance versus channel length for various carrier mobilities;

FIG. 11 is a graph showing the propagation delay of a 0.25 $\mu m$ CMOS inverter for a range of electron and hole mobility enhancements;

FIGS. 12A–12H show a fabrication process sequence for strained silicon on SOI substrates; and

FIGS. 13A–13C are circuit schematics for a NOR gate, a NAND gate and a XOR gate, respectively

DETAILED DESCRIPTION OF THE INVENTION

Strained Silicon Enhancement

FIG. 1 is a cross-section of the substrate structure **100** required to produce a strained silicon surface channel MOSFET. The larger lattice constant, relaxed SiGe layer applies biaxial strain to the silicon surface layer. In this structure, a compositionally graded buffer layer **102** is used to accommodate the lattice mismatch between a relaxed SiGe film

**4**

**106** and a Si substrate **104** By spreading the lattice mismatch over a distance, the graded buffer minimizes the number of dislocations reaching the surface and thus provides a method for growing high-quality relaxed SiGe films on Si Subsequently, a silicon film **108** below the critical thickness can be grown on the SiGe film. Since the lattice constant of SiGe is larger than that of Si, the Si film is under biaxial tension and thus the carriers exhibit strain-enhanced mobilities Thereafter, a layer **110** of $SiO_2$ and a gate **112** are provided thereon

In the structure shown in FIG. 1, the silicon channel is placed under biaxial tension by the underlying, larger lattice constant SiGe layer. This strain causes the conduction band to split into two-fold and four-fold degenerate bands. The two-fold band is preferentially occupied since it sits at a lower energy The energy separation between the bands is approximately:

$$\Delta E_{strain} = 0.67 \, x(eV) \tag{1}$$

where x is equal to the Ge content in the SiGe layer. The equation shows that the band splitting increases as the Ge content increases This splitting causes mobility enhancement by two mechanisms. First, the two-fold band has a lower effective mass, and thus higher mobility than the four-fold band Therefore, as the higher mobility band becomes energetically preferred, the average carrier mobility increases Second, since the carriers are occupying two orbitals instead of six, inter-valley phonon scattering is reduced, further enhancing the carrier mobility.

The effects of Ge concentration on electron and hole mobility for a surface channel device can be seen in FIGS. 2A and 2B, respectively. FIGS. 2A and 2B are graphs of mobility enhancements for electrons and holes, respectively, for strained silicon on $Si_{1-x}Ge_x$ for x=10–30%. At 20% Ge, the electron enhancement at high fields is approximately 1.75 while the hole enhancement is essentially negligible. Above approximately 20% Ge, the electron enhancement saturates This saturation occurs because the conduction band splitting is large enough that almost all of the electrons occupy the high mobility band. Hole enhancement saturation has not yet been observed; therefore, raising the Ge concentration to 30% increases hole mobility by a factor of 1.4 Hole enhancement saturation is predicted to occur at a Ge concentration of about 40%.

The low hole mobility in surface channel devices has caused other researchers to move to higher mobility, buried channel devices for the PMOSFET. Here, it is shown that significant CMOS enhancement can be achieved using surface channel devices for both NMOS and PMOS This design allows for high performance without the complications of dual channel operation and without adding complexity to circuit fabrication

Until recently, the material quality of relaxed SiGe on Si was insufficient for utilization in CMOS fabrication During epitaxial growth, the surface of the SiGe becomes very rough as the material is relaxed via dislocation introduction. Researchers have tried to intrinsically control the surface morphology through the growth; however, since the stress fields from the misfit dislocations affect the growth front, no intrinsic epitaxial solution is possible. U.S. Pat. No. 6,107,653 issued to Fitzgerald, incorporated herein by reference, describes a method of planarization and regrowth that allows all devices on relaxed SiGe to possess a significantly flatter surface This reduction in surface roughness is critical in the production of strained Si CMOS devices since it increases the yield for fine-line lithography

FIG. 3 is a table that displays surface roughness data for various relaxed SiGe buffers on Si substrates. It will be

US 6,881,632 B2

5

appreciated that the as-grown crosshatch pattern for relaxed $Si_{0.8}Ge_{0.2}$ buffers creates a typical roughness of approximately 7.9 nm. This average roughness increases as the Ge content in the relaxed buffer is increased. Thus, for any relaxed SiGe layer that is relaxed through dislocation introduction during growth, the surface roughness is unacceptable for state-of-the-art fabrication facilities. After the relaxed SiGe is planarized, the average roughness is less than 1 nm (typically 0.57 nm), and after a 1.5 $\mu m$ device layer deposition, the average roughness is 0.77 nm. Therefore, after the complete structure is fabricated, there is over an order of magnitude reduction in the surface roughness. The resulting high quality material is well suited for state of the art CMOS processing.

CMOS Inverter

FIG. 4 is a schematic diagram of a CMOS inverter 400. When the input voltage, $V_{in}$, to the inverter is low, a PMOS transistor 402 turns on, charges up a load capacitance 404, and the output goes to a gate drive 406, $V_{DD}$. Alternatively, when $V_{in}$ is high, an NMOS transistor 408 turns on, discharges the load capacitance, and the output node goes to ground 410. In this manner, the inverter is able to perform the logic swing necessary for digital processing. The load capacitance, denoted as $C_L$, represents a lumped model of all of the capacitances between $V_{out}$ and ground.

Since the load capacitance must be fully charged or discharged before the logic swing is complete, the magnitude of $C_L$ has a large impact on inverter performance. The performance is usually quantified by two variables: the propagation delay, $t_p$, and the power consumed, P. The propagation delay is defined as how quickly a gate responds to a change in its input and is given by:

$$t_p = \frac{C_L \cdot V_{DD}}{I_{av}} \qquad (2)$$

where $I_{av}$ is the average current during the voltage transition. There is a propagation delay term associated with the NMOS discharging current, $t_{pHL}$, and a term associated with the PMOS charging current, $t_{pLH}$. The average of these two values represents the overall inverter delay:

$$t_p = \frac{t_{pHL} + t_{pLH}}{2} \qquad (3)$$

Assuming that static and short-circuit power are negligible, the power consumed can be written as:

$$P = \frac{C_L \cdot V_{DD}^2}{t_p} \qquad (4)$$

From equations 2 and 4, one can see that both the propagation delay and the power consumption have a linear dependence on the load capacitance. In an inverter, $C_L$ consists of two major components: interconnect capacitance and device capacitance. Which component dominates $C_L$ depends on the architecture of the circuit in question.

Strained Silicon, Long Channel CMOS Inverter

FIGS. 5A and 5B are schematic diagrams of the structures of a strained silicon MOSFET 500 and a strained silicon MOSFET 550 on SOI, respectively. The structure in FIG. 5A contains the elements shown in the substrate structure of FIG. 1 along with basic elements of the MOSFET device structure, i.e. source 513 and drain 514 regions, gate oxide 510 and gate 512 layers, and device isolation regions 516

6

FIG. 5B shows the same device elements on a SiGe-on-insulator (SGOI) substrate. In the SGOI substrate, a buried oxide layer 518 separates the relaxed SiGe layer 506 from the underlying Si substrate 504. In both MOSFET structures, the strained Si layer 508 serves as the carrier channel, thus enabling improved device performance over their bulk Si counterparts.

When strained silicon is used as the carrier channel, the electron and hole mobilities are multiplied by enhancement factors. FIGS. 2A and 2B demonstrate that this enhancement differs for electrons and holes and also that it varies with the Ge fraction in the underlying SiGe layer.

A summary of the enhancements for $Si_{0.8}Ge_{0.2}$ and $Si_{0.7}Ge_{0.3}$ is shown in FIG. 6. FIG. 6 is a table showing electron and hole mobility enhancements measured for strained silicon on 20% and 30% SiGe. These enhancements are incorporated into 1.2 $\mu m$ CMOS models in order to quantify the effects on inverter performance. The mobility enhancement can be capitalized upon in two primary ways: 1) increase the inverter speed at a constant power and 2) reduce the inverter power at a constant speed. These two optimization methods are investigated for both a wiring capacitance dominated case and a device capacitance dominated case.

Interconnect Dominated Capacitance

In high performance microprocessors, the interconnect or wiring capacitance is often dominant over the device capacitance. In this scenario, standard silicon PMOS devices are made two to three times wider than their NMOS counterparts. This factor comes from the ratio of the electron and hole mobilities in bulk silicon. If the devices were of equal width, the low hole mobility would cause the PMOS device to have an average current two to three times lower than the NMOS device. Equation 2 shows that this low current would result in a high $t_{pLH}$ and thus cause a large gate delay. Increasing the width of the PMOS device equates the high-to-low and low-to-high propagation delays and thus creates a symmetrical, high-speed inverter.

Key values for a bulk silicon, 1.2 $\mu m$ symmetrical inverter are shown in FIG. 7. FIG. 7 is a table showing inverter characteristics for 1.2 $\mu m$ CMOS fabricated in both bulk and strained silicon when the interconnect capacitance is dominant. The strained silicon inverters are optimized to provide high speed at constant power and low power at constant speed. The propagation delay for the bulk silicon inverter is 204 psec and the consumed power is 3.93 mW. In an application where speed is paramount, such as in desktop computing, strained silicon provides a good way to enhance the circuit speed. Assuming no change from the bulk silicon design, a strained silicon inverter on $Si_{0.8}Ge_{0.2}$ results in a 15% speed increase at constant power. When the channel is on $Si_{0.7}Ge_{0.3}$, the speed enhancement improves to 29% (FIG. 7)

The improvement in inverter speed expected with one generation of scaling is approximately 15% (assumes an 11% reduction in feature size). Thus, the speed enhancement provided by a strained silicon inverter on 20% SiGe is equal to one scaling generation, while the speed enhancement provided by 30% SiGe is equivalent to two scaling generations.

Alternatively, reducing the gate drive, $V_{DD}$, can reduce the power at a constant speed. For 20% SiGe, the power consumption is 27% lower than its bulk silicon counterpart. When 30% SiGe is used, the power is reduced by 44% from the bulk silicon value (FIG. 7). This power reduction is important for portable computing applications such as laptops and handhelds.

US 6,881,632 B2

7

Equation 4 shows that if $C_L$ is constant and $t_p$ is reduced, $V_{DD}$ must decrease to maintain the same inverter power If the power consumption is not critical, the inverter frequency can be maximized by employing strained silicon devices at the same $V_{DD}$ as bulk Si devices As described heretofore above, in a constant power scenario, the inverter speed is increased 15% for Si on $Si_{0.8}Ge_{0.2}$ and 29% for Si on $Si_{0.7}Ge_{0.3}$. When $V_{DD}$ is held constant, this enhancement increases to 29% and 58%, for Si on $Si_{0.8}Ge_{0.2}$ and $Si_{0.7}Ge_{0.3}$, respectively FIG 8 is a table showing additional scenarios for strained silicon inverters on 20% and 30% SiGe when the interconnect capacitance is dominant. Parameters are given for 1) strained silicon inverters with the same $V_{DD}$ as comparable bulk silicon inverters 2) symmetrical strained silicon inverters—designed for high speed and 3) symmetrical strained silicon inverters designed for low power

One drawback of strained silicon, surface channel CMOS is that the electron and hole mobilities are unbalanced further by the uneven electron and hole enhancements This unbalance in mobility translates to an unbalance in the noise margins of the inverter The noise margins represent the allowable variability in the high and low inputs to the inverter. In bulk silicon microprocessors, both the low and high noise margins are about 2.06 V For strained silicon on 20% and 30% SiGe, the low noise margin, $NM_L$, is decreased to 1 65 V and 1 72 V, respectively While the $NM_L$ is reduced, the associated $NM_H$ is increased Therefore, if the high input is noisier than the low input, the asymmetric noise margins may be acceptable or even desired.

However, if a symmetrical inverter is required, the PMOS device width must be increased to $\mu_n/\mu_p$ times the NMOS device width. This translates to a 75% increase in PMOS width for $Si_{0.8}Ge_{0.2}$ and a 29% increase for $S_{0.7}Ge_{0.3}$. If the circuit capacitance is dominated by interconnects, the increased device area will not cause a significant increase in $C_L$. As a result, if the increased area is acceptable for the intended application, inverter performance can be further enhanced In the constant power scenario, the speed can now be increased by 37% for $Si_{0.8}Ge_{0.2}$ and by 39% for $Si_{0.7}Ge_{0.3}$. When the power is reduced for a constant frequency, a 50% and 52% reduction in consumed power is possible with 20% and 30% SiGe, respectively (FIG 8) However, in many applications an increase in device area is not tolerable In these situations if inverter symmetry is required, it is best to use strained silicon on 30% SiGe Since the electron and hole enhancement is comparable on $Si_{0.7}Ge_{0.3}$, it is easier to trade-off size for symmetry to meet the needs of the application

Non-Interconnect Dominant Capacitance

The device capacitance is dominant over the wiring capacitance in many analog applications The device capacitance includes the diffusion and gate capacitance of the inverter itself as well as all inverters connected to the gate output, known as the fan-out. Since the capacitance of a device depends on its area, PMOS upsizing results in an increase in $C_L$. If inverter symmetry is not a prime concern, reducing the PMOS device size can increase the inverter speed. This PMOS downsizing has a negative effect on $t_{pLH}$ but has a positive effect on $t_{pHL}$. The optimum speed is achieved when the ratio between PMOS and NMOS widths is set to $\sqrt{\mu_n/\mu_p}$, where $\mu_n$ and $\mu_p$ represent the electron and hole mobilities, respectively The optimized design has a propagation delay as much as 5% lower than the symmetrical design. The down side is that making $t_{pLH}$ and $t_{pHL}$ unbalanced reduces the low noise margin by approximately 15%. In most designs, this reduced $NM_L$ is still acceptable.

8

FIG. 9 is a table showing inverter characteristics for 1 2 $\mu m$ CMOS fabricated in both bulk and strained silicon when the device capacitance is dominant. The strained silicon inverters are optimized to provide high speed at constant power and low power at constant speed. For strained silicon on $Si_{0.8}Ge_{0.2}$, the electron mobility is a factor of 5 25 higher than the hole mobility. When the PMOS width is re-optimized to accommodate these mobilities, i.e., by using the $\sqrt{\mu_n/\mu_p}$ optimization, the strained silicon PMOS device on $Si_{0.8}Ge_{0.2}$ is over 30% wider than the bulk Si PMOS device

The resulting increase in capacitance offsets some of the advantages of the enhanced mobility Therefore, only a 4% speed increase occurs at constant power, and only an 8% decrease in power occurs at constant speed (FIG. 9). Although these improvements are significant, they represent a fraction of the performance improvement seen with a generation of scaling and do not surpass the performance capabilities available with SOI architectures.

In contrast, strained silicon on $Si_{0.7}Ge_{0.3}$ offers a significant performance enhancement at constant gate length for circuits designed to the $\sqrt{\mu_n/\mu_p}$ optimization. Since the electron and hole mobilities are more balanced, the effect on the load capacitance is less substantial. As a result, large performance gains can be achieved At constant power, the inverter speed can be increased by over 23% and at constant speed, the power can be reduced by over 37% (FIG. 9). The latter enhancement has large implications for portable analog applications such as wireless communications

As in the microprocessor case (interconnect dominated), the strained silicon devices suffer from small low noise margins. Once again, this effect can be minimized by using 30% SiGe If larger margins are required, the PMOS device width can be increased to provide the required symmetry However, this PMOS upsizing increases $C_L$ and thus causes an associated reduction in performance. Inverter design must be tuned to meet the specific needs of the intended application

Short Channel CMOS Inverter

In short channel devices, the lateral electric field driving the current from the source to the drain becomes very high As a result, the electron velocity approaches a limiting value called the saturation velocity, $v_{sat}$. Since strained silicon provides only a small enhancement in $v_{sat}$ over bulk silicon, researchers believed that strained silicon would not provide a performance enhancement in short channel devices However, recent data shows that transconductance values in short channel devices exceed the maximum value predicted by velocity saturation theories FIG 10 is a graph showing NMOSFET transconductance versus channel length for various carrier mobilities. The dashed line indicates the maximum transconductance predicted by velocity saturation theories The graph shows that high low-field mobilities translate to high high-field mobilities The physical mechanism for this phenomenon is still not completely understood; however, it demonstrates that short channel mobility enhancement can occur in strained silicon

The power consumed in an inverter depends on both $V_{DD}$ and $t_p$ (equation 4). Therefore, as $t_p$ is decreased due to mobility enhancement, $V_{DD}$ must also be decreased in order to maintain the same power consumption In a long channel device, the average current, $I_{avg}$, is proportional to $V_{DD}^2$. Inserting this dependence into equation 2 reveals an inverse dependence of the propagation delay on $V_{DD}$ Thus, as the average current in strained silicon is increased due to mobility enhancement, the effect on the propagation delay is somewhat offset by the reduction in $V_{DD}$.

US 6,881,632 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

A comparison of the high-speed scenario in FIG. 7 to the constant $V_{DD}$ scenario in FIG. 8 reveals the effect the reduced $V_{DD}$ has on speed enhancement. In a short channel device, the average current is proportional to $V_{DD}$ not $V_{DD}^2$, causing the propagation delay to have no dependence on $V_{DD}$ (assuming $V_{DD} >> V_T$). As a result, mobility enhancements in a short channel, strained silicon inverter are directly transferred to a reduction in $t_p$. A 1.2 μm strained silicon inverter on 30% SiGe experiences a 29% increase in device speed for the same power. Assuming the same levels of enhancement, a short channel device experiences a 58% increase in device speed for constant power, double the enhancement seen in the long channel device.

FIG. 11 is a graph showing the propagation delay of a 0.25 μm CMOS inverter for a range of electron and hole mobility enhancements. Although the exact enhancements in a short channel device vary with the fabrication processes, FIG. 11 demonstrates that even small enhancements can result in a significant effect on $t_p$.

Strained Silicon on SOI

Strained silicon technology can also be incorporated with SOI technology for added performance benefits. FIGS. 12A–12E show a fabrication process sequence for strained silicon on SOI substrates. First, a SiGe graded buffer layer 1202 is grown on a silicon substrate 1200 with a uniform relaxed SiGe cap layer 1204 of the desired concentration (FIG. 12A). This wafer is then bonded to a silicon wafer 1206 oxidized with a SiO₂ layer 1208 (FIGS. 12B–12C). The initial substrate and graded layer are then removed through either wafer thinning or delamination methods. The resulting structure is a fully relaxed SiGe layer on oxide (FIG. 12D). A strained silicon layer 1210 can subsequently be grown on the engineered substrate to provide a platform for strained silicon, SOI devices (FIG. 12E). The resulting circuits would experience the performance enhancement of strained silicon as well as about an 18% performance improvement from the SOI architecture. In short channel devices, this improvement is equivalent to 3–4 scaling generations at a constant gate length.

A similar fabrication method can be used to provide relaxed SiGe layers directly on Si, i.e., without the presence of the graded buffer or an intermediate oxide. This heterostructure is fabricated using the sequence shown in FIGS. 12A–12D without the oxide layer on the Si substrate. The graded composition layer possesses many dislocations and is quite thick relative to other epitaxial layers and to typical step-heights in CMOS. In addition, SiGe does not transfer heat as rapidly as Si. Therefore, a relaxed SiGe layer directly on Si is well suited for high power applications since the heat can be conducted away from the SiGe layer more efficiently.

Other Digital Gates

Although the preceding embodiments describe the performance of a CMOS inverter, strained silicon enhancement can be extended to other digital gates such as NOR, NAND, and XOR structures. Circuit schematics for a NOR gate 1300, a NAND gate 1302 and a XOR gate 1304 are shown in FIGS. 13A–C, respectively. The optimization procedures are similar to that used for the inverter in that the power consumption and/or propagation delay must be minimized while satisfying the noise margin and area requirements of the application. When analyzing these more complex circuits, the operation speed is determined by the worst-case delay for all of the possible inputs.

For example, in the pull down network of the NOR gate 1300 shown in FIG. 13A, the worst delay occurs when only one NMOS transistor is activated. Since the resistances are wired in parallel, turning on the second transistor only serves to reduce the delay of the network. Once the worst-case delay is determined for both the high to low and low to high transitions, techniques similar to those applied to the inverter can be used to determine the optimum design.

The enhancement provided by strained silicon is particularly beneficial for NAND-only architectures. As shown in FIG. 13B, in the architecture of the NAND gate 1302, the NMOS devices are wired in series while the PMOS devices are wired in parallel. This configuration results in a high output when either input A or input B is low, and a low output when both input A and input B are high, thus providing a NAND logic function. Since the NMOS devices are in series in the pull down network, the NMOS resistance is equal to two times the device resistance. As a result, the NMOS gate width must be doubled to make the high to low transition equal to the low to high transition.

Since electrons experience a larger enhancement than holes in strained Si, the NMOS gate width up scaling required in NAND-only architectures is less severe. For 1.2 μm strained silicon CMOS on a $Si_{0.8}Ge_{0.2}$ platform, the NMOS gate width must only be increased by 14% to balance the pull down and pull up networks (assuming the enhancements shown in FIG 6). Correspondingly, for 1.2 μm CMOS on $Si_{0.7}Ge_{0.3}$, the NMOS width must be increased by 55% since the n and p enhancements are more balanced. The high electron mobility becomes even more important when there are more than two inputs to the NAND gate, since additional series-wired NMOS devices are required.

Although the present invention has been shown and described with respect to several preferred embodiments thereof, various changes, omissions and additions to the form and detail thereof, may be made therein, without departing from the spirit and scope of the invention.

What is claimed is:

1. A method of fabricating a CMOS inverter, the method comprising the steps of:

providing a heterostructure including a Si substrate, a $Si_{1-x}Ge_x$ layer on the Si substrate, and a strained layer on the $Si_{1-x}Ge_x$ layer, the heterostructure comprising an interface, located between the strained layer and the Si substrate, that exhibits a roughness less than 1 nm, whereby the strained layer exhibits a surface roughness less than 1 nm; and

integrating a pMOSFET and an nMOSFET in the heterostructure, wherein a channel of the pMOSFET and a channel of the nMOSFET are formed in the strained surface layer.

2. The method of claim 1 wherein the $Si_{1-x}Ge_x$ layer is relaxed.

3. The method of claim 1 wherein the heterostructure further comprises an underlying insulator layer.

4. The method of claim 1 wherein $0 < x < 0.5$.

5. A method of fabricating an integrated circuit comprising:

providing a heterostructure having a Si substrate and a strained layer thereover, the strained layer exhibiting a surface roughness less than 1 nm; and

forming a p transistor and an n transistor in the heterostructure, wherein the strained layer comprises a channel of at least one of the transistors, the transistors being interconnected in a CMOS circuit.

6. The method of claim 5 wherein the heterostructure further comprises an insulating layer below the strained layer.

7. The method of claim 5 wherein the heterostructure further comprises a SiGe graded buffer layer positioned between the relaxed $Si_{1-x}Ge_x$ layer and the Si substrate.

US 6,881,632 B2

**11**

8. The method of claim 5 wherein the strained layer comprises Si.

9. The method of claim 5 wherein 0.1<x<0.5.

10. The method of claim 5 wherein the CMOS circuit comprises a logic gate.

11. The method of claim 10 wherein the logic gate is a NOR gate.

12. The method of claim 10 wherein the logic gate is an XOR gate.

13. The method of claim 10 wherein the logic gate is a NAND gate.

**12**

14. The method of claim 5 wherein the p-channel transistor serves as a pull-up transistor in the CMOS circuit and the n-channel transistor serves as a pull-down transistor in the CMOS circuit.

15. The method of claim 5 wherein the heterostructure further comprises a $Si_{1-x}Ge_x$ layer below the strained layer.

16. The method of claim 5 wherein an interface including an unexposed face of the strained layer exhibits a roughness less than 1 nm.

* * * * *

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| AMBERWAVE SYSTEMS CORPORATION | § § § | |
| Plaintiff | § § | |
| vs. | § § | CASE NO. 2:05-CV-321 |
| INTEL CORPORATION | § § § | |
| Defendant | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is Intel's Motion to Transfer (Docket No. 17). Having considered the parties' written submissions, the Court **GRANTS** the motion.

### BACKGROUND

AmberWave Systems Corporation brought this suit on July 15, 2005 accusing Intel Corporation of infringing U.S. Patent No. 6,881,632. Two months earlier, on May 17, 2005, Intel brought a declaratory judgment action against AmberWave in Delaware seeking a judgment that Intel does not infringe AmberWave's U.S. Patent No. 6,831,292. The '632 patent teaches a method of constructing inverters and other circuits using strained semiconductor transistors. The '292 patent teaches a method minimizing or eliminating the impurities in the semiconductor material while fabricating individual transistors. Thus, the patents are related to different scientific fields in the same area of technology. AmberWave and Intel are the only two entities involved in both litigations, and the same products are accused in both litigations.

Intel moves the Court to transfer this case to the Delaware court where the declaratory

1

judgment action is pending.  Intel claims the Delaware action is the first-filed action and therefore, under the first-to-file rule, this Court should transfer this action to the Delaware court where the declaratory judgment action is pending.

## APPLICABLE LAW

When overlapping suits are filed in multiple federal courts, each court must decide whether to keep the case, or whether interests of judicial economy favor transferring the case to a sister court so all issues can be resolved in the same forum.  *See Tex. Instruments, Inc. v. Micron Semiconductor,* 815 F. Supp. 994, 997-98 (E.D. Tex. 1993).  "The general rule favors the forum of the first-filed action" as the forum for resolving all the issues in dispute.  *Genetech v. Eli Lilly & Co.,* 998 F.2d 931, 937 (Fed. Cir. 1993).  Exceptions to this rule though "are not rare, and are made when justice or expediency requires."  *Id.*

The first-to-file rule applies when the two actions involve closely related questions or subject matter or the core issues substantially overlap, but the core issues do not need to be identical.  *Texas Instruments Inc.*, 815 F. Supp. at 997.  A subsequent action that does not have complete identity of the parties can still substantially overlap on the substantive issues of the first-filed action, warranting dismissal or transfer.  *Superior Sav. Ass'n v. Bank of Dallas*, 705 F. Supp. 326, 328-29 (N.D. Tex. 1989); *see Save Power Ltd. v. Sintek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997).

Once it has been proven that the two actions might substantially overlap, the court with the second-filed action transfers the case to the court where the first-filed action is pending.  The court of the first-filed action then decides if the cases actually do substantially overlap and require consolidation.  *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599 (5th Cir. 1999).  The underlying policies supporting the first-to-file rule are comity and the orderly administration of

justice.  *Superior Sav. Ass'n*, 705 F. Supp. at 331.

## ANALYSIS

It is undisputed that Intel filed the Delaware action two months before AmberWave brought suit in this Court.  The parties do dispute whether the two actions substantially overlap such that the first-to-file rule applies.  Substantial overlap does not require that the core issues be identical, but that the two actions will involve closely related questions or subject matter.  *See Texas Instruments Inc.*, 815 F. Supp. at 997.  The patents address different scientific aspects, mechanical engineering and electrical engineering, of semiconductor transistors.  Thus the patents do not raise identical issues in the two actions, but the subject matter is closely related.  Although not required for substantial overlap, the same parties are involved in both actions.  Additionally, the same products are accused in both actions.  Importantly, the Honorable Kent A. Jordan, presiding over the Delaware action, thought the cases would involve overlapping issues:

> You guys [AmberWave] have created now a conflict that probably shouldn't have existed by suing the same party in another district.  Now, maybe you got a good reason for that and it's just not something I'm aware of but is certainly does, on the face of it, create the potential for conflicting discovery rules and schedules and that is a problem.  That is a real problem.

*Intel Corp. v. AmberWave Sys. Corp.*, No. 05-301, Telephonic Conference, September 7, 2005.  Overlapping discovery would be much less of a concern for either court if the technologies at issue and products in dispute were unrelated.  Based on these considerations, the two actions do involve closely related questions and subject matter such that their core issues substantially overlap.

AmberWave argues that the first-to-file rule should not apply because Intel brought its declaratory judgment action in a race to the courthouse to gain a strategic advantage while the parties were involved in good faith negotiations.  The Court disagrees with AmberWave's perception of the

impetus for the declaratory judgment action. AmberWave's evidence, a letter from Intel's counsel to AmberWave's counsel accompanying a copy of the complaint, demonstrates that Intel filed suit after "AmberWave chose to escalate the matter by placing Intel on 'formal notice' [of infringement] and in light of the serious nature of the allegations." Given that AmberWave had escalated the dispute between the parties, it is not clear that the parties were negotiating in such good faith that Intel filed suit only to gain an upper hand in the ongoing negotiations. Thus, this argument does not defeat the application of the first-to-file rule. Additionally, AmberWave has not challenged the propriety of the Delaware action in the Delaware court "in order to facilitate a prompt adjudication of the patent."

AmberWave also argues that convenience weighs against transfer. If this Court retains this action, there will be two complex and simultaneous actions between the same parties over related technologies and involving the same accused products. Consequently, justice and expediency do not outweigh application of the first-to-file rule. Accordingly, the Court applies the first-to-file rule and transfers the case to Judge Jordan's docket in the District of Delaware.

## CONCLUSION

Having found that the first-to-file rule applies, the Court **GRANTS** Intel's motion and **ORDERS** the case transferred to Judge Jordan in the District of Delaware.

**So ORDERED and SIGNED this 1st day of November, 2005.**



**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

4

# EXHIBIT E

RECEIVED-CLERK
U.S. DISTRICT COURT

'05 SEP 20   AM 5:50

TX EASTERN-MARSHALL

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

SEP 20 2005

DAVID J. MALAND, CLERK
BY
DEPUTY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

AMBERWAVE SYSTEMS
CORPORATION,

    Plaintiff,

vs.

INTEL CORPORATION

    Defendant.

§
§
§
§
§
§
§
§
§
§
§

Civil Action No. **2-05CV-449**

        *TJW*

JURY

## AMBERWAVE'S COMPLAINT FOR PATENT INFRINGEMENT
## AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

    Plaintiff AmberWave Systems Corporation ("AmberWave"), for its complaint against Defendant Intel Corporation ("Intel"), alleges as follows:

### INTRODUCTION

    1.    AmberWave is a small technology and engineering firm founded by a university professor and his former students. AmberWave develops innovative technology for the production of microprocessors and other semiconductor devices. For years, Intel has been improving the performance of its microprocessors by shrinking the size of their fundamental components. Intel now finds itself unable to continue its historical pace of performance enhancement using its own technological developments. In order to defend its market position against inroads by competitors, Intel is using AmberWave's patented inventions to enable the production of faster and more efficient microprocessors—without obtaining a license from AmberWave. This action seeks redress for Intel's infringing activities.

1355864

### THE PATENT IN SUIT

2.     United States Patent No. 6,946,371 (the "'371 patent"), entitled "Method of fabricating semiconductor structures having epitaxially grown source and drain elements," was duly and legally issued on September 20, 2005. AmberWave is the owner by assignment of all right, title and interest in and to the '371 patent

### PARTIES AND JURISDICTION

3.     This is an action for patent infringement arising under the United States Patent Act, 35 U.S.C. § 101 *et seq.* This is also an action for declaratory judgment of patent infringement under the United States Patent Act, 35 U.S.C. § 101 *et seq.* and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

4.     AmberWave is a Delaware corporation with its principal place of business in Salem, New Hampshire.

5.     AmberWave is informed and believes, and thereon alleges, that Intel is a Delaware corporation with business locations throughout the United States.

6.     AmberWave is informed and believes, and thereon alleges, that Intel has done and continues to do business in this District. AmberWave is informed and believes, and thereon alleges, that Intel has harmed and continues to harm AmberWave in this District. AmberWave is informed and believes, and thereon alleges, that Intel products have been sold in this District. AmberWave is informed and believes, and thereon alleges, that these products include 90nm Pentium processors. AmberWave is informed and believes, and thereon alleges, that Intel maintains a website accessible to the residents of this District. AmberWave is informed and believes, and thereon alleges, that Intel's website allows users in this District to submit information to Intel, and to download information from the website. AmberWave is informed and believes, and thereon alleges, that Intel's website allows users in this District to locate companies who will sell Intel products to users in this District, including 90 nm Pentium processors. AmberWave is informed and believes, and thereon alleges, that Intel has at least two authorized distributors with facilities located in the Eastern District of Texas. AmberWave is

informed and believes, and thereon alleges, that these distributors sell Intel products, including 90 nm microprocessors

7.    AmberWave is informed and believes, and thereon alleges, that Intel has voluntarily availed itself of the courts in this District. AmberWave is informed and believes, and thereon alleges, that Intel has filed complaints in this District as both a plaintiff and as an intervenor. AmberWave is informed and believes, and thereon alleges, that Intel has appeared as a defendant and a counterclaim plaintiff in this District, without contesting that venue is proper in the District

8.    AmberWave is informed and believes, and thereon alleges, that Intel has sought and received authorization to do business in the State of Texas. AmberWave is informed and believes, and thereon alleges, that Intel has a registered agent in the State of Texas. AmberWave is informed and believes, and thereon alleges, that Intel maintains multiple business offices in State of Texas. AmberWave is informed and believes, and thereon alleges, that Intel has at least approximately 600 employees in the State of Texas.

9.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, and venue in this District is proper under 28 U.S.C. §§ 1391 and 1400(b).

## CLAIMS FOR RELIEF

## COUNT I

## (Patent Infringement by Intel)

10.    AmberWave incorporates by reference paragraphs 1 through 9 as if set forth here in full

11.    AmberWave is informed and believes, and thereon alleges, that in violation of 35 U.S.C. § 271, Intel has and is currently directly infringing, contributorily infringing, and/or inducing infringement of, the '371 patent by, among other things, making, using, offering to sell, selling and/or importing, without authority or license from AmberWave, certain computer processor products, including 90 nm Pentium processors

12. AmberWave is informed and believes, and thereon alleges, that Intel's infringement of the '371 patent has been and continues to be willful.

13. Unless enjoined, Intel will continue to infringe the '371 patent, and AmberWave will suffer irreparable injury as a direct and proximate result of Intel's conduct

14. AmberWave has been damaged by Intel's conduct, and until an injunction issues will continue to be damaged in an amount yet to be determined.

## COUNT II

### (Declaratory Judgment of Patent Infringement by Intel)

15. AmberWave incorporates by reference paragraphs 1 through 14 as if set forth here in full.

16. AmberWave is informed and believes, and thereon alleges, that to the extent Intel has not already infringed the '371 patent, it is engaged in activity directed toward the imminent infringement of the '371 patent by, among other things, preparing to make, use, offer to sell, sell and/or import certain computer processor products, including 90 nm Pentium processors.

17. The '371 patent issued from United States Application No. 10/458,544 (the "'544 application"). Prior to the issuance of the '371 patent, AmberWave gave written notice to Intel of the '544 application and informed Intel that it would be infringing allowed claims in the '544 application once they issued. Those allowed claims have now issued in the '371 patent

18. AmberWave is informed and believes, and thereon alleges that, to the extent actual infringement of the '371 patent has not already occurred, Intel has refused to take any steps to avoid infringement of claims in the '371 patent.

19. In light of the foregoing, Intel has a reasonable apprehension of suit for infringement by AmberWave on the '371 patent.

20. An actual and justiciable controversy exists between AmberWave and Intel regarding whether Intel's imminent conduct will directly infringe, contributorily infringe, and/or induce infringement of the '371 patent by, among other things, making, using, offering to sell,

selling and/or importing, without authority or license from AmberWave, certain computer processor products, including 90 nm Pentium processors

21.     AmberWave is informed and believes, and thereon alleges, that Intel's infringement will be willful.

22.     Unless enjoined, Intel will infringe the '371 patent, and AmberWave will suffer irreparable injury as a direct and proximate result of Intel's conduct.

23.     AmberWave will be damaged by Intel's conduct and, until an injunction issues, will continue to be damaged in an amount yet to be determined.

## PRAYER FOR RELIEF

WHEREFORE, AmberWave prays for relief as follows:

A.     For a determination that the '371 patent is valid and enforceable;

B.     For a determination that Intel infringes the '371 patent, and that Intel's infringement is willful;

C.     For a declaratory judgment that the '371 patent is valid and enforceable;

D.     For a declaratory judgment that Intel will infringe the '371 patent, and that Intel's infringement of the '371 patent will be willful;

E.     For an order preliminarily and permanently enjoining Intel, and its directors, officers, employees, attorneys, agents and all persons in active concert or participation with any of the foregoing from acts of infringement of the '371 patent;

F.     For damages resulting from infringement of the '371 patent in an amount to be determined at trial, and the trebling of such damages due to the willful nature of their infringement;

G.     For an award of interest on damages;

H.     For a declaration that this case is exceptional pursuant to 35 U.S.C. § 285 and an award of attorneys' fees and costs; and

I    For an award of such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

AmberWave hereby demands a trial by jury on any issue triable of right by a jury.

Respectfully submitted,

Morgan Chu (CA #70446)
David I. Gindler (CA #117824)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Phone: (310) 277-1010
Facsimile: (310) 203-7199
E-mail: dgindler@irell.com

By: _S. Calvin Capshaw (by permission EJD)_
S. Calvin Capshaw III (TX #03783900)
Attorney-in-Charge
BROWN MCCARROLL LLP
1127 Judson Road, Suite 220
P.O. Box 3999
Longview, Texas 75601-5157
Phone: (903) 236-9800
Facsimile: (903) 236-8787
E-mail: CCapshaw@mailbmc.com

Otis W. Carroll (TX #03895700)
IRELAND, CARROLL & KELLY, PC
6101 South Broadway Avenue
Suite 500
P.O. Box 7879
Tyler, Texas 75711
Phone: (903) 561-1600
Facsimile: (903) 581-1070

Franklin Jones, Jr. (TX #00000055)
JONES & JONES, INC., PC
201 W. Houston Street
P.O. Drawer 1249
Marshall, Texas 75671-1249
Phone: (903) 938-4395
Facsimile: (903) 938-3360

Samuel F. Baxter (TX #01938000)
McKool Smith, PC
300 Crescent Court
Suite 1500
Dallas, TX 75201
Phone: (214) 978-4000
Facsimile: (214) 978-4044

**Attorneys For Plaintiff**
AmberWave Systems Corporation

# EXHIBIT F

233 F.R.D. 416                                                                                      Page 1
233 F.R.D. 416, 63 Fed.R.Serv.3d 653
**(Cite as: 233 F.R.D. 416)**

**Motions, Pleadings and Filings**

United States District Court,
D. Delaware.
INTEL CORPORATION, Plaintiff,
v.
AMBERWAVE SYSTEMS CORPORATION,
Defendant.
**No. CIV.A. 05-301-KAJ.**

Nov. 29, 2005.

**Background:** Semiconductor manufacturer, seeking
declaration of patent non-infringement, moved to
supplement its complaint by adding claim for
non-infringement of additional patent.

**Holding:** The District Court, Jordan, J., held that
supplementation of complaint was warranted.
 Motion granted.

West Headnotes

**[1] Federal Civil Procedure** 863
170Ak863 Most Cited Cases
Application of rule authorizing supplemental
pleadings is within broad discretion of court.
Fed.Rules Civ.Proc.Rule 15(d), 28 U.S.C.A.

**[2] Federal Civil Procedure** 861
170Ak861 Most Cited Cases
Leave to supplement pleading should be granted if it
will promote just disposition of case, will not cause
undue prejudice or delay, and will not prejudice rights
of any parties. Fed.Rules Civ.Proc.Rule 15(d), 28
U.S.C.A.

**[3] Declaratory Judgment** 324
118Ak324 Most Cited Cases
Supplementation of semiconductor manufacturer's
complaint for declaration of patent non-infringement,
so as to add claim for non-infringement of defendant's
newly-issued patent, was warranted; there was
substantial overlap of core issues with respect to
alleged infringement of both patents. Fed.Rules
Civ.Proc.Rule 15(d), 28 U.S.C.A.

**[4] Limitation of Actions** 127(3)
241k127(3) Most Cited Cases

Suit for declaration of non-infringement of newly
issued patent related back to filing date of suit for
non-infringement of earlier, related patent, for purpose
of determining whether declaratory judgment suit or
patentee's competing infringement suit was first-filed,
even though new patent had not been issued at time
earlier non-infringement suit had been filed.

**Patents** 328(2)
291k328(2) Most Cited Cases
6,831,292, 6,881,632, 6,946,371. Cited.
 **\*416** Josy W. Ingersoll, Glenn John W. Shaw, Karen
Elizabeth Keller, Young, Conaway, Stargatt & Taylor,
Wilmington, DE, for plaintiff.

 Jack B. Blumenfeld, Leslie A. Polizoti, Morris,
Nichols, Arsht & Tunnel, Wilmington, DE, for
defendant.

*MEMORANDUM ORDER*

JORDAN, District Judge.

**Introduction**

 In this patent case, Intel Corporation ("Intel") seeks a
declaratory judgment of non-infringement of certain
patent rights held by defendant AmberWave Systems
Corporation ("AmberWave"). (See Docket Item
["D.I."] 1 at ¶¶ 11-15.) Before me now is Intel's
motion (D.I. 30; the "Motion") to supplement its
complaint by adding a claim for declaratory judgment
of non-infringement as to a patent newly issued to
AmberWave, U.S. Patent No. 6,946,371 (the " '371
patent"). For the reasons stated herein, I am granting
the Motion.

**Background and Procedural History**

 For purposes of this Motion, the relevant background
flows primarily from the parties' forum shopping.
AmberWave, kicked things off by sending a
cease-and-desist letter to Intel on May 9, 2005. (See
D.I. 31 at Ex. C.) In that letter, counsel for
AmberWave identified **\*417** an issued patent, U.S.
Patent No. 6,831,292 (the " '292 patent"), and two
allowed patent applications, No.2004/0161947 (the "
'947 application") and No.2004/00445499 (the " '499
application") as having been discussed by the parties
in a meeting about AmberWave's concern that Intel
was infringing AmberWave's intellectual property

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

233 F.R.D. 416
233 F.R.D. 416, 63 Fed.R.Serv.3d 653
(Cite as: 233 F.R.D. 416)

Page 2

rights. (*Id.*) The letter went on to say, "[t]his will serve as formal notice to Intel that its current commercial products ... infringes [sic] claims of the patent and the allowed applications ...." (*Id.*) Intel responded by filing the present suit on May 17, 2005. (D.I.1.) In its original complaint, Intel not only specified that it was seeking "a declaration that [it] has not infringed the '292 Patent ...," it also stated that it wished to reserve "all rights to amend this Complaint to seek a declaratory judgment of non-infringement of the patents that issue from the '947 and '499 Applications." (*Id.* at ¶ 10.)

Two months later, on July 15, 2005, AmberWave filed suit against Intel in the United States District Court for the Eastern District of Texas, alleging that Intel infringed AmberWave's U.S. Patent No. 6,881,632 (the "'632 patent"). Intel moved that court to transfer the '632 litigation to this court on the grounds that the '632 litigation and this case substantially overlap and that, because this case was filed first, this court is the appropriate forum to resolve the parties' disputes. (*See* D.I. 50, attaching Nov. 1, 2005 Memorandum Opinion and Order in *AmberWave Systems Corp. v. Intel Corp.*, C.A. No. 2:05- CV-321 (E.D.Tex.) (the "Transfer Order").) The transfer motion was granted on November 1, 2005. (*Id.*)

Meanwhile, on September 20, 2005, the '499 application matured into the ' 371 patent. The proverbial race to the courthouse somehow began before business hours that same day. AmberWave was able, at 5:50 a.m. Central Time, to leave in a drop box at the U.S. District Court for the Eastern District of Texas a copy of an infringement complaint invoking the '371 patent against Intel. (*See* D.I. 31 at Ex. F.) Less than two hours later, at approximately 8:30 a.m. Eastern Time, Intel filed its complaint for a declaratory judgment of non-infringement, which is now pending as Civil Action No. 05-682-KAJ in this court. (*See* D.I. 31 at Ex. G.) On September 26th, Intel filed the present Motion, recognizing that the proposed supplementation of the Complaint in this case is duplicative of the non-infringement complaint it has already filed. (D.I. 31 at 2 n.2.)

Basic to its Motion is Intel's claim that the technology involved in the '292 patent and in the '371 patent is so closely connected that it is most just, fair, and efficient to try the parties' disputes over that technology in the same case. (*Id.* at 6-7.) The '292 patent is entitled "Semiconductor Structures Employing Strained Material Layers with Defined Impurity Gradients and Methods for Fabricating Same." ('292 patent, attached to D.I. I as Ex. A.) It is directed to fabricating

"semiconductor structures and field effect transistors ... incorporating strained material layers and controlled impurity diffusion gradients." (*Id.* at col. 1, lines 17-20.) The '371 patent is entitled "Methods of Fabricating Semiconductor Structures Having Epitaxially Grown Source and Drain Elements." ('371 patent, attached to D.I. 1 of C.A. No. 05-682-KAJ as Ex. A.) It relates to "methods for fabricating semiconductor devices having substantially faceless raised source and drain elements." (*Id.* at col. 1, lines 16-18.) I do not pretend to have a grasp of the science of semiconductor fabrication, though the parties will no doubt be struggling valiantly to bring me up the learning curve as this case progresses. This much is discernable at this point, however: the technology is closely enough related that the same Intel devices are accused of infringing both patents and AmberWave itself chose to treat the inventions as related by making them the subject of the same infringement discussion last May and the same cease-and-desist letter in the wake of that discussion. (*See* D.I. 31 at Ex. C.)

## Discussion

[1][2] Rule 15(d) of the Federal Rules of Civil Procedure provides that, "upon reasonable notice and upon such terms as are just," a party may be permitted "to serve a supplemental pleading setting forth transactions or occurrences or events which have happened *418 since the date of the pleading sought to be supplemented." The application of that rule is within the "broad discretion" of the court. *Medeva Pharma Ltd. v. Am. Home Prod. Corp.*, 201 F.R.D. 103, 104 (D.Del.2001). "Leave to supplement should be granted if it will promote the just disposition of the case, will not cause undue prejudice or delay and will not prejudice the rights of any parties." *Id.*

[3] Intel, of course, argues that its proposed supplementation meets that standard and should be allowed. Rather than address that standard, however, AmberWave argues that I should defer ruling until Intel files a motion to transfer in the Eastern District of Texas. AmberWave reasons that its '371 infringement action was filed before Intel's '371 non-infringement action was filed in this court. According to AmberWave, its infringement action is therefore the first filed action for purposes of determining which court should have priority in deciding where the dispute is to be tried. (D.I. 39 at 6.) That argument ignores the persuasive analysis already undertaken by the court in Texas in the related '632 litigation.

Judge Leonard Davis observed in transferring the '632 litigation from the Eastern District of Texas to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this court that the '632 patent _[FN1]_ and the '272 patent do not raise identical issues, "but the subject matter is closely related." (Transfer Order at 3.) He concluded that the cases involved "closely related questions and subject matter such that their core issues substantially overlap." (*Id.*) His conclusions in that regard appear to apply with even greater strength to the technology involved in the '371 patent and the '272 patent. While AmberWave argues that its infringement analysis will not overlap in presenting proof regarding the two patents and the infringing devices, only the narrowest and most artificial view of the issues could support that assertion. The more sensible view must acknowledge that, at a minimum, presentations on infringement for both the '292 and the '371 patents will require a judge, on the summary judgment motions that are sure to be filed, and a jury, at any trial of the case, to become familiar with the same field of art, the same fundamental science and technology associated with methods of semiconductor fabrication, the same allegedly infringing devices, and, in any damages analysis, the same pricing, sales, and related market data. Moreover, because of AmberWave's assertions of willfulness (*see* D.I. 11 at ¶ 24; D.I. 39 at Ex. I, ¶ 21), it is highly likely that the same or substantially overlapping operative facts regarding Intel's decision-making and AmberWave's negotiations with Intel will also be at issue with regard to both patents. In short, as Judge Davis concluded in the related '632 litigation, there is substantial overlap of core issues with respect to the alleged infringement of both the '371 and the '292 patents.

> FN1. "The '632 patent teaches a method of constructing inverters and other circuits using strained semiconductor transistors." (Transfer Order at 1.)

[4] That conclusion means that the present case, which preceded AmberWave's filing on the '371 patent in Texas by approximately four months is the first-filed action. AmberWave seeks to avoid that consequence by arguing that, even if the cases overlap, this cannot be the first-filed action because the proposed supplementation here cannot relate back to the original filing date of the complaint. According to AmberWave, the '499 application could not serve as the basis of any claim until it became the '371 patent on September 20th, and therefore it cannot be a claim that relates back to the original May filing date in this case.

As authority, AmberWave relies on *GAF Building Materials Corp. v. Elk Corp. of Dallas,* 90 F.3d 479 (Fed.Cir.1996), in which the Federal Circuit observed

that an issued patent is a prerequisite to subject matter jurisdiction in a patent dispute. *See id.* at 483 ("If there is no issued patent, 'no controversy under the patent laws exists, upon which [the accused infringer] can bring an action for declaratory judgment.' ") (quoting *Muskegon Piston Ring Co. v. Olsen,* 307 F.2d 85, 89 (6th Cir.1962), *cert. denied,* 371 U.S. 952, 83 S.Ct. 508, 9 L.Ed.2d 500 (1963)). That basic ruling does not, however, stretch to fit the circumstances here, as AmberWave would like. *GAF* does not hold that a case in **\*419** which subject matter jurisdiction already exists cannot be supplemented by adding a dispute over a later-issued patent, nor does it hold that, when such supplementation occurs, relation back to the original filing date is inappropriate for purposes of determining which of two competing suits should go forward. AmberWave barely takes a pass at distinguishing cases cited by Intel on this issue, [FN2] saying simply that they are "unpersuasive" because they did not address the argument that AmberWave is pressing. (D.I. 39 at 13.) I disagree, and while I do not need to resolve the question of whether relation back would be appropriate in other circumstances, I am persuaded that, at least for purposes of determining the priority of litigation between this court and the Eastern District of Texas in this case, it is appropriate to consider this the first-filed action.

> FN2. Those cases include, for example, *Ramsey Group, Inc. v. EGS Intern., Inc.,* 208 F.R.D. 559, 563 (W.D.N.C.2002) (determining to allow supplementation of complaint to add a claim on a later issued patent and noting "the supplemental amended complaint relates back to the date of filing of the original complaint"), and *Cosden Oil & Chem. Co. v. Foster Grant Co., Inc.,* 432 F.Supp. 956, 960 (D.Del.1977) (declaratory judgment plaintiff was "entitled to add to its original complaint a claim for declaration of invalidity and noninfringement of [a later issued patent]").

By AmberWave's own reasoning (D.I. 39 at 6), the court with the first-filed action should determine where the parties' dispute over the '371 patent should be resolved. For the reasons outlined, I have decided that this court is the more appropriate forum. AmberWave has done nothing to rebut Intel's showing (D.I. 31 at 5-9) that supplementation "will not cause undue prejudice or delay and will not prejudice the rights of any parties." *Medeva Pharma,* 201 F.R.D. at 104. I will already be dealing with the '292 and the '632 patents. It makes no sense to burden the Eastern District of Texas with this third and latest version of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the substantially overlapping disputes between the parties. *See* *EEOC v. Univ. of Pa., 850 F.2d 969, 971 (3d Cir.1988)* ("The first-filed rule encourages sound judicial administration ...."), *aff'd*, *493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990)*.

**Conclusion**

Accordingly, it is hereby ORDERED that (1) Intel's Motion (D.I.30) is GRANTED; (2) within three days of the date of this Order, Intel shall file its Supplemental Complaint as a separate document, with the attachments required by Local Rules 3.2 and 15.1; and (3) AmberWave shall file an answer or otherwise respond to the Supplemental Complaint within 10 days of that pleading being filed as a separate document.

233 F.R.D. 416, 63 Fed.R.Serv.3d 653

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1199941 (Trial Pleading) Intel Corporation's Answer to Amberwave's Amended and Consolidated Complaint for Patent Infringement (Mar. 20, 2006)Original Image of this Document (PDF)

• 2006 WL 809186 (Trial Pleading) Amberwave's Amended and Consolidated Complaint for Patent Infringement (Feb. 27, 2006)Original Image of this Document (PDF)

• 2005 WL 2385552 (Trial Pleading) Intel's Reply to Counterclaim (Aug. 4, 2005)Original Image of this Document (PDF)

• 2005 WL 2385666 (Trial Pleading) Amberwave's Answer and Counterclaim (Jul. 15, 2005)Original Image of this Document (PDF)

• 2005 WL 1529873 (Trial Pleading) Complaint (May 17, 2005)Original Image of this Document (PDF)

• 1:05cv00301 (Docket) (May. 17, 2005)

• 2000 WL 34583394 (Expert Report and Affidavit) (Report or Affidavit) (2000)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMBERWAVE SYSTEMS CORPORATION, | ) | Civil Action No. 05-837-KAJ |
| Plaintiff, | ) | |
| v. | ) | |
| INTEL CORPORATION, | ) | |
| Defendant. | ) | |
| INTEL CORPORATION, | ) | Civil Action No. 05-682-KAJ |
| Plaintiff, | ) | |
| v. | ) | |
| AMBERWAVE SYSTEMS CORPORATION, | ) | |
| Defendant. | ) | |
| INTEL CORPORATION, | ) | Civil Action No. 05-301-KAJ |
| Plaintiff, | ) | |
| v. | ) | |
| AMBERWAVE SYSTEMS CORPORATION, | ) | |
| Defendant. | ) | |

062992.1002

```
                                        )
AMBERWAVE SYSTEMS CORPORATION,          )
                                        )
                    Counterclaimant,    )
                                        )
        v.                              )
                                        )
INTEL CORPORATION,                      )
                                        )
                    Counterdefendant.   )
                                        )
```

## STIPULATION AND CONSOLIDATION ORDER

WHEREAS, on May 17, 2005, Intel Corporation ("Intel") commenced an action in this

Court against AmberWave Systems Corporation ("AmberWave") captioned *Intel Corporation v.*

*AmberWave Systems Corporation*, Civil Action No. 05-301-KAJ, seeking a declaration that none

of its devices or systems infringes AmberWave's United States Patent No. 6,831,292 (the "'292

Action");

WHEREAS, on July 15, 2005, AmberWave commenced an action in the United States

District Court for the Eastern District of Texas against Intel captioned *AmberWave Systems*

*Corporation v. Intel Corporation*, Civil Action No. 2-05CV-321, alleging that certain computer

processor products that Intel made, used, offered to sell, sold, and/or imported infringed

AmberWave's United States Patent No. 6,881,632 (the "'632 Action");

WHEREAS, on September 20, 2005, Intel commenced an action in this Court against

AmberWave captioned *Intel Corporation v. AmberWave Systems Corporation*, Civil Action No.

05-682-KAJ, seeking a declaration that none of its devices or systems infringes AmberWave's

United States Patent No. 6,946,371, otherwise known as the "'371 Patent" (the "Intel '371

Action");

2

WHEREAS, on September 20, 2005, AmberWave commenced an action in the United States District Court for the Eastern District of Texas captioned *AmberWave Systems Corporation v. Intel Corporation*, Civil Action No. 2-05CV-449, alleging that certain computer processor products that Intel made, used, offered to sell, sold, and/or imported infringed the '371 Patent (the "AmberWave '371 Action");

WHEREAS, by order dated November 1, 2005, the United States District Court for the Eastern District of Texas transferred the '632 Action to this Court, and the case was designated Civil Action No. 05-837-KAJ;

WHEREAS, on November 29, 2005, this Court granted Intel's motion to supplement its complaint in the '292 Action to seek a declaration that none of its devices or systems infringes the '371 Patent;

WHEREAS, the parties have agreed to withdraw without prejudice the AmberWave '371 Action and the Intel '371 Action, respectively;

and

WHEREAS, the parties believe that consolidation of the '632 Action and the '292 Action is appropriate;

THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between Intel and AmberWave as follows:

1.      Consolidation Of Actions: The '632 Action shall be consolidated with the '292 Action for all purposes, including trial (the "Consolidated Action"). All discovery conducted to date in the '632 Action and the '292 Action shall be treated as having been conducted in the Consolidated Action; provided that neither party intends to limit or waive any rights or objections it may have with regard to further discovery on the parties to the Consolidated Action

or on third-parties. Papers in the Consolidated Action shall be filed and docketed solely in Civil Action No. 05-301-KAJ. Upon entry of this Stipulation and Consolidation order by the Court, all filing in the Consolidated Action shall bear the following caption:

| | | |
|---|---|---|
| AMBERWAVE SYSTEMS CORPORATION, | ) | Civil Action No. 05-301-KAJ |
| | ) | (consolidated) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

2.    Filing Of Amended Complaint: Not later than twenty-one days after the Court's entry of this Stipulation and Consolidation Order, AmberWave shall file an amended, consolidated complaint in the Consolidated Action. AmberWave's claims for infringement of the '371 patent shall relate back to at least September 20, 2005, the date of filing of the AmberWave '371 Action. Intel shall file its response twenty days thereafter.

3.    Withdrawal Of '371 Actions:  Not later than three days after the filing of the consolidated complaint in the Consolidated Action, AmberWave will withdraw without prejudice the AmberWave '371 Action and Intel will withdraw without prejudice the Intel '371 Action pursuant to the forms of dismissal attached as Exhibits A and B to this Stipulation and Consolidation Order. AmberWave's withdrawal of the AmberWave '371 Action and Intel's withdrawal of the Intel '371 Action are without prejudice to each party's respective rights and/or remedies, if any, as of September 20, 2005 so that each party may pursue any and all rights and remedies available to it with regard to the '371 Patent in the Consolidated Action.

4.      Additional Claims: If AmberWave elects to file an action against Intel alleging

infringement of the patent that issues from United States Patent Application No. 10/774,890,

entitled "Relaxed SiGe Platform for High Speed CMOS Electronics and High-Speed Analog

Circuits" (the "'890 application"), AmberWave shall do so by filing an amended complaint in the

Consolidated Action asserting such claim within three business days of the issuance of the patent

from the '890 application.  AmberWave shall not file an action against Intel alleging

infringement of the '890 patent in any other court.  Intel hereby consents to the filing of an

amended complaint in the Consolidated Action alleging that Intel infringes the patent that issues

from the '890 application.

Dated: February 2, 2006                        Respectfully submitted,

OF COUNSEL
George M. Newcombe                    By:      _____
SIMPSON THACHER & BARTLETT LLP                 Josy W. Ingersoll (No. 1088)
3330 Hillview Avenue                            John W. Shaw (No. 3362)
Palo Alto, California 94304                     YOUNG CONAWAY STARGATT &
                                                TAYLOR, LLP
                                                The Brandywine Building, 17th Floor
                                                1000 West Street
                                                Wilmington, Delaware 19801

                                                Attorneys for Intel Corporation

OF COUNSEL
Morgan Chu
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California  90067

By:   /s/ Jack B. Blumenfeld
      Jack B. Blumenfeld (#1014)
      Leslie A. Polizoti (#4299)
      MORRIS, NICHOLS, ARSHT &
      TUNNELL LLP
      1201 N. Market Street
      P.O. Box 1347
      Wilmington, Delaware  19899

      Attorneys for AmberWave Systems
      Corporation

SO ORDERED this _6th_ day of _Feb._ , 2006,

United States District Judge

# TAB A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

INTEL CORPORATION,                          )
                                            )
                        Plaintiff,          )        Civil Action No. 05-682-KAJ
                                            )
        vs.                                 )
                                            )
AMBERWAVE SYSTEMS CORPORATION,              )
                                            )
                        Defendant.          )
                                            )

## STIPULATED ORDER OF DISMISSAL WITHOUT PREJUDICE

IT IS HEREBY STIPULATED, by and between Intel Corporation ("Intel") and AmberWave Systems Corporation ("AmberWave") that the Court enter the following Stipulated Order of Dismissal, which shall be binding upon them:

1.      Intel's claims against AmberWave are hereby dismissed without prejudice.

2.      Intel and AmberWave shall bear their own costs and attorneys' fees in connection with this action. In addition, Intel and AmberWave waive any and all rights to appeal this Stipulated Order of Dismissal.

Dated: February 2, 2006                     Respectfully submitted,

OF COUNSEL                          By:     _____
George M. Newcombe                          Josy W. Ingersoll (No. 1088)
SIMPSON THACHER & BARTLETT LLP              John W. Shaw (No. 3362)
3330 Hillview Avenue                        YOUNG CONAWAY STARGATT &
Palo Alto, California 94304                 TAYLOR, LLP
                                            The Brandywine Building, 17th Floor
                                            1000 West Street
                                            Wilmington, Delaware 19801

                                            Attorneys for Plaintiff Intel Corporation

OF COUNSEL
Morgan Chu
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067

By:    /s/ Jack B. Blumenfeld
       Jack B. Blumenfeld (#1014)
       Leslie A. Polizoti (#4299)
       MORRIS, NICHOLS, ARSHT, &
       TUNNELL LLP
       1201 N. Market Street
       P.O. Box 1347
       Wilmington, Delaware 19899

       Attorneys for Defendant AmberWave
       Systems Corporation

**ORDER**

Pursuant to the Stipulation between Intel and AmberWave, IT IS ORDERED, ADJUDGED AND DECREED THAT:

1.     Intel's claims against AmberWave are hereby dismissed without prejudice;

2.     Intel and AmberWave shall bear their own costs and attorneys' fees in connection with this action.  In addition, Intel and AmberWave waive any and all rights to appeal this Stipulated Order of Dismissal.


Dated: February __, 2005

_____

United States District Court Judge

# TAB B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

AMBERWAVE SYSTEMS CORPORATION, §
                    Plaintiff, §
§
       vs. §    Civil Action No. 2-05CV-449-TJW
§
INTEL CORPORATION, §    Jury
§
                 Defendant. §

## JOINT MOTION TO DISMISS WITHOUT PREJUDICE

Intel Corporation ("Intel") and AmberWave Systems Corporation ("AmberWave")
jointly move the Court to enter the attached Order of Dismissal, pursuant to Federal Rule of
Civil Procedure 41(a)(2), and in support will show the Court as follows.

AmberWave has agreed to dismiss its claims against Intel without prejudice.

Intel and AmberWave have agreed to bear their own costs and attorneys' fees in
connection with this action. In addition, Intel and AmberWave waive any and all rights to
appeal the Order of Dismissal, attached to this motion.

Based on the foregoing, Intel and AmberWave respectfully move the Court to grant
their Joint Motion to Dismiss this action without prejudice.

Dated: February __, 2006           Respectfully submitted,

OF COUNSEL              By: _____
Morgan Chu                  S. Calvin Capshaw III
IRELL & MANELLA LLP         Texas Bar No. #03783900)
1800 Avenue of the Stars, Suite 900    BROWN MCCARROLL LLP
Los Angeles, California 90067-4276    1127 Judson Road, Suite 220
                                P.O. Box 3999
                                Longview, Texas 75601-5157
                                Phone: (903) 236-9800
                                Facsimile: (903) 236-8787
                                E-mail: CCapshaw@mailbmc.com

Attorneys for Plaintiff AmberWave
Systems Corporation

OF COUNSEL            By: _____
George M. Newcombe            Michael E. Jones
SIMPSON THACHER & BARTLETT LLP     Texas Bar No. 10929400
3330 Hillview Avenue            POTTER MINTON, PC
Palo Alto, California 94304         100 North College
                                     500 Plaza Tower
                                     Tyler, Texas 75702
                                     mikejones@potterminton.com
                                     Telephone: (903) 597-8311
                                     Facsimile: (903) 593-0846

                                     Attorneys for Defendant Intel
                                     Corporation

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic
service are being served this _____ day of _____, 2006, with a copy of this
document via the Court's CM/ECF system per Local Rule CV-5(a)(3). Any other counsel of
record will be served by, electronic mail, facsimile transmission and/or first class mail on
this same date.

_____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

AMBERWAVE SYSTEMS CORPORATION, §
                                §
          Plaintiff,            §
                                §
     vs.                        §    Civil Action No. 2-05CV-449-TJW
                                §
INTEL CORPORATION,              §    Jury
                                §
          Defendant.            §

## **ORDER OF DISMISSAL**

Before the Court is the Joint Motion to Dismiss without Prejudice, filed by the parties pursuant to Federal Rule of Civil Procedure 41(a)(2) in the above referenced matter. The Court is of the opinion that the motion is well taken and should be granted.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED THAT:

1.     AmberWave's claims against Intel are hereby dismissed without prejudice;

2.     Intel and AmberWave shall bear their own costs and attorneys fees in connection with this action. In addition, Intel and AmberWave waive any and all rights to appeal this Order of Dismissal.

- 3 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMBERWAVE SYSTEMS CORPORATION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| INTEL CORPORATION, | ) ) |
| Defendant. | ) |

Civil Action No. 05-301-KAJ
(Consolidated)

**DEMAND FOR JURY TRIAL**

### AMBERWAVE'S AMENDED AND
### CONSOLIDATED COMPLAINT FOR PATENT INFRINGEMENT

Pursuant to the February 6, 2006 Stipulation and Consolidation Order (D.I. 82), Plaintiff AmberWave Systems Corporation ("AmberWave"), for its Amended and Consolidated Complaint against Defendant Intel Corporation ("Intel"), alleges as follows:

### INTRODUCTION

1.     AmberWave is a small technology and engineering firm founded by a university professor and his former students. AmberWave develops innovative technology for the production of microprocessors and other semiconductor devices. For years, Intel has been improving the performance of its microprocessors by shrinking the size of their fundamental components. Intel now finds itself unable to continue its historical pace of performance enhancement using its own technological developments. In order to defend its market position against inroads by competitors, Intel is using AmberWave's patented inventions to enable the production of faster and more efficient microprocessors—without obtaining a license from AmberWave. This action seeks redress for Intel's infringing activities.

## PARTIES AND JURISDICTION

2.      This is an action for patent infringement arising under the United States Patent Act, 35 U.S.C. § 101 *et seq.*

3.      AmberWave is a Delaware corporation with its principal place of business in Salem, New Hampshire.

4.      AmberWave is informed and believes, and thereon alleges, that Intel is a Delaware corporation with its principal place of business in Santa Clara, California.

5.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), and venue in this District is proper under 28 U.S.C. §§ 1391 and 1400(b).

## THE PATENTS IN SUIT

6.      United States Patent No. 6,831,292 (the "'292 patent"), entitled "Semiconductor Structures Employing Strained Material Layers With Defined Impurity Gradients And Methods For Fabricating Same," was duly and legally issued on December 14, 2004.  AmberWave is the owner by assignment of all right, title and interest in and to the '292 patent.  A true and correct copy of the '292 patent is attached hereto as Exhibit A.

7.      United States Patent No. 6,881,632 (the "'632 patent"), entitled "Method of Fabricating CMOS Inverter And Integrated Circuits Utilizing Strained Surface Channel MOSFETS," was duly and legally issued on April 19, 2005.  AmberWave is the owner by assignment of all right, title and interest in and to the '632 patent.  A true and correct copy of the '632 patent is attached as Exhibit B.

8.      United States Patent No. 6,946,371 (the "'371 patent"), entitled "Method of Fabricating Semiconductor Structures Having Epitaxially Grown Source And Drain Elements," was duly and legally issued on September 20, 2005.  AmberWave is the owner by

assignment of all right, title and interest in and to the '371 patent. A true and correct copy of the '371 patent is attached as Exhibit C.

## CLAIMS FOR RELIEF
### COUNT I

#### (Infringement of the '292 Patent by Intel)

9.    AmberWave incorporates by reference paragraphs 1 through 8 as if set forth here in full.

10.    AmberWave is informed and believes, and thereon alleges, that in violation of 35 U.S.C. § 271, Intel has been and is currently directly infringing, contributorily infringing, and/or inducing infringement of, the '292 patent by, among other things, making, using, offering to sell, selling and/or importing, without authority or license from AmberWave, certain semiconductor devices.

11.    AmberWave is informed and believes, and thereon alleges, that Intel's infringement of the '292 patent has been and continues to be willful.

12.    Unless enjoined, Intel will continue to infringe the '292 patent, and AmberWave will suffer irreparable injury as a direct and proximate result of Intel's conduct.

13.    AmberWave has been damaged by Intel's conduct, and until an injunction issues will continue to be damaged in an amount yet to be determined.

### COUNT II
#### (Patent Infringement of the '632 Patent by Intel)

14.    AmberWave incorporates by reference paragraphs 1 through 8 as if set forth here in full.

15.    AmberWave is informed and believes, and thereon alleges, that in violation of 35 U.S.C. § 271, Intel has been and is currently directly infringing, contributorily infringing, and/or inducing infringement of, the '632 patent by, among other things, making,

- 3 -

using, offering to sell, selling and/or importing, without authority or license from AmberWave, certain semiconductor devices.

16. AmberWave is informed and believes, and thereon alleges, that Intel's infringement of the '632 patent has been and continues to be willful.

17. Unless enjoined, Intel will continue to infringe the '632 patent, and AmberWave will suffer irreparable injury as a direct and proximate result of Intel's conduct.

18. AmberWave has been damaged by Intel's conduct, and until an injunction issues will continue to be damaged in an amount yet to be determined.

## COUNT III
### (Patent Infringement of the '371 Patent by Intel)

19. AmberWave incorporates by reference paragraphs 1 through 8 as if set forth here in full.

20. AmberWave is informed and believes, and thereon alleges, that in violation of 35 U.S.C. § 271, Intel has been and is currently directly infringing, contributorily infringing, and/or inducing infringement of, the '371 patent by, among other things, making, using, offering to sell, selling and/or importing, without authority or license from AmberWave, certain semiconductor devices.

21. AmberWave is informed and believes, and thereon alleges, that Intel's infringement of the '371 patent has been and continues to be willful.

22. Unless enjoined, Intel will continue to infringe the '371 patent, and AmberWave will suffer irreparable injury as a direct and proximate result of Intel's conduct.

23. AmberWave has been damaged by Intel's conduct, and until an injunction issues will continue to be damaged in an amount yet to be determined.

## **PRAYER FOR RELIEF**

WHEREFORE, AmberWave prays for relief as follows:

A.  For a determination that Intel has infringed and is infringing the '292 patent, the '632 patent, and the '371 patent, and that Intel's infringement is willful;

B.  For an order preliminarily and permanently enjoining Intel, and its directors, officers, employees, attorneys, agents and all persons in active concert or participation with any of the foregoing from acts of infringement of the '292 patent, the '632 patent, and the '371 patent;

C.  For damages resulting from infringement of the '292 patent, the '632 patent, and the '371 patent in an amount to be determined at trial, and the trebling of such damages due to the willful nature of their infringement;

D.  For an award of interest on damages;

E.  For a declaration that this case is exceptional pursuant to 35 U.S.C. § 285 and an award of attorneys' fees and costs; and

F.  For an award of such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

AmberWave hereby demands a trial by jury on any issue triable of right by a jury.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ *Leslie A. Polizoti*

Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
lpolizoti@mnat.com
   *Attorneys for Plaintiff*
   *AmberWave Systems Corporation*

OF COUNSEL:

Morgan Chu
David I. Gindler
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067
(310) 277-1010

February 27, 2006
508747

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2006 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to Josy W. Ingersoll, Karen Elizabeth Keller and John W. Shaw.

I further certify that I caused copies to be served upon the following in the manner indicated:

### BY HAND & EMAIL

Josy W. Ingersoll
YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899

### BY FACSIMILE & EMAIL

George M. Newcombe
Jeffrey E. Ostrow
Patrick E. King
SIMPSON THACHER & BARTLETT LLP
3300 Hillview Avenue
Palo Alto, CA 94304

/s/ Leslie A. Polizoti
Leslie A. Polizoti (#4299)
lpolizoti@mnat.com

# EXHIBIT C



US006946371B2

(12) **United States Patent** (10) Patent No.: **US 6,946,371 B2**
Langdo et al. (45) Date of Patent: **Sep. 20, 2005**

(54) **METHODS OF FABRICATING SEMICONDUCTOR STRUCTURES HAVING EPITAXIALLY GROWN SOURCE AND DRAIN ELEMENTS**

(75) Inventors: **Thomas A. Langdo**, Cambridge, MA (US); **Anthony J. Lochtefeld**, Somerville, MA (US)

(73) Assignee: **Amberwave Systems Corporation**, Salem, NH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 22 days.

(21) Appl. No.: **10/458,544**

(22) Filed: **Jun. 10, 2003**

(65) **Prior Publication Data**

US 2004/0045499 A1 Mar. 11, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/387,867, filed on Jun. 10, 2002.

(51) Int. Cl.$^7$ ................................................. **H01L 21/20**
(52) U.S. Cl. ........................................ **438/481**; 438/504
(58) Field of Search ................................ 438/481, 504, 438/505

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,717,681 A | 1/1988 | Curran | |
| 4,755,478 A | 7/1988 | Abernathey et al. | .......... 437/41 |
| 4,803,539 A | 2/1989 | Psaras et al. | |
| 5,034,348 A | 7/1991 | Hartswick et al. | |
| 5,089,872 A | 2/1992 | Ozturk et al. | |
| 5,198,689 A | 3/1993 | Fujioka | |
| 5,217,923 A | 6/1993 | Suguro | |
| 5,242,847 A | 9/1993 | Ozturk et al. | |
| 5,334,861 A | 8/1994 | Pfiester et al. | |
| 5,336,903 A | 8/1994 | Ozturk et al. | |
| 5,346,840 A | 9/1994 | Fujioka | |
| 5,442,205 A | 8/1995 | Brasen et al. | |
| 5,496,750 A | 3/1996 | Moslehi | |
| 5,496,771 A | 3/1996 | Cronin et al. | ............... 437/187 |
| 5,659,194 A | 8/1997 | Iwamatsu et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2002-324765 | 11/2002 |
| WO | WO01/22482 | 3/2001 |
| WO | 02/13262 A2 | 2/2002 |

OTHER PUBLICATIONS

Antoniadis et al., "SOI Devices and Technology," *SOI devices and technology*, Neuilly sur Seine, France, 1999, pp. 81–87.
Aoyama et al., "Facet formation mechanism of silicon selective epitaxial layer by Si ultrahigh vacuum chemical vapor deposition," *Journal of Crystal Growth*, 136 (1994), pp. 349–354.

(Continued)

*Primary Examiner*—George Fourson
*Assistant Examiner*—Fernando L. Toledo
(74) *Attorney, Agent, or Firm*—Goodwin Procter, LLP

(57) **ABSTRACT**

Methods for fabricating facetless semiconductor structures using commercially available chemical vapor deposition systems are disclosed herein. A key aspect of the invention includes selectively depositing an epitaxial layer of at least one semiconductor material on the semiconductor substrate while in situ doping the epitaxial layer to suppress facet formation. Suppression of faceting during selective epitaxial growth by in situ doping the epitaxial layer at a predetermined level rather than by manipulating spacer composition and geometry alleviates the stringent requirements on the device design and increases tolerance to variability during the spacer fabrication.

**35 Claims, 5 Drawing Sheets**



# US 6,946,371 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,714,777 A | 2/1998 | Ismail et al. | |
| 5,844,260 A | 12/1998 | Ohori | 257/190 |
| 5,847,419 A | 12/1998 | Imai et al. | |
| 5,869,359 A | 2/1999 | Prabhakar | |
| 5,877,535 A | 3/1999 | Matsumoto | 257/369 |
| 5,891,769 A | 4/1999 | Liaw et al. | 438/167 |
| 5,933,741 A | 8/1999 | Tseng | |
| 5,998,807 A | 12/1999 | Lustig et al. | |
| 6,008,111 A | 12/1999 | Fushida et al. | |
| 6,066,563 A | 5/2000 | Nagashima | |
| 6,096,647 A | 8/2000 | Yang et al. | |
| 6,107,653 A | 8/2000 | Fitzgerald | |
| 6,121,100 A | 9/2000 | Andideh et al. | |
| 6,132,806 A | 10/2000 | Dutartre | |
| 6,133,124 A | 10/2000 | Horstmann et al. | |
| 6,159,856 A | 12/2000 | Nagano | |
| 6,187,657 B1 | 2/2001 | Xiang et al. | 438/596 |
| 6,214,679 B1 | 4/2001 | Murthy et al. | |
| 6,235,575 B1 | 5/2001 | Kasai et al. | |
| 6,246,077 B1 | 6/2001 | Kobayashi et al. | 257/77 |
| 6,251,780 B1 | 6/2001 | Sohn et al. | |
| 6,268,257 B1 | 7/2001 | Wieczorek et al. | |
| 6,281,532 B1 | 8/2001 | Doyle et al. | |
| 6,291,321 B1 | 9/2001 | Fitzgerald | 438/494 |
| 6,294,448 B1 | 9/2001 | Chang et al. | |
| 6,306,698 B1 | 10/2001 | Wieczorek et al. | |
| 6,313,486 B1 | 11/2001 | Kencke et al. | 257/192 |
| 6,315,384 B1 | 11/2001 | Ramaswami et al. | |
| 6,316,357 B1 | 11/2001 | Lin et al. | |
| 6,319,805 B1 | 11/2001 | Iwamatsu et al. | |
| 6,362,071 B1 | 3/2002 | Nguyen et al. | |
| 6,380,008 B2 | 4/2002 | Kwok et al. | |
| 6,399,970 B2 | 6/2002 | Kubo et al. | |
| 6,406,986 B1 | 6/2002 | Yu | |
| 6,410,371 B1 | 6/2002 | Yu et al. | |
| 6,461,960 B2 | 10/2002 | Lee | |
| 6,486,520 B2 | 11/2002 | Okuno et al. | |
| 6,498,359 B2 | 12/2002 | Schmidt et al. | |
| 6,503,833 B1 | 1/2003 | Ajmera et al. | |
| 6,509,587 B2 | 1/2003 | Sugiyama et al. | |
| 6,555,839 B2 | 4/2003 | Fitzgerald | |
| 6,555,880 B2 | 4/2003 | Cabral et al. | |
| 6,562,703 B1 * | 5/2003 | Maa et al. | 438/518 |
| 6,563,152 B2 | 5/2003 | Roberds et al. | |
| 6,566,718 B2 | 5/2003 | Wieczorek et al. | |
| 6,573,126 B2 | 6/2003 | Chen et al. | |
| 6,573,160 B2 | 6/2003 | Taylor, Jr. et al. | |
| 6,583,015 B2 | 6/2003 | Fitzgerald et al. | |
| 6,593,191 B2 | 7/2003 | Fitzgerald | |
| 6,593,641 B1 | 7/2003 | Fitzgerald | |
| 6,603,156 B2 | 8/2003 | Rim | |
| 6,605,498 B1 | 8/2003 | Murthy et al. | |
| 6,621,131 B2 | 9/2003 | Murthy et al. | |
| 6,657,223 B1 | 12/2003 | Wang et al. | |
| 6,682,965 B1 | 1/2004 | Noguchi et al. | |
| 6,686,617 B2 | 2/2004 | Agnello et al. | |
| 6,699,765 B1 * | 3/2004 | Shideler et al. | 438/312 |
| 6,703,648 B1 | 3/2004 | Xiang et al. | |
| 6,724,019 B2 | 4/2004 | Oda et al. | |
| 6,743,684 B2 | 6/2004 | Liu | |
| 2001/0001724 A1 | 5/2001 | Kwok et al. | |
| 2001/0009303 A1 | 7/2001 | Tang et al. | |
| 2001/0031535 A1 | 10/2001 | Agnello et al. | |
| 2001/0045604 A1 | 11/2001 | Oda et al. | |
| 2002/0019127 A1 | 2/2002 | Givens | |
| 2002/0048910 A1 | 4/2002 | Taylor, Jr. et al. | |
| 2002/0052084 A1 | 5/2002 | Fitzgerald | |
| 2002/0056879 A1 | 5/2002 | Wieczorek et al. | |
| 2002/0063292 A1 | 5/2002 | Armstrong et al. | |
| 2002/0190284 A1 | 12/2002 | Murthy et al. | |
| 2003/0113971 A1 * | 6/2003 | Nagaoka et al. | 438/287 |
| 2004/0007724 A1 | 1/2004 | Murthy et al. | |
| 2004/0014276 A1 | 1/2004 | Murthy et al. | |
| 2004/0014304 A1 | 1/2004 | Bhattacharyya | |
| 2004/0070035 A1 | 4/2004 | Murthy et al. | |
| 2004/0084735 A1 | 5/2004 | Murthy et al. | |
| 2004/0119101 A1 | 6/2004 | Schrom et al. | |
| 2004/0142545 A1 | 7/2004 | Ngo et al. | |
| 2004/0173815 A1 | 9/2004 | Yeo et al. | |

## OTHER PUBLICATIONS

Arst et al., "Surface planarity and microstructure of low temperature silicon SEG and ELO," *Journal of Materials Research,* vol. 6, No. 4 (Apr. 1991), pp. 784–791.

Cao et al., "0.18–μm Fully–Depleted Silicon–on–Insulator MOSFET's," *IEEE Electron Device Letters,* vol. 18, No. 6 (Jun. 1997), pp. 251–253.

Chieh et al., "Low–Resistance Bandgap–Engineered W/Si$_{1-x}$Ge$_x$/Si Contacts," *IEEE Electron Device Letters,* vol. 17, No. 7 (Jul. 1996), pp. 360–362.

Choi et al., "Nanoscale Ultrathin Body PMOSFETs With Raised Selective Germanium Source/Drain," *IEEE Electron Device Letters,* vol. 22, No. 9 (Sep. 2001), pp. 447–448.

Choi et al., "30nm ultra–thin body SOI MOSFET with selectively deposited Ge raised S/D," *58th Device Research Conference* (2000), pp. 23–24.

Drowley et al., "Model for facet and sidewall defect formation during selective epitaxial growth of (001) silicon," *Applied Physics Letters,* 52 (7) (Feb. 15, 1988), pp. 546–548.

Eaglesham et al., "Growth Morphology and the Equilibrium Shape: The Role of 'Surfactants' in the Ge/Si Island Formation," *Physical Review Letters,* vol. 70, No. 7 (Feb. 15, 1993), pp. 966–969.

Gallas et al., "Influence of doping on facet formation at the SiO2/Si interface," *Surface Science,* 440 (1999) pp. 41–48.

Glück et al., "CoSi$_2$ and TiSi$_2$ for Si/SiGe heterodevices," *Thin Solid Films,* vol. 270 (1995), pp. 549–554.

Goulding, "The selective epitaxial growth of silicon," *Materials Science and Engineering,* B17 (1993), pp. 47–67.

Greve et al., "Growth Rate of Doped and Undoped Silicon by Ultra–High Vacuum Chemical Vapor Deposition," *Journal of the Electrochemical Society,* vol. 138, No. 6 (Jun. 1991), pp. 1744–1748.

Huang et al., "Electrical and Compositional Properties of Co–Silicided Shallow P$^+$–n Junction Using Si–Capped/Boron–Doped Si$_{1-x}$Ge$_x$ Layer Deposited by UHVCME," *Journal of the Electrochemical Society,* vol. 148, No. 3 (2001), pp. G126–G131.

Ilderem et al., "Very low pressure chemical vapor deposition process for selective titanium silicide films," *Appl. Phys. Lett.,* vol. 53, No. 8 (Aug. 22, 1988), pp. 687–689.

Ishitani et al., "Facet Formation in Selective Silicon Epitaxial Growth," *Japanese Journal of Applied Physics,* vol. 24, No. 10 (Oct., 1995), pp. 1267–1269.

Jang et al., "Phosphorus doping of epitaxial Si and Si1–xGex at very low pressure," *Applied Physics Letters,* 63 (12) (Sep. 20, 1993), pp. 1675–1677.

Jastrzebski, "SOI by CVD: Epitaxial Lateral Overgrowth (ELO) Process—Review," *Journal of Crystal Growth,* 63 (1983), pp. 493–526.

Kamins et al., "Kinetics of selective epitaxial deposition of Si1–xGex," *Applied Physics Letters,* 61 (6) (Aug. 10, 1992), pp. 669–671.

Kendel et al., "Surfactant Mediated Crystal Growth of Semiconductors," *Physical Review Letters*, vol. 75, No. 14 (Oct. 2, 1995), pp. 2742–2745.

King, "Silicon–Germanium: from Microelectronics to Micromechanics," Presentation to the Thin Film Users Group Meeting, AVS Northern California Chapter, Apr. 17, 2002.

Kitajima et al., "Lattice Defect in Selective Epitaxial Silicon and Laterally Overgrown Regions on SiO2," *Journal of Crystal Growth*, 98 (1989), pp. 264–276.

Kummer et al., "Low energy plasma enhanced chemical vapor deposition," *Materials Science and Engineering*, B89 (2002), pp. 288–295.

Langdo, "Selective SiGe Nanostructures," Ph.D. Thesis, Massachusetts Institute of Technology, 2001.

Li et al., "Modeling of facet growth on patterned Si substrate in gas source MBE," *Journal of Crystal Growth*, 157 (1995), pp. 185–189.

Lochtefeld, "Toward the End of the MOSFET Roadmap: Investigating Fundamental Transport Limits and Device Architecture Alternatives," Ph.D. Thesis, Massachusetts Institute of Technology, 2001.

Lynch, "Self–Aligned Contact Schemes for Source–Drains in Submicron Devices," *IEDM Technical Digest* (1987), pp. 354–357.

Maillard–Schaller et al., "Role of the substrate strain in the sheet resistance stability of NiSi deposited on Si(100)," *Journal of Applied Physics*, vol. 85, No. 7 (Apr. 1, 1999), pp. 3614–3618.

Maiti et al., "Strained–Si heterostructure field effect transistors," *Semiconductor Science and Technology*, vol. 13 (1998), pp. 1225–1246.

Mercier et al., "Selective TiSi₂ Deposition with no Silicon Substrate Consumption by Rapid Thermal Processing in a LPCVD Reactor," *Journal of Electronic Materials*, vol. 19, No. 3 (1990), pp. 253–258.

Meyerson et al., "Phosphorus–Doped Polycrystalline Silicon via LPCVD," *Journal of the Electrochemical Society*, vol. 131, No. 10 (Oct. 1984), pp. 3042–3047.

Miyano et al., "Facet–Free Si Selective Epitaxial Growth Adaptable to Elevated Source/Drain MOSFETs with Narrow Shallow Trench Isolation," *Japanese Journal of Applied Physics*, vol 38, Part 1, No. 4B (Apr. 1999), pp. 2419–2423.

Moon et al., "Application of interferometric broadband imaging alignment on an experimental x–ray stepper," *Journal of Vacuum Science and Technology*, B 16(6) (Nov./Dec. 1998), pp. 3631–3636.

Osburn et al., "Low parasitic resistance contacts for scaled ULSI devices," *Thin Solid Films*, 332 (1998), pp. 428–436.

Öztürk et al., "Rapid Thermal Chemical Vapor Deposition of Germanium and Germanium/Silicon Alloys on Silicon: New Applications in the Fabrication of MOS Transistors," *Materials Research Society Symposium Proceedings*, vol. 224 (1991), pp. 223–234.

Pfiester et al., "A Self–Aligned Elevated Source/Drain MOSFET," *IEEE Electron Device Letters*, vol. 11, No. 9 (Sep. 1990), pp. 365–367.

Raaijmakers et al., "Enabling technologies for forming and contacting shallow junctions in Si: HF–vapor cleaning and selective epitaxial growth of Si and SiGe," *Journal of Vacuum Science and Technology*, B 17(5) (Sep./Oct. 1999), pp. 2311–2320.

Ren et al., "A Novel Implantation Free Raised Source/Drain MOSFET Process Using Selective Rapid Thermal Chemical Vapor Deposition of In–Situ Boron Doped Si$_x$ Ge$_{1-x}$," *Materials Research Society Symposium Proceedings*, vol. 303 (1993), pp. 37–41.

Reynolds et al., "Selective titanium disilicide by low–pressure chemical vapor deposition," *Journal of Applied Physics*, vol. 65, No. 8 (Apr. 15, 1989), pp. 3212–3218.

Robbins et al., "A model for heterogeneous growth of Si1–xGex films from hydrides," *Journal of Applied Physics*, 69 (6) (Mar. 15, 1991), pp. 3729–3732.

Rodder et al., "Raised Source/Drain MOSFET with Dual Sidewall Spacers," *IEEE Electron Device Letters*, vol. 12, No. 3 (Mar. 1991), pp. 89–91.

Samavedam et al., "Elevated source drain devices using silicon selective epitaxial growth," *Journal of Vacuum Science and Technology*, B 18(3) (May/Jun. 2000), pp. 1244–1250.

Savina et a., "Faceting of a growing crystal surface by surface diffusion," *Physical Review*, E 67, 021606 (2003), pp 1–16.

Sedgwick et al., "Growth of Facet–Free Selective Silicon Epitaxy at Low Temperature and Atmospheric Pressure," *Journal of the Electrochemical Society*, vol. 138, No. 10 (Oct. 1991), pp. 3042–3047.

Shibata et al., "High Performance Half–Micron PMOSFETs with 0.1UM Shallow PᐩN Junction Utilizing Selective Silicon Growth and Rapid Thermal Annealing," *IEDM Technical Digest* (1987), pp. 590–593.

Sidek et al., "Reduction of parasitic bipolar transistor action and punchthrough susceptibility in MOSFETs using Si/Si1–xGex sources and drains," *Electronics Letters*, vol. 32, No. 3 (Feb. 1, 1996), pp. 269–270.

Sun et al., "A Comparative Study of n+/p Junction Formation for Deep Submicron Elevated Source/Drain Metal Oxide Semiconductor Field Effect Transistors," *Journal of the Electrochemical Society*, vol. 144, No. 10 (Oct. 1997), pp. 3659–3664.

Sun et al., "The Effect of the Elevated Source/Drain Doping Profile on Performance and Reliability of Deep Submicron MOSFET's," *IEEE Transactions on Electron Devices*, vol. 44, No. 9 (Sep. 1997), pp. 1491–1498.

Sun et al., "Impact of Epi Facets on Deep Submicron Elevated Source/Drain MOSFET Characteristics," *IEEE Transactions on Electron Devices*, vol. 45, No. 6 (Jun. 1998), pp. 1377–1380.

Tromp et al., "Local Dimer Exchange in Surfactant–Mediated Epitaxial Growth," *Physical Review Letters*, vol. 68, No. 7 (Feb. 17, 1992), pp. 954–957.

Uchino et al., "MOSFETs with Ultrashallow Junction and Minimum Drain Area Formed by Using Solid–Phase Diffusion from SiGe," *IEEE Transactions on Electron Devices*, vol. 48, No. 7 (Jul. 2001), pp. 1406–1411.

Uhrberg et al., "Electronic and atomic structure of arsenic terminated Si(100)," *Journal of Vacuum Science and Technology*, A 4 (3) (May/Jun. 1986), pp. 1259–1264.

Violette et al., "Facet–Free Selective Silicon Epitaxy by Reduced–Pressure Chemical Vapor Deposition: Process Evaluation and Impact on Shallow Trench Isolation," *Journal of the Electrochemical Society*, 146 (5) (1999), pp. 1895–1902.

Wong et al., "Elevated Source/Drain MOSFET," *IEDM Technical Digest*, 28 (1984), pp. 634–637.

Xiang et al., "Interfacet mass transport and facet evolution in selective epitaxial growth of Si by gas source molecular beam epitaxy," *Journal of Vacuum Science and Technology*, B 14(3) (May/Jun. 1996), pp. 2381–2386.

Yu et al., "Doping reaction of PH3 and B2H6 with Si(100)," *Journal of Applied Physics*, 59 (12) (Jun. 15, 1986), pp. 4032–4037.

Augendre et al., "Elevated Source/Drain by Sacrificial Selective Epitaxy for High Performance Deep Submicron CMOS: Process Window versus Complexity," *IEEE Transactions on Electron Devices*, vol. 47, No. 7 (Jul. 2000), pp. 1484–1491.

International Search Report for PCT/US03/18140, Nov. 5, 2003, 5 pages.

Meyer, "Elevated Source/Drain Structures," *The ASM Epitaxy Newsletter of Continuous Improvement*, (Spring 1998).

Yew, "Growth and Characterization of Low Temperature Silicon Selective Epitaxy," Ph.D. Thesis, MIT, 1990, pp. 1–210.

Kurosawa et al., "A New Bird's Beak Free Field Isolation Technology for VLSI Devices," *IEDM Technical Digest*, Washington, D.C., Dec. 7–9, 1981, pp. 384–387.

O'Neill et al., "Si–Ge Virtual Substrate N–channel Heterojunction MOSFETs," *Semiconductor Science Technology*, vol. 14, No. 9, 1999, pp. 784–789.

Aldrich et al., "Stability of C54 Titanium Germanosilicide on a Silicon–Germanium Alloy Substrate," *J. Appl. Phys.*, 1995, 77(10):5107–5114.

Aubry–Fortuna et al., "Phase Formation and Strain Relaxation During Thermal Reaction of Zr and Ti with Strained $Si_{1-x-y}Ge_xC_y$ epilayers," *Journal of Applied Physics*, 2000, 88(3):1418–1423.

Detavernier, et al., "CoSi$_2$ Nucleation in the presence of Ge," *Thin Solid Films*, 2001, 384(2):243–250.

Eberhardt et al., "Ni/Ag Metallization for SiGe HBTs using a Ni Silicide Contact," *Semicond. Sci. Technol.*, 2001 16(9):L47–L49.

Freiman et al., "Kinetics of Processes in the Ti–$Si_{1-x}Ge_x$ Systems," *Appl. Phys. Lett.*, 1996, 69(25):3821–3823.

Freiman et al., "Titanium Metallization of Si/Ge Alloys and Superlattices," *Thin Solid Films*, 1997, 294:217–219.

Hsiao et al., "Advanced Technologies for Optimized Sub–Quarter–Micrometer SOI CMOS Devices," *IEEE Transactions on Electron Devices*, 1998, 45(5):1092–1098.

Huang et al., "Study on Ge/Si ratio, Silicidation, and Strain Relaxation of High Temperature Sputtered Co/$Si_{1-x}Ge_x$ Structures," *Journal of Applied Physics*, 2000, 88(4):1831–1837.

Jungemann et al., "Full–Band Monte Carlo Simulation of a 0.12 $\mu$m–Si–PMOSFET with and without a Strained SiGe–Channel," *IEEE Electron Devices Meeting*, 1998, pp. 897–900.

King et al., "A Polycrystalline $Si_{1-x}Ge_x$–Gate CMOS Technology", *IEEE*, vol., No., 1990, pp. 253–256.

Ku et al., "High Performance pMOSFETs with Ni(Si$_x$Ge$_{1-x}$)/Poly–Si$_{0.8}$Ge$_{0.2}$ Gate," *IEEE–2000 Symposium on VLSI Technology Digest of Technical Papers*, 2000, 114–115.

Lai et al., "Effects of Composition on the Formation Temperatures and Electrical Resistivities of C54 Titanium Germanosilicide in Ti–$Si_{1-x}Ge_x$ Systems," 1999, *Journal of Applied Physics*, 86(3):1340–1345.

Okada et al., "Epitaxial Growth of Heavily B–Doped SiGe Films and Interfacial Reaction of Ti/B–Doped SiGe Bilayer Structure Using Rapid Thermal Processing," *Thin Solid Films*, 2000, 369:130–133.

Qin et al., "Structure and Thermal Stability of Ni/$Si_{1-x}Ge_x$ Contacts for VLSI Applications," *Electronics Letters*, 2000, 36(21):1819–1821.

Ponomarev et al., "High–Performance Deep SubMicron CMOS Technologies with Polycrystalline–SiGe Gates," *IEEE Transactions on Electron Devices*, vol. 47, No. 4, Apr. 2000, pp. 848–855.

Yasuda et al., "Interfacial Reactions of Ti/ and Zr/$Si_{1-x}Ge_x$/ Si Contacts with Rapid Thermal Annealing," *Thin Solid Films*, 2000, 373:73–78.

Gannavaram, et al., "Low Temperature ($\leqq 800°$ C.) Recessed Junction Selective Silicon–Germanium Source/ Drain Technology for sub–70 nm CMOS," *IEEE International Electron Device Meeting Technical Digest*, (2000), pp. 437–440.

Ge et al., "Process–Strained Si (PSS) CMOS Technology Featuring 3D Strain Engineering," *IEEE International Electron Devices Meeting Technical Digest*, (2003) pp. 73–76.

Ghani et al., "A 90nm High Volume Manufacturing Logic Technology Featuring Novel 45nm Gate Length Strained Silicon CMOS Transistors," *IEEE International Electron Devices Meeting Technical Digest*, (2003), 978–980.

Hamada et al., "A New Aspect of Mechanical Stress Effects in Scaled MOS Devices," *IEEE Transactions on Electron Devices*, vol. 38, No. 4 (Apr. 1991), pp. 895–900.

Huang et al., "Isolation Process Dependence of Channel Mobility in Thin–Film SOI Devices," *IEEE Electron Device Letters*, vol. 17, No. 6 (Jun. 1996), pp. 291–293.

Huang et al., "LOCOS–Induced Stress Effects on Thin–Film SOI Devices," *IEEE Transactions on Electron Devices*, vol. 44, No. 4 (Apr. 1997), pp. 646–650.

Huang, et al., "Reduction of Source/Drain Series Resistance and Its Impact on Device Performance for PMOS Transistors with Raised $Si_{1-x}Ge_x$ Source/Drain", *IEEE Electron Device Letters*, vol. 21, No. 9, (Sep. 2000) pp. 448–450.

Iida et al., "Thermal behavior of residual strain in silicon–on–insulator bonded wafer and effects on electron mobility," *Solid–State Electronics*, vol. 43 (1999), pp. 1117–1120.

Ito et al., "Mechanical Stress Effect on Etch–Stop Nitride and its Impact on Deep Submicron Transistor Design," *IEEE International Electron Devices Meeting Technical Digest*, (2000), pp. 247–250.

Lochtefeld et al., "Investigating the Relationship Between Electron Mobility and Velocity in Deeply Scaled NMOS via Mechanical Stress," *IEEE Electron Device Letters*, vol. 22, No. 12 (2001), pp. 591–593.

Ootsuka et al., "A Highly Dense, High–Performance 130nm node CMOS Technology for Large Scale System–on–a–Chip Applications," *IEEE International Electron Devices Meeting Technical Digest*, (2000), pp. 575–578.

Ota et al., "Novel Locally Strained Channel Technique for High Performance 55nm CMOS," *IEEE International Electron Devices Meeting Technical Digest*, (2002), pp. 27–30.

Öztürk et al., "Advanced $Si_{1-x}Ge_x$ Source/Drain and Contact Technologies for Sub–70 nm CMOS," *IEEE International Electron Device Meeting Technical Digest*, (2002), pp. 375–378.

US 6,946,371 B2

Page 5

Öztürk, et al., "Low Resistivity Nickel Germanosilicide Contacts to Ultra–Shallow $Si_{1-x}Ge_x$ Source/Drain Junctions for Nanoscale CMOS," *IEEE International Electron Device Meeting Technical Digest* (2003), pp. 497–500.

Öztürk, et al., "Selective Silicon–Gremanium Source/Drain Technology for Nanoscale CMOS," *Mat. Res. Soc. Symp. Proc.*, vol. 717, (2002), pp. C4.1.1–C4.1.12.

Öztürk, et al., "Ultra–Shallow Source/Drain Junctions for Nanoscale CMOS Using Selective Silicon–Germanium Technology," *Extended Abstracts of International Workshop on Junction Technology*, (2001), pp. 77–82.

Shimizu et al., "Local Mechanical–Stress Control (LMC): A New Technique for CMOS–Performance Enhancement," *IEEE International Electron Devices Meeting Technical Digest*, (2001), pp. 433–436.

Thompson et al., "A Logic Nanotechnology Featuring Strained–Silicon," *IEEE Electron Device Letters*, vol. 25, No. 4 (Apr. 2004), pp. 191–193.

Thompson et al., "A 90 nm Logic Technology Featuring 50nm Strained–Silicon Channel Transistors, 7 layers of Cu Interconnects, Low k ILD, and $1um^2$ SRAM Cell," *IEEE International Electron Devices Meeting Technical Digest*, (2002), pp. 61–64.

Tiwari et al., "Hole Mobility Improvement in Silicon–on–Insulator and Bulk Silicon Transistors Using Local Strain," *IEEE International Electron Devices Meeting Technical Digest*, (1997), pp. 939–941.

Uchino, et al., "A Raised Source/Drain Technology Using In–situ P–doped SiGe and B–doped Si for 0.1–$\mu$m CMOS ULSIs," *IEEE International Electron Device Meeting Technical Digest*, (1997), pp. 479–482.

* cited by examiner



Prior Art

**FIG. 1**



Prior Art

**FIG. 2**

Prior Art



FIG. 3



**FIG. 4**



**FIG. 5**



**FIG. 6**

US 6,946,371 B2

1

# METHODS OF FABRICATING SEMICONDUCTOR STRUCTURES HAVING EPITAXIALLY GROWN SOURCE AND DRAIN ELEMENTS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority to and the benefit of U.S. Provisional Application Ser. No. 60/387,867 filed Jun. 10, 2002, the entire disclosure of which is incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates generally to semiconductor fabrication methods and, more specifically, to methods for fabricating semiconductor devices having substantially facetless raised source and drain elements.

## BACKGROUND

In order to improve performance and packing density of modern microelectronic devices, it is often desirable to reduce channel lengths of metal-oxide-semiconductor-field-effect transistors ("MOSFETs") during device design. As the MOSFET channel length decreases, however, short channel effects and parasitic resistance become of increasing concern. To minimize short channel effects in bulk silicon devices, for example, the source/drain doping junction depths are decreased during scaling. But shallower junctions require the use of thinner silicides to minimize leakage current from the silicon/silicide interface to the junction depletion region, which, at the same time, may increase parasitic contact resistances. As another example, to improve performance of a silicon-on-insulator ("SOI") device by reducing short channel effects, its silicon region should preferably be less than about 20 nm thick. Conventional silicide formation processes, however, may consume substantially the entire silicon layer of such thickness, which may, in turn, result in undesirably large leakage currents and parasitic contact resistance because the silicide/silicon interface area is small.

The increasing operating speeds and computing power of microelectronic devices have recently given rise to the need for an increase in the complexity and functionality of the semiconductor substrates that are used as the starting substrate in these microelectronic devices. Such "virtual substrates" based on silicon and germanium provide a platform for new generations of VLSI devices that exhibit enhanced performance when compared to devices fabricated on bulk Si substrates. Specifically, new technological advances enable formation of heterostructures using silicon-germanium alloys (hereinafter referred to as "SiGe" or "$Si_{1-x}Ge_x$") to further increase performance of the semiconductor devices by changing the atomic structure of Si to increase electron mobility. These substrates are called strained Si substrates.

A strained Si substrate is generally formed by a first epitaxial growth of a relaxed SiGe layer on bulk Si, and then a second epitaxial growth of a thin (less than about 500 Å) Si layer on the relaxed SiGe layer. Because the lattice constant of relaxed SiGe heterostructure is different from Si, the thin Si layer becomes "strained," resulting in enhanced mobilities (and hence improved device speeds) over bulk Si. The percentage of Ge in SiGe, and the method of deposition can have a dramatic effect on the characteristics of the strained Si layer. U.S. Pat. No. 5,442,205, "Semiconductor

2

Heterostructure Devices with Strained Semiconductor Layers," incorporated herein by reference, demonstrates one such method of producing a strained Si device structure.

A method of epitaxially growing a relaxed SiGe layer on bulk Si is discussed in international application WO 01/22482, "Method of Producing Relaxed Silicon Germanium Layers," incorporated herein by reference. The method includes providing a monocrystalline Si substrate, and then epitaxially growing a graded $Si_{1-x}Ge_x$ layer with increasing Ge concentration at a gradient of less than 25% Ge per micron to a final composition in the range of 0.1 <x<1, using a source gas of $Ge_xH_yCl_z$ for the Ge component, on the Si substrate at a temperature in excess of 850° C. and then epitaxially growing a semiconductor material on the graded layer.

Another method of epitaxially growing a relaxed SiGe layer on bulk Si is discussed in a paper entitled, "Low Energy plasma enhanced chemical vapor deposition," by M. Kummer et. al. (Mat. Sci. & Eng. B89, 2002, pp. 288–95), incorporated herein by reference, in which a method of low-energy plasma-enhanced chemical vapor deposition (LEPECVD) is shown, which allows the formation of a SiGe layer on bulk Si at high growth rates (0.6 micron per minute) and low temperatures (500–750° C.).

To grow a high-quality, thin, epitaxial strained Si layer on a graded SiGe layer, the SiGe layer is, preferably, planarized to reduce the surface roughness in the final strained Si substrate. Current methods of chemical mechanical polishing (CMP) are typically used to improve the planarity of surfaces in semiconductor fabrication processes. U.S. Pat. No. 6,107,653, "Controlling Threading Dislocations in Ge on Si Using Graded GeSi Layers and Planarization," incorporated herein by reference, describes how planarization can be used to improve the quality of SiGe graded layers.

Although the resulting biaxial tensile or compressive strain alters the carrier mobilities in the layers of the "virtual substrate" enabling the fabrication of high-speed and/or low-power devices, short channel effects and parasitic resistance remain of concern for strained-Si-based devices as well.

Raised source/drain structures have been proposed as a technique for forming high-quality contacts to improve performance of bulk silicon, silicon-on-insulator (SOI), and strained silicon devices. Raised source/drains are generally fabricated by raising the level of the source and drain regions by selective semiconductor, e.g., silicon, deposition. The extra silicon increases the process margin for the silicide process and extends the latitude for contact junction design. To maintain a similar crystalline structure, the extra silicon is "grown" by silicon epitaxy.

For example, in bulk and strained Si devices, raised source/drain contacts have been proposed as a means of forming shallow dopant junctions to minimize contact resistances and short channel effects. In SOI devices, the raised source and drain regions provide sacrificial silicon useful for silicide consumption to form low resistance contacts on thin Si films.

Typically, source and drain regions are formed by selective epitaxial silicon growth after formation of a sidewall dielectric spacer of silicon dioxide ($SiO_2$), silicon nitride ($Si_3N_4$), or a combination of both materials. In this process, silicon is epitaxially grown on exposed windows in a dielectric mask while nucleation of polysilicon on the masking material is suppressed during the incubation time by, for example, etching of spurious nuclei on the dielectric material by hydrogen chloride, the mediation of saturation by

US 6,946,371 B2

3

formation of a number of intermediate chlorine-containing silicon precursors, and passivation of surface defect sites which serve as heterogeneous nucleation centers. Also, selectivity is facilitated by growing for a period of time that is generally shorter than the incubation period needed for polysilicon nucleation on the dielectric mask.

The dielectric spacer electrically isolates a gate made of, for example, polysilicon, from the source and drain regions. After the selective epitaxial growth step, a heavy low-energy implant forms a doped region, and is followed by a silicidation process for, e.g., low resistance complementary metal-oxide-semiconductor (CMOS) contacts.

During selective epitaxial growth, however, decreased thickness of the epitaxial layer typically occurs at interfaces between the epitaxial layer and the dielectric spacer or field oxide, where facets form by growth of low-energy crystal planes that minimize the energetically less favorable epitaxial Si/dielectric material interface. Because the raised source/drain regions grow thinner near the dielectric spacer edge, faceting leads to non-planar device layers. This phenomenon raises processing concerns in bulk Si, SOI, and strained Si devices by complicating implementation of selective epitaxial growth in device applications. Specifically, thinner faceted regions cause localized deeper dopant penetration during ion implantation, which increases short channel effects and leakage currents. Also, thinner faceted regions typically result in deeper silicide penetration and greater Si consumption during silicidation. Thus, faceting may result in poor doping profile control and poor silicide depth control, leading to degraded device characteristics and more complex device designs.

For example, referring to FIG. 1, a cross-sectional transmission electron microscope (XTEM) image illustrates undoped Si layers 10 grown adjacent to reactive ion etched <110>-oriented $SiO_2$ sidewalls 12. The SiGe layers 14 were included as markers to track facet development and evolution. The selective Si epitaxy has noticeable (311)-oriented facets 15 and (110)-oriented facets 17 next to $SiO_2$ sidewalls. Such faceting would be detrimental during implant and silicidation of source and drain regions. Referring to FIG. 2, a silicided source region 20 is formed by selective epitaxial growth on a thin film SOI substrate 22 according to any method known in the art. Such faceted growth leads to deep penetration of a silicide 24 to a buried $SiO_2$ layer 26. This penetration may dramatically increase the contact resistance because the silicide/silicon channel interfacial area is reduced, which leads to poor device characteristics. The electrical contact to the device channel is made through the area adjacent to the spacer 28, which is only the width of the Si channel. Furthermore, the contact quality may degrade because of incomplete silicide formation if the thickness of consumed Si is insufficient.

Similarly, in strained-Si-based devices, thinner faceted raised source and drain regions may cause the silicide to penetrate into a relaxed silicon-germanium (SiGe) layer underneath a strained Si layer. This may result in formation of a poor quality silicide because of the rejection of Ge during alloying of the SiGe layer with the silicide metal. This rejection may create high-resistivity regions that compromise the contact quality.

Faceless selective epitaxial growth is, therefore, desirable for fully realizing the performance advantages of the raised source/drain scheme for fabrication of low-resistance contacts and shallow junctions in advanced devices that have wide ranging application to Si, SOI, and strained Si technologies.

4

Recently, facetless epitaxy has received much attention in the design of raised source/drain contacts for CMOS applications. For example, selective growth in inverse patterns, i.e. using $SiO_2$ pillars with a Si field as opposed to Si windows in a $SiO_2$ field, has been proposed. Another approach involves fabrication of facetless raised source/drain structures by selective epitaxial growth in commercially available low-pressure and atmospheric-pressure chemical vapor deposition systems by carefully controlling the geometry of the multilayer spacer structure and sidewall spacer profile. For example, it has been suggested that undercutting the liner oxide and silicon growth under the silicon nitride spacer recesses the silicon-liner oxide interaction away from the source/drain region. This gives extra thickness in the source/drain region before the increase in silicon-dielectric interface energy causes the epitaxial layer to facet.

In yet another approach, discussed in a thesis entitled "Selective SiGe Nanostructures" by Tom Langdo (Ph.D. Thesis, MIT, 2001)("Langdo thesis"), incorporated herein by reference, facetless growth was demonstrated by in situ n-type doping of a silicon layer being deposited by selective epitaxy adjacent to a sidewall of a reactive ion etched $SiO_2$ spacer in a ultra-high vacuum chemical vapor deposition (UHVCVD) system. It was demonstrated that a combination of moderate n-type doping and relatively vertical $SiO_2$ sidewalls results in facet-free epitaxy along <110>-oriented $SiO_2$ sidewalls. Referring to FIG. 3, an XTEM image illustrates growth of $1 \times 10^{18}$ /$cm^3$ n-type doped Si with $Si_{0.9}Ge_{0.1}$ marker layers on <110>-oriented $SiO_2$ sidewalls. As shown in FIG. 3, all $Si_{0.9}Ge_{0.1}$ marker layers follow (100) planes, and thus, facet formation is suppressed during the growth. $SiO_2$ was chosen as the sidewall material instead of more commonly used $Si_3N_4$ because selective growth generally cannot be achieved with either $SiH_4$ or $SiH_2Cl_2$ source gases, common Si precursors, on $Si_3N_4$ spacers without the addition of hydrogen chloride. Because of the deleterious effects of chloride on a UHVCVD system, however, addition of hydrogen chloride to the source gases is impractical.

Obstacles hinder the commercialization of this UHVCVD growth approach. First, UHVCVD is generally not feasible for large-scale commercial applications. Second, UHVCVD selective growth is not possible with $Si_3N_4$ dielectric materials. Finally, the UHVCVD process described above is generally not compatible with multi-layered commercial spacer structures that include, e.g., $Si_3N_4$ materials.

Thus, there remains a need in the art for a process of fabricating semiconductor devices having facetless raised source/drain structures that is compatible with existing semiconductor manufacturing processes, systems, and materials and that also possesses improved process tolerances.

SUMMARY OF THE INVENTION

It is an object of the present invention to provide a process for fabricating facetless semiconductor structures that overcomes the limitations of known processes. Specifically, it is an object of the invention to provide a process for fabricating semiconductor devices having facetless raised source/drain structures that complements existing epitaxial processes and does not require stringent control of the geometry of the dielectric regions. It is also desirable that such process be less expensive in comparison to the manufacturing processes known in the art and not limited to a particular dielectric or semiconductor material.

Accordingly, methods for fabricating facetless semiconductor structures using commercially available chemical

US 6,946,371 B2

5

vapor deposition systems are disclosed herein. A key aspect of the invention includes selectively depositing an epitaxial layer of at least one semiconductor material on the semiconductor substrate while in situ doping the epitaxial layer to suppress facet formation. Suppression of facet formation during selective epitaxial growth by in situ doping of the epitaxial layer at a predetermined level rather than by manipulating spacer composition and geometry alleviates the stringent requirements on the device design. For example, in various embodiments of the fabrication methods according to the invention, it is not necessary to precisely control the liner oxide undercut beneath the silicon nitride spacer prior to epitaxial growth to minimize faceting, thus making the process more robust and compatible with very thin spacer dimensions. Accordingly, in situ doping during epitaxial growth to suppress faceting increases tolerance to variability during the spacer fabrication, providing an improved robust process suitable for volume manufacturing.

Throughout the following description, the term "facet" is used to refer generally to a slanted low-energy crystal plane formed in a semiconductor material at its interface with a dielectric material. Further, the term "epitaxy" is used to refer generally to methods for growing thin layers of single crystal materials on a single crystal substrate whereby crystallographic structure of the substrate is reproduced in the deposited material. Also, the term "MOS" is used to refer generally to semiconductor devices that include a conductive gate spaced at least by an insulating layer from a semiconducting channel layer. Conversely, the terms "MOSFET" or "MOS transistor" refer to a field-effect transistor having a conductive gate spaced at least by an insulating layer from a semiconducting channel layer. The terms "SiGe" and "Si$_{1-x}$Ge$_x$" are used interchangeably to refer to silicon-germanium alloys. The term "silicide" is here used to refer to a reaction product of a metal, silicon, and optionally other components, such as germanium. The term "silicide" is also used, less formally, to refer to the reaction product of a metal with an elemental semiconductor, a compound semiconductor or an alloy semiconductor. The term "doping" is used to refer generally to the process of adding impurities to a semiconductor material to achieve desired properties.

In general, in one aspect, the invention is directed to a method of fabricating a semiconductor structure including the steps of providing a chamber and providing a semiconductor substrate in the chamber. The semiconductor substrate has a surface including a first portion and a second portion proximal to the first portion. The method of the invention also includes forming a dielectric region on the first portion of the substrate and selectively depositing an epitaxial layer of at least one semiconductor material on the second portion of the substrate while in situ doping the epitaxial layer. The in situ doping occurs at a first predetermined level to substantially suppress facet formation thereby forming a substantially facetless semiconductor region. The pressure in the chamber during selective deposition of the epitaxial layer is greater than about 5 Torr.

In one embodiment of the invention, the epitaxial layer is deposited in a chemical vapor deposition system, such as, for example, a reduced-pressure chemical vapor deposition system, atmospheric-pressure chemical vapor deposition system, or plasma-enhanced chemical vapor deposition system.

In another embodiment of the invention, the step of selectively depositing an epitaxial layer includes introducing a source gas into the chamber. The source gas may include at least one precursor gas and a carrier gas, such as, for

6

example hydrogen. According to one feature of this embodiment, the at least one precursor gas includes a silicon precursor gas, such as, for example, silane, disilane, trisilane, or dichlorosilane. According to another feature of this embodiment, the at least one precursor gas includes a germanium precursor gas, such as, for example, germane, digermane, germanium tetrachloride, or germanium dichloride. According to yet another feature of this embodiment, in addition to the at least one precursor gas and a carrier gas, the source gas also includes an etchant for suppressing nucleation of the at least one semiconductor material over the dielectric region during deposition. The etchant may include hydrogen chloride or chlorine.

In yet another embodiment of the invention, the epitaxial layer is doped by adding a dopant to the epitaxial layer during deposition of the epitaxial layer. Examples of suitable dopants are phosphorus, arsenic, antimony, and boron. The dopant may be added to the epitaxial layer by introducing a dopant gas, such as phosphine, arsine, stibine, and diborane, into the chamber. According to one feature of this embodiment, the first predetermined level of doping ranges from about $10^{17}$ to about $10^{19}$ cm$^{-3}$.

The epitaxial layer may include at least one of silicon and germanium. Also, the dielectric region may include at least one of silicon oxide and silicon nitride. Optionally, the dielectric region may have a two-layered spacer structure including a silicon oxide layer and a silicon nitride layer disposed thereon.

In some embodiments of the invention, the semiconductor substrate includes silicon. In other embodiments, the semiconductor substrate may include a silicon wafer; an insulating layer disposed thereon; and a strained semiconductor layer, for example, silicon or germanium, disposed on the insulating layer. Alternatively, the semiconductor substrate may include a silicon wafer; a compositionally uniform relaxed Si$_{1-x}$Ge$_x$ layer deposited thereon; and a strained silicon layer deposited on the relaxed Si$_{1-x}$Ge$_x$ layer. In this embodiment, the semiconductor substrate may also include a compositionally graded Si$_{1-x}$Ge$_x$ layer disposed between the compositionally uniform relaxed Si$_{1-x}$Ge$_x$ layer and the silicon wafer, or an insulating layer disposed between the compositionally uniform relaxed Si$_{1-x}$Ge$_x$ layer and the silicon wafer.

In still another embodiment of the invention, the temperature in the chamber during selective deposition of the epitaxial layer ranges from about 300° C. to about 900° C., for example, from about 500° C. to about 700° C. Also, the epitaxial layer may be deposited at a rate greater than about 1 nm/min.

In one embodiment of the invention, the method includes the steps of fabricating an n-channel MOSFET in a first portion of the semiconductor region; and fabricating a p-channel MOSFET in a second portion of the semiconductor region. According to one feature of this embodiment, the method includes counter-doping the first portion or the second portion at a second predetermined level. Optionally, the first predetermined level of doping does not exceed the second predetermined level of doping.

In some embodiments, the method of the invention also includes forming a metal silicide layer over the semiconductor region. The surface of the semiconductor substrate may have a substantially (100) crystallographic orientation. Also, the dielectric region may include a sidewall having an angle relative to the semiconductor substrate that ranges from about 60° to about 90°. The sidewall may be substantially aligned with either the <110> crystallographic plane or the <100> crystallographic plane of the semiconductor substrate.

US 6,946,371 B2

7

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, like reference characters generally refer to the same parts throughout the different views. Also, the drawings are not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the invention. In the following description, various embodiments of the present invention are described with reference to the following drawings, in which:

FIG. 1 depicts an XTEM image illustrating faceted selective epitaxial growth of alternating Si and SiGe layers proximate a sidewall of a SiO$_2$ spacer according to methods known in the art

FIG. 2 depicts a cross-sectional schematic view of a semiconductor device having a faceted raised source region according to methods known in the art;

FIG. 3 depicts an XTEM image illustrating factless selective epitaxial growth according to one method known in the art;

FIG. 4 depicts a cross-sectional view of a semiconductor substrate suitable for use with various embodiments of the invention;

FIG. 5 depicts a cross-sectional view of a semiconductor device having selectively grown and in situ doped factless Si source/drain epitaxial layers according to the invention; and

FIG. 6 depicts a cross-sectional view of the device of FIG. 5 after silicidation of the source/drain epitaxial layers.

## DETAILED DESCRIPTION

In various embodiments of the invention, factless semiconductor structures, for example, raised source and drain elements of a MOSFET, are fabricated by selective epitaxial growth proximate commonly used spacer structures, such as those including Si$_3$N$_4$, SiO$_2$, or both, using commercially available chemical vapor deposition systems. Facet formation in the epitaxial layer is suppressed by doping the epitaxial layer at a predetermined level in situ during epitaxial growth, which increases tolerance to variability during the spacer fabrication process.

Referring to FIG. 4, a substrate 40 suitable for use with the invention, comprises a semiconductor, such as silicon or silicon deposited over an insulator, such as, for example, SiO$_2$. In one embodiment, several layers collectively indicated as 42 are formed on the substrate 40. The layers 42 may be grown, for example, in a CVD system, including a reduced-pressure chemical vapor deposition system (LPCVD), atmospheric-pressure chemical vapor deposition system (APCVD), and plasma-enhanced chemical vapor deposition system (PECVD). In this embodiment, the layers 42 and the substrate 40 may be referred to together as a "semiconductor substrate 44."

The layers 42 include a graded layer 46 disposed over the substrate 40. The graded layer 46 may include SiGe with a grading rate of, for example, 10% Ge/μm of thickness, with a thickness T1 of, for example, 2–9 μm, and grown, for example, at 600–1100° C. A relaxed layer 48 is disposed over the graded layer 46. The relaxed layer 48 may include, for example, Si$_{1-x}$Ge$_x$ with a uniform composition containing, for example, 20–90% Ge, (i.e., 0.2 ≤x≤0.9) having a thickness T2 ranging from, e.g., about 0.2 μm to about 2 μm. In an alternative embodiment, the relaxed layer 48 may be formed directly on the substrate 40, without the graded layer 46.

A tensilely strained layer 50 is disposed over relaxed layer 48, sharing an interface therewith. In one embodiment, the

8

tensilely strained layer 50 is formed of silicon. In other embodiments, the tensilely strained layer 50 may be formed of SiGe, or at least one of a group II, a group III, a group V, and a group VI element. The tensilely strained layer 50 may have a starting thickness T3 ranging, for example, from about 50 angstroms to about 300 angstroms (Å).

In some embodiments, a compressively strained layer (not shown) may be disposed between the relaxed layer 48 and the tensilely strained layer 50. In an embodiment, the compressively strained layer includes Si$_{1-y}$Ge$_y$ with a Ge content (y) higher than the Ge content (x) of the relaxed Si$_{1-x}$Ge$_x$ layer 48. The compressively strained layer may contain, for example 40–100% Ge and have a thickness ranging, e.g., from about 10 angstroms to about 200 angstroms (Å).

Referring to FIG. 5, in one embodiment, a semiconductor device, such as, for example, a transistor 60 having factless raised source/drain regions is fabricated in a chamber 90 of a chemical vapor deposition system, such as, for example, LPCVD, APCVD, or PECVD system. The transistor 60 is formed on a semiconductor substrate 62 including, for example, silicon, silicon-on-insulator, or strained silicon, as described in detail above. The surface of the semiconductor substrate may have a substantially (100) crystallographic orientation.

In a particular variation of this embodiment of the invention, prior to MOSFET fabrication, the substrate 62 is cleaned using, for example, a dilute RCA process known in the art, in order to remove organic contaminants, particles, and any ionic or heavy metal contaminants from the substrate surface. Alternatively, or in addition to the RCA cleaning, the surface of the substrate may be passivated with hydrogen using a dilute hydrofluoric acid treatment. In yet another variation, a sacrificial SiO$_2$ layer may be grown on the substrate thermally or by an oxygen plasma and then completely removed by hydrofluoric acid. In still another variation, a non-selective dry-etch process can be used. The clean surface must be achieved while minimizing substrate consumption to ensure compatibility with thin film materials heterostructures and SOI wafers. Prior to epitaxial growth the substrate may be subjected to a high temperature bake step to remove any residual oxide on the surface. For example, after hydrogen passivation with a dilute HF treatment a suitable bake could include heating the substrate for 5 minutes at 800° C.

The transistor 60 includes a gate electrode 64, made of, for example, polycrystalline silicon, and a gate insulator 66 made of, for example, SiO$_2$ or a high-k material, patterned using, for example, reactive ion etching ("RIE") whereby SiO$_2$ gate insulator is defined by selective reactive ion etching using, e.g. CHF$_3$ /O$_2$ gas mixture with subsequent post-RIE cleaning to remove the growth-inhibiting fluoropolymer layer, as described in the above-referenced Langdo thesis.

Isolation regions 86, 88, made of, e.g., SiO$_2$, are introduced to isolate transistor 60 from other devices. Isolation regions 86,88 can be, for example, shallow trench isolation regions produced early in the transistor fabrication process by methods known in the art.

The transistor 60 also includes a source region 68 and a drain region 70 defined in the substrate 60 proximate the gate electrode 64. In a particular embodiment, the transistor 60 is an n-type MOSFET with the source and drain regions formed by n-type doping via, e.g. implantation of arsenic ions, as will be described in detail below. Shallow extension regions 68a, 70a of the source region 68 and the drain region

US 6,946,371 B2

9

70, respectively, are formed by, e.g., ion implantation after the gate electrode 64 and the gate insulator 66 are defined. The shallow extension regions 68a, 70a preferably extend to and, in one variation of this embodiment, slightly below the gate insulator 66. The depth of the extension regions 68a, 70a may range from about 5 nm to about 50 nm. A first liner 72 and a second liner 74 are deposited proximate the gate electrode 64 and the gate insulator 66. In a particular embodiment, the thickness of the liners 72, 74 is approximately 250 angstroms. The liners 72, 74 may be formed of, e.g., a low temperature oxide (LTO). During the formation of liners 72, 74, a hard mask 76 is formed on a top surface 78 of the gate electrode 64. Hard mask 76 is formed of, e.g., LTO.

Subsequently, spacers 80, 82 are formed proximate liners 72, 74 to electrically isolate the gate and source/drain regions during the device operation. The spacers 80, 82 are formed of a dielectric such as, for example, $Si_3N_4$, by chemical vapor deposition followed by an etchback step, such as reactive ion etch. Alternatively, spacers can be formed from $SiO_2$. In one embodiment, the height of the spacers 80, 82 roughly approximates or exceeds the height of the gate electrode 64 and ranges from about 80 nm to about 250 nm. The widths of the spacers 80, 82 range from about 30 nm to about 100 nm. Spacer sidewalls 81, 83 proximate to the source/drain regions 68, 70 may have at least partially concave profile. Sidewalls 81, 83 intersect the surface of the substrate 62 at angles $\alpha$, $\beta$ that range from about 60° to about 90°. In a particular embodiment, the angles $\alpha$, $\beta$ substantially, but not necessarily precisely, equal 90°. Furthermore, in various embodiments of the fabrication methods according to the invention, it is not necessary to precisely control the liner oxide undercut beneath the silicon nitride spacer prior to epitaxial growth to minimize faceting. The spacers 80, 82 may be fabricated so that the sidewalls 81, 83 are substantially aligned with a particular crystallographic plane of the semiconductor substrate 62, such as, for example, the <100> or <110> crystallographic plane.

The raised source/drain regions 68, 70 are formed by selective epitaxial growth coupled with ion implantation after formation of sidewall spacers 80, 82, as described below. The height of the source/drain regions 68, 70 may range from about 10 nm to about 100 nm.

Referring to FIG. 6, a contact material 100 is subsequently formed on raised source and drain regions 68, 70. In a particular embodiment, the contact material 100 is a metal compound that is thermally stable and has low electrical resistivity at the silicon/refractory metal interface, such as a metal silicide including, for example, cobalt, titanium, tungsten, molybdenum, platinum, nickel, or tantalum. Preferably, the contact material 90 is formed by a self-aligned silicide process, in which the contacts are formed only in the areas where the deposited metal is in direct contact with the source/drain regions 68, 70. Because of the facet-free formation, the metal uniformly penetrates the raised source 68 and drain 70 regions thereby maintaining the advantages of the raised source and drain approach.

In various embodiments of the invention, the raised source/drain elements 68, 70 include, for example, Si, Ge, or SiGe alloys, and are formed by selective epitaxial growth in a CVD system, such as LPCVD, APCVD, or PECVD reactor. Suitable CVD systems commonly used for volume epitaxy in manufacturing applications include, for example, EPI CENTURA™ single-wafer multi-chamber systems available from Applied Materials of Santa Clara, Calif., or EPSILON® single-wafer epitaxial reactors available from ASM International based in Bilthoven, The Netherlands.

10

In the CVD process, selective epitaxial growth typically includes introducing a source gas into the chamber. The source gas may include at least one precursor gas and a carrier gas, such as, for example hydrogen. In those embodiments of the invention where the raised regions 68, 70 are formed from Si, silicon precursor gases such as, for example, silane, disilane, trisilane, or dichlorosilane (DCS) are used. Conversely, in those embodiments of the invention where the raised regions 68, 70 are formed from Ge, germanium precursor gases, such as, for example, germane ($GeH_4$), digermane, germanium tetrachloride, or germanium dichloride are used. Finally, in the embodiments where the raised regions 68, 70 are formed from SiGe alloy, a combination of silicon and germanium precursor gases in various proportions is used. In a particular embodiment of the invention for selective deposition of $Si_{0.80}$ $Ge_{0.20}$ layers, 100 standard cubic centimeters (sccm) of DCS, 25 sccm 10% $GeH_4/H_2$, and 150 sccm of HCl in a hydrogen carrier gas at a growth temperature of 750° C. and pressure of 20 Torr may be used. In another embodiment of the invention for selective deposition of Si layers, 100 sccm of DCS and 100 sccm of HCl in a hydrogen carrier gas at a growth temperature of 850° C. and pressure of 10 Torr may be used.

The LPCVD, APCVD, or PECVD system chamber is heated, such as, for example, by RF-heating. The growth temperature in the chamber ranges from about 300° C to about 900° C depending on the composition of the raised regions 68, 70. Specifically, if the source gas predominantly contains silicon precursor, the temperature preferably ranges from about 500 to about 900° C, and if the source gas predominantly contains germanium precursor, the temperature ranges from about 300° C to about 700° C. The chamber pressure during formation of raised regions 68, 70 is greater than about 5 Torr and the growth rate is greater than 1 nanometer/minute (nm/min).

Referring again to FIG. 5, during selective epitaxial growth, the material composing raised regions 68, 70 forms only on the semiconductor substrate, such as the silicon substrate 62. The top surface 78 of gate electrode 64 is protected from epitaxial growth by the hard mask 76. Alternatively, hard mask 76 is absent from top surface 78 of gate electrode 64, and epitaxial growth additionally occurs on top surface 78. Epitaxy parameters are chosen such that substantially no epitaxial layer is formed on sidewall spacers 80, 82, and, as described below, substantially no facets are formed at the interface between raised regions 68, 70 and spacers 80, 82.

Selective growth of epitaxial layers substantially only on silicon or other semiconductors, and not on dielectrics such as silicon nitride or silicon dioxide, is facilitated by the introduction of an etchant, such as, for example, hydrogen chloride or chlorine, to the source gas mixture. Specifically, epitaxial layers are grown on exposed windows in a dielectric mask while nucleation of polysilicon on the masking material is suppressed during the incubation time by, for example, etching of spurious nuclei on the dielectric material, the mediation of saturation by formation of a number of intermediate chlorine-containing silicon precursors, and passivation of surface defect sites which serve as heterogeneous nucleation centers. Also, selectivity is facilitated by growing for a period of time that is generally shorter than the incubation period needed for polysilicon nucleation on the dielectric mask.

In various embodiments of the invention, the epitaxial layers of the source/drain regions 68, 70 are doped in situ by adding a dopant during deposition of the epitaxial layer to suppress facet formation at the interface with the spacers 80,

US 6,946,371 B2

11

82. Examples of suitable dopants are n-type dopant such as phosphorus, arsenic, and antimony, or p-type dopant, such as boron. The dopant may be added to the epitaxial layer by introducing a dopant gas, such as phosphine, arsine, stibine, and diborane, into the chamber. The dopant gas is diluted in a carrier gas of the source gas mixture to, for example, approximately 1% concentration.

In a particular embodiment, facetless selective epitaxial growth according to the invention is compatible with CMOS fabrication. CMOS fabrication entails formation of a n-channel MOSFET ("NMOS") in a first portion of the semiconductor region; and a p-channel MOSFET ("PMOS") in a second portion of the semiconductor region so that both MOSFETs are disposed on the same substrate. Accordingly, in this embodiment, in situ doping that is used during the epitaxial growth to suppress facet formation is sufficiently low so that it will not interfere with introduction of additional dopants of opposite type ("counterdoping") that is necessary in order to manufacture both n-channel and p-channel MOSFETs on the same substrate. This counterdoping may be performed with suitable masking in place for either NMOS (if the in situ doping to suppress faceting was p-type) or PMOS (if the in situ doping to suppress faceting was n-type), thus allowing CMOS fabrication. Accordingly, in this embodiment of the invention, a level of in situ doping that is used during the epitaxial growth to suppress facet formation does not exceed the level of counterdoping (for example, ion implantation) that is necessary for CMOS fabrication. For example, in one variation of this embodiment, the level of in situ doping ranges from about $10^{17}$ to about $10^{19}$ cm$^{-3}$, which does not interfere with a typical doping level used during CMOS fabrication that usually exceeds about $10^{20}$ cm$^{-3}$.

Other embodiments incorporating the concepts disclosed herein may be used without departing from the spirit and scope of the invention. The described embodiments are to be considered in all respects as only illustrative and not restrictive. Therefore, it is intended that the scope of the invention be only limited by the following claims.

What is claimed is:

1. A method of fabricating a semiconductor structure, the method comprising:

providing a chamber;

providing a semiconductor substrate in the chamber, the semiconductor substrate having a surface including a first portion and a second portion proximal to the first portion;

providing a gate stack disposed over the first portion of said substrate, the gate stack comprising a dielectric region; and

selectively depositing an epitaxial layer of at least one semiconductor material on the second portion of the substrate adjacent to the gate stack while in situ doping the epitaxial layer at a first predetermined level to substantially suppress facet formation thereby forming a substantially facetless semiconductor region, wherein the pressure in the chamber during selective deposition of the epitaxial layer is greater than about 5 Torr.

2. The method of claim 1 wherein the epitaxial layer is deposited in a chemical vapor deposition system.

3. The method of claim 2 wherein the chemical vapor deposition system is selected from the group consisting of: a reduced-pressure chemical vapor deposition system, atmospheric-pressure chemical vapor deposition system, and plasma-enhanced chemical vapor deposition system.

4. The method of claim 1 wherein the step of selectively depositing an epitaxial layer comprises introducing a source gas into the chamber.

12

5. The method of claim 4 wherein the source gas comprises at least one precursor gas and a carrier gas.

6. The method of claim 5 wherein the carrier gas comprises hydrogen.

7. The method of claim 5 wherein the at least one precursor gas comprises a silicon precursor gas.

8. The method of claim 7 wherein the silicon precursor gas is selected from the group consisting of: silane, disilane, trisilane, and dichlorosilane.

9. The method of claim 5 wherein the at least one precursor gas comprises a germanium precursor gas.

10. The method of claim 9 wherein the germanium precursor gas is selected from the group consisting of: germane, digermane, germanium tetrachloride, or germanium dichloride.

11. The method of claim 5 wherein the source gas further comprises an etchant for suppressing nucleation of the at least one semiconductor material over the dielectric region during deposition.

12. The method of claim 11 wherein the etchant comprises hydrogen chloride or chlorine.

13. The method of claim 1 wherein the epitaxial layer is doped by adding a dopant to the epitaxial layer during deposition of the epitaxial layer, the dopant selected from the group consisting of: phosphorus, arsenic, antimony, and boron.

14. The method of claim 13 wherein the dopant is added to the epitaxial layer by introducing a dopant gas into the chamber, the dopant gas selected from the group consisting of: phosphine, arsine, stibine, and diborane.

15. The method of claim 13 wherein the first predetermined level of doping ranges from about $10^{17}$ to about $10^{19}$ cm$^{-3}$.

16. The method of claim 1 wherein the epitaxial layer comprises at least one of silicon and germanium.

17. The method of claim 1 wherein the dielectric region comprises at least one of silicon oxide and silicon nitride.

18. The method of claim 17 wherein the dielectric region comprises a two-layered spacer structure comprising a silicon oxide layer and a silicon nitride layer disposed thereon.

19. The method of claim 1 wherein the semiconductor substrate comprises silicon.

20. The method of claim 1 wherein the semiconductor substrate comprises

a silicon wafer;

an insulating layer disposed thereon; and

a strained semiconductor layer disposed on the insulating layer.

21. The method of claim 20 wherein the strained semiconductor layer comprises silicon or germanium.

22. The method of claim 1 wherein the semiconductor substrate comprises

a silicon wafer;

a compositionally uniform relaxed $Si_{1-x}Ge_x$ layer deposited thereon; and

a strained silicon layer deposited on the relaxed $Si_{1-x}Ge_x$ layer.

23. The method of claim 22 wherein the semiconductor substrate further comprises a compositionally graded $Si_{1-x}Ge_x$ layer disposed between the compositionally uniform relaxed $Si_{1-x}Ge_x$ layer and the silicon wafer.

24. The method of claim 22 wherein the semiconductor substrate further comprises an insulating layer disposed between the compositionally uniform relaxed $Si_{1-x}Ge_x$ layer and the silicon wafer.

25. The method of claim 1 wherein the temperature in the chamber during selective deposition of the epitaxial layer ranges from about 300° C. to about 900° C.

US 6,946,371 B2

13

26. The method of claim 25 wherein the temperature in the chamber during selective deposition of the epitaxial layer further ranges from about 500° C. to about 700° C.

27. The method of claim 1 wherein the epitaxial layer is deposited at a rate greater than about 1 nm/min.

28. The method of claim 1 further comprising:

fabricating a n-channel MOSFET in a first portion of the semiconductor region; and

fabricating a p-channel MOSFET in a second portion of the semiconductor region.

29. The method of claim 28 comprising counter-doping the first portion or the second portion at a second predetermined level.

30. The method of claim 29 wherein the first predetermined level of doping does not exceed the second predetermined level of doping.

14

31. The method of claim 1 further comprising forming a metal silicide layer over the semiconductor region.

32. The method of claim 1 wherein the surface of the semiconductor substrate has a substantially (100) crystallographic orientation.

33. The method of claim 1 wherein the dielectric region comprises a sidewall having an angle relative to the semiconductor substrate, the angle ranging from about 60° to about 90°.

34. The method of claim 33 wherein the semiconductor substrate has a <110> crystallographic plane, the sidewall being substantially aligned therewith.

35. The method of claim 33 wherein the semiconductor substrate has a <100> crystallographic plane, the sidewall being substantially aligned therewith.

*  *  *  *  *

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMBERWAVE SYSTEMS CORPORATION, | ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. 05-301-KAJ (Consolidated) |
| vs. | ) ) | **DEMAND FOR JURY TRIAL** |
| INTEL CORPORATION, | ) ) | |
| Defendant. | ) ) | |

**PLAINTIFF AMBERWAVE SYSTEMS CORPORATION'S OPENING BRIEF
IN SUPPORT OF ITS MOTION FOR LEAVE TO AMEND ITS COMPLAINT**

Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
  Attorneys for Plaintiff
  AmberWave Systems Corporation

OF COUNSEL:

Morgan Chu
David I. Gindler
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

June 27, 2006

## TABLE OF CONTENTS

Page

TABLE OF CITATIONS                                                    ii

NATURE AND STAGE OF THE PROCEEDING                                    1

SUMMARY OF ARGUMENT                                                   1

FACTUAL BACKGROUND                                                    2

    I.    TECHNICAL BACKGROUND                                 2

    II.   PROCEDURAL BACKGROUND                                4

ARGUMENT                                                             4

    I.    UNDER FEDERAL RULE OF CIVIL PROCEDURE 15(A), LEAVE TO AMEND SHALL BE FREELY GIVEN    4

    II.   AMBERWAVE HAS NOT UNDULY DELAYED IN SEEKING LEAVE TO AMEND    5

    III.  INTEL WOULD NOT SUFFER UNDUE PREJUDICE             6

    IV.  AMBERWAVE HAS NOT SOUGHT LEAVE TO AMEND IN BAD FAITH    7

CONCLUSION                                                           8

ii.

## TABLE OF CITATIONS

                                                                    Page(s)

Cases

*CenterForce Techs., Inc. v. Austin Logistics, Inc.*,
    No. 99-243 MMS, 2000 WL 652943 (D. Del. March 10, 2000)      5, 6, 8

*E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*,
    621 F. Supp. 310 (D. Del. 1985)                                     5

*Foman v. Davis*,
    371 U.S. 178 (1962)                                                 4

*Micron Tech., Inc. v. Rambus Inc.*,
    409 F. Supp. 2d 552 (D. Del. 2006)                              5, 6, 7

*Trueposition, Inc. v. Allen Telecom, Inc.*,
    No. 01-823 GMS, 2002 WL 1558531 (D. Del. July 16, 2002)      4, 5, 7, 8

Rules

Fed. R. Civ. P. 15(a) (2006)                                            1

## NATURE AND STAGE OF THE PROCEEDING

The parties are engaged in a consolidated proceeding in which AmberWave is suing Intel for infringement of U.S. Patent Nos. 6,831,292 (the "'292 patent"), 6,881,632 (the "'632 patent") and 6,946,371 (the "'371 patent"). AmberWave now seeks to amend its complaint to add a fourth patent, U.S. Patent No. 5,158,907 (the "'907 patent"), which AmberWave very recently acquired the right to assert against Intel. (Sheasby Decl. at ¶ 3 & Exs. A, B.)[1] AmberWave brings this motion for leave to amend its complaint well in advance of the November 3, 2006 deadline set by the Court to move to amend or supplement the pleadings in this case. (D.I. 118.) Moreover, the area of technology of the '907 patent is the same as that of the '292, '632, and '371 patents already in suit. The products that AmberWave accuses of infringing the '907 patent are a subset of those accused of infringing the '292, '632, and '371 patents.

## SUMMARY OF ARGUMENT

AmberWave seeks leave to amend its complaint to assert an additional patent against Intel. AmberWave very recently obtained ownership rights to assert this patent. Under Fed. R. Civ. P. 15(a), leave to amend should be freely granted.

1. AmberWave has not unduly delayed in seeking leave to amend its complaint to add the '907 patent. Indeed, AmberWave sought leave to amend immediately after acquiring the right to assert the '907 patent against Intel. Furthermore, AmberWave has moved

---

[1] The Declaration of Jason G. Sheasby in Support of Plaintiff AmberWave Systems Corporation's Motion for Leave to Amend Its Complaint is being filed with this brief. Citations to this Declaration are abbreviated as "Sheasby Decl."

to amend its complaint approximately five months before the Court's November 3, 2006 deadline for doing so.

2.    Intel would not suffer undue prejudice—or really any prejudice—if the Court were to grant AmberWave's motion to amend its complaint to include the '907 patent. The discovery cut-off date in this case is January 5, 2007, the deadline to file dispositive motions is February 2, 2007, and the trial date is August 20, 2007. All of these deadlines would provide Intel with more than ample time to conduct discovery relating to the '907 patent and to fully formulate its defenses, leaving the schedule set by the Court unaffected. Moreover, the '907 patent involves the same area of technology as the patents already in suit and implicates the same Intel method used to fabricate transistors that is already accused of infringement in this suit. Given this overlap, the parties and the Court would benefit from the efficient resolution of all infringement and damages issues relating to Intel's accused products in one forum and in a single proceeding.

3.    AmberWave has not sought leave to amend its complaint in bad faith or with dilatory motive. AmberWave moved to amend as soon as it had the right to assert the '907 patent and well before the Court's deadline to amend.

## FACTUAL BACKGROUND

### I.    TECHNICAL BACKGROUND

AmberWave's founder, Professor Gene Fitzgerald, is a pioneer in the field of strained semiconductor materials. "Straining" involves altering the spacing of atoms in semiconductor material. When material such as silicon is "strained," the speed at which electric current moves through the silicon can increase. First at Bell Laboratories, and now at MIT, Dr. Fitzgerald has worked to develop techniques for the practical application of strained

semiconductor materials. He founded AmberWave with his students to commercialize this technology.

The '907 patent, entitled "Method for Making Semiconductor Devices with Low Dislocation Defects," represents the fruits of some of Dr. Fitzgerald's research at Bell Laboratories. It teaches, among other things, techniques for depositing semiconductor materials in a manner that reduces defects. (*See, e.g.*, Sheasby Decl. Ex. A at 1:5-12.)

The '907 patent applies to the same fabrication method already at issue in this lawsuit by virtue of the three existing patents in suit, and will not add any new accused products to the suit. AmberWave is informed that Intel's strained-silicon fabrication is used in at least two different types of semiconductor products—microprocessors and dual-core chips. For the three patents already in suit (the '292, '371, and '632 patents), AmberWave accuses both types of semiconductor products of infringement when made using Intel's strained-silicon fabrication method. For the '907 patent which is the subject of this motion to amend, AmberWave accuses the same Intel strained-silicon fabrication method of infringing, when used in at least Intel's dual core products.

After multiple rounds of corporate spin-offs, a number of patents that resulted from Dr. Fitzgerald's work at Bell Laboratories in the field of strained semiconductor materials (including the '907 patent) ultimately ended up with Agere Systems, Inc. ("Agere"). AmberWave received a license to these patents in 2003. (*See* Sheasby Decl. at ¶ 3 & Ex. B.) AmberWave received ownership rights to assert the '907 patent against Intel on June 26, 2006. (*Id.*)

## II.   PROCEDURAL BACKGROUND

On February 27, 2006, AmberWave filed its Amended and Consolidated Complaint for Patent Infringement, which included claims for infringement against Intel based on the '292 patent, the '632 patent, and the '371 patent. (D.I. 87.) On May 10, 2006, the Court issued a Revised Scheduling Order, giving the parties until November 3, 2006, to seek leave to amend the pleadings. (D.I. 118.) The Court also set January 5, 2007 as the discovery cut-off date, designated February 2, 2007 as the deadline to file dispositive motions, and scheduled trial of this action for August 20-31, 2007. (*Id.*)

## ARGUMENT

## I.    UNDER FEDERAL RULE OF CIVIL PROCEDURE 15(A),
##       LEAVE TO AMEND SHALL BE FREELY GIVEN

Federal Rule of Civil Procedure 15(a), which provides for leave to amend a pleading, states that "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a) (2006). *Foman v. Davis*, 371 U.S. 178 (1962), the U.S. Supreme Court's foundational decision on this issue, holds that absent a sufficient reason, "the leave sought should, as the rules require, be 'freely given.'" *Id.* at 182.

Courts in this District have followed *Foman*'s instruction. *See, e.g.*, *Trueposition, Inc. v. Allen Telecom, Inc.*, No. 01-823 GMS, 2002 WL 1558531, at *1 (D. Del. July 16, 2002) (citing *Foman*, 371 U.S. at 182) (Sheasby Decl. Ex. C). This Court recently explained that "'[s]ufficient reasons [to deny leave] include undue delay, bad faith or dilatory motive on the part of the movant, [and] undue prejudice to the opposing party . . . .'" *Micron Tech., Inc. v. Rambus Inc.*, 409 F. Supp. 2d 552, 558 (D. Del. 2006) (quoting *CenterForce Techs., Inc. v. Austin Logistics, Inc.*, No. 99-243 MMS, 2000 WL 652943, at *3 (D. Del. March 10, 2000) (Sheasby Decl. Ex. D)).

## II.   AMBERWAVE HAS NOT UNDULY DELAYED IN SEEKING LEAVE TO AMEND

AmberWave has not unduly delayed in seeking leave to amend its complaint. Indeed, AmberWave sought to add the '907 patent just after obtaining its ownership interest in the patent. Before receiving such rights on June 26, 2006, AmberWave could not assert the '907 patent against Intel. Given these facts, AmberWave did not unduly delay in seeking to assert the '907 patent against Intel. *See Micron*, 409 F. Supp. 2d at 558 (where patent holder sought to amend pleadings to add new patents which issued after the litigation began and after the court granted a stay of the action, court found that patent holder did not unduly delay in asserting patents); *cf. E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 621 F. Supp. 310, 315 (D. Del. 1985) (in granting patent holder's motion for leave to amend, court explained that a "delay of six months . . . cannot be characterized as 'undue'").

Furthermore, AmberWave sought to amend its complaint well before the deadline set by the Court. AmberWave's motion comes more than four months before the Court's deadline to move to amend or supplement the pleadings. *See Trueposition*, 2002 WL 1558531, at *2 (in granting plaintiff's motion to amend, court considered that plaintiff filed its motion within the court's deadline). In addition, discovery in this action will not end until January 5, 2007, dispositive motions are not due until February 2, 2007, and trial is more than a year away. As in *CenterForce Techs.*, 2000 WL 652943, where the court granted plaintiff CenterForce's motion to amend its complaint to include an additional patent, there is no undue delay when "fact discovery has yet to close and there have been no determinations on the merits." *Id.* at *5 n.4.

Finally, "[d]elay in [and] of itself will not serve as a basis for denying a motion to amend unless the defendant is prejudiced." *Id.* at *4. As discussed below, Intel would not be prejudiced by the grant of AmberWave's motion for leave to amend.

### III.   INTEL WOULD NOT SUFFER UNDUE PREJUDICE

Intel would not suffer undue prejudice if the Court were to allow AmberWave to amend its complaint to include the '907 patent.  Because the '907 patent and the three existing patents in suit implicate the same Intel method of transistor fabrication, there would be substantial overlap in discovery between the patents.

This Court has recently allowed a patent holder to amend its pleadings in an analogous situation.  In *Micron*, the patent holder sought to add patents involving technology similar to that of the patents already in suit and directed against the same products already in issue.  409 F. Supp. 2d at 558.  In granting Rambus leave to amend and supplement its counterclaims to include four additional patents, this Court found no undue prejudice to the opposing party, Micron.  *Id.* at 559.  Although Micron argued that the need for additional discovery relative to the newly added patents would result in prejudice, the Court found, based on Rambus's representation that the additional patents related to the "same subject matter as the patents-in-suit" and because the infringement claims would be directed at products already in suit, that "Rambus rightly asserts . . . that there will be some overlap with already completed preparation, and the overlap will reduce any prejudice to Micron."  *Id.* at 559 & n.2.  Other decisions from this District have reached the same decision using the same logic.  *See Trueposition*, 2002 WL 1558531, at *2 (given the overlapping technology between the existing and proposed patents, "it would be economically beneficial to the parties to resolve all issues in a single proceeding" and "judicial economy weighs in favor of granting [plaintiff's] motion to amend.")

Here, as in *Micron* and *Trueposition*, the patent that AmberWave seeks to add relates to similar subject matter as the patents already in suit and is directed against some of the same Intel products, resulting in substantial overlap with the facts and arguments implicated by

the other patents. Such overlap only serves to diminish the force of any argument by Intel that it will suffer prejudice. And adding the '907 patent to this case would permit the parties and the Court to efficiently resolve this dispute in one forum and in one consolidated proceeding.

Finally, Intel cannot complain about prejudice due to the timing of AmberWave's motion to amend. In its Revised Scheduling Order, the Court set the discovery cut-off date as January 5, 2007, more than six months from now. This allows more than enough time for the parties to complete whatever additional discovery might be required for the '907 patent. *See Trueposition*, 2002 WL 1558531, at *2 (granting leave to amend, court explained that with five months of discovery remaining, "amendment of the complaint will not deprive [the defendant] Allen of the opportunity to present facts or evidence or otherwise prepare and present its case"). Moreover, the parties have until February 2, 2007 to file dispositive motions and until August 20, 2007 before the start of trial, leaving Intel ample time to formulate and investigate any defenses that it might have relative to the '907 patent.

## IV. AMBERWAVE HAS NOT SOUGHT LEAVE TO AMEND IN BAD FAITH

There is no basis for Intel to accuse AmberWave of bad faith or to contend that AmberWave's motion is brought with dilatory motive. AmberWave acquired the right to assert the '907 patent against Intel on June 26, 2006. (*See* Sheasby Decl. at ¶ 3 & Ex. B.) AmberWave then immediately sought to amend its complaint, well before the Court's November 3, 2006 deadline to move to amend the pleadings. *See Trueposition*, 2002 WL 1558531, at *2 (court explained that because plaintiff "filed its motion to amend in compliance with the May 31 deadline imposed by the court . . . , the court will not deny the motion to amend on the basis of bad faith"). Moreover, having promptly brought its motion for leave to amend and having done so with ample time such that no changes to the scheduling order are necessary, AmberWave has

not sought to delay or hinder the proceedings. *See CenterForce Techs.*, 2000 WL 652943, at *7 (because "there is no evidence to indicate that [the] motion to amend is simply a delaying tactic by CenterForce" and because CenterForce "argued that there is no need to change the current schedule, [and] that very little . . . additional discovery would be necessitated by the additional claims . . . ," the court concluded that CenterForce did not seek amendment in bad faith).

## CONCLUSION

For the foregoing reasons, AmberWave respectfully requests that the Court grant its motion for leave to amend its complaint to include the '907 patent.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


/s/ Jack B. Blumenfeld (#1014)
Jack B. Blumenfeld (No. 1014)
Leslie A. Polizoti (No. 4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
  Attorneys for Plaintiff
  AmberWave Systems Corporation

OF COUNSEL

Morgan Chu
David I. Gindler
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

June 27, 2006

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld (#1014), hereby certify that on June 27, 2006 I electronically filed Plaintiff AmberWave Systems Corporation's Opening Brief in Support of Its Motion for Leave to Amend Its Complaint with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Josy W. Ingersoll (#1088)
> Young, Conaway, Stargatt & Taylor, LLP

I also certify that copies were caused to be served on June 27, 2006 upon the following and in the manner indicated:

### BY HAND

Josy W. Ingersoll
John W. Shaw
YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899

### BY EMAIL AND FEDERAL EXPRESS

George M. Newcombe
Jeffrey E. Ostrow
Patrick E. King
SIMPSON THACHER & BARTLETT LLP
2550 Hanover Street
Palo Alto, CA  94304

/s/  Jack B. Blumenfeld (#1014)
jblumenfeld@mnat.com

# EXHIBIT J

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | |
|---|---|
| AMBERWAVE SYSTEMS CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 9:06-CV-00143(RHC) |
| vs. ) | |
| ) | Jury Trial Demanded |
| INTEL CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

**NOTICE OF VOLUNTARY DISMISSAL PURSUANT TO RULE 41(a)(1) OF THE
FEDERAL RULES OF CIVIL PROCEDURE**

Plaintiff AmberWave Systems Corporation ("AmberWave") hereby voluntarily dismisses this action without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1). Rule 41(a)(1) states that "an action may be dismissed by the plaintiff without order of court . . . by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment."

WHEREAS, on July 12, 2006, AmberWave filed the Complaint in this matter alleging infringement by Defendant Intel Corporation ("Intel") of U.S. Patent No. 5,158,907 (the "'907 patent");

WHEREAS, Intel has not answered the Complaint or filed for summary judgment;

NOW, THEREFORE, NOTICE IS HEREBY GIVEN that, pursuant to Federal Rule of Civil Procedure 41(a)(1), AmberWave voluntarily dismisses the Complaint in this matter without prejudice.

Dated: July 31, 2006.

Respectfully Submitted,

     /s/ Samuel K. Lu
Samuel K. Lu (CA #171969)
Morgan Chu (CA #70446)
David Gindler (CA #117824)
IRELL & MANELLA LLP
1800 Avenue of the Stars, #900
Los Angeles, CA  90067-4276
Telephone:  (310) 277-1010
Facsimile:  (310) 203-7199
E-mail:  slu@irell.com

Clayton Edward Dark, Jr., Esq. (TX #05384500)
P.O. Box 2207
207 East Frank
Lutkin, TX  75902-2207
Phone:  (936) 637-1733
Facsimile:  (936) 637-2897
E-mail: clay.dark@yahoo.com

J. Thad Heartfield, Esq. (TX #09347000)
The Law Offices of J. Thad Heartfield
2195 Dowlen Road
Beaumont, TX  77706-2534
Phone (409) 866-3318 Ext. 1
E-mail:  thad@jth-law.com

ATTORNEYS FOR PLAINTIFF
AmberWave Systems Corporation

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on July 31, 2006.  Any other counsel of record will be served by facsimile transmission and first class mail.

_____/s/ Samuel K. Lu_____
Samuel K. Lu

**EXHIBIT K**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2006 JUL 11 PM 3: 15

| | | |
|---|---|---|
| INTEL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ 0 6 – 4 2 9 |
| | ) | |
| AMBERWAVE SYSTEMS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | **DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Intel Corporation ("Intel") by and through its undersigned attorneys, hereby demands a trial by jury on all issues so triable and, for its Complaint in this declaratory judgment action, alleges as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction of this action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions relating to patents, 28 U.S.C. § 1338(a).

2.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), because, upon information and belief, AmberWave Systems Corporation ("Defendant") is incorporated in Delaware.

## THE PARTIES

3.      Intel is a Delaware corporation with its principal place of business in Santa Clara, California.  Intel is engaged in the business of manufacturing high performance computer microprocessors.

4.      Upon information and belief, Defendant is a Delaware corporation with its principal place of business in Salem, New Hampshire.  Defendant is engaged in the business of manufacturing and developing strained silicon technology.

## BACKGROUND

5.      On July 11, 2006, United States Patent No. 7,074,655 entitled "Gate Material for Semiconductor Device Fabrication" ("the '655 Patent") was issued, naming, Anthony J. Lochtefeld, Dimitri Antoniadis and Matthew T. Currie as inventors and Defendant as assignee.  A copy of the '655 Patent is attached as Exhibit A.

6.      On July 8, 2006, counsel for Defendant communicated to counsel for Plaintiff its intention to assert the '655 Patent against Intel.

7.      As a result of this communication, Intel reasonably apprehends that Defendant intends imminently to assert a claim against Intel under 35 U.S.C. § 271 alleging infringement of the '655 Patent by Intel's continuing to make, offer to sell, and selling its current commercial products.

8.      There is a substantial and continuing justiciable controversy between Intel and Defendant as to Defendant's rights to threaten or maintain suit for infringement of the '655 Patent and as to whether any of Intel's current commercial products infringes any of the claims of the '655 Patent.

## CLAIM FOR RELIEF

### (Declaratory Judgment of Non-infringement)

9.      Intel re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 8, inclusive, as set forth above.

10.     Intel has not manufactured, assembled, sold, offered for sale or distributed within the Unites States any devices or systems that directly infringe any of the claims of the '655 Patent.

11.     Intel has not manufactured, assembled, sold, offered for sale or distributed within the United States any devices or systems that fall within the range of equivalents of any of the claims of the '655 Patent.

12.     Intel has not induced, and is not now inducing, infringement of the '655 Patent in any manner whatsoever.

13.     Intel has not, and is not now, contributing to the infringement of the '655 Patent in any manner whatsoever.

062992.1002

## PRAYER FOR RELIEF

WHEREFORE, Intel respectfully prays for relief and judgment against Defendant as follows:

(a) a declaration that Intel has not infringed the '655 Patent directly, by inducement, or by contribution; and

(b) for such other and further relief that may be just and appropriate.

Respectfully submitted,

Josy W. Ingersoll (No. 1088)
John W. Shaw (No 3362)
Karen E. Keller (No. 4489)
YOUNG CONWAY STARGATT &
  TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

George M. Newcombe (CA Bar No. 202898)
SIMPSON THACHER & BARTLETT
3330 Hillview Avenue
Palo Alto, California 94303
(650) 251-5000

Attorneys for Plaintiff Intel Corporation

Dated: July 11, 2006

062992.1002

# EXHIBIT A



US007074655B2

(12) **United States Patent**　　　　(10) Patent No.: **US 7,074,655 B2**
Lochtefeld et al.　　　　　　　　　　　(45) Date of Patent: ***Jul. 11, 2006**

(54) **GATE MATERIAL FOR SEMICONDUCTOR DEVICE FABRICATION**

(75) Inventors: **Anthony J. Lochtefeld**, Somerville, MA (US); **Dimitri Antoniadis**, Newton, MA (US); **Matthew T. Currie**, Brookline, MA (US)

(73) Assignee: **AmberWave Systems Corporation**, Salem, NH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/237,175**

(22) Filed: **Sep. 28, 2005**

(65) **Prior Publication Data**

US 2006/0024869 A1　　Feb. 2, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 10/691,007, filed on Oct. 22, 2003.

(60) Provisional application No. 60/420,227, filed on Oct. 22, 2002.

(51) Int. Cl.
　　*H01L 21/00*　　(2006.01)
　　*H01L 27/01*　　(2006.01)
(52) U.S. Cl. ...................... **438/149**; 438/150; 438/198; 438/938; 257/347; 257/350; 257/351
(58) Field of Classification Search ................ 438/149, 438/150, 198, 933, 938; 257/190, 191, 192, 257/347, 350, 351
　　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,227,644 A | 7/1993 | Ueno | |
| 6,268,253 B1 | 7/2001 | Yu | |
| 6,383,879 B1 | 5/2002 | Kizilyalli et al. | |
| 6,429,061 B1 | 8/2002 | Rim | |
| 2002/0076886 A1 | 6/2002 | Rotondaro et al. | |
| 2003/0227057 A1 | 12/2003 | Lochtefeld et al. | |
| 2004/0005740 A1 | 1/2004 | Lochtefeld et al. | |
| 2004/0031979 A1 | 2/2004 | Lochtefeld et al. | |
| 2004/0075105 A1 | 4/2004 | Leitz et al. | |
| 2004/0115916 A1 | 6/2004 | Lochtefeld et al. | |
| 2004/0137685 A1 * | 7/2004 | Lochtefeld et al. | ......... 438/285 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 784 339 A2 | 7/1997 |
| WO | 01/93338 A1 | 12/2001 |

OTHER PUBLICATIONS

Imai et al. (May, 2002) "A 100nm Node CMOS Technology for System-on-a-Chip Applications". *IEICE Trans. Electron.*, vol. E85-C, No. 5, pp. 1057-1063.

(Continued)

*Primary Examiner*—Kevin M. Picardat
(74) *Attorney, Agent, or Firm*—Goodwin Procter LLP

(57) **ABSTRACT**

In forming an electronic device, a semiconductor layer is pre-doped and a dopant distribution anneal is performed prior to gate definition. Alternatively, the gate is formed from a metal. Subsequently formed shallow sources and drains, therefore, are not affected by the gate annealing step.

**31 Claims, 10 Drawing Sheets**



**US 7,074,655 B2**

Page 2

## OTHER PUBLICATIONS

Park et al. (2002) "Gate Postdoping to Decouple Implant/ Anneal for Gate, Source/Drain, and Extension: Maximizing Polysilicon Gate Activation for 0.1 μm CMOS Technologies", *2002 Symposium on VLSI Technology Digest of Technical Papers*, pp. 134-135.

Reinking et al. (Mar. 1999) "Fabrication of high-mobility Ge p-channel MOSFETs on Si substrates", *Electronics Letters*, vol. 35, No. 6, pp. 503-504.

Rim et al. (2002) "Characteristics and Device design of Sub-100 nm Strained SI N-and PMOSFETs", *2002 Symposium on VLSI Technology Digest of Technical Papers*, pp. 98-99.

Su et al. (2000) "Strained $Si_{1-x}Ge_x$ graded channel PMOSFET grown by UHVCVD", *Thin Solid Films, Elsevier Science*, vol. 369, No. 1-2, pp. 371-374.

Takagi et al. (Aug., 2001) "Strained-Si-on-Insulator (Strained-SOI) MOSFETs-Concept, Structures and Device Characteristics", IEICE Trans. Electron., vol. E84-C, No. 8, pp. 1043-1050.

Wyon (2002) "Future technology for advanced MOS devices", *Nuclear Instruments & Methods in Physics Research, Section-B:Beam Interactions With Materials and Atoms*, North-Holland Publishing Company, Amsterdam, NL, vol. 186, No. 1-4, pp. 380-391.

Xiang et al. (2000) "Very High Performance 40nm CMOS with Ultra-thin Nitride/Oxynitride Stack Gate Dielectric and Pre-doped Dual Poly-Si Gate Electrodes", *International Electron Devices Meeting 2000 IEDM Technical Digest*, pp. 860-862.

International Search Report for PCT/US03/33561, dated Mar. 24, 2004.

* cited by examiner



# FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8B



FIG. 8A



FIG. 9



FIG. 10

US 7,074,655 B2

**1**

GATE MATERIAL FOR SEMICONDUCTOR
DEVICE FABRICATION

RELATED APPLICATIONS

This application is a continuation of U.S. application Ser.
No. 10/691,007, filed Oct. 22, 2003, which claims the
benefit of U.S. Provisional Application 60/420,227 filed Oct.
22, 2002; the entire disclosures of both applications are
hereby incorporated by reference.

FIELD OF THE INVENTION

This application relates generally to semiconductor
devices and particularly to semiconductor structures made
on semiconductor substrates with strained layers.

BACKGROUND

Formation of metal-oxide-semiconductor field-effect tran-
sistors (MOSFETs) requires the introduction of dopants into,
e.g., a silicon (Si) substrate to define source and drain
regions. Dopants are also introduced into a gate material,
such as polycrystalline silicon (polysilicon), to achieve a
desired conductivity. Dopants disposed in source, drain, and
gate (S/D/G) regions are activated by a heat treatment to
provide the needed electrical characteristics. For good-
quality n-type MOS (NMOS) devices, dopant activation is
typically performed at a high temperature, e.g., at least
1000° C. for 5 seconds, to avoid polysilicon depletion
effects. A gate in which the polysilicon is depleted has a
non-uniform distribution of dopants, with a relatively low
concentration of dopants near an interface with a gate
dielectric. This depletion region can result in reduced gate
capacitance during device operation, resulting in a lower
transistor drive current.

Activation of dopants in regions defined on substrates
with strained layers, such as strained Si, presents a chal-
lenge. Strained Si substrates include a thin strained Si layer
having a thickness of, e.g., 40–400 Å. The strained Si layer
is disposed over a second material, e.g., a relaxed SiGe layer.
A compressively strained SiGe layer may be disposed above
or below the strained Si layer. These layer structures may
make it difficult to maintain shallow source/drain junctions
in, for example, complementary MOS (CMOS) devices,
especially when the strained Si/SiGe substrate is subjected
to high temperatures. This difficulty arises from the different
diffusion rates of dopants in SiGe and in Si. For example,
arsenic (As) may diffuse much more rapidly in SiGe than in
Si at temperatures significantly above 900° C. and/or times
significantly above 30 seconds. This rapid diffusion leads to
deeper source/drain junctions in NMOS transistors fabri-
cated on strained-Si/SiGe substrates and/or excessive lateral
diffusion of dopants beneath the gate, i.e., into the channel
region. Because of the diffusion of As into a channel of the
NMOS transistor, the transistor has a high off current ($I_{off}$)
and it becomes more difficult to turn off.

In alternative structures, the second material over which
the strained layer is disposed may be e.g., a bulk semicon-
ductor substrate, or an insulating material. Here, too, it may
be difficult to maintain shallow source/drain junctions or
prevent excessive lateral diffusion of dopants, especially
when the strained structures are subjected to high tempera-
tures. This difficulty arises from the different diffusion rates
of dopants in strained layers in comparison to bulk, non-
strained materials. For example, boron diffuses faster
through strained Si than through bulk Si.

**2**

A possible solution is to perform the S/D/G dopant
activation at a restricted time and temperature (e.g., 900° C.
for 30 sec). However, these restricted parameters may lead
to unacceptable polysilicon depletion effects.

SUMMARY

A semiconductor layer is pre-doped and a dopant distri-
bution anneal is performed prior to gate definition. Subse-
quently formed shallow sources and drains, therefore, are
not affected by the gate annealing step.

In an aspect, the invention features a method for forming
a structure, the method including forming a layer over a
substrate, the layer having a depletion region with a thick-
ness less than approximately 20 angstroms. A portion of the
layer is removed to define a gate of a transistor, the gate
defining a channel length. A plurality of dopants are intro-
duced into the substrate proximate the gate to define a source
and a drain, and the substrate is heated to a temperature to
activate the plurality of dopants. The temperature is suffi-
ciently low to prevent at least a portion of the plurality of
dopants from diffusing enough to induce a high off current.

One or more of the following features may be included.
The substrate may include an insulating layer. A strained
layer may be disposed over the insulating layer. The sub-
strate may include a strained layer. The strained layer may
be tensilely strained or compressively strained. The sub-
strate may include a relaxed layer. The substrate may include
germanium. The depletion region thickness may be less than
10 angstroms.

The induced off current may be less than $10^{-6}$ Amperes
per micrometer, and preferably may be less than $10^{-9}$
Amperes per micrometer.

After the plurality of dopants are introduced, a portion of
the plurality of dopants disposed in a region of the source
may define a source extent proximate the channel, and after
heating the substrate, the source extent may diffuses under
the gate a distance extending less than 12.5% of the channel
length. A concentration of the portion of dopants at the
source extent may be at least approximately $10^{18}$ atoms/
cubic centimeter.

After the plurality of dopants are introduced, a portion of
the plurality of dopants disposed in a region of the drain may
define a drain extent proximate the channel, and after
heating the substrate, the drain extent may diffuse under the
gate a distance extending less than 12.5% of the channel
length. A concentration of the portion of dopants at the drain
extent may be at least approximately $10^{18}$ atoms/cubic
centimeter.

The layer may include a semiconductor and the step of
forming the layer may include introducing a plurality of gate
dopants into the layer, and heating the layer to a first
temperature to alter a distribution of the gate dopants in the
layer. The semiconductor may include silicon and/or ger-
manium.

The layer may include a metallic element, such as at least
one of molybdenum, titanium, tantalum, tungsten, iridium,
nickel, cobalt, and platinum.

In another aspect, the invention features a method for
forming a structure, the method including introducing a first
plurality of dopants into a gate electrode layer disposed over
a substrate. The gate electrode layer is heated to a first
temperature to alter a distribution of the first plurality of
dopants in the gate electrode layer. A portion of the gate
electrode layer is removed to define a gate of a transistor. A
second plurality of dopants is introduced into the substrate
proximate the gate to define a source and a drain. The

US 7,074,655 B2

3      4

substrate is heated to a second temperature to activate the second plurality of dopants, with second temperature being less than the first temperature.

One or more of the following features may be included. The substrate may include an insulating layer. The substrate may include a strained layer disposed over the insulating layer.

The substrate may include a strained layer. The strained layer may be tensilely strained or compressively strained. The substrate may include a relaxed layer. The substrate may include germanium.

The first temperature may be greater than 1000° C. The second temperature may be less than 1000° C.

The gate electrode layer may include a semiconductor layer, such as silicon and/or germanium.

The first plurality and the second plurality of dopants may include n-type dopants and/or p-type dopants.

In another aspect, the invention features a method for forming a structure, the method including introducing a first plurality of dopants into a gate electrode layer disposed over a substrate. The semiconductor layer is heated for a first time period to alter a distribution of the first plurality of dopants in the gate electrode layer. A portion of the gate electrode layer is removed to define a gate of a transistor. A second plurality of dopants is introduced into the substrate approximate the gate to define a source and a drain. The substrate is heated for a second time period to activate the second plurality of dopants, with the second time period having a shorter duration than a duration of the first time period.

One or more of the following features may be included. The substrate may include an insulating layer. The substrate may include a strained layer disposed over the insulating layer. The substrate may include a strained layer. The strained layer may be tensilely strained or compressively strained. The substrate may include a relaxed layer. The substrate may include at least one of silicon and germanium.

The first time period may be greater than 5 seconds. In some embodiments, the first time period may be greater than 30 seconds.

The gate electrode layer may include a semiconductor layer. The semiconductor layer may include silicon and/or germanium.

The first and the second plurality of dopants may include n-type dopants and/or p-type dopants.

In another aspect, the invention features a structure including a strained layer disposed over a substrate. A first transistor includes a first source and a first drain, with at least a portion of the first source and the first drain disposed in a first portion of the strained layer. The first gate is disposed above the strained layer and between the source and drain regions, the first gate including a first metal. A first gate dielectric layer is disposed between the first gate and the strained layer.

One or more of the following features may be included. The substrate may include dielectric material and the strained layer may be disposed in contact with the dielectric material. The first metal may be selected from the group consisting of titanium, tungsten, molybdenum, tantalum, nickel, cobalt, and platinum. The strained layer may include silicon and/or germanium. The gate may include a metal-semiconductor alloy. In some embodiments, the gate may include only metal silicide.

A channel may be disposed under the gate. The source may include a source extent proximate the channel, the source extent extending under the gate a distance less than 12.5% of a channel length. A concentration of dopants in the source extent may be at least approximately 10^18 atoms/

cubic centimeter. The drain may include a drain extent proximate the channel, the drain extent extending under the gate a distance less than 12.5% of a channel length. A concentration of dopants in the drain extent may be at least approximately 10^18 atoms/cubic centimeter.

The structure may have a second transistor that includes a second source and a second drain, with at least a portion of the first source and the first drain disposed in a second portion of the strained layer. A second gate may be disposed above the strained layer and between the second source and second drain regions, the second gate including a second metal. A second gate dielectric layer may be disposed between the second gate and the strained layer. The first transistor may be an n-type metal-oxide semiconductor field-effect transistor, the first source and the first drain may include n-type dopants, the second transistor may be a p-type metal-oxide-semiconductor field-effect transistor, and the second source and second drain may include p-type dopants.

The first gate may have a first workfunction, the second gate may have a second workfunction, and the first workfunction may be substantially equal to or substantially different from the second workfunction.

BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1–4 illustrate several substrates amenable for use fabrication of semiconductor structures;

FIGS. 5–8A are a series of schematic cross-sectional views of a semiconductor substrate illustrating a process for fabricating a semiconductor structure on the substrate;

FIG. 8B graphically depicts a distribution of dopants in the semiconductor structure illustrated in FIG. 8A;

FIG. 9 is a schematic cross-sectional view of a semiconductor structure fabricated on the substrate; and

FIG. 10 is a schematic cross-sectional view of a semiconductor structure fabricated on another substrate.

Like-referenced features represent common features in corresponding drawings.

DETAILED DESCRIPTION

Referring to FIG. 1, which illustrates an epitaxial wafer 100 amenable to use with the present invention, several layers collectively indicated at 101, including a strained layer 102 and a relaxed layer 104, are disposed over a substrate 106. The ensuing discussion focuses on a strained layer 102 that is tensilely strained, but it is understood that strained layer 102 may be tensilely or compressively strained. Strained layer 102 has a lattice constant other than the equilibrium lattice constant of the material from which it is formed, and it may be tensilely or compressively strained; relaxed layer 104 has a lattice constant equal to the equilibrium lattice constant of the material from which it is formed. Tensilely strained layer 102 shares an interface 108 with relaxed layer 104.

Substrate 106 and relaxed layer 104 may be formed from various materials systems, including various combinations of group II, group III, group IV, group V, and group VI elements. For example, each of substrate 106 and relaxed layer 104 may include a III–V compound. Substrate 106 may include gallium arsenide (GaAs), and relaxed layer 104 may include indium gallium arsenide (InGaAs) or aluminum gallium arsenide (AlGaAs). These examples are merely illustrative, and many other material systems are suitable.

In an embodiment, relaxed layer 104 may include $Si_{1-x}Ge_x$ with a uniform composition, containing, for example,

US 7,074,655 B2

5

Ge in the range $0.1 \leq x \leq 0.9$ and having a thickness $T_1$ of, e.g., 0.2–2 μm. In an embodiment, $T_1$ is 1.5 μm.

Strained layer 102 may include a semiconductor such as at least one of a group II, a group III, a group IV, a group V, and a group VI element. Strained semiconductor layer 102 may include, for example, Si, Ge, SiGe, GaAs, indium phosphide (InP), and/or zinc selenide (ZnSe). In some embodiments, strained semiconductor layer 102 may include approximately 100% Ge, and may be compressively strained. A strained semiconductor layer 102 comprising 100% Ge may be formed over, e.g., relaxed layer 104 containing uniform $Si_{1-x}Ge_x$ having a Ge content of, for example, 50–90% (i.e., x=0.5–0.9), preferably 70% (i.e., x=0.7).

In an embodiment, tensilely strained layer 102 is formed of silicon. Tensilely strained layer 102 has a thickness $T_2$ of, for example, 50–1000 Å. In an embodiment, thickness $T_2$ is less than 200 Å.

Relaxed layer 104 and strained layer 102 may be formed by epitaxy, such as by atmospheric-pressure CVD (APCVD), low- (or reduced-) pressure CVD (LPCVD), ultra-high-vacuum CVD (UHVCVD), by molecular beam epitaxy (MBE), or by atomic layer deposition (ALD). Strained layer 102 containing Si may be formed by CVD with precursors such as silane, disilane, or trisilane. Strained layer 102 containing Ge may be formed by CVD with precursors such as germane or digermane. The epitaxial growth system may be a single-wafer or multiple-wafer batch reactor. The growth system may also utilize a low-energy plasma to enhance layer growth kinetics.

In an embodiment in which strained layer 102 contains substantially 100% Si, strained layer 102 may be formed in a dedicated chamber of a deposition tool that is not exposed to Ge source gases, thereby avoiding cross-contamination and improving the quality of interface 108 between strained layer 102 and relaxed layer 104. Furthermore, strained layer 102 may be formed from an isotopically pure silicon precursor(s). Isotopically pure Si has better thermal conductivity than conventional Si. Higher thermal conductivity may help dissipate heat from devices subsequently formed on strained layer 102, thereby maintaining the enhanced carrier mobilities provided by strained layer 102.

In some embodiments, relaxed layer 104 and/or strained layer 102 may be planarized by, e.g., CMP, to improve the quality of subsequent wafer bonding. Strained layer 102 may have a low surface roughness, e.g., less than 0.5 nanometer (nm) root mean square (RMS).

Referring to FIG. 2, an alternative epitaxial wafer 100 amenable for use with the present invention may include layers in addition to those indicated in FIG. 1. For example, a substrate 200 formed from a semiconductor, such as silicon, may have several layers collectively indicated at 202 formed upon it. Layers 202 may be grown, for example, by APCVD, LPCVD, or UHVCVD.

Layers 202 include a graded layer 204 disposed over substrate 200. Graded layer 204 may include Si and Ge with a grading rate of, for example, 10% Ge per μm of thickness, and a thickness $T_3$ of, for example, 2–9 μm. Graded layer 204 may be grown, for example, at 600–1200° C. See, e.g., U.S. Pat. No. 5,221,413, incorporated herein by reference in its entirety. Relaxed layer 104 is disposed over graded layer 204. A virtual substrate 206 includes relaxed layer 104 and graded layer 204.

A compressively strained layer 208 including a semiconductor material is disposed over relaxed layer 104. In an embodiment, compressively strained layer 208 includes group IV elements, such as $Si_{1-y}Ge_y$, with a Ge content (y)

6

higher than the Ge content (x) of relaxed $Si_{1-x}Ge_x$ layer 104. Compressively strained layer 208 contains, for example, Ge in the range $0.25 \leq y \leq 1$ and has a thickness $T_4$ of, e.g., 10–500 angstroms (Å). In some embodiments, compressively strained layer 208 has a thickness $T_4$ of less than 500 Å. In certain embodiments, $T_4$ is less than 200 Å.

Tensilely strained layer 102 is disposed over compressively strained layer 208, sharing an interface 210 with compressively strained layer 208. In some embodiments, compressively strained layer 208 may be disposed not under, but over tensilely strained layer 102.

Substrate 200 with layers 202 typically has a threading dislocation density of $10^{4-10^5}$/cm².

Referring to FIG. 3, yet another alternative epitaxial wafer amenable for use with the present invention is a strained-semiconductor-on-semiconductor SSOS substrate 300, having a strained layer 102 disposed in contact with a crystalline semiconductor handle wafer 310. Handle wafer 310 may include a bulk semiconductor material, such as silicon. The strain of strained layer 102 is not induced by underlying handle wafer 310, and is independent of any lattice mismatch between strained layer 102 and handle wafer 310. In an embodiment, strained layer 102 and handle wafer 310 include the same semiconductor material, e.g., silicon. Handle wafer 310 may have a lattice constant equal to a lattice constant of strained layer 102 in the absence of strain. Strained layer 102 may have a strain greater than approximately $10^{-3}$. Strained layer 102 may have been formed by epitaxy, and may have a thickness $T_2$ ranging from approximately 20 Å to approximately 1000 Å, with a thickness uniformity of better than approximately ±10%. In an embodiment, strained layer 102 may have a thickness uniformity of better than approximately ±5%. Strained layer 102 may have a surface roughness of less than 20 Å.

The SSOS substrate 300 may be formed, as described in U.S. Ser. Nos. 10/456,708, 10/456,103, 10/264,935, and 10/629,498, the entire disclosures of each of the four applications being incorporated herein by reference. The SSOS substrate formation process may include the formation of strained layer 102 over substrate 106 as described above with reference to FIG. 1. A cleave plane may be defined in, e.g., relaxed layer 104. Strained layer 102 may be bonded to the handle wafer 310, and a split may be induced at the cleave plane. Portions of the relaxed layer 104 remaining on strained layer 102 may be removed by, e.g., oxidation and/or wet etching.

Yet another epitaxial wafer amenable for use with the present invention is a strained-semiconductor-on-insulator (SSOI) wafer 400. Referring to FIG. 4, a SSOI wafer 400 has strained layer 102 disposed over an insulator, such as a dielectric layer 410 formed on a semiconductor substrate 420. SSOI substrate 400 may be formed by methods analogous to the methods described above in the formation of SSOS substrate 300. Dielectric layer 410 may include, for example, $SiO_2$. In an embodiment, dielectric layer 410 includes a material having a melting point ($T_m$) higher than a $T_m$ of pure $SiO_2$, i.e., higher than 1700° C. Examples of such materials are silicon nitride ($Si_3N_4$), aluminum oxide, magnesium oxide, etc. In another embodiment, dielectric layer 410 includes a high-k material with a dielectric constant higher than that of $SiO_2$, such as aluminum oxide ($Al_2O_3$), hafnium oxide ($HfO_2$) or hafnium silicate (HfSiON or $HfSiO_4$). Semiconductor substrate 420 includes a semiconductor material such as, for example, Si, Ge, or SiGe. Strained layer 102 has a thickness $T_4$ selected from a range of, for example, 50–1000 Å, with a thickness uniformity of better than approximately +5% and a surface roughness of

7

less than approximately 20 Å. Dielectric layer 410 has a thickness $T_5$ selected from a range of, for example, 500–3000 Å. In an embodiment, strained layer 102 includes approximately 100% Si or 100% Ge having one or more of the following material characteristics: misfit dislocation density of, e.g., $0-10^5$ cm/cm²; a threading dislocation density of about $10^1-10^7$ dislocations/cm²; a surface roughness of approximately 0.01–1 nm RMS; and a thickness uniformity across SSOI substrate 400 of better than approximately ±10% of a mean desired thickness; and a thickness $T_4$ of less than approximately 200 Å. In an embodiment, SSOI substrate 400 has a thickness uniformity of better than approximately ±5% of a mean desired thickness.

In an embodiment, dielectric layer 410 has a $T_m$ greater than that of SiO₂. During subsequent processing, e.g., MOS-FET formation, SSOI substrate 400 may be subjected to high temperatures, i.e., up to 1100° C. High temperatures may result in the relaxation of strained layer 102 at an interface 430 between strained layer 102 and dielectric layer 410. The use of dielectric layer with a $T_m$ greater than 1700° C. may help keep strained layer 102 from relaxing at the interface 430 between strained layer 102 and dielectric layer 410 when SSOI substrate is subjected to high temperatures.

In an embodiment, the misfit dislocation density of strained layer 102 may be lower than its initial dislocation density. The initial dislocation density may be lowered by, for example, performing an etch of a top surface 440 of strained layer 102. This etch may be a wet etch, such as a standard microelectronics clean step such as an RCA SC1, i.e., hydrogen peroxide, ammonium hydroxide, and water ($H_2O_2+NH_4OH+H_2O$), which at, e.g., 80° C. may remove silicon.

In an embodiment, substrate 210 with layers 202 is processed through various CMOS front-end steps such as well definition and isolation formation (not shown).

Referring to FIG. 5, a gate dielectric layer 500 is formed on a top surface 510 of strained layer 102. Gate dielectric layer 500 is, for example, a thermally grown gate oxide such as silicon dioxide (SiO₂). Alternatively, gate dielectric layer 500 may include a high-k material with a dielectric constant higher than that of SiO₂, such as aluminum oxide (Al₂O₃), hafnium oxide (HfO₂) or hafnium silicate (HfSiON or HfSiO₄). In some embodiments, gate dielectric layer 500 may be a stacked structure, e.g., a thin SiO₂ layer capped with a high-k material. A gate electrode layer 520 is formed over gate dielectric layer 500. Gate electrode layer 520 may include, for example, polysilicon, amorphous silicon, Ge, or SiGe gate material.

Referring to FIG. 6, an implantation mask 600 is formed over gate electrode layer 520. Implantation mask 600 may be made of a masking material such as photoresist. Implantation mask 600 defines an opening 610, with opening 610 exposing a portion 620 of gate electrode layer 520 (defined for purposes of illustration by the dashed lines). Gate electrode layer portion 620 is disposed over a portion of region 630 of substrate 200 and layers 202 in which NMOS devices will be formed. Implantation mask 600 protects portions of the top surface 640 of gate electrode layer 520 disposed over regions of substrate 200 and layers 202 in which NMOS devices will not be formed. In the illustrated embodiment, implantation mask exposes only an area 620 in which an NMOS gate will be defined (see below). In some other embodiments, implantation mask 600 exposes entire regions of gate electrode layer 520 disposed over regions of substrate 200 and layers 202 in which NMOS devices will be formed, including regions in which n-type sources and drains will be formed (see below).

8

Subsequent to the formation of implantation mask 600, a plurality of n-type dopants 650 are introduced into gate electrode layer portion 620 through opening 610. N-type dopants 650 may be, for example, As or phosphorus (P) ions introduced by ion implantation. After the implantation of n-type dopants, implantation mask 600 is removed by a stripping process such as a dry strip in an oxygen plasma. A diffusion anneal is performed to diffuse n-type dopants 650 uniformly in a vertical direction throughout portion 620 of gate electrode layer 520. This diffusion anneal is performed at a relatively high temperature, e.g., over 1000° C., such as 1025° C., for a sufficiently long time to uniformly diffuse dopants 650, e.g., 5 seconds or more. The diffusion anneal results in the formation of a depletion region 660 in portion 620 of gate electrode layer 520 having a thickness $T_6$ of, e.g., less than 20 angstroms, preferably less than 10 angstroms.

Referring to FIG. 7, as well as to FIG. 6, a gate 700 formed from gate electrode layer 520 is defined as follows. A gate photoresist mask (not shown) is deposited and patterned to protect at least part of portion 620 of gate electrode layer 520. Regions of gate electrode layer 520, as well as regions of portion 620, exposed by the gate photoresist mask are removed by a removal process such as reactive ion etching (RIE). Subsequently, portions of dielectric layer 500 exposed by the RIE of portions of gate electrode layer 520 are also removed by a removal step, such as RIE with an etch chemistry selective to the material comprising strained layer 102, such as Si. Removal of portions of dielectric layer 500 exposes top surface 510 of strained layer 102, and defines a gate dielectric 710 disposed under gate 700. The gate photoresist mask is removed by, for example, a stripping process such as a dry strip in an oxygen plasma. Gate 700 includes a uniform distribution of n-type dopants, and defines an initial channel length $L_1$.

Referring to FIG. 8A, a shallow implantation of n-type dopants, such as As, is performed to define a source extension 800 and a drain extension 810 in strained layer 102. A first sidewall spacer 820 and a second sidewall spacer 830 are defined proximate gate 700. First and second sidewall spacers 820, 830 are formed from a dielectric, such as silicon dioxide or silicon nitride. A source 840 and a drain 850 may be defined in portions of strained layer 102, compressively strained layer 208, and relaxed layer 104, proximate first and second sidewall spacers 820, 830. In some embodiments, source 840 and drain 850 may be defined in strained layer 102. Source 840 and drain 850 are defined by the introduction of a plurality of dopants, such as by an implantation of n-type dopants, e.g., As, into layers 202 disposed over substrate 200. These dopants are substantially prevented from reaching regions of compressively strained layer 208 and strained layer 102 disposed below gate dielectric 710 by the presence of sidewall spacers 820, 830.

After the introduction of dopants to define source 840, drain 850, source extension 800, and drain extension 810, an activation anneal is performed to activate these dopants. The activation anneal is performed at a relatively low temperature, e.g., less than 1000° C. For example, an activation anneal may be done at 900° C. for 30 seconds. Alternatively, the activation anneal may be done for a very short duration at a higher temperature, e.g., 1 second at 1100° C. In an alternative embodiment, an activation anneal of extremely short duration (e.g., less than 1 second) may be performed by techniques such as flash lamp annealing or laser annealing at temperatures between 900° C. and 1350° C. This temperature and time are sufficient to activate the dopants in the source 840 and drain 850, without inducing excessive diffusion of n-type dopants into a channel 860 under gate

9

700. As a result of this procedure, good dopant activation is achieved and polysilicon depletion avoided due to the high-temperature diffusion anneal. At the same time, dopants in the vicinity of strained layer 102 and/or compressively strained layer 208 do not experience high temperatures for long durations (high thermal budgets) and, hence, do not significantly invade these layers beyond the boundaries of source 840, drain 850, source extension 800, and drain extension 810. Dopants do not diffuse into channel 860 enough to induce a high off current. The off current may be less than $10^{-8}$ Amperes per micrometer. In some embodiments, the off current is less than $10^{-9}$ Amperes per micrometer.

Referring to FIG. 8B as well as to FIG. 8A, a concentration of dopants in layers 202 may be graphically depicted with a graph 865, with an x-axis representing positions within strained layer 102 and a y-axis representing a logarithm of dopant concentration. A concentration [n] 870 of dopants in source 840 and source extension 800 and a concentration [n] 875 of dopants in drain 850 and drain extension 810 may have a maximum level of approximately $10^{21}$ atoms/cubic centimeter at a level 880 disposed below a surface of strained layer 102. Dopants disposed in an outer region of source 840 may define a source extent 890, and dopants disposed in an outer region of drain 850 may define a drain extent 895. The concentration of dopants at source extent 76 and drain extent 78 may be approximately $10^{18}$ atoms/cubic centimeter. After heating of substrate 200, portions of source extent 890 and drain extent 895 disposed proximate channel 860 may diffuse a distance extending less than 12.5% of gate length $L_1$, thereby decreasing channel length $L_1$ by no more than 25%. The abruptness of the dopant concentration in the source and drain region may also be greater than 2 nm per decade (i.e., per order of magnitude in concentration). In some embodiments, this abruptness may be better than 4 nm/decade.

In an alternative embodiment, PMOS devices are formed with pre-doped gates. Here, the semiconductor material from which the PMOS gate will be defined is doped with p-type dopants (e.g. boron or indium) prior to PMOS gate definition.

In some embodiments, source and drain extensions may extend into an underlying layer that may include an element other than Si, such as Ge.

In an alternative embodiment, no mask, e.g., no implantation mask 600, is formed before gate electrode layer 520 is implanted with n-type dopants. In some applications, however, implantation of n-type dopants into gate electrode layer 520 material which will be used for PMOS gates (or vice versa) may adversely affect threshold voltages.

In some embodiments, gate 700 is formed from a conductive material that does not require doping, such as a metal. Gate 700 can be formed from metals such as titanium (Ti), tungsten (W), molybdenum (Mo), or tantalum (Ta), as well as other materials, e.g., titanium nitride (TiN), titanium silicon nitride (TiSiN), tungsten nitride (WN), tantalum nitride (TaN), tantalum silicide (TaSi), iridium (Ir), iridium oxide (IrO$_2$), etc., that provide an appropriate workfunction, i.e., a workfunction of approximately 4–5.5 electron volts (eV), without doping. Metal gates may have a depletion region of 20 angstroms or less, preferably less than 10 angstroms.

Referring to FIG. 9, a first transistor 910 and a second transistor 920 may be formed over strained layer 102. At least a portion 922 of first source 840 and at least a portion 924 of first drain 850 may be disposed in a first portion 930 of the strained layer 102. First source 840 and first drain 924

10

may extend into compressively strained layer 208 and relaxed layer 104. First gate 700 may be disposed above strained layer 102 and between first source 840 and first drain 850. First gate 700 may include a metal, such as titanium, tungsten, molybdenum, tantalum, nickel, cobalt, or platinum. In some embodiments, gate 700 may contain a metal-semiconductor alloy, such as metal silicide, metal germanocide, or metal germanosilicide. In some embodiments, the gate 700 may include only a metal-semiconductor alloy. Channel 860 may be disposed under gate 700. Source 840 may include a source extent 890 and drain 850 may include a drain extent 895. Each or both of the drain source extent 890 and drain extent 895 may extend under gate 700 a distance less than 12.5% of channel length $L_1$ (see FIG. 8A). A concentration of dopants in the source extent 890 and/or the drain extent 895 may be at least $10^{18}$ atoms/cubic centimeter.

The second transistor 920 may include a second source 940 and a second drain 950 disposed in a second portion 960 of the strained layer 102. A second gate 965 may be disposed above the strained layer 102 and between the second source 940 and second drain 950. The second gate 965 may include a second metal, such as titanium, tungsten, molybdenum, tantalum, nickel, cobalt, or platinum. In some embodiments, gate 965 may contain a metal-semiconductor alloy. In some embodiments, the gate 965 may include only a metal-semiconductor alloy. A second gate dielectric layer 970 may be disposed between the second gate 965 and the strained layer 102. The first transistor 910 may be an n-type metal-oxide semiconductor field-effect transistor (n-MOSFET), the first source 840 and the first drain 850 may include n-type dopants. The second transistor 920 may be a p-type metal-oxide-semiconductor field-effect transistor (p-MOS-FET), and the second source 940 and second drain 950 may include p-type dopants. CMOS device 900, therefore, includes both n-MOSFET 910 and p-MOSFET 920.

In some embodiments, gates 700 and 965 may be formed from semiconductor layers or from metal-semiconductor alloys, such as silicides.

In a CMOS device, a single gate having a mid-band gap workfunction (approximately 4.4–4.6 eV) may be used for both NMOS and PMOS devices such as, for example, fully depleted semiconductor-on-insulator devices built on SSOI substrates. Alternatively, two different materials having workfunctions closer to the respective band edges, e.g., approximately 0.2–0.4 eV below the conduction band edge (~4 eV) or approximately 0.2 eV above the valence band edge (~5 eV), may be used for NMOS and PMOS devices, respectively, formed with strained semiconductors such as strained silicon. By using a gate material that provides an appropriate workfunction without doping, gate depletion effects are avoided because dopants are unnecessary. Further, adverse short channel effects due to dopant diffusion from source and drain extensions 800, 810 are also avoided by the elimination of high thermal budget activation steps.

In some embodiments, gate electrode layer 520 may be formed from a gate semiconductor material such as poly-crystalline Si, Ge, or SiGe that is reacted with a subsequently deposited metal, e.g., nickel, cobalt, titanium, or platinum, either before or after the definition of gate 700. The gate semiconductor material may be deposited as a layer by CVD and may have a thickness of approximately 500–2000 Å, e.g., 1000 Å. The subsequently deposited metal may be deposited by, e.g., sputter deposition, and may have a thickness of, for example, 2–15 nm. The gate semiconductor material and the metal may be reacted in a reaction process such as a silicidation process that includes, e.g., rapid

US 7,074,655 B2

**11**

thermal processing at, for example, 10–120 seconds at 400–850° C. The reaction process can also include a second rapid thermal processing step after a wet chemical strip that removes any unreacted metal from the structure. In these embodiments, the reaction conditions and the thicknesses of the gate semiconductor material and the metal are selected such that the gate semiconductor material and the metal substantially completely react with each other to form a metal-semiconductor alloy, such as a metal silicide. Gate 700, thus, substantially comprises a silicide material such as nickel silicide, cobalt silicide, titanium silicide, or platinum silicide, or a germanocide material such as nickel germanocide, cobalt germanocide, titanium germanocide, or platinum germanocide. Gate electrode layer 520 may be doped by the introduction of a plurality of n-type or p-type dopants prior to the reaction process, e.g., the silicidation reaction. Such doping may alter the post-reaction process gate work-function, facilitating the fabrication of devices with a desired threshold voltage. The reaction process may be performed before or after the definition of gate 700. Because the full reaction of the semiconductor gate electrode layer 520 (and hence gate 700) results in gate 700 being a metal gate, polysilicon depletion effects are eliminated.

Referring to FIG. 10 as well as to FIGS. 4 and 9, transistor 910 may be formed on SSOI substrate 410, in which strained layer 102 is disposed in contact with dielectric layer 410. In this embodiment, source 840 and drain 850 are disposed entirely within strained layer 102.

The methods and structures described above with reference to FIGS. 5–10 may be formed on other epitaxial wafers, such as the wafers illustrated in FIGS. 1 and 3.

The invention may be embodied in other specific forms without departing from the spirit or essential characteristics thereof. The foregoing embodiments are therefore to be considered in all respects illustrative rather than limiting on the invention described herein. Scope of invention is thus indicated by the appended claims rather than by the foregoing description, and all changes which come within the meaning and range of equivalency of the claims are intended to be embraced therein.

The invention claimed is:

1. A method for forming a structure, the method comprising:

forming a gate of a transistor over a substrate, the gate defining a channel therebelow;

introducing a plurality of dopants into the substrate proximate the channel to define a source and drain; and

heating the substrate to a temperature for a time to activate the plurality of dopants,

wherein the gate includes a depletion region having a thickness less than approximately 20 Angstroms, and at least one of the temperature and the time is sufficiently low so that diffusion of the plurality of dopants beyond the source and the drain is sufficiently low such that an off current of the transistor is low.

2. The method of claim 1, wherein the channel comprises a strained semiconductor.

3. The method of claim 1, wherein forming the gate comprises depositing a semiconductor layer over the substrate, forming a metal layer over the semiconductor layer, and heating the substrate such that at least a portion of the semiconductor layer reacts with the metal layer to form a metal-semiconductor alloy.

4. The method of claim 3, further comprising introducing a plurality of dopants into the gate.

**12**

5. The method of claim 3, wherein substantially all of the semiconductor layer reacts with the metal to form the metal-semiconductor alloy.

6. The method of claim 3, wherein the metal comprises Ni.

7. The method of claim 6, wherein the substrate is heated by at least one of flash annealing and laser annealing and the time is less than 1 second.

8. The method of claim 7, wherein the temperature is chosen from a range of 900° C. –1350° C.

9. The method of claim 1, wherein after heating the substrate, an abruptness of a dopant concentration in at least one of the source and the drain is greater than approximately 2 nanometers per decade.

10. The method of claim 9, wherein the abruptness is greater than approximately 4 nanometers per decade.

11. The method of claim 1, wherein the gate consists essentially of metal.

12. The method of claim 11, wherein the metal consists essentially of a single metallic element.

13. The method of claim 11, wherein the metal consists essentially of at least two metallic elements.

14. The method of claim 1, wherein at least one of the source and drain comprises an element other than Si.

15. The method of claim 14, wherein the element comprises Ge.

16. The method of claim 1, wherein at least one of the source and the drain comprises a strained semiconductor material.

17. The method of claim 16, wherein the strained semiconductor material is compressively strained.

18. The method of claim 1, wherein the strained semiconductor material comprises at least one of SiGe and Ge.

19. The method of claim 1, wherein the off current is less than $10^{-6}$ Amperes per micrometer.

20. The method of claim 19, wherein the off current is less than $10^{-9}$ Amperes per micrometer.

21. A structure comprising:

a substrate;

an n-type metal-oxide semiconductor field-effect transistor disposed over the substrate including:

a first source and a first drain, defining a first channel therebetween and each of the first source and first drain comprising n-type dopants,

a first gate disposed above the first channel, the first gate having a first workfunction and comprising a first metal, and

a first gate dielectric layer disposed between the first gate and the first channel; and

a p-type metal-oxide semiconductor field-effect transistor disposed over the substrate including:

a second source and a second drain, defining a second channel therebetween and each of the second source and second drain comprising p-type dopants;

a second gate disposed above the second channel, the second gate having a second workfunction and comprising a second metal; and

a second gate dielectric layer disposed between the second gate and the second channel,

wherein the first workfunction is substantially different from the second workfunction, and at least one of the first channel and the second channel comprises a strained semiconductor.

22. The structure of claim 21, wherein the first channel and the second channel each comprises a strained semiconductor.

US 7,074,655 B2

23. The structure of claim **21**, wherein at least one of the first metal and the second metal comprises at least one of molybdenum, titanium, tantalum, tungsten, iridium, cobalt, and platinum.

24. The structure of claim **21**, wherein at least one of the first metal and the second metal comprises nickel.

25. The structure of claim **21**, wherein at least one of the first gate and the second gate consists essentially of a metal-semiconductor alloy.

26. The structure of claim **21**, wherein an abruptness of a dopant concentration in at least one of the first source, the first drain, the second source, and the second drain is greater than approximately 2 nanometers per decade.

27. The structure of claim **26**, wherein the abruptness is greater than approximately 4 nanometers per decade.

28. The structure of claim **21**, wherein at least one of the first source, the first drain, the second source, and the second drain comprises a second strained semiconductor.

29. The structure of claim **28**, wherein the second strained semiconductor is compressively strained.

30. The structure of claim **28**, wherein the second strained semiconductor comprises at least one of SiGe and Ge.

31. The structure of claim **21**, wherein the strained semiconductor comprises tensilely strained Si.

* * * * *

# EXHIBIT L

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Intel Corporation

**DEFENDANTS**

AmberWave Systems Corporation

**(b)** County Of Residence Of First Listed Plaintiff:
(Except In U.S. Plaintiff Cases)

County Of Residence Of First Listed Defendant:
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** Attorneys (Firm Name, Address, And Telephone Number)
Josy W. Ingersoll, Esquire (#1088)
John W. Shaw, Esquire (#3362)
Karen E. Keller, Esquire (#4489)
Young Conaway Stargatt & Taylor, LLP
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6672

Attorneys (If Known)

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government
     Plaintiff

☒ 3 Federal Question
     (U.S. Government Not a Party)

☐ 2 U.S. Government
     Defendant

☐ 4 Diversity
     (Indicate Citizenship of
     Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place An X In One Box For Plaintiff And

(For Diversity Cases Only)   One Box For Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in This State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## V. NATURE OF SUIT (Place An X In One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>  & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>  (Excl. Veterans)<br>☐ 153 Recovery of Overpayment<br>  of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>  Liability<br>☐ 320 Assault, Libel &<br>  Slander<br>☐ 330 Federal Employers<br>  Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>  Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>  Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury -<br>  Med Malpractice<br>☐ 365 Personal Injury -<br>  Product Liability<br>☐ 368 Asbestos Personal<br>  Injury Product<br>  Liability<br><br>**PERSONAL ROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>  Property Damage<br>☐ 385 Property Damage<br>  Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of<br>  Property 21 U.S.C. 881<br>☐ 630 Liquor Laws<br>☐ 640 R R & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational<br>  Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 U.S.C. 158<br><br>☐ 423 Withdrawal<br>  28 U.S.C. 157<br><br>**PROPERTY RIGHTS**<br><br>☐ 820 Copyrights<br>☒ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates,<br>  etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>  Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/<br>  Exchange<br>☐ 875 Customer Challenge<br>  12 U.S.C. 3410 |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>  Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate<br>  Sentence<br>  Habeas Corpus<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **LABOR**<br>☐ 710 Fair Labor Standards<br>  Act<br>☐ 720 Labor/Mgmt<br>  Relations<br>☐ 730 Labor/Mgmt. Reporting<br>  & Disclosure Act<br>☐ 740 Railway Labor Act<br><br>☐ 790 Other Labor Litigation<br><br>☐ 791 Empl Ret Inc<br>  Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW<br>  (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>  or Defendant)<br>☐ 871 IRS - Third Party<br>  26 U.S.C. 7609 | ☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization<br>  Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information<br>  Act<br>☐ 900 Appeal of Fee<br>  Determination Under<br>  Equal Access to Justice<br>☐ 950 Constitutionality of<br>  State Statutes<br>☐ 890 Other Statutory Actions |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
     Proceeding

☐ 2 Removed from
     Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     another district
     (specify)

☐ 6 Multidistrict
     Litigation

☐ 7 Appeal to
     District
     Judge from
     Magistrate
     Judgment

## VI. CAUSE OF ACTION

(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTSE UNLESS DIVERSITY.):
35 U.S.C. § 101 et seq.

Brief description of cause:
Cause of action for declaratory judgment of no patent infringement.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
   UNDER F.R.C.P. 23

DEMAND ☐ YES ☐ NO

DEMAND $

Check YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) (See instructions) IF ANY

JUDGE: KAJ

DOCKET NUMBER: 05-301 (Consol.)

DATE

7-11-06

SIGNATURE OF ATTORNEY OF RECORD

*Karen E. Keller*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

DB01:1623952.1

# EXHIBIT M

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

FILED – CLERK
U.S. DISTRICT COURT

200 JUL 12  AM 9: 02

TX EASTERN – LUFKIN

BY _____

|  |  |  |
|---|---|---|
| AMBERWAVE SYSTEMS CORPORATION, | § § § | |
| Plaintiff, | § § | Civil Action No. ___9:06cv143___ |
| vs. | § § | JURY TRIAL DEMANDED |
| INTEL CORPORATION | § § | *Judge Clark* |
| Defendant. | § § § | |

## AMBERWAVE'S COMPLAINT FOR PATENT INFRINGEMENT

## AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff AmberWave Systems Corporation ("AmberWave"), for its complaint against Defendant Intel Corporation ("Intel"), alleges as follows:

### INTRODUCTION

1.      AmberWave is a small technology and engineering firm founded by a Massachusetts Institute of Technology ("MIT") professor—Eugene Fitzgerald—and his former students.  AmberWave develops innovative technology for the production of semiconductor devices.  For years, Intel has been improving the performance of its semiconductor devices by shrinking the size of their fundamental components.  Intel now finds itself unable to continue its historical pace of performance enhancement using its own technological developments.  In order to defend its market position against inroads by competitors, Intel is using the inventions of Eugene Fitzgerald to enable the production of faster and more efficient semiconductor devices—

all without obtaining a license from AmberWave. This action seeks redress for Intel's infringing activities.

<div align="center"><b><u>THE PATENT IN SUIT</u></b></div>

2.     U.S. Patent No. 5,158,907 (the "'907 patent"), entitled "Method for Making Semiconductor Devices with Low Dislocation Effects," was duly and legally issued on October 27, 1992. The sole named inventor on the '907 patent is Eugene Fitzgerald. The '907 patent represents the fruits of some of Dr. Fitzgerald's research while he was working at AT&T Bell Laboratories, before he began teaching at MIT. AmberWave is the co-assignee of the '907 patent and has the sole right to license it. AmberWave has the sole right to assert the '907 patent against Intel and its subsidiaries, their agents, partners, suppliers, distributors, customers and any other third party, that has direct or indirect liability based on the past, present, or future manufacture, use, offer for sale, sale, or importation of Intel products. A true and correct copy of the '907 patent is attached as Exhibit A.

<div align="center"><b><u>PARTIES AND JURISDICTION</u></b></div>

3.     This is an action for patent infringement arising under the United States Patent Act, 35 U.S.C. § 101 *et seq.*

4.     AmberWave is a Delaware corporation with its principal place of business in Salem, New Hampshire.

5.     AmberWave is informed and believes, and thereon alleges, that Intel is a Delaware corporation with its principal place of business in Santa Clara, California.

6.     AmberWave is informed and believes, and thereon alleges, that Intel has done and continues to do business in this District. AmberWave is informed and believes, and thereon alleges, that Intel has harmed and continues to harm AmberWave in this District. AmberWave is informed and believes, and thereon alleges, that Intel products have been sold in this District. AmberWave is informed and believes, and thereon alleges, that these products include Intel's dual-core devices. AmberWave is informed and believes, and thereon alleges, that Intel maintains a website accessible to the residents of this District. AmberWave is informed and

believes, and thereon alleges, that Intel's website allows users in this District to submit information to Intel, and to download information from the website. AmberWave is informed and believes, and thereon alleges, that Intel's website allows users in this District to locate companies who will sell Intel products to users in this District, including dual-core devices.

7.    AmberWave is informed and believes, and thereon alleges, that Intel has voluntarily availed itself of the courts in this District. AmberWave is informed and believes, and thereon alleges, that Intel has filed complaints in this District as both a plaintiff and as an intervenor. AmberWave is informed and believes, and thereon alleges, that Intel has appeared as a defendant and a counterclaim plaintiff in this District, without contesting that venue is proper in the District.

8.    AmberWave is informed and believes, and thereon alleges, that Intel has sought and received authorization to do business in the State of Texas. AmberWave is informed and believes, and thereon alleges, that Intel has a registered agent in the State of Texas. AmberWave is informed and believes, and thereon alleges, that Intel maintains multiple business offices in the State of Texas. AmberWave is informed and believes, and thereon alleges, that Intel has at least approximately 600 employees in the State of Texas.

9.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), and venue in this District is proper under 28 U.S.C. §§ 1391 and 1400(b).

## RELATED ACTIONS

10.    On May 17, 2005, Intel filed a declaratory judgment for non-infringement of AmberWave's U.S. Patent No. 6,831,292 in the District of Delaware (the "Delaware I Action").[1] On July 15, 2005, AmberWave filed an action against Intel in the Eastern District of Texas alleging infringement of AmberWave's U.S. Patent No. 6,881,632 (the "'632 Action").[2]  On September 20, 2005, AmberWave filed a separate action in the Eastern District of Texas alleging

---

[1] *Intel Corp. v. AmberWave Systems Corp.*, 05-301-KAJ

[2] *AmberWave Systems Corp. v. Intel Corp.*, 2-05cv-321-LED

that Intel infringed AmberWave's U.S. Patent No. 6,946,371 (the "'371 Action").[3]  On November 1, 2005, Judge Davis transferred the '632 Action to Delaware because, among other reasons, the issues in the '632 Action were "closely related" to the issues in the Delaware I Action.  At Intel's insistence, the parties stipulated to the consolidation of AmberWave's infringement claims on the three patents (including the '371 Action) in the Delaware I Action.

11.     Upon obtaining the right to assert the '907 patent against Intel, AmberWave sought leave to amend its complaint in the consolidated Delaware I Action to add the '907 patent.  Intel informed AmberWave that it opposed adding the '907 patent to the Delaware I Action, among other reasons, because AmberWave allegedly unduly delayed in seeking to add the '907 patent, because adding the '907 patent to the Delaware I Action prejudiced Intel, and because the '907 patent, according to Intel, "is almost completely unrelated to the patents in suit" in the consolidated Delaware I Action.

12.     On July 8, AmberWave asked Intel whether it would assent to a motion to amend in the consolidated Delaware I Action to add an additional patent when it issued—U.S. Patent No. 7,074,655 (the "'655 patent").  While purporting to meet and confer with AmberWave on the subject, Intel filed a separate declaratory judgment (the "Delaware II Action") on the '655 patent on the day that it issued—July 11.[4]  This confirmed that Intel no longer believes that all patent litigation between the parties should occur in the consolidated Delaware I Action.

## CLAIM FOR RELIEF

### COUNT I

### (Patent Infringement by Intel)

13.     AmberWave incorporates by reference paragraphs 1 through 12 as if set forth here in full.

---

[3] *AmberWave Systems Corp. v. Intel Corp.*, 2-05cv-449-TJW

[4] *Intel Corp. v. AmberWave Systems Corp.*, 06-429.

14.     AmberWave is informed and believes, and thereon alleges, that in violation of 35 U.S.C. § 271, Intel has been and is currently directly infringing, contributorily infringing, and/or inducing infringement of, the '907 patent by, among other things, making, using, offering to sell, selling and/or importing, without authority or license, certain semiconductor devices, including at least dual-core devices.

15.     AmberWave is informed and believes, and thereon alleges, that Intel's infringement of the '907 patent has been and continues to be willful.

16.     Unless enjoined, Intel will continue to infringe the '907 patent, and AmberWave will suffer irreparable injury as a direct and proximate result of Intel's conduct.

17.     AmberWave has been damaged by Intel's conduct, and until an injunction issues will continue to be damaged in an amount yet to be determined.

## PRAYER FOR RELIEF

WHEREFORE, AmberWave prays for relief as follows:

A.     For a determination that the '907 patent is valid and enforceable;

B.     For a determination that Intel has infringed and is infringing the '907 patent, and that Intel's infringement is willful;

C.     For an order preliminarily and permanently enjoining Intel, and its directors, officers, employees, attorneys, agents and all persons in active concert or participation with any of the foregoing from acts of infringement of the '907 patent;

D.     For damages resulting from infringement of the '907 patent in an amount to be determined at trial, and the trebling of such damages due to the willful nature of their infringement;

E.     For an award of interest on damages;

F.     For a declaration that this case is exceptional pursuant to 35 U.S.C. § 285 and an award of attorneys' fees and costs; and

G.     For an award of such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

AmberWave hereby demands a trial by jury on any issue triable of right by a jury.


Dated: July 12, 2006                Respectfully submitted,


                                 Morgan Chu (CA #70446)
                                 Lead Counsel
                                 David I. Gindler (CA #117824)
                                 IRELL & MANELLA LLP
                                 1800 Avenue of the Stars, Suite 900
                                 Los Angeles, California 90067-4276
                                 Phone: (310) 277-1010
                                 Facsimile: (310) 203-7199
                                 E-mail: dgindler@irell.com


                                 By: _____
                                 Clayton Edward Dark, Jr., Esq. (TX #05384500)
                                 P.O. Box 2207
                                 207 East Frank
                                 Suite 100
                                 Lufkin, TX 75902-2207
                                 Phone: (936) 637-1733
                                 Facsimile: (936) 637-2897
                                 E-mail: clay.dark@yahoo.com


                                 J. Thad Heartfield, Esq. (TX #09347000)
                                 The Law Offices J. Thad Heartfield
                                 2195 Dowlen Rd
                                 Beaumont, TX 77706-2534
                                 Phone: (409) 866-3318 ext. 1
                                 Email: thad@jth-law.com


                                 **ATTORNEYS FOR PLAINTIFF**
                                 AmberWave Systems Corporation

1533838

US005158907A

# United States Patent [19]

## Fitzgerald, Jr.

[11] Patent Number: 5,158,907

[45] Date of Patent: Oct. 27, 1992

[54] **METHOD FOR MAKING SEMICONDUCTOR DEVICES WITH LOW DISLOCATION DEFECTS**

[75] Inventor: **Eugene A. Fitzgerald, Jr.,** Bridgewater, N.J.

[73] Assignee: **AT&T Bell Laboratories,** Murray Hill, N.J.

[21] Appl. No.: **561,744**

[22] Filed: **Aug. 2, 1990**

[51] Int. Cl.$^5$ ............................................. H01L 21/20

[52] U.S. Cl. ........................... 437/126; 437/110; 437/132; 437/133; 148/DIG. 42

[58] Field of Search ............... 437/110, 126, 132, 133; 148/DIG. 42

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,962,716 | 6/1976 | Pétroff et al. ...................... 437/130 |
| 4,088,515 | 5/1978 | Blakeslee et al. .................. 437/128 |
| 4,370,510 | 1/1983 | Stirn ................................... 136/262 |
| 4,632,712 | 12/1986 | Fan et al. ........................... 437/132 |
| 4,769,341 | 9/1988 | Luryi ................................. 437/132 |
| 4,826,784 | 5/1989 | Salerno et al. ..................... 437/126 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 62-087490 | 4/1987 | Japan . |
| 1-223718 | 9/1989 | Japan . |
| 2215514 | 9/1989 | United Kingdom . |

### OTHER PUBLICATIONS

Choi, et al, "Monolithic Integration of GaAs/AlGaAs Double–Heterostructure LED's and Si MOSFET's" *IEEE Electron Device Letters*, vol. EDL–7, No. 9, Sep. 1986.

Shichijo et al, "Co-Integration of GaAs MESFET and Si CMOS Circuits", *IEEE Electron Device Letters*, vol. 9, No. 9, Sep. 1988.

Choi et al, "Monolithic Integration of GaAs/AlGaAs LED and Si Driver Circuit", *IEEE Electron Device Letters*, vol. 9, No. 10, Oct. 1988 (p. 513).

Smith et al, "A New Infrared Detector Using Electron Emission From Multiple Quantum Wells," *J. Vac. Sci. Technol. B.*, vol. 1, No. 2, Apr.–Jun. 1983.

Levine, et al, "New 10 Micron Infrared Detector Using

Intersubband absorption in resonant tunneling GaAlAs superlattices," *Applied Physics Letters*, vol. 50, No. 16, Apr. 20, 1987.

Windhorn et al, "Al GaAs/GaAs Laser Diodes on Si", *Applied Physics Letters*, vol. 47, p. 1031 (1985).

Ettenburg, "Continuous Low Threshold AlGaAs/-GaAs Laser", *Applied Physics Letters*, vol. 27, p. 652 (1975).

Fitzgerald, E. A., "In Search of Low–Disloca-tion-Density Hetero–Epitaxial Structures", *Journal of Metals*, vol. 41, pp. 20–24 (1989).

Fitzgerald, et al, "Nucleation Mechanisms and the Elimination of Misfit Dislocations at Mismatched Interfaces by Reduction in Growth Area", *Journal of Appl. Phys.*, vol. 65, No. 6, Mar. 1989.

Matthews, et al, "Accommodation of Misfit Across the Interface Between Crystals of Semiconducting Elements or Compounds", *Journal of Appl. Phys.*, vol. 41, No. 9, (1970).

C. H. Henry, "Recent Advances in Integrated Optics on Silicon", the Eighth Annual European Fibre Optic Communications and Local Area Networks Conference, Jun. 1990, pp. 11–14.

(List continued on next page.)

*Primary Examiner*—Brian E. Hearn
*Assistant Examiner*—Laura M. Holtzman
*Attorney, Agent, or Firm*—G. E. Books

[57] **ABSTRACT**

Semiconductor devices having a low density of dislocation defects can be formed of epitaxial layers grown on defective or misfit substrates by making the thickness of the epitaxial layer sufficiently large in comparison to the maximum lateral dimension. With sufficient thickness, threading dislocations arising from the interface will exit the sides of the epitaxial structure and not reach the upper surface. Using this approach, one can fabricate integral gallium arsenide on silicon optoelectronic devices and parallel processing circuits. One can also improve the yield of lasers and photodetectors.

**10 Claims, 3 Drawing Sheets**



**5,158,907**

Page 2

OTHER PUBLICATIONS

D. V. Lang, "Defects and Future Semiconductor Devices", *Materials Science Forum*, vols. 38–41, (1989) pp. 13–24.

J. Narayan et al., "Critical Phenomenon and Segregation Behavior at Interfaces and Subgrain Boundaries", *Journal de Physique*, vol. 49, No. C–5, pp. 731–767, Oct. 1988.

H. L. Tsai et al, "Generation of Misfit Dislocations in GaAs grown on Si", *Applied Physics Letters*, vol. 55, No. 3, Jul. 17, 1989, pp. 265–267.

E. A. Fitzgerald, "The Effect of Substrate Growth Area on Misfit and Threading Dislocation . . . " *J. Vac. Sci. Tech. B*, vol. 7, No. 4, Jul./Aug. 1989, pp. 782–788.

E. A. Fitzgerald et al., "Elimination of Interface Defects in Mismatched Epilayers by a Reduction in Growth Area," *Applied Physics Letters*, vol. 52, No./8, May 2, 1988, pp. 149–158.

H. K. Choi et al., "Monolithic Integrated Circuits of Si MOSFET's and GaAs MESFET's" *IEEE Electron Device Letters*, vol. EDL–7, No. 4, Apr. 1986, pp. 241–243.

*FIG. 1*



*FIG. 2*



*FIG. 3*



Case 2:06-cv-00835-LPR-HTC Document 85-22 Filed 08/22/2008 Page 4 of 16

### FIG. 4



### FIG. 5



### FIG. 6



Case Case 0:06 9-cv-01833-SLR-49-PH Document Document 35-22 Filed Filed 08/22/2006 2006 Page Page 5 9 of 2 16 of 16



*FIG. 7*

5,158,907

1

## METHOD FOR MAKING SEMICONDUCTOR DEVICES WITH LOW DISLOCATION DEFECTS

### FIELD OF THE INVENTION

This invention relates to semiconductor devices having a low density of dislocation defects and, in particular, to semiconductor devices comprising limited area epitaxial regions grown on either misfit substrates or substrates having a high density of dislocation defects. It further concerns methods for making and using such devices.

### BACKGROUND OF THE INVENTION

A low level of dislocation defects is important in a wide variety of semiconductor devices and processes. Dislocation defects partition an otherwise monolithic crystal structure and introduce unwanted and abrupt changes in electrical and optical properties. Dislocation defects can arise in efforts to epitaxially grow one kind of crystalline material on a substrate of a different kind of material (heterostructures) due to different crystalline lattice sizes of the two materials. Misfit dislocations form at the mismatched interface to relieve the misfit strain. Many misfit dislocations have vertical components, termed threading segments, which terminate at the surface. These threading segments continue through all subsequent layers added. Dislocation defects can also arise in the epitaxial growth of the same material as the substrate (homostructures) where the substrate itself contains dislocations. Some of the dislocations replicate as threading dislocations in the epitaxially grown material. Such dislocations in the active regions of semiconductor devices such as diodes, lasers and transistors, seriously degrade performance.

To avoid dislocation problems, most semiconductor heterostructure devices have been limited to semiconductor layers that have very closely lattice-matched crystal structures. Typically the lattice mismatch is within 0.1%. In such devices a thin layer is epitaxially grown on a mildly lattice mismatched substrate. So long as the thickness of the epitaxial layer is kept below a critical thickness for defect formation, the substrate acts as a template for growth of the epitaxial layer which elastically conforms to the substrate template. While lattice matching and near matching eliminates dislocations in a number of structures, there are relatively few lattice-matched systems with large energy band offsets, limiting the design options for new devices.

There is considerable interest in heterostructure devices involving greater epitaxial layer thickness and greater lattice misfit than present technology will allow. For example, it has long been recognized that gallium arsenide grown on silicon substrates would permit a variety of new optoelectronic devices marrying the electronic processing technology of silicon VLSI circuits with the optical component technology available in gallium arsenide. See, for example, Choi et al, "Monolithic Integration of Si MOSFET's and GaAs MESFET's", *IEEE Electron Device Letters*, Vol. EDL-7, No. 4, April 1986. Highly advantageous results of such a marriage include high speed gallium arsenide circuits combined with complex silicon VLSI circuits and gallium arsenide optoelectronic interface units to replace wire interconnects between silicon VLSI circuits. Progress has been made in integrating gallium arsenide and silicon devices. See, for example, Choi et al, "Monolithic Integration of GaAs/AlGaAs Double-

2

Heterostructure LED's and Si MOSFET's" *IEEE Electron Device Letters*, Vol. EDL-7, No. 9, September 1986; Shichijo et al, "Co-Integration of GaAs MESFET and Si CMOS Circuits", *IEEE Electron Device Letters*, Vol. 9, No. 9, September 1988. However, despite the widely recognized potential advantages of such combined structures and substantial efforts to develop them, their practical utility has been limited by high defect densities in gallium arsenide layers grown on silicon substrates. See, for example, Choi et al, "Monolithic Integration of GaAs/AlGaAs LED and Si Driver Circuit", *IEEE Electron Device Letters*, Vol. 9, No. 10, Oct. 1988 (p. 513). Thus while basic techniques are known for integrating gallium arsenide and silicon devices, there exists a need for producing gallium arsenide layers having a low density of dislocation defects.

There is also considerable interest in growing low defect density gallium arsenide surfaces irrespective of the type of substrate. Gallium arsenide is prone to dislocation defects; and, as a consequence, devices grown on gallium arsenide substrates have a notoriously low yield.

### SUMMARY OF THE INVENTION

In contrast with the prior art approach of minimizing dislocation defects by limiting misfit epitaxial layers to less than a critical thickness for elastic conformation to the substrate, the present invention utilizes greater thickness and limited lateral areas to produce limited area regions having upper surfaces exhausted of threading dislocations. Since threading dislocations propagate with a lateral as well as a vertical component, making the thickness sufficiently large in comparison to the lateral dimension permits the threading dislocations to exit the sides of the epitaxial structure. The upper surface is thus left substantially free of defects. As a result, one can fabricate monolithic heterostructure devices, such as gallium arsenide on silicon optoelectronic devices, long sought in the art but heretofore impractical due to dislocation defects. As another embodiment, one can fabricate a monolithic structure using gallium arsenide circuitry to perform high speed processing tasks and silicon VLSI circuitry to perform complex, lower speed tasks. In yet another embodiment, one can fabricate arrays of low defect density devices on a high defect density substrate, substantially improving the yield.

### BRIEF DESCRIPTION OF THE DRAWINGS

The advantages, nature and various additional features of the invention will appear more fully upon consideration of the illustrative embodiments now to be described in detail. In the drawings:

FIG. 1 is a schematic cross section illustrating the problem of threading dislocations addressed by the present invention.

FIG. 2 is a schematic cross section of a first embodiment of a semiconductor workpiece provided with limited area regions of low defect density in accordance with the invention.

FIG. 3 is a schematic cross section of a second embodiment of a semiconductor workpiece in accordance with the invention.

FIG. 4 is a schematic cross section of a third embodiment of the invention;

FIG. 5 schematically illustrates the use of the invention to provide optical input, optical interconnections

3

and/or optical output to integrated circuits in the substrate.

FIG. 6 schematically illustrates the use of the invention to provide a supplementary high speed circuit to an integrated circuit in the substrate; and

FIG. 7 schematically illustrates the use of the invention to provide arrays of low defect density regions on a high defect density substrate.

It is to be understood that these drawings are for purposes of illustrating the concepts of the invention and are not to scale. Similar structural elements are denoted by the same reference numerals throughout the drawing.

## DETAILED DESCRIPTION

Referring to the drawings, FIG. 1 is a schematic cross section illustrating the problem of threading dislocations resulting from efforts to epitaxially grow a blanket layer 10 of crystalline material on a crystalline substrate 11. As illustrated, dislocation defects 12 form at the interface 13 between layers 10 and 11. Many of these defects 12 have not only horizontal portions 14, termed misfit segments, but also portions with vertical components 15, termed threading segments. Such threading segments can also arise as continuations of pre-existing threading segments 16 in the substrate 11.

FIG. 2 is a schematic cross section of a first embodiment of a semiconductor workpiece provided with limited area regions of low defect density in accordance with the invention. The workpiece comprises a monolithic semiconductor substrate 20 having a major surface 21 covered with an insulating layer 22. The insulating layer includes one or more openings 23, and grown within the openings on substrate 20, one or more limited area epitaxial regions 24 of low defect density semiconductor. The substrate 20 and the low defect region 24 can be different crystalline semiconductors having lattice mismatch in excess of 0.2%.

Because of dislocations or pre-existing threading segments at the interface between substrate 20 and grown regions 24, threading segments 15 and 16 arise from the interface. However each epitaxial region 24 has a thickness t sufficiently large as compared with its maximum lateral extent L that the threading segments exit the sides of regions 24 rather than reaching the upper surfaces 27. The ratio of t/L required to insure exit of threading segments arising from the interface depends on the crystalline orientation of the substrate. A (100) substrate requires a ratio of 1; a (111) substrate requires a ratio of $\sqrt{2}$, and a (110) substrate requires $\sqrt{3}/3$. Ratios of 50% of these values provide a useful level of defect elimination.

In a preferred embodiment, the substrate 20 is (100) monocrystalline silicon, the insulating layer 22 is silicon oxide, and the limited area regions 24 are gallium arsenide. The limited area regions are approximately circular in the lateral surface and preferably have a transverse thickness t at least as great as their maximum lateral dimension L.

This preferred embodiment can be fabricated by growing on a conventional (100) silicon IC wafer 20 a layer of silicon oxide 22 having a thickness preferably in the range from 5 to 100 microns. Conventional photolithography can be used with HF etchant to open windows 23, and gallium arsenide having a thickness 65 greater than or approximately equal to the maximum lateral dimension is deposited on the exposed silicon by MBE with a substrate temperature of 570° C. Preferably

4

the thickness of the silicon oxide and the gallium arsenide are equal in order to produce a co-planar structure as shown in FIG. 2.

FIG. 3 is a schematic cross section of a second embodiment of a semiconductor workpiece provided with limited area regions of low defect density. The embodiment is similar to that shown in FIG. 2 except that the substrate 20 is provided with one or more limited area mesa regions 30 upon which the limited area regions 24 of low defect density semiconductor are grown. The mesas are substantially surrounded by trenches 31.

This embodiment can be fabricated by forming on a silicon substrate an aluminum mask which selectively exposes trench regions 31. The masked substrate is then subjected to reactive ion etching to produce trenches 31. The aluminum is removed over the mesas, and a silicon oxide layer is deposited. The silicon oxide over the mesas is selectively removed, and the gallium arsenide region 24, having a thickness preferably in excess of its maximum lateral dimension, is deposited by CVD at a temperature of about 600°–700° C. or by MBE at about 550°–650° C. Any GaAs deposited on the oxide covered areas can be removed by dissolving the underlying silicon oxide in HF. Finally a planarized insulating layer 22, such as silicon oxide can be applied to the non-mesa areas, resulting in the structure shown in FIG. 3.

FIG. 4 is a schematic cross section of a third embodiment of the invention wherein a semiconductor substrate 20 is provided with limited area regions 24 of low defect density by providing a plurality of relaxed, misfitted buffer layers 42 and 43 between the substrate and the low defect layer.

In essence the preferred form of the FIG. 4 embodiment is similar to the preferred form of the FIG. 3 embodiment except that disposed between the upper surface of silicon mesa 30 and limited area gallium arsenide region 24 is a limited area region 42 of germanium silicon alloy $Ge_x Si_{1-x}$ having an upper surface 43 of substantially pure germanium upon which gallium arsenide region 24 is grown. The $Ge_x Si_{1-x}$ region is grown as a limited area region having an area in the range between 25 and 10,000 square microns. The $Ge_x Si_{1-x}$ region 42 has gradient of increasing Ge concentration as the region extends from the mesa 30 to the gallium arsenide layer 24. The advantage of growing this structure in limited area is that a high proportion of threading segments from the interface with substrate 20 can glide out to the sides of the structure. Thus the Germanium surface 43 presents the gallium arsenide layer 24 with a very low defect substrate. If desired, highly effective further filtering can be provided by growing layer 24 in sufficient thickness t in relation to maximum lateral dimension L that threading segments exit the sides.

The workpiece of FIG. 4 can be prepared by etching trenches 31 to define mesas 30, and depositing $Ge_x Si_{1-x}$ onto the mesas by the MBE or CVD processes. The Ge concentration increased linearly with thickness or step graded at a rate in the range between 5% and 0.1% per one thousand angstroms until the concentration of germanium is substantially 100%. The temperature of growth should be greater than about 600° C. For the CVD process the temperature is preferably about 900° C. and for the MBE process, preferably 650°–750° C.

Once the pure germanium concentration is reached, either the GaAs layer can be grown immediately or a

5,158,907

5

6

Ge buffer layer 43 of about 1000 angstroms can be grown before the GaAs deposition.

Semiconductor workpieces as shown in FIGS. 2, 3 and 4 are highly advantageous in that they present upper surfaces of epitaxial regions 24 that are substantially free of dislocation defects. While the low defect surfaces are limited in area, they present areas of 25 to 10,000 square microns that are large enough to permit fabrication of useful optoelectronic devices and high speed integrated circuits. Primary uses include 1) provision of optical input, optical output and optical interconnections to integrated circuits in the substrate; 2) provision of high speed supplementary circuitry in support of integrated circuits in the substrate; and 3) provision of high yield areas in low yield substrates.

FIG. 5 schematically illustrates the use of the invention to provide optical input, optical interconnections and optical output to integrated circuits in the substrate. Specifically, the substrate 20 is preferably a monolithic silicon substrate containing one or more integrated circuits 50A and 50B and one or more limited area, low defect gallium arsenide regions 24A, 24B, 24C and 24D.

Integrated circuit 50A is provided with optical input, as from optical fiber 51A, by forming a photodetector 52A on limited area gallium arsenide region 24A. The optical signal coupled to the photodetector produces an electrical signal coupled to circuit 50A by conformal metal leads 53.

Integrated circuit 50A is provided with optical output, as to optical waveguide 54, by forming a light emitter 55A, such as a LED or laser, on limited area gallium arsenide region 24B. An electrical signal from circuit 50A is coupled to light emitter 55A by metal leads 56. The light emitter, in turn, produces a modulated optical output signal coupled by waveguide 54 to a second photodetector 52B formed on limited area region 24C. The electrical output of 52B is coupled to a second integrated circuit 50B by metal leads 57. Thus integrated circuits 50A and 50B are provided with optical interconnections.

As illustrated, the system can similarly be provided with an optical output as by a second light emitter 55B formed on limited area region 24D. An electrical output signal from circuit 50B over leads 53 causes emitter 55B to produce an optical output signal coupled into optical fiber 51B.

The integrated circuits 50A and 50B can be any of a large number of known silicon VLSI circuits useful, for example, in processing serial digital signals. The structure and fabrication of such circuits is well known in the art.

Limited area gallium arsenide regions 24A, 24B, 24C, and 24D can be fabricated on substrate 20 after formation of integrated circuits 50A and 50B without significantly deteriorating the underlying integrated circuits. MBE at 550°–650° C. is particularly advantageous because of the low deposition temperatures. Photodetectors 52A and 52B can be formed on regions 24A and 24C in accordance with one of a variety of known methods of forming photodetectors on gallium arsenide substrates. See, for example, the photodetectors disclosed in Smith et al, "A New Infrared Detector Using Electron Emission From Multiple Quantum Wells," *J. Vac. Sci. Technol. B*, Vol. 1, No. 2, April-June 1983 and Levine et al, "New 10 Micron Infrared Detector Using Intersubband Absorption In Resonant Tunneling GaAlAs Superlattices," *Applied Physics Letters*, Vol. 50, No. 16, Apr. 20, 1987. Similarly light emitters 55A and

55B can be formed on regions 24B and 24D in accordance with one of a variety of known methods for forming LED's or lasers on gallium arsenide substrates. See, for example, Windhorn et al, "AlGaAs/GaAs Laser Diodes on Si", *Applied Physics Letters*, Vol. 47, p. 1031 (1985); Ettenburg, "Continuous Low Threshold AlGaAs/GaAs Laser", *Applied Physics Letters*, Vol. 27, p. 652 (1975), or the previously cited Choi et al articles. Waveguide 54 can be polymer, silicon oxide, or glass. Preferably it is a phosphosilicate glass waveguide such as described in Henry, "Recent Advances in Integrated Optics on Silicon", Proceedings of Eighth Annual European Fiber Optic Communications and Local Area Networks Conference, Jun. 27–29, 1990.

FIG. 6 schematically illustrates the use of the invention to provide a supplementary high-speed circuit to an integrated circuit in the substrate. Here, as above, the substrate 20 is preferably a monolithic silicon substrate containing one or more integrated circuits 50 and one or more limited area, low defect density gallium arsenide regions 24. The primary difference between this embodiment and that of FIG. 5 is that in FIG. 6 the regions 24 is sufficiently large to contain a small integrated circuit 60 rather than only a device. For example, a limited area region 24 having dimensions $50 \times 50 \times 50$ microns is sufficiently large to contain the GaAs MESFET Circuit described in Shichijo, et al, "Co-Integration of GaAs MESFET and Si CMOS Circuits", *IEEE Electron Device Letters*, Vol. 9, No. 9, September 1988. The silicon integrated circuit 50 can be CMOS inverter stages. The combination can form a ring oscillator. The advantage of using limited area regions 24 in accordance with the invention is lower defects in the gallium arsenide with resulting higher yield and improved performance.

FIG. 7 schematically illustrates the use of the invention to provide arrays of low defect density regions integrally formed on a high defect density substrate. Here substrate 20 is a monolithic crystalline substrate having a level of defect density sufficiently large to preclude high yield or to limit desired quality of devices formed on the substrate. For example, substrate 20 can be gallium arsenide having a defect density in excess of about $10^3$ cm$^{-2}$.

As a preliminary step, substrate 20 is etched, as by reactive ion etching, to form a sequence of pits 70 and mesas 71. Gallium arsenide is deposited as by MBE to form low defect regions 24A on the mesas 30, and low defect regions 24B can be simultaneously formed in the pits. By growing the gallium arsenide sufficiently thick as compared with its maximum lateral dimension, the regions 24A and 24B are provided with upper surfaces substantially free of defects. The resulting structure can be used to fabricate on the upper surfaces of regions 24A and 24B, arrays of devices such as photodetectors and lasers, having reduced defects and resulting higher yield and performance.

It is to be understood that the above-described embodiments are illustrative of only a few of the many possible specific embodiments which can represent applications of the principles of the invention. Numerous and varied other arrangements can be readily devised in accordance with these principles by those skilled in the art without departing from the spirit and scope of the invention.

I claim:

5,158,907

7

1. A method for making a semiconductor device having one or more limited area regions with low defect density semiconductor surfaces comprising the steps of:
   providing a monocrystalline semiconductor substrate;
   epitaxially growing on said semiconductor substrate one or more limited area regions of semiconductor material having a maximum lateral dimension L and a thickness t, the ratio t/L being in excess of $\sqrt{3}/3$ so that threading dislocations arising from the interface between said limited area regions and said substrate exit at lateral side surfaces of said limited area regions.

2. The method of claim 1 further comprising the step of etching one or more pit regions in said substrate; and
   wherein said limited area regions are grown in said pit regions.

3. The method of claim 1 further comprising the step of forming on said substrate one or more mesa regions on said substrate; and
   wherein said limited area regions are grown on said mesa regions.

4. The method of claim 1 further comprising the steps of a) providing said substrate with a layer of insulating material, and b) etching in said insulating layer one or more pit regions to said substrate; and
   wherein said limited area regions are grown in said pit regions.

5. The method of claim 1 further comprising the steps of a) providing said substrate with a layer of insulating material of thickness substantially equal to the thickness to which said limited area regions are to be grown, and b) etching in said insulating material one or more pit regions to said substrate; and

8

wherein said limited area regions are grown in said pit regions.

6. The method of claim 1 wherein said substrate is of a first crystalline material and said limited area regions are of a second crystalline material, said first and second materials having a lattice mismatch in excess of about 0.2%.

7. The method of claim 1 wherein said substrate comprises silicon and said limited area regions comprise gallium arsenide.

8. The method of claim 1 wherein said substrate has a density of dislocation defects in excess of about $10^3$ per $cm^2$ and said limited area regions are comprised of the same semiconductor material as said substrate.

9. A method for making a semiconductor device having one or more limited area regions with low defect density semiconductor surfaces comprising the steps of:
   providing a monocrystalline silicon substrate;
   epitaxially growing on said silicon substrate one or more limited area regions of $Ge_xSi_{1-x}$ having respective areas in the range between 25 and 10,000 square microns and having a graded concentration of Germanium increasing to about 100%; and
   epitaxially growing on said $Ge_xSi_{1-x}$ regions respective limited area regions of gallium arsenide having a thickness sufficiently large as compared with the maximum lateral dimension that threading dislocations arising from the GaAs-Ge interface exit at lateral side surfaces.

10. The method of claim 9 wherein the concentration of germanium in said $Ge_xSi_{1-x}$ is graded at a rate in the range between 5% and 0.1% per one thousand angstroms.

* * * * *

# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

AMBERWAVE SYSTEMS                )
CORPORATION,                     )
                                 )
                 Plaintiff,      )    Civil Action No. 05-301-KAJ
                                 )    (Consolidated)
        vs.                      )
                                 )
INTEL CORPORATION,               )
                                 )
                 Defendant.      )


**PLAINTIFF AMBERWAVE SYSTEMS CORPORATION'S NOTICE OF
WITHDRAWAL OF ITS MOTION FOR LEAVE TO AMEND ITS COMPLAINT**

On June 27, 2006, AmberWave sought leave from the Court to amend its complaint in the above-captioned action to add a claim for infringement by Intel of United States Patent No. 5,158,907 (the "'907 patent").  (D.I. 126.)  Intel has not yet filed an opposition to this motion. By this paper, AmberWave withdraws its motion to amend.  AmberWave no longer seeks leave to amend its complaint to add the '907 patent.  AmberWave takes this step based on the following actions by Intel:

First, Intel has informed AmberWave that it does not believe that the '907 patent should be a part of the consolidated action, among other reasons, because AmberWave allegedly unduly delayed in seeking to add the '907 patent, because adding the '907 patent to the consolidated action would prejudice Intel, and because the '907 patent "is almost completely unrelated to the patents in suit."

Second, on July 11, Intel filed an improper declaratory judgment action on AmberWave's United States Patent No. 7,074,655 (the "'655 patent"),[1] making it clear that Intel no longer believes all patent infringement actions between the parties should be a part of the consolidated

---

[1]     *Intel Corp. v. AmberWave Systems Corp.*, 06-429 (D. Delaware).

action. On July 8, AmberWave sent a letter to Intel asking whether Intel would oppose a motion to amend to add the '655 patent to the consolidated action when the '655 patent issued. On the morning of July 11, the day the '655 patent issued, lead counsel for Intel informed counsel for AmberWave that he would "respond . . . shortly" to AmberWave's request to meet and confer on the motion to amend. Instead of responding, Intel surreptitiously filed the declaratory judgment action. In explaining its conduct, Intel stated that the '655 patent "should proceed as a separate action . . . with its own scheduling order and trial date[,]" making it clear that Intel believes that there are no benefits to coordinating new patent lawsuits with the consolidated action.

Concurrently with this withdrawal of AmberWave's motion to amend the consolidated action to add the '907 patent, AmberWave has filed a complaint for patent infringement in the Lufkin Division of the Eastern District of Texas alleging that Intel has and continues to infringe the '907 patent. The '907 patent expires in August 2010. AmberWave believes that one of the reasons that Intel sought to avoid adding the '907 patent to the consolidated action was to delay its adjudication as long as possible. A suit in the Lufkin Division in the Eastern District of Texas gives AmberWave the opportunity to obtain a prompt adjudication of its rights under the '907 patent, which is critical given the limited term left on the patent.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Karen Jacobs Louden (#2881)
Jack B. Blumenfeld (# 1014)
Karen Jacobs Louden (#2881)
kjl@efiling
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
 (302) 658-9200
Attorneys for Plaintiff
AmberWave Systems Corporation

Of Counsel:

Morgan Chu
David I. Gindler
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067
Tel: (310) 277-1010


July 12, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2006 I electronically filed Plaintiff AmberWave Systems Corporation's Revised Motion for Leave to Amend its Complaint with the Clerk of the Court using CM/ECF, which will send notification of such filing to Josy W. Ingersoll and John W. Shaw.

I further certify that I caused copies of the foregoing document to be served on July 12, 2006 upon the following in the manner indicated:

### BY HAND

Josy W. Ingersoll
John W. Shaw
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899

### BY EMAIL AND FEDERAL EXPRESS

George M. Newcombe
Jeffrey E. Ostrow
Patrick E. King
Simpson Thacher & Bartlett LLP
2550 Hanover Street
Palo Alto, CA  94304

*/s/  Karen Jacobs Louden*
Karen Jacobs Louden (#2881)
klouden@mnat.com

# EXHIBIT O

1

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                       - - -

4    INTEL CORPORATION,           :  CIVIL ACTION
                                   :
5              Plaintiff and       :
               Counter-defendant,  :
6                                  :
     v.                            :
7                                  :
     AMBERWAVE SYSTEMS CORPORATION,:
8                                  :
               Defendant and       :
9              Counter-claimant.   :  NO. 05-301 (KAJ)
                         - - -

10

                    Wilmington, Delaware
11          Wednesday, September 7, 2005 at 4:05 p.m.
                    TELEPHONE CONFERENCE
12

                        - - -
13
     BEFORE:      HONORABLE KENT A. JORDAN, U.S.D.C.J.
14
                        - - -
15   APPEARANCES:

16

           YOUNG CONAWAY STARGATT & TAYLOR
17         BY:  JOSY W. INGERSOLL, ESQ.

18              and

19         SIMPSON THACHER & BARTLETT, LLP
           BY:  GEORGE M. NEWCOMBE, ESQ., and
20              PATRICK E. KING, ESQ.
                (Palo Alto, California)
21
                    Counsel for Intel Corporation
22

23

24
                            Brian P. Gaffigan
25                          Registered Merit Reporter

SHEET 2

**2**

1  APPEARANCES:  (Continued)

2
       MORRIS NICHOLS ARSET & TUNNELL
3       BY:  JACK B. BLUMENFELD, ESQ.

4           and

5  IRELL & MANELLA, LLP
       BY:  JASON SHEASBY, ESQ.
6           (Los Angeles, California)

7           and

8  AMBERWAVE SYSTEMS CORPORATION
       BY:  BRYAN LORD, ESQ.
9
           Counsel for AmberWave Systems
10          Corporation

11

12

13

14

15                    - oOo -

16          P R O C E E D I N G S

17      (REPORTER'S NOTE:  The following telephone

18  conference was held in chambers, beginning at 4:05 p.m.)

19      THE COURT:  Hi, this is Judge Jordan.  Who do I

20  have on the line?

21      MS. INGERSOLL:  Hi, Judge Jordan.  Josy

22  Ingarsoll on the line for Intel; and with me are George

23  Newcombe -- or I think George is the only one with me.  He

24  is a partner with Simpson Thacher & Bartlett, and you may

25  remember him from long ago.

**3**

1      THE COURT: I do recall.

2      MR. KING: Patrick King is also on, Your Honor.

3      THE COURT: All right. Thanks. And for the

4  defense?

5      MR. BLUMENFELD: Good afternoon, Your Honor.

6  Jack Blumenfeld for AmberWave, along with Jason Sheasby from

7  Irell & Manella, and Bryan Lord who is the General Counsel

8  for AmberWave is also on the line.

9      THE COURT: All right. I apologize for keeping

10  folks waiting. I was disengaging from another call and it

11  took a moment or two longer to do that than I had

12  anticipated.

13      I have the letter that Mr. Blumenfeld sent over

14  yesterday with the proposed form of order and assume that

15  you folks have that in front of you and we'll run through

16  this together.

17      And I note at the get-go as to paragraph 1, we

18  have a dispute about the e-discovery standard with Intel

19  saying they would rather not and AmberWave saying they would

20  rather. So who wants to speak to this from the Intel side?

21      MR. NEWCOMBE: Your Honor, this is George

22  Newcombe. I'll address that.

23      We have two concerns. And it may be that these

24  can be addressed and we can move past this, but one is the

25  rules are particularly burdensome, the first part of the

**4**

1  rules for a company as large and diverse and geographically

2  as Intel is. So that's a concern that we have. And there

3  may be a way to mutually agree to narrow this in a way that

4  is manageable.

5      The other concern we have is that there is a

6  very similar action pending in Texas where AmberWave has

7  sued Intel at the time that they answered the complaint in

8  Your Honor's court. Last Friday, we had moved to transfer

9  that action to Delaware. If that motion is granted, this

10  concern, which is being whipsawed between two different sets

11  of rules, goes away. Or if the Court in Texas were to agree

12  and the parties were to agree the same rules would apply in

13  Texas, at least we would be operating under consistent rules

14  in both cases because the subject matter is so similar, the

15  documents will overlap and we don't want to be whipsawed

16  between two different sets of standards.

17      THE COURT: All right. Mr. Blumenfeld or

18  Mr. Sheasby, who is going to be speaking to this on the

19  defense side?

20      MR. BLUMENFELD: This is Jack Blumenfeld. I

21  will. I mean, first of all, Your Honor, this is the first

22  we've heard as to it not applying. I guess we're happy to

23  discuss the first issue, which is the burden or purported

24  burden on Intel. I understand it's a huge multinational

25  company, but there ought to be ways to deal with that by

**5**

1  focusing on the areas of technology that are at issue here.

2  The fact that they have hundreds of thousands of employees I

3  don't think means that they shouldn't have to do electronic

4  searches that are appropriate under the rules.

5      But as I said, we're willing to discuss that.

6  It just hasn't been discussed. It seems to us that the

7  standard of this court ought to apply by default unless we

8  reach some different agreement.

9      I don't really understand the Texas action

10  issue.

11      THE COURT: Well, let me tell you what I under-

12  stand. I understand them to be saying you guys went to

13  court after they had already sued you here. You guys

14  decided to go to another court and sue them and they're

15  worried about two different discovery standards being

16  applied. And that seems to me a pretty straightforward

17  and reasonable concern to have.

18      MR. BLUMENFELD: Right. But I don't know why

19  we can't have the same discovery standard to apply. Mr.

20  Newcombe is right. Either it's going to be transferred to

21  this court, in which case we won't have an issue, or it's

22  not going to be transferred, in which case I don't

23  understand why we can't have the same discovery standard.

24      THE COURT: How about because there is a judge

25  in Texas who might not choose to follow the standard we have

SHEET 3

**6**

1  here? I mean when you say you don't understand, I'm getting
2  it. You guys have created now a conflict that probably
3  shouldn't have existed by suing the same party in another
4  district. Now, maybe you got a good reason for that and
5  it's just not something I'm aware of but it certainly does,
6  on the face of it, create the potential for conflicting
7  discovery rules and schedules and that is a problem. That
8  is a real problem.
9  MR. BLUMENFELD: Well, my point, Your Honor,
10  that if they're going to have to adhere to the default
11  standard of this court and search for documents in that way,
12  presumably they can search for documents in that way in both
13  cases whether or not that standard formally applies.
14  THE COURT: Well, here is what we're going to do
15  to handle it. I'm going to expect the parties to discuss
16  this in good faith, leaving aside the Texas vs. Delaware
17  issue in the first instance. Treat this as if it were a
18  matter strictly pending here and come up with a resolution
19  for how to handle it.
20  Until that is done, by definition, you're under
21  the default standard because that is what it is. If you
22  can't agree by default, you are under this standard until
23  the parties either agree otherwise or they persuade me that
24  something different is required, and that could well be the
25  case. I'm not at all unsympathetic to the pitch that Mr.

**7**

1  Newcombe has made for Intel. If you guys can't agree to
2  something that seems more reasonable under the circum-
3  stances, I'll hear the parties on what would be more
4  reasonable under the circumstances. But we won't have no
5  standard in place, okay?
6  So you can word this something along these
7  lines: "Until further Order of the Court anticipated after
8  discussions by the parties, the default standard will
9  apply." Because we're not going to have the case
10  standardless moving forward; okay?
11  MS. INGERSOLL: Yes, Your Honor.
12  THE COURT: All right. And let me just state,
13  before I leave this subject entirely, if you folks can't
14  agree, and if there is a suit that going on on roughly a
15  parallel track down in Texas, that is factor I'll consider
16  in whether or not this default standard should stay in
17  place.
18  All right. Paragraph 2 for joinder of other
19  parties and amendment of pleadings. The October 7th date
20  for joinder motion is fine.
21  The supplemental pleading or amendment of
22  pleading date will be April 17, 2006. We'll just put that
23  date in specifically. All right?
24  Now, on discovery, limitation on hours of
25  deposition discovery, again we have a dispute. I gave the

**8**

1  ball to Intel first last time so, AmberWave, I'll give it to
2  you first on this.
3  MR. BLUMENFELD: Your Honor, you know, we
4  had this conversation before and it's sometimes hard to
5  anticipate how much are you going to need, but I don't think
6  this is a simple case particularly because there are a
7  lot of defenses asserted, including inventorship, double
8  patenting and a lot of nontechnical defenses: laches,
9  waiver estoppel, unclean hands and a bunch of things. It's
10  just one of those cases where 100 hours may not be enough.
11  We originally proposed 175, we came down to 125, and we're
12  not going to abuse our hours. If we don't need to use them
13  we won't use them, but I'd hate to have to come back because
14  we have a dispute over whether we can take those last three
15  depositions and I think 125 in a case like this is
16  reasonable.
17  THE COURT: Mr. Newcombe?
18  MR. NEWCOMBE: Your Honor, it's always hard to
19  predict so it's not as if this is a mathematical exercise.
20  It seemed to us that 100 hours was more than sufficient here
21  under the circumstances given this is a one patent case, but
22  it's a matter of judgment. We can't predict what it will
23  be. We think 100 hours is adequate.
24  THE COURT: All right. Well, I guess I'll err
25  on the side of generosity here and we'll go ahead and mark

**9**

1  this down for 125 on the representation which I know is made
2  in good faith by Mr. Blumenfeld, and I accept it as such,
3  that if it doesn't take that much, they won't use that much.
4  So we'll move to location of depositions next.
5  Now, I have standard language that is in my orders and
6  typically, and it looks like Intel, you folks want to move
7  off that. Do you want to tell me why?
8  MR. NEWCOMBE: Well, we know that it depends
9  on how broadly the party representative is defined, but
10  certainly all of our people reside in California and it
11  would be more convenient for them certainly to be closer to
12  their residence than otherwise this is.
13  THE COURT: AmberWave?
14  MR. BLUMENFELD: Your Honor, this is one where I
15  think on an ad hoc basis, we're willing to discuss location
16  of depositions. And it may well be that for a lot of these
17  depositions that we're willing to take them in California
18  where Mr. Sheasby's office is, but what we don't want to
19  happen is we get into a situation where we have a lot of
20  depositions going on at the end of the case which typically
21  happens and we're on the East Coast and they're on the West
22  Coast and people, lawyers are shuttling back and forth.
23  All we're looking for is a default provision
24  that if the parties can't agree, it will be in Delaware
25  for the types of witnesses that are described there, but

**10**

1   certainly we're going to discuss with them and try to agree
2   on locations for depositions.
3          THE COURT: Okay. Well, I don't see any reason
4   to depart from ordinary practice here so the ordinary
5   language in my orders will stand. And I do expect the
6   parties to discuss in good faith what makes sense under the
7   circumstances for any particular deponent. But if an
8   officer, director or managing agent is going to be deposed
9   and they want to insist on you folks coming here to do it,
10   all other things being equal, that's the way we'll play it.
11          Now, interrogatories. We're at again a split of
12   25 and 50. Are we talking about basically the same thing we
13   were dealing with with depositions or not?
14          MR. BLUMENFELD: Your Honor, Jack Blumenfeld.
15   It's a little bit that and there are a lot of issues here.
16   And interrogatories are not a particularly inexpensive or
17   not a particularly expensive way to get at contentions and
18   they have a lot of defenses here.
19          Again, we're not planning on abusing this but
20   there is actually a reason why I preferred to have it at 50,
21   and that is I've had recent cases -- none of them before
22   Your Honor. I've had three experiences where we put out a
23   set of interrogatories that we thought was about 15 long and
24   the other side got to about nine or 12 and said, well, the
25   way we count them, you're past 25 and we're not answering

**11**

1   any more. And I just don't think that is the type of issue
2   we should be dealing with in a large case and we're just
3   trying to avoid that. I'm hopeful that neither side is
4   going to abuse this but I think it's easier if we just have
5   50 and don't have to have issues like that before the Court.
6          THE COURT: Mr. Newcombe.
7          MR. NEWCOMBE: Yes, Your Honor. Again, this is
8   a matter of judgment. The rules provide for 25. We think
9   that is adequate. Interrogatories can be abusive and
10   abused. I'm not suggesting Mr. Blumenfeld would do that but
11   if you do them carefully and judicially, we thought 25 was
12   adequate. But, you know, can we sit here today and say that
13   is absolutely so, we wouldn't need more? It's hard to say
14   that is adequate. That is what the rules provide.
15   AmberWave wants 50. It's your call.
16          THE COURT: These types of cases are typically
17   complicated. Even if there is one patent involved, it's my
18   experience that the issues sometimes get a little complex so
19   I don't think this is, you know, your run-of-the-mill civil
20   action and so 50 does not seem out of the ballpark to me.
21   And I'll go ahead and allow there to be 50 interrogatories.
22   The discovery cutoff you folks have agreed on is
23   fine with me at July 14, 2006.
24          Turning over to paragraph 7, the status report,
25   we'll have the interim status report due on May 30, 2006.

**12**

1   And that means I'm going to need to have a status conference
2   with you the following week, June 6th, 2006 at 4:30 p.m.
3          So those are the dates for paragraphs 7 and 8.
4   The status report on May 30th, the status conference at 4:30
5   p.m. on June 6th.
6          Turning over to paragraph 9, I'm happy to have
7   you folks take me to school with a tutorial but I need to
8   shift the date on you. February 10, 2006 at 9:30 a.m. is
9   when we could make that work.
10          Paragraph 10, your case dispositive motion
11   deadline and briefing suggestion is all right with me.
12          Paragraph 11, the July 21, 2006 date is fine.
13   As is the August 14, 2006 date; and the other two dates in
14   there, September 8th and October 6th.
15          We'll have the hearing on claim construction at
16   2:00 p.m. on October 27, 2006.
17          Now looking down to paragraph 15, pretrial
18   conference, we'll schedule that for February 22nd, 2007 at
19   4:30 p.m., which means I'll need your form of pretrial order
20   on January 22nd, 2007.
21          Down to paragraph 18. The parties apparently
22   agree it's going to take a couple weeks to try this and you
23   are correct that that means 22 hours per side. We can and
24   will set this down for a trial between the dates of
25   March 19th and 30, 2007.

**13**

1          All right. Are there any questions about the
2   scheduling order and the changes that we've just discussed?
3   Mr. Newcombe?
4          MR. NEWCOMBE: No, Your Honor. Thank you.
5          THE COURT: Mr. Blumenfeld?
6          MR. BLUMENFELD: No, Your Honor. We'll redo
7   this and get something submitted within a few days.
8          THE COURT: Okay. Is there anything else we
9   need to discuss while we're all on the line together from
10   the plaintiff's perspective?
11          MR. NEWCOMBE: No, Your Honor.
12          THE COURT: Okay. From the defendant's
13   perspective?
14          MR. BLUMENFELD: No, Your Honor.
15          THE COURT: Okay. Appreciate your time.
16   Good-bye.
17          (The attorneys respond, "Thank you, Your
18   Honor.")
19          (Telephone conference ends at 4:22 p.m.)
20
21
22
23
24
25

1

**0**

05-301 [1] - 1:9

**1**

1 [1] - 3:17
10 [2] - 12:8, 12:10
100 [3] - 8:10, 8:20, 8:23
11 [1] - 12:12
12 [1] - 10:24
125 [3] - 8:11, 8:15, 9:1
14 [2] - 11:23, 12:13
15 [2] - 10:23, 12:17
17 [1] - 7:22
175 [1] - 8:11
18 [1] - 12:21
19th [1] - 12:25

**2**

2 [1] - 7:18
2005 [1] - 1:11
2006 [8] - 7:22, 11:23, 11:25, 12:2, 12:8, 12:12, 12:13, 12:16
2007 [3] - 12:18, 12:20, 12:25
21 [1] - 12:12
22 [1] - 12:23
22nd [2] - 12:18, 12:20
25 [4] - 10:12, 10:25, 11:8, 11:11
27 [1] - 12:16
2:00 [1] - 12:16

**3**

30 [2] - 11:25, 12:25
30th [1] - 12:4

**4**

4:05 [2] - 1:11, 2:18
4:22 [1] - 13:19
4:30 [3] - 12:2, 12:4, 12:19

**5**

50 [6] - 10:12, 10:20, 11:5, 11:15, 11:20, 11:21

**6**

6th [3] - 12:2, 12:5,

12:14

**7**

7 [3] - 1:11, 11:24, 12:3
7th [1] - 7:19

**8**

8 [1] - 12:3
8th [1] - 12:14

**9**

9 [1] - 12:6
9:30 [1] - 12:8

**A**

absolutely [1] - 11:13
abuse [2] - 8:12, 11:4
abused [1] - 11:10
abusing [1] - 10:19
abusive [1] - 11:9
accept [1] - 9:2
action [2] - 4:6, 4:9, 5:9, 11:20
Action [1] - 1:4
ad [1] - 9:15
address [1] - 3:22
addressed [1] - 3:24
adequate [4] - 8:23, 11:9, 11:12, 11:14
adhere [1] - 6:10
afternoon [1] - 3:5
agent [1] - 10:8
ago [1] - 2:25
agree [10] - 4:3, 4:11, 4:12, 6:22, 6:23, 7:1, 7:14, 9:24, 10:1, 12:22
agreed [1] - 11:22
agreement [1] - 5:8
ahead [2] - 8:25, 11:21
allow [1] - 11:21
Alto [1] - 1:20
Amberwave [10] - 1:7, 2:8, 2:9, 3:6, 3:8, 3:19, 4:6, 8:1, 9:13, 11:15
amendment [2] - 7:19, 7:21
Angeles [1] - 2:6
answered [1] - 4:7
answering [1] - 10:25
anticipate [1] - 8:5
anticipated [2] - 3:12, 7:7

apologize [1] - 3:9
Appearances [2] - 1:15, 2:1
applied [1] - 5:16
applies [1] - 6:13
apply [4] - 4:12, 5:7, 5:19, 7:9
applying [1] - 4:22
Appreciate [1] - 13:15
appropriate [1] - 5:4
April [1] - 7:22
areas [1] - 5:1
Arsht [1] - 2:2
aside [1] - 6:16
asserted [1] - 8:7
assume [1] - 3:14
attorneys [1] - 13:17
August [1] - 12:13
avoid [1] - 11:3
aware [1] - 6:5

**B**

ball [1] - 8:1
ballpark [1] - 11:20
Bartlett [2] - 1:19, 2:24
basis [1] - 9:15
beginning [1] - 2:18
between [3] - 4:10, 4:16, 12:24
bit [1] - 10:15
Blumenfeld [18] - 2:3, 3:5, 3:6, 3:13, 4:17, 4:20, 5:18, 6:9, 8:3, 9:2, 9:14, 10:14, 11:10, 13:5, 13:6, 13:14
Brian [1] - 1:24
briefing [1] - 6:12
broadly [1] - 9:9
Bryan [2] - 2:8, 3:7
bunch [1] - 8:9
burden [2] - 4:23, 4:24
burdensome [1] - 3:25
bye [1] - 13:16

**C**

California [4] - 1:20, 2:6, 9:10, 9:17
carefully [1] - 11:11
case [10] - 5:21, 5:22, 6:25, 7:9, 8:6, 8:15, 8:21, 9:20, 11:2, 12:2
cases [5] - 4:14, 6:13, 8:10, 10:21, 11:16
certainly [4] - 6:5,

9:10, 9:11, 10:1
chambers [1] - 2:18
changes [1] - 13:2
choose [1] - 5:25
circum [1] - 7:2
circumstances [3] - 7:4, 8:21, 10:7
Civil [1] - 1:4
civil [1] - 11:19
claim [1] - 12:15
claimant [1] - 1:9
closer [1] - 9:11
Coast [2] - 9:21, 9:22
coming [1] - 10:9
company [2] - 4:1, 4:25
complaint [1] - 4:7
complex [1] - 11:18
complicated [1] - 11:17
Conaway [1] - 1:16
concern [4] - 4:2, 4:5, 4:10, 5:17
concerns [1] - 3:23
Conference [1] - 1:11
conference [5] - 2:18, 12:1, 12:4, 12:18, 13:19
conflict [1] - 6:2
conflicting [1] - 6:6
consider [1] - 7:15
consistent [1] - 4:13
construction [1] - 12:15
contentions [1] - 10:17
Continued [1] - 2:1
convenient [1] - 9:11
conversation [1] - 8:4
Corporation [5] - 1:4, 1:7, 1:21, 2:8, 2:10
correct [1] - 12:23
Counsel [3] - 1:21, 2:9, 3:7
count [1] - 10:25
Counter [2] - 1:5, 1:9
Counter-claimant [1] - 1:9
Counter-defendant [1] - 1:5
couple [1] - 12:22
court [6] - 4:8, 5:7, 5:13, 5:14, 5:21, 6:11
Court [23] - 1:1, 2:19, 3:1, 3:3, 3:9, 4:11, 4:17, 5:11, 5:24, 6:14, 7:7, 7:12, 8:17, 8:24, 9:13, 10:3, 11:5, 11:6, 11:16,

13:5, 13:8, 13:12, 13:15
create [1] - 6:6
created [1] - 6:2
cutoff [1] - 11:22

**D**

date [6] - 7:19, 7:22, 7:23, 12:8, 12:12, 12:13
dates [3] - 12:3, 12:13, 12:24
days [1] - 13:7
deadline [1] - 12:11
deal [1] - 4:25
dealing [2] - 10:13, 11:2
decided [1] - 5:14
default [7] - 5:7, 6:10, 6:21, 6:22, 7:8, 7:16, 9:23
defendant [1] - 1:5
Defendant [1] - 1:8
defendant's [1] - 13:12
defense [2] - 3:4, 4:19
defenses [3] - 8:7, 8:8, 10:18
defined [1] - 9:9
definition [1] - 6:20
Delaware [5] - 1:2, 1:10, 4:9, 6:16, 9:24
depart [1] - 10:4
deponent [1] - 10:7
deposed [1] - 10:8
deposition [1] - 7:25
depositions [7] - 8:15, 9:4, 9:16, 9:17, 9:20, 10:2, 10:13
described [1] - 9:25
different [5] - 4:10, 4:16, 5:8, 5:15, 6:24
director [1] - 10:8
discovery [8] - 3:18, 5:15, 5:19, 5:23, 6:7, 7:24, 7:25, 11:22
discuss [2] - 4:23, 5:5, 6:15, 9:15, 10:1, 10:6, 13:9
discussed [2] - 5:6, 13:2
discussions [1] - 7:8
disengaging [1] - 3:10
dispositive [1] - 12:10
dispute [3] - 3:18, 7:25, 8:14
district [1] - 6:4
District [2] - 1:1, 1:2

diverse [1] - 4:1
documents [3] - 4:15, 6:11, 6:12
done [1] - 6:20
double [1] - 8:7
Down [1] - 12:21
down [5] - 7:15, 8:11, 9:1, 12:17, 12:24
due [1] - 11:25

**E**

e-discovery [1] - 3:18
easier [1] - 11:4
East [1] - 9:21
either [1] - 6:23
Either [1] - 5:20
electronic [1] - 5:3
employees [1] - 5:2
end [1] - 9:20
ends [1] - 13:19
entirely [1] - 7:13
equal [1] - 10:10
err [1] - 8:24
Esq [6] - 1:17, 1:19, 1:20, 2:3, 2:5, 2:8
estoppel [1] - 8:9
exercise [1] - 8:19
existed [1] - 6:3
expect [2] - 6:15, 10:5
expensive [1] - 10:17
experience [1] - 11:18
experiences [1] - 10:22

**F**

face [1] - 6:6
fact [1] - 5:2
factor [1] - 7:15
faith [3] - 6:16, 9:2, 10:6
February [2] - 12:8, 12:18
few [1] - 13:7
fine [3] - 7:20, 11:23, 12:12
first [7] - 3:25, 4:21, 4:23, 6:17, 8:1, 8:2
focusing [1] - 5:1
folks [7] - 3:10, 3:15, 7:13, 9:6, 10:9, 11:22, 12:7
follow [1] - 5:25
following [2] - 2:17, 12:2
form [2] - 3:14, 12:19
formally [1] - 6:13
forth [1] - 9:22

forward [1] - 7:10
Friday [1] - 4:8
front [1] - 3:15

**G**

Gaffigan [1] - 1:24
General [1] - 3:7
generosity [1] - 8:25
geographically [1] - 4:1
George [4] - 1:19, 2:22, 2:23, 3:21
get-go [1] - 3:17
given [1] - 8:21
Good-bye [1] - 13:16
granted [1] - 4:9
guess [2] - 4:22, 8:24
guys [4] - 5:12, 5:13, 6:2, 7:1

**H**

handle [2] - 6:15, 6:19
hands [1] - 8:9
happy [2] - 4:22, 12:6
hard [3] - 8:4, 8:18, 11:13
hate [1] - 8:13
hear [1] - 7:3
heard [1] - 4:22
hearing [1] - 12:15
held [1] - 2:18
Hi [2] - 2:19, 2:21
hoc [1] - 9:15
Honor [17] - 3:2, 3:5, 3:21, 4:21, 6:9, 7:11, 8:3, 8:18, 9:14, 10:14, 10:22, 11:7, 13:4, 13:6, 13:11, 13:14, 13:18
Honor's [1] - 4:8
Honorable [1] - 1:13
hopeful [1] - 11:3
hours [6] - 7:24, 8:10, 8:12, 8:20, 8:23, 12:23
huge [1] - 4:24
hundreds [1] - 5:2

**I**

including [1] - 8:7
inexpensive [1] - 10:16
Ingersoll [4] - 1:17, 2:21, 2:22, 7:11
insist [1] - 10:9
instance [1] - 6:17

Intel [11] - 1:4, 1:21, 2:22, 3:18, 3:20, 4:2, 4:7, 4:24, 7:1, 8:1, 9:6
interim [1] - 11:25
interrogatories [4] - 10:11, 10:16, 10:23, 11:21
Interrogatories [1] - 11:9
inventorship [1] - 8:7
involved [1] - 11:17
Irell [1] - 2:5, 3:7
issue [5] - 4:23, 5:1, 5:10, 5:21, 6:17, 11:1
issues [3] - 10:15, 11:5, 11:18

**J**

Jack [4] - 2:3, 3:6, 4:20, 10:14
January [1] - 12:20
Jason [2] - 2:5, 3:6
joinder [2] - 7:18, 7:20
Jordan [3] - 1:13, 2:19, 2:21
Josy [2] - 1:17, 2:21
Judge [2] - 2:19, 2:21
judge [1] - 5:24
judgment [2] - 8:22, 11:8
judicially [1] - 11:11
July [2] - 11:23, 12:12
June [2] - 12:2, 12:5

**K**

Kaj [1] - 1:9
keeping [1] - 3:9
Kent [1] - 1:13
King [3] - 1:20, 3:2

**L**

laches [1] - 8:8
language [2] - 9:5, 10:5
large [2] - 4:1, 11:2
last [2] - 8:1, 8:14
Last [1] - 4:8
lawyers [1] - 9:22
least [1] - 4:13
leave [1] - 7:13
leaving [1] - 6:16
letter [1] - 3:13
limitation [1] - 7:24
line [4] - 2:20, 2:22,

3:8, 13:9
lines [1] - 7:7
Lip [2] - 1:19, 2:5
location [2] - 9:4, 9:15
locations [1] - 10:2
looking [2] - 9:23, 12:17
looks [1] - 9:6
Lord [2] - 2:8, 3:7
Los [1] - 2:6

**M**

manageable [1] - 4:4
managing [1] - 10:8
Manella [2] - 2:5, 3:7
March [1] - 12:25
mark [1] - 8:25
mathematical [1] - 8:19
matter [4] - 4:14, 6:18, 8:22, 11:8
mean [2] - 4:21, 6:1
means [4] - 5:3, 12:1, 12:19, 12:23
Merit [1] - 1:25
might [1] - 6:25
mill [1] - 11:19
moment [1] - 3:11
Morris [1] - 2:2
motion [3] - 4:9, 7:20, 12:10
move [3] - 3:24, 9:4, 9:6
moved [1] - 4:8
moving [1] - 7:10
multinational [1] - 4:24
mutually [1] - 4:3

**N**

narrow [1] - 4:3
need [7] - 8:5, 8:12, 11:13, 12:1, 12:7, 12:19, 13:9
Newcombe [14] - 1:19, 2:23, 3:21, 3:22, 5:20, 7:1, 8:17, 8:18, 9:8, 11:6, 11:7, 13:3, 13:4, 13:11
next [1] - 9:4
Nichols [1] - 2:2
nine [1] - 10:24
none [1] - 10:21
nontechnical [1] - 8:8
Note [1] - 2:17
note [1] - 3:17

**O**

October [3] - 7:19, 12:14, 12:16
office [1] - 9:18
officer [1] - 10:8
one [6] - 2:23, 3:24, 8:10, 8:21, 9:14, 11:17
ooo [1] - 2:15
operating [1] - 4:13
Order [1] - 7:7
order [3] - 3:14, 12:19, 13:2
orders [2] - 9:5, 10:5
ordinary [1] - 10:4
originally [1] - 8:11
otherwise [2] - 6:23, 9:12
ought [2] - 4:25, 5:7
overlap [1] - 4:15

**P**

Palo [1] - 1:20
paragraph [5] - 3:17, 11:24, 12:6, 12:17, 12:21
Paragraph [1] - 7:18, 12:10, 12:12
paragraphs [1] - 12:3
parallel [1] - 7:15
part [1] - 3:25
particular [1] - 10:7
particularly [4] - 3:25, 8:6, 10:16, 10:17
parties [9] - 4:12, 6:15, 6:23, 7:3, 7:8, 7:19, 9:24, 10:6, 12:21
partner [1] - 2:24
party [2] - 6:3, 9:9
past [2] - 3:24, 10:25
patent [2] - 8:21, 11:17
patenting [1] - 8:8
Patrick [2] - 1:20, 3:2
pending [2] - 4:6, 6:18
people [2] - 9:10, 9:22
per [1] - 12:23
perspective [2] - 13:10, 13:13
persuade [1] - 6:23
pitch [1] - 6:25
place [2] - 7:5, 7:17
Plaintiff [1] - 1:5
plaintiff's [1] - 13:10
planning [1] - 10:19
play [1] - 10:10

pleading [2] - 7:21, 7:22
pleadings [1] - 7:19
Pm [7] - 1:11, 2:18, 12:2, 12:5, 12:16, 12:19, 13:19
point [1] - 6:9
potential [1] - 6:6
practice [1] - 10:4
predict [2] - 8:19, 8:22
preferred [1] - 10:20
presumably [1] - 6:12
pretrial [2] - 12:17, 12:19
pretty [1] - 5:16
problem [2] - 6:7, 6:8
proposed [2] - 3:14, 8:11
provide [2] - 11:8, 11:14
provision [1] - 9:23
purported [1] - 4:23
put [2] - 7:22, 10:22

**Q**

questions [1] - 13:1

**R**

rather [2] - 3:19, 3:20
reach [1] - 5:8
real [1] - 6:8
really [1] - 5:9
reason [3] - 6:4, 10:3, 10:20
reasonable [4] - 5:17, 7:2, 7:4, 8:16
recent [1] - 10:21
redo [1] - 13:6
Registered [1] - 1:25
remember [1] - 2:25
report [3] - 11:24, 11:25, 12:4
Reporte [1] - 1:25
Reporter [1] - 2:17
representation [1] - 9:1
representative [1] - 9:9
required [1] - 6:24
reside [1] - 9:10
residence [1] - 9:12
resolution [1] - 6:18
respond [1] - 13:17
roughly [1] - 7:14
rules [9] - 3:25, 4:1, 4:11, 4:12, 4:13, 5:4, 6:7, 11:8, 11:14

run - 3:15, 11:19
run-of-the-mill [1] - 11:19

**S**

schedule [1] - 12:18
schedules [1] - 6:7
scheduling [1] - 13:2
school [1] - 12:7
search [2] - 6:11, 6:12
searches [1] - 5:4
see [1] - 10:3
seem [1] - 11:20
sense [1] - 10:6
sent [1] - 3:13
September [1] - 1:11, 12:14
set [2] - 10:23, 12:24
sets [2] - 4:10, 4:16
Sheasby [3] - 2:5, 3:6, 4:18
Sheasby's [1] - 9:18
shift [1] - 12:8
shuttling [1] - 9:22
side [5] - 3:20, 4:19, 8:25, 10:24, 11:3, 12:23
similar [2] - 4:6, 4:14
simple [1] - 8:6
Simpson [2] - 1:19, 2:24
sit [1] - 11:12
situation [1] - 9:19
sometimes [2] - 8:4, 11:18
speaking [1] - 4:18
specifically [1] - 7:23
split [1] - 10:11
stances [1] - 7:3
stand [2] - 5:12, 10:5
standard [13] - 3:18, 5:7, 5:19, 5:23, 5:25, 6:11, 6:13, 6:21, 6:22, 7:5, 7:8, 7:16, 9:5
standardless [1] - 7:10
standards [2] - 4:16, 5:15
Stargatt [1] - 1:16
state [1] - 7:12
States [1] - 1:1
status [5] - 11:24, 11:25, 12:1, 12:4
stay [1] - 7:16
straightforward [1] - 5:16
strictly [1] - 6:18

subject [2] - 4:14, 7:13
submitted [1] - 13:7
sue [1] - 5:14
sued [2] - 4:7, 5:13
sufficient [1] - 8:20
suggesting [1] - 11:10
suggestion [1] - 12:11
suing [1] - 6:3
suit [1] - 7:14
supplemental [1] - 7:21
Systems [3] - 1:7, 2:8, 2:9

**T**

Taylor [1] - 1:16
technology [1] - 5:1
telephone [2] - 2:17
Telephone [2] - 1:11, 13:19
Texas [7] - 4:6, 4:11, 4:13, 5:9, 5:25, 6:16, 7:15
Thacher [2] - 1:19, 2:24
thousands [1] - 5:2
three [2] - 8:14, 10:22
today [1] - 11:12
together [2] - 3:16, 13:9
took [1] - 3:11
track [1] - 7:15
transfer [1] - 4:8
transferred [2] - 5:20, 5:22
Treat [1] - 6:17
trial [1] - 12:24
try [2] - 10:1, 12:22
trying [1] - 11:3
Tunnel [1] - 2:2
Turning [2] - 11:24, 12:6
tutorial [1] - 12:7
two [6] - 3:11, 3:23, 4:10, 4:16, 5:15, 12:13
type [1] - 11:1
types [2] - 9:25, 11:16
typically [3] - 9:6, 9:20, 11:16

**U**

unclean [1] - 8:9
under [6] - 4:13, 5:4, 5:11, 6:20, 6:22, 7:2, 7:4, 8:21, 10:6

United [1] - 1:1
unless [1] - 5:7
unsympathetic [1] - 6:25
up [1] - 6:18
Usdcj [1] - 1:13

**V**

vs [1] - 6:16

**W**

waiting [1] - 3:10
waiver [1] - 8:9
wants [2] - 3:20, 11:15
ways [1] - 4:25
Wednesday [1] - 1:11
week [1] - 12:2
weeks [1] - 12:22
West [1] - 9:21
whipsawed [2] - 4:10, 4:15
willing [3] - 5:5, 9:15, 9:17
Wilmington [1] - 1:10
witnesses [1] - 9:25
word [1] - 7:6
worried [1] - 5:15

**Y**

yesterday [1] - 3:14
Young [1] - 1:16

# Exhibit P

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTEL CORPORATION,                                )
                                                  )
    Plaintiff/Counterclaim-defendant    )
                                                  )
         v.                          )    Civil Action No. 05-301-KAJ
                                                  )
AMBERWAVE SYSTEMS                                 )
CORPORATION,                                      )
                                                  )
    Defendant/Counterclaim-plaintiff    )

## NOTICE OF SUBPOENA TO AGERE SYSTEMS, INC.

PLEASE TAKE NOTICE that pursuant to Rule 45 of the Federal Rules of Civil Procedure Defendant and Counterclaim-plaintiff Amberwave Systems Corporation will serve the attached subpoena duces tecum on Agere Systems, Inc.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Leslie A. Polizoti*
Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
Tel:  (302) 658-9200
lpolizoti@mnat.com
Attorneys for Defendant and Counterclaim Plaintiff
AmberWave Systems Corporation

OF COUNSEL:
Morgan Chu
David I. Gindler
Jason G. Sheasby
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067
Tel: (310) 277-1010

1345207



## CERTIFICATE OF SERVICE

I, Leslie A. Polizoti, hereby certify that on September 16, 2005 I electronically filed the Notice of Subpoena to Agere Systems, Inc. with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Josy W. Ingersoll (#1088)
> Young, Conaway, Stargatt & Taylor, LLP

I also certify that copies were caused to be served on September 16, 2005 upon the following in the manner indicated:

**BY HAND**

Josy W. Ingersoll
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899

**BY FEDERAL EXPRESS**

George M. Newcombe
Simpson Thacher & Bartlett LLP
300 Hillview Avenue
Palo Alto, CA 94304

/s/ *Leslie A. Polizoti (#4299)*
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
lpolizoti@mnat.com

454672

AO 88 (Rev. 11/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

Eastern DISTRICT OF Pennsylvania

Intel Corporation

**SUBPOENA IN A CIVIL CASE**

v.

Amberwave Systems Corporation

Case Number:[1] 05-301-KAJ
(District of Delaware)

TO: Agere Systems, Inc.
1110 American Parkway NE. Allentown, Pennsylvania 18109. (610) 712 1000
Att: Jean F. Rankin (General Counsel)

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
| --- | --- |
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A.

| PLACE | DATE AND TIME |
| --- | --- |
| Legal Beagles, Attn: Craig Baker | September 30, 2005, |
| 2215 Arch Street, Philadelphia, PA 19103 | 5:00 PM EST |
| Tel: (215) 751-0880 | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| | September 16 2005 |

ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER

Leslie Polizoti, Morris Nichols Arsht & Tunnell, 1201 N. Market St, Wilmington DE

(302) 658-9200

(See Rule 45, Federal Rules of Civil Procedure, parts C & D on reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

AO 88 (Rev. 11/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

### (c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to

the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanding party to contest the claim.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

### (d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

## DEFINITIONS

1.    "DOCUMENT" as used herein shall mean every kind of recording of any form of communication or representation upon any tangible thing, including letters, words, pictures, sounds or symbols, or combinations thereof, whether recorded by handwriting, printing, photostatic or photographic means, magnetic impulse, tape, computer disk or any other form of data storage, data compilation or mechanical or electronic recording, and all other tangible things which come within the meaning of "writing" or "recording" as used in Federal Rules of Evidence Rule 1001 or "document" as used in Federal Rules of Civil Procedure Rule 34. Every draft or non-identical copy of a DOCUMENT is a separate DOCUMENT as that term is used herein.

2.    "RELATING TO" and "RELATE TO" shall mean having any connection, relation, or reference to and include, by way of example and without limitation, discussing, identifying, containing, showing, evidencing, describing, reflecting, dealing with, regarding, pertaining to, analyzing, evaluating, estimating, constituting, comprising, studying, surveying, projecting, recording, summarizing, assessing, criticizing, reporting, commenting on, referring to in any way, either directly or indirectly, or otherwise involving, in whole or in part.

## REQUESTS

**REQUEST NO. 1**:

All DOCUMENTS RELATING TO the Patent License Agreement between Agere Systems Inc. and AmberWave Systems Corporation, dated April 23, 2003, as amended.

**REQUEST NO. 2**:

All DOCUMENTS RELATING TO: United States Patent Nos. 5,158,907, 5,221,413, 5,285,086, 5,308,444, 5,442,205; Japan Patent Nos. 2813080 and 2792785; France Patent No. 0469790; and Great Britain Patent No. 0469790.

# Exhibit Q

SIMPSON THACHER & BARTLETT LLP

425 LEXINGTON AVENUE
NEW YORK, N.Y. 10017-3954
(212) 455-2000

———

FACSIMILE (212) 455-2502

DIRECT DIAL NUMBER

212-455-2663

E-MAIL ADDRESS

kkonrad@stblaw.com

<u>VIA ELECTRONIC MAIL</u>

August 18, 2006

Re:  *AmberWave Systems Corp v. Intel Corp.*
<u>Case No. 05-301-KAJ (consolidated)</u>

Jason G. Sheasby, Esq.
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067-4276

Dear Jason:

This letter will memorialize the positions I have expressed in conversations with you and your colleague Sam Lu concerning the six-month extension to the pretrial schedule that AmberWave requested in Civil Action No. 05-301-KAJ (the "Consolidated Action").

Intel believes that, with each side taking realistic and reasonable positions and working flat-out, it would be possible, if extremely difficult, to complete discovery in the Consolidated Action within the current schedule.  At the same time, Intel agrees that there is a very substantial burden of work remaining to be done in the Consolidated Action and that we can accomplish that work in a more efficient and orderly manner with more flexibility in timing.  Thus, we are willing to agree to an across-the-board extension of six months for all pretrial deadlines in the Consolidated Action.

We also understand that there might be circumstances under which it might make sense to include in the Consolidated Action claims arising from patents that may

LOS ANGELES       PALO ALTO       WASHINGTON, D.C.       HONG KONG       LONDON       TOKYO

Simpson Thacher & Bartlett llp

Jason G. Sheasby, Esq.        -2-        August 18, 2006

issue as continuations of one of the three patents already in suit.  However, it is difficult to make that determination hypothetically, without knowing what the claims might be or when in the pretrial process they might be asserted.  That is why we are willing to consider such claims on a case-by-case basis, leaving the door open but reserving the right to contest their inclusion in the Consolidated Action and/or this extended pretrial schedule if, under the circumstances prevailing at the time, we believe such claims cannot be added without causing prejudice or delay.

We do *not* believe it would be appropriate under the circumstances to add any unrelated patents (in the sense of patents issuing in different patent application families) to the Consolidated Action under either the current or extended schedule.  We appreciate that you have agreed not to try to do so during the extended schedule.  (As I told Sam, we were hoping you would agree to this restriction immediately, but accepted your position in the spirit of compromise while reserving our right to challenge any attempt to add unrelated new patents between now and November.)  We have enough work to do as it is with only three patents in the case.  To add a new patent would, in our view, inevitably throw off the schedule.  Simply put, we need a reasonable target for closure to the pretrial process for the claims already in hand.

At the same time, we wish to be clear that our position is based upon the current procedural posture of the Consolidated Action, which is already well progressed under the existing pretrial schedule.  We specifically do *not* mean to convey that other claims arising from other patents that AmberWave might try to assert against Intel should

SIMPSON THACHER & BARTLETT LLP

Jason G. Sheasby, Esq.                    -3-                    August 18, 2006

be heard in other courts.  To the contrary, we believe that there likely are substantial

efficiencies and judicial economy in having such other claims heard by the same court that

is handling the Consolidated Action, including claims arising from the '907 patent that

AmberWave recently asserted against Intel in the Eastern District of Texas (after moving

to add claims arising from that patent to the Consolidated Action in Delaware on the

ground that they were, in fact, substantially related).  The question of fixing an appropriate

schedule for any new patent claim would, again, depend on the circumstances.  We expect

that we could address the scheduling of any such claim in a cooperative and realistic

manner, should the need to do so arise.

                                        Very truly yours,

                                        Kerry L. Konrad

                                        Kerry L. Konrad

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| AMBERWAVE SYSTEMS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO. 9:06cv157** |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING INTEL'S MOTION TO TRANSFER ACTION TO EARLIER-FILED LITIGATION PENDING IN THE DISTRICT OF DELAWARE

ON THIS DAY, came on to be heard Defendant INTEL CORPORATION'S Motion to Transfer Action to Earlier-Filed Litigation Pending in the District of Delaware in the above-styled and numbered cause. After considering said Motion, and the entire record in this cause, it is hereby ORDERED that said Motion shall be in all things GRANTED; and it is

FURTHER ORDERED that this case is transferred to Judge Kent Jordan in the United States District Court for the District of Delaware.

CLOSED, JURY, PATENT

## U.S. District Court [LIVE]
## Eastern District of TEXAS LIVE (Lufkin)
## CIVIL DOCKET FOR CASE #: 9:06-cv-00157-RHC

*06CV638*

AmberWave Systems Corporation v. Intel Corporation
Assigned to: Judge Ron Clark
Related Cases: 2:05-cv-00321-LED
              2:05-cv-00449-TJW
              9:06-cv-00143-RHC
Cause: 35:271 Patent Infringement

Date Filed: 08/31/2006
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

### Plaintiff

**AmberWave Systems Corporation**





represented by **Clayton Edward Dark, Jr**
Attorney at Law
PO Box 2207
Lufkin, TX 75902-2207
936/637-1733
Fax: 19366372897
Email: cekrad@yahoo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander C D Giza**
Irell & Manella LLP
1800 Ave of the Stars
Ste 900
Los Angeles, CA 90067-4276
310/277-1010
Fax: 13102037199
Email: agiza@irell.com
*ATTORNEY TO BE NOTICED*

**Amir A Naini**
Irell & Manella - Los Angeles
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276
310/277-1010
Fax: 13102037199
Email: anaini@irell.com
*ATTORNEY TO BE NOTICED*

**Andrew D Weiss**
Irell & Manella - Los Angeles
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276
310/277-7175
Fax: 310/203-7199
Email: aweiss@irell.com
*ATTORNEY TO BE NOTICED*

**Christopher A Vanderlaan**
Irell & Manella LLP
1800 Avenue of the Stars

Suite 900
Los Angeles, CA 90067-4276
310/277-1010
Fax: 13102037199
Email: cvanderlaan@irell.com
*ATTORNEY TO BE NOTICED*

**David I Gindler**
Irell & Manella LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067
310/277-1010
Fax: 13105565206
Email: dgindler@irell.com
*ATTORNEY TO BE NOTICED*

**J Thad Heartfield**
Law Offices of J. Thad Heartfield
2195 Dowlen Rd
Beaumont, TX 77706
409/866-3318
Fax: 14098665789
Email: thad@jth-law.com
*ATTORNEY TO BE NOTICED*

**Jason G Sheasby**
Irell & Manella - Los Angeles
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276
310/277-1010
Fax: 13102037199
Email: jsheasby@irell.com
*ATTORNEY TO BE NOTICED*

**Maclain Wells**
Irell & Manella - Los Angeles
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276
310.277.1010
Fax: 310.203.7199
Email: mwells@irell.com
*ATTORNEY TO BE NOTICED*

**Morgan Chu**
Irell & Manella
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276
310/277-1010
Fax: 13102037199
Email: mchu@irell.com
*ATTORNEY TO BE NOTICED*

**Samuel K Lu**
Irell & Manella - Los Angeles
1800 Avenue of the Stars
Suite 900

Los Angeles, CA 90067-4276
310/277-1010
Fax: 310/203-7199
Email: slu@irell.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Intel Corporation**                    represented by **Michael Edwin Jones**
Potter Minton PC
110 N College
Suite 500
PO Box 359
Tyler, TX 75710-0359
903/597/8311
Fax: 9035930846
Email: mikejones@potterminton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher K. Ridder**
Simpson Thacher & Bartlett - Palo Alto
2550 Hanover St
Palo Alto, CA 94304
650-251-5000
Fax: 650-251-5002
Email: cridder@stblaw.com
*ATTORNEY TO BE NOTICED*

**George M Newcombe**
Simpson Thacher & Bartlett - Palo Alto
2550 Hanover St
Palo Alto, CA 94304
650/251-5000
Fax: 16502515002
Email: gnewcombe@stblaw.com
*ATTORNEY TO BE NOTICED*

**Jeffrey E Ostrow**
Simpson Thacher & Bartlett - Palo Alto
2550 Hanover St
Palo Alto, CA 94304
650/251-5000
Fax: 16502515002
Email: jostrow@stblaw.com
*ATTORNEY TO BE NOTICED*

**John Frederick Bufe**
Potter Minton
P. O. Box 359
Tyler, TX 75710
903/597/8311
Fax: 9035930846
Email: johnbufe@potterminton.com
*ATTORNEY TO BE NOTICED*

**Kerry L. Konrad**
Simpson Thacher & Bartlett - New York
425 Lexington Ave

New York, NY 10017-3954
212-455-2000
Fax: 212-455-2502
Email: kkonrad@stblaw.com
*ATTORNEY TO BE NOTICED*

**Patrick E King**
Simpson Thacher & Bartlett - Palo Alto
2550 Hanover St
Palo Alto, CA 94304
650/251-5000
Fax: 16502515002
Email: pking@stblaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/28/2006 | ❶1 | COMPLAINT (35:0271 Patent Infringement) against Intel Corporation , filed by AmberWave Systems Corporation. (Attachments: # 1 Civil Cover Sheet)(djh, ) (Entered: 08/02/2006) |
| 07/28/2006 | ❷2 | NOTICE by AmberWave Systems Corporation of cases that involve the same parties as this case at bar and is a collateral proceeding and cases that do not constitute collateral proceedings but brings notice of their existence to the Court's attention (djh, ) Modified on 8/2/2006 (djh, ). (Entered: 08/02/2006) |
| 07/28/2006 | ❸ | Filing fee: $ 350, receipt number 9-1-416 (djh, ) (Entered: 08/02/2006) |
| 07/28/2006 | ❹3 | CORPORATE DISCLOSURE STATEMENT filed by AmberWave Systems Corporation (djh, ) (Entered: 08/02/2006) |
| 07/28/2006 | ❺ | Summons Issued as to Intel Corporation and handed back to atty for service (djh, ) Modified on 8/2/2006 (djh, ). (Entered: 08/02/2006) |
| 08/02/2006 | ❻4 | Return of Service Executed as toIntel Corporation on 7/31/2006, answer due: 8/21/2006. (djh, ) Additional attachment(s) added on 8/2/2006 (djh, ). (Entered: 08/02/2006) |
| 08/02/2006 | ❼5 | Form mailed to Commissioner of Patents and Trademarks. (djh, ) (Entered: 08/02/2006) |
| 08/04/2006 | ❽6 | NOTICE of Attorney Appearance by Michael Edwin Jones on behalf of Intel Corporation (Jones, Michael) (Entered: 08/04/2006) |
| 08/04/2006 | ❾7 | NOTICE of Attorney Appearance by John Frederick Bufe on behalf of Intel Corporation (Bufe, John) (Entered: 08/04/2006) |
| 08/11/2006 | ❿8 | MOTION for Extension of Time to File Answer re 1 Complaint by Intel Corporation. (Attachments: # 1 Text of Proposed Order)(Bufe, John) (Entered: 08/11/2006) |
| 08/14/2006 | ⓫9 | RESPONSE in Opposition re 8 MOTION for Extension of Time to File Answer re 1 Complaint filed by AmberWave Systems Corporation. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Text of Proposed Order)(Dark, Clayton) Modified on 8/14/2006 (kjr, ). (Entered: 08/14/2006) |
| 08/15/2006 | ⓬10 | ORDER denying 8 Motion for Extension of Time to Answer . Signed by Judge Ron Clark on 8/15/06. (kjr, ) (Entered: 08/15/2006) |
| 08/16/2006 | ⓭11 | (APPROVED) APPLICATION to Appear Pro Hac Vice by Attorney Morgan Chu for AmberWave Systems Corporation. (djh, ) (Entered: 08/16/2006) |
| 08/16/2006 | ⓮12 | (APPROVED) APPLICATION to Appear Pro Hac Vice by Attorney Christopher A Vanderlaan for AmberWave Systems Corporation. (djh, ) (Entered: 08/16/2006) |

| 08/16/2006 | ❹13 | (APPROVED) APPLICATION to Appear Pro Hac Vice by Attorney David I Gindler for AmberWave Systems Corporation. (djh, ) (Entered: 08/16/2006) |
| 08/16/2006 | ❹14 | (APPROVED) APPLICATION to Appear Pro Hac Vice by Attorney Jason G Sheasby for AmberWave Systems Corporation. (djh, ) (Entered: 08/16/2006) |
| 08/16/2006 | ❹15 | (APPROVED) APPLICATION to Appear Pro Hac Vice by Attorney Amir A Naini for AmberWave Systems Corporation. (djh, ) (Entered: 08/16/2006) |
| 08/16/2006 | ❹16 | (APPROVED) APPLICATION to Appear Pro Hac Vice by Attorney Samuel K Lu for AmberWave Systems Corporation. (djh, ) (Entered: 08/16/2006) |
| 08/16/2006 | ❹17 | (APPROVED) APPLICATION to Appear Pro Hac Vice by Attorney Andrew D Weiss for AmberWave Systems Corporation. (djh, ) (Entered: 08/16/2006) |
| 08/16/2006 | ❹18 | (APPROVED) APPLICATION to Appear Pro Hac Vice by Attorney Alexander C D Giza for AmberWave Systems Corporation. (djh, ) (Entered: 08/16/2006) |
| 08/16/2006 | ❹19 | (APPROVED) APPLICATION to Appear Pro Hac Vice by Attorney Maclain Wells for AmberWave Systems Corporation. (djh, ) (Entered: 08/16/2006) |
| 08/16/2006 | ❹ | Pro Hac Vice Filing fee paid by Morgan Chu, Christopher Vanderlaan, David Gindler, Jason Sheasby, Amir Naini, Samuel Lu, Andrew Weiss, Alexander Giza, Maclain Wells; Fee: $225, receipt number: 9-1-431 (djh, ) (Entered: 08/16/2006) |
| 08/21/2006 | ❹20 | *Intel Corporation's* ANSWER to Complaint with Jury Demand by Intel Corporation. (Bufe, John) (Entered: 08/21/2006) |
| 08/21/2006 | ❹21 | MOTION to Change Venue *to Earlier-Filed Litigation Pending in the District of Delaware* by Intel Corporation. (Attachments: # 1 Declaration of Michael E. Jones# 2 Exhibit A# 3 Exhibit B# 4 Exhibit C# 5 Exhibit D# 6 Exhibit E# 7 Exhibit F# 8 Exhibit G# 9 Exhibit H# 10 Exhibit I# 11 Exhibit J# 12 Exhibit K# 13 Exhibit L# 14 Exhibit M# 15 Exhibit N# 16 Exhibit O# 17 Exhibit P# 18 Exhibit Q# 19 Text of Proposed Order)(Bufe, John) (Entered: 08/21/2006) |
| 08/28/2006 | ❹22 | REFERRAL ORDER. Discovery disputes and discovery motions, as well as certain othermotions filed in this case, shall be REFERRED, at the discretion of, or in the absence of, theundersigned, to United States Magistrate Judge Keith F. Giblin . Signed by Judge Ron Clark on 8/28/06. (kjr, ) (Entered: 08/29/2006) |
| 08/29/2006 | ❹23 | CORPORATE DISCLOSURE STATEMENT filed by Intel Corporation identifying NONE as Corporate Parent. (Bufe, John) (Entered: 08/29/2006) |
| 08/29/2006 | ❹24 | PROTECTIVE ORDER . Signed by Judge Ron Clark on 8/28/06. (kjr, ) (Entered: 08/30/2006) |
| 08/29/2006 | ❹25 | ORDER GOVERNING PROCEEDINGS. The case is set for the initial Rule 16 management conference on 10/31/06 at 10:00 am in Beaumont. Signed by Judge Ron Clark on 8/28/06. (kjr, ) (Entered: 08/30/2006) |
| 08/31/2006 | ❹ | Pro Hac Vice Filing fee paid by Kerry L. Konrad, Jeffrey E. Ostrow, Patrick E. King, Christopher K. Ridder, George M. Newcombe; Fee: $125.00, receipt numbers: 6-1-6549 thru 6-1-6553 (kjr, ) (Entered: 09/05/2006) |
| 08/31/2006 | ❹27 | APPLICATION (approved) to Appear Pro Hac Vice by Attorney George M Newcombe for Intel Corporation. (kjr, ) (Entered: 09/05/2006) |
| 08/31/2006 | ❹28 | APPLICATION (approved) to Appear Pro Hac Vice by Attorney Christopher K. Ridder for Intel Corporation. (kjr, ) (Entered: 09/05/2006) |
| 08/31/2006 | ❹29 | APPLICATION (approved) to Appear Pro Hac Vice by Attorney Patrick E King for Intel Corporation. (kjr, ) (Entered: 09/05/2006) |
| 08/31/2006 | ❹30 | APPLICATION (approved) to Appear Pro Hac Vice by Attorney Jeffrey E Ostrow for |

| | | Intel Corporation. (kjr, ) (Entered: 09/05/2006) |
|---|---|---|
| 08/31/2006 | ◉31 | APPLICATION (approved) to Appear Pro Hac Vice by Attorney Kerry L. Konrad for Intel Corporation. (kjr, ) (Entered: 09/05/2006) |
| 09/01/2006 | ◉26 | MOTION to Amend/Correct 1 Complaint by AmberWave Systems Corporation. (Attachments: # 1 Exhibit Exhibit A - First Amended Complaint# 2 Text of Proposed Order)(Giza, Alexander) (Entered: 09/01/2006) |
| 09/05/2006 | ◉32 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 21 MOTION to Change Venue *to Earlier-Filed Litigation Pending in the District of Delaware* filed by AmberWave Systems Corporation. (Attachments: # 1 Text of Proposed Order Proposed Order# 2 Affidavit Declaration of Anthony Lochtefeld# 3 Affidavit (Filed Under Seal) Confidential Portion of the Declaration of Anthony Lochtefeld# 4 Affidavit Declaration of C. Maclain Wells# 5 Exhibit #1# 6 Exhibit (Filed Under Seal) #2# 7 Exhibit #3# 8 Exhibit #4# 9 Exhibit #5# 10 Exhibit #6# 11 Exhibit #7# 12 Exhibit #8# 13 Exhibit #9# 14 Exhibit #10# 15 Exhibit #11# 16 Exhibit #12# 17 Exhibit #13# 18 Exhibit #14# 19 Exhibit #15# 20 Exhibit #16# 21 Exhibit #17# 22 Exhibit #18# 23 Exhibit #19# 24 Exhibit #20# 25 Exhibit #21# 26 Exhibit #22# 27 Exhibit #23# 28 Exhibit #24# 29 Exhibit #25# 30 Exhibit #26# 31 Exhibit #27# 32 Exhibit Ex. 28# 33 Exhibit #29# 34 Exhibit #30# 35 Exhibit #31# 36 Exhibit #32# 37 Exhibit #33# 38 Exhibit (Filed Under Seal) #34# 39 Exhibit #35# 40 Exhibit #36# 41 Exhibit #37# 42 Exhibit #38# 43 Exhibit #39# 44 Exhibit #40# 45 Exhibit #41# 46 Exhibit #42# 47 Exhibit #43# 48 Proof of Service# 49 Proof of Service)(Wells, Maclain) (Entered: 09/05/2006) |
| 09/11/2006 | ◉33 | Consent MOTION for Leave to File Excess Pages *For Its Reply Brief in Support Of Its Motion to Transfer* by Intel Corporation. (Attachments: # 1 Exhibit # 2 Text of Proposed Order)(Bufe, John) (Entered: 09/11/2006) |
| 09/12/2006 | ◉34 | ORDER granting 33 Motion to File Excess Pages for Intel Corporation's Reply in Support of its Motion to Transfer. Signed by Judge Ron Clark on 9/12/06. (kjr, ) (Entered: 09/13/2006) |
| 09/12/2006 | ◉35 | REPLY to Response to Motion re 21 MOTION to Change Venue *to Earlier-Filed Litigation Pending in the District of Delaware* filed by Intel Corporation. (kjr, ) (Entered: 09/13/2006) |
| 09/13/2006 | ◉36 | RESPONSE to Motion re 26 MOTION to Amend/Correct 1 Complaint *Intel Corporation's Statement of Non-Opposition to AmberWave's Motion for Leave to File Its First Amended Complaint* filed by Intel Corporation. (Bufe, John) (Entered: 09/13/2006) |
| 09/18/2006 | ◉37 | SEALED PATENT DOCUMENT *Sur-Reply of AmberWave to Intel's Motion To Transfer*. (Attachments: # 1 Proof Of Service)(Wells, Maclain) (Entered: 09/18/2006) |
| 09/21/2006 | ◉38 | SEALED ORDER granting 21 Motion to Change Venue. This case is transferred to the United States District Court for the District of Delaware. The Clerk shall send a copy of this Order to the Clerk of the United States District Court for the District of Delaware. Signed by Judge Ron Clark on 9/21/06. (kjr, ) Modified on 9/22/2006 (kjr, ). (Entered: 09/22/2006) |
| 10/12/2006 | ◉ | Interdistrict transfer to the District of Delaware District. Forwarded certified copy of complaint, order of transfer (sealed) and docket sheet. (kjr, ) (Entered: 10/12/2006) |